## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, 80 F Street N.W., Washington, D.C. 20001, <br><br> AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, LOCAL 3707 975 Patriot Ave, Chicopee, MA 01022, <br><br> AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, 1625 L Street, N.W. Washington, D.C. 20036, <br><br> and <br><br> NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC. 159 Thomas Burgin Parkway Quincy, MA 01269 <br><br> *Plaintiffs*, <br><br> v <br><br> CHARLES EZELL, in his official capacity as Acting Director of the Office of Personnel Management, 1900 E Street, N.W. Washington, D.C. 20415, <br><br><br> and <br><br> OFFICE OF PERSONNEL MANAGEMENT, 1900 E Street, N.W. Washington, D.C. 20415 <br><br> *Defendants*. | Case No. 1:25-cv-10276 |

1

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs American Federation of Government Employees, AFL-CIO (AFGE), AFGE Local 3707 (Local 3707), American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME), and National Association of Government Employees, Inc. (NAGE) bring this action against the Office of Personnel Management (OPM) and the Acting Director of OPM and allege as follows:

1. The Office of Personnel Management's January 28, 2025 decision to offer a purported "deferred resignation" program to federal career employees is the latest effort by this Administration to drastically reduce the nonpartisan career civil service upon which this country has depended and under which it has thrived for more than 140 years.

2. The continued success of government is based, in large part, on the institutional memory of its career civil servants who are committed to the missions of their agencies and the prospect of working for the American people. These civil servants are professionals and subject matter experts, many of whom have worked diligently and impartially through successive administrations of both major parties to implement changing administration priorities. If these employees leave or are forced out *en masse*, the country will suffer a dangerous one-two punch. First, the government will lose expertise in the complex fields and programs that Congress has, by statute, directed the Executive to faithfully implement. The government will have fewer qualified employees to execute the statutorily-required tasks that still remain.

3. And second, when vacant positions become politicized, as this Administration seeks to do, partisanship is elevated over ability and truth, to the detriment of agency missions and the American people. That is why Congress, since 1883, has established rights and processes for

protecting these employees from undue political influence and has granted employees who have completed a probationary period, or prior applicable service, protections from termination.

4.     The Administration, in its first two weeks, has purported to wipe away longstanding civil service protections and merit system principles mandated by Congress with strokes of a pen. On Inauguration Day, the President signed an executive order, quickly followed by an OPM memorandum, that would make it possible for him to convert large swaths of the civil service to at-will employment, in contravention of the CSRA and OPM regulations (*see* 89 Fed. Reg. 24982 (Apr. 9, 2024)). The President signed an executive order declaring that career members of the Senior Executive Service serve at the pleasure of the President, even though Congress specifically granted these civil servants adverse-action rights (*see* 5 U.S.C. §§ 7541-7543). Daily, the President is also eliminating offices and programs that are supported by Congressional appropriations and tasked by Congress with specific functions.

5.     In line with these efforts, on January 28, 2025, Defendants sent federal employees an email titled "Fork in the Road," offering employees what they called a "deferred resignation . . . program" – the ability to resign now and purportedly retain all pay and benefits until September 30, 2025. *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025) (hereinafter, "the Directive" or "the Fork Directive").

6.     Employees were given a little more than a week, until February 6, 2025, to accept or reject the offer. *Id.*

7.     To leverage employees into accepting the offer and resigning, the Fork Directive threatens employees with eventual job loss in the event that they refuse to resign. OPM stated that "the majority of federal agencies are likely to be downsized through restructurings, realignments,

and reductions in force," and Defendants "cannot give you full assurance regarding the certainty of your position or agency." *Id.*

8.    Plaintiffs, who are routinely called upon to advise their federal employee members, as well as unions affiliated with Plaintiffs who directly represent federal employees, are unable to render dependable advice because basic information is absent from the Directive, including:

a.  Whether OPM can (or will) honor the financial commitment for agencies across government when Congress has appropriated no funds for this purpose, and the statutory basis and appropriation for this promise remain unclear;

b.  Whether and under what circumstances employees are expected to continue working for the federal government, and whether they can seek outside employment before their final resignation date;

c.  The implications for pensions, health insurance, retirement eligibility, service tenure requirements, reinstatement rights, and similar issues; and

d.  How and when the threatened restructuring, realignments, and reductions in force will be announced and whether the Administration will honor employees' adverse-action and due process protections.

9.    The Fork Directive is arbitrary and capricious in numerous respects, including that the Directive: (1) fails to consider possible adverse consequences of the Directive provided to millions of federal employees to the continuing functioning of government; (2) offers conflicting information about employees' rights and obligations if they accept the government's offer; (3) runs counter to long-standing rules and requirements for federal employees; (4) is contrary to reasoned practices of government restructuring, (5) ignores history and practices around effective

workforce reduction, (6) sets an arbitrarily short deadline; and (7) is pretext for removing and replacing government workers on an ideological basis.

10.    The Fork Directive is also contrary to law. OPM has offered no statutory basis for its unprecedented offer. Moreover, the current appropriation for most federal agencies expires on March 14, 2025, but the Directive purports to make or authorize an expenditure or obligation through September 30, 2025, before an appropriation is authorized. The Antideficiency Act forbids such a guarantee.

11.    Plaintiffs are labor organizations that collectively represent more than 800,000 federal civil servants. They have a direct interest in ensuring that their members make informed decisions about their employment, and that the ability to make those decisions is not compromised by an irrational and illegal offer made on such a compressed and arbitrary timetable. Plaintiffs have had to expend significant resources to counsel their federal employee members, as well as unions affiliated with Plaintiffs who represent those members, about the effects of the directive.

12.    Because the Fork Directive is a final agency action that, as written, is arbitrary and capricious and contrary to law, the Court should, *inter alia*, declare that the Directive as issued is arbitrary, capricious, and not in accordance with law, vacate and remand the Directive to OPM to provide a reasoned basis for the Directive and extend the deadline accordingly, and until such time as Defendants provide an adequate justification for the Directive, and enjoin the February 6, 2024 deadline.

## **PARTIES**

13.    The American Federation of Government Employees, AFL-CIO ("AFGE") is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington,

D.C. 20001. AFGE, the largest federal employee union, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.

14.    AFGE members include nurses caring for our nation's veterans, border patrol agents securing our borders, correctional officers maintaining safety in federal facilities, scientists conducting critical research, health care workers serving on military bases, civilian employees in the Department of Defense supporting our military personnel and their families, and employees of the Social Security Administration making sure retirees receive the benefits they have earned.

15.    AFGE was founded in 1932 by federal employees seeking to create a right to fair employment and pay during the Great Depression. As the union grew, it advocated for and secured numerous victories for career civil servants, including the passage of the Civil Service Reform Act in 1978.

16.    AFGE is dedicated to fighting for dignity, safety, and fairness on the job for its members, and promoting efficiency and the improvement of government service so that government can more effectively serve the American people.

17.    AFGE Local 3707 ("Local 3707") is a labor organization and unincorporated association based at the Westover Airforce Reserve Base, Chicopee, MA 01022. Local 3707 represents approximately 400 civilian employees at Westover Reserve Air Base.

18.    The American Federation of State, County & Municipal Employees, AFL-CIO ("AFSCME") is a national labor organization and unincorporated membership association headquartered at 1625 L Street N.W., Washington, D.C. 20036. AFSCME is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils and other affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME, through its affiliate District Council 20 and its constituent

local unions, represents federal civilian employees in agencies and departments across the federal government.

19.     AFSCME was founded in 1932 by civil servants seeking to combat state efforts to replace a competitive civil service system with political patronage, united by a simple idea: that a professional civil service is essential to a strong democracy, and public service should be delivered by individuals dedicated to serving their communities, not those who have close connections to politicians. This idea has sustained AFSCME through nearly nine decades, as the union has succeeded in its efforts to pass or strengthen civil service laws across the United States.

20.     AFSCME members include nurses, corrections officers, childcare providers, emergency medical technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with one thing in common: a dedication to making our communities stronger, healthier, and safer. Its members working for the federal government make our communities stronger, healthier, and safer by working to ensure aviation safety at the Federal Aviation Administration, criminal justice through the Department of Justice, and more.

21.     The National Association of Government Employees, Inc. ("NAGE") is a national labor organization and is affiliated with the Service Employees International Union. NAGE is incorporated in the state of Delaware with its place of business at 159 Thomas Burgin Parkway, Quincy, MA 02169. NAGE and its local units are the certified exclusive bargaining representative of approximately 125,000 employees, including nearly 75,000 federal employees in 43 states, including Massachusetts.

22.     NAGE members, many of whom are veterans, include health care workers, police officers, scientists, office workers, researchers, childcare providers, janitorial staff, drivers, and

more, working at many federal agencies such as the U.S. Department of Defense, U.S. Department of Veterans Affairs, the U.S. Department of Transportation, and the National Park Service.

23.     Founded in 1961, NAGE is an organization of members united by the belief in the dignity and worth of workers and the services they provide, dedicated to improving the lives of workers and their families, and creating a more just and humane society.

24.     AFGE, Local 3707, AFSCME, and NAGE bring this action on behalf of themselves as organizations.

25.     Defendant Office of Personnel Management (OPM) is a federal agency that serves as the chief human resources agency and personnel policy manager for the Federal government.

26.     Defendant Charles Ezell is the Acting Director of OPM. He is sued in his official capacity.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et. seq.*, and the Administrative Procedure Act, 5. U.S.C. § 701, *et seq.*

28.     Venue is proper in the District of Massachusetts pursuant to both 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiffs AFGE Local 3707 and NAGE are residents of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Massachusetts, where thousands of their members have received the Fork Directive.

## LEGAL FRAMEWORK

29.     Under the Administrative Procedure Act (APA), a court shall "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2)(A). The APA likewise requires a court to hold unlawful agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(B).

30.     The Appropriations Clause of the Constitution commands that "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., Art. I, § 9, cl. 7. In 1870, Congress enacted the Antideficiency Act (31 U.S.C. §§ 1341, 1342, 1349-1351, 1511-1519) to address the increasingly common problem of the executive branch obligating funds in advance of appropriations, which put pressure on Congress to then appropriate those funds so that creditors would be paid.

31.     The Antideficiency Act protects Congress's constitutional power of the purse. Section 1341 of the Act provides, in relevant part, that a federal official may not (1) "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation"; or (2) "involve" the federal government "in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a).

## ALLEGATIONS

32.     On the afternoon of January 28, 2025, OPM sent an email directly to all—or nearly all—federal employees with the subject title, "Fork in the Road," which announced a "deferred resignation" "program" to those employees—the "Fork Directive." *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025).

33.     The Fork Directive instructed recipients to reply to the email with the word "RESIGN" directly to hr@opm.gov to participate. Specifically, OPM's message stated:

> This program begins effective January 28 and is available to all federal employees until February 6. If you resign under this program, you will retain all pay and benefits regardless

of your daily workload and will be exempted from all applicable in-person work requirements until September 30, 2025 [].

*Id.*

34.     OPM announced that "deferred resignation is available to all full-time federal employees" except those in certain national security roles and at the U.S. Postal Service and "any other positions specifically excluded by your employing agency." *Id.*

35.     In making this extraordinarily broad solicitation for resignations, OPM offered employees barely more than a single week to respond, demanding a single word response— "RESIGN"—by February 6, 2025.

36.     This incredibly short timeframe was accompanied by implicit threats of earlier termination for those who failed to accept a deferred resignation date of September 30, 2025, and substantial uncertainty about the legality and details of the newly announced program and the breadth of its exclusions.

37.     Indeed, the Fork Directive itself made clear that "the majority of federal agencies are likely to be downsized," including through reductions in force and furloughs. *Id.* The OPM website now explains to workers that the "federal workplace is expected to undergo significant near-term changes" and advises that employees "may wish to depart" "on terms that provide you with sufficient time and economic security to plan for your future." *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Feb. 4, 2025) ("Why am I being offered deferred resignation?").

### *OPM failed to consider numerous factors, including critical concerns of continuity and service across government operations, in promulgating the Directive*

38.     In issuing the Directive across the government barely a week after the new Administration was sworn in, OPM did not conduct any analysis of which agencies were likely to experience high levels of resignations, the optimal number of resignations, or where staffing was

already woefully insufficient such that soliciting resignations would be incontrovertibly harmful to government operations. *See, e.g.*, Department of Veterans Affairs, Office of Inspector General, *OIG Determination of Veterans Health Administration's Severe Occupational Staffing Shortages Fiscal Year 2024* (Aug. 7, 2024), https://www.vaoig.gov/reports/national-healthcare-review/oig-determination-veterans-health-administrations-severe-0 (documenting 2,959 Veteran Health Administration medical facilities with "severe occupational staffing shortages" in the fiscal year (FY) 2024).

39.     Compounding the confusion, OPM sent the Fork Directive to individuals that it ultimately deemed ineligible to participate. Even where OPM may have made determinations to exclude employees in critical positions from the program, those employees were still sent multiple emails soliciting their resignations, creating uncertainty and suggesting their employment could be in jeopardy if they did not resign. *See, e.g., Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025) ("the majority of federal agencies are likely to be downsized through . . . actions . . . likely to include the reclassification to at-will status for a substantial number of federal employees"). For example, air traffic controllers received this email even as an OPM official told media that air traffic controllers were exempt from the program. *See* Thomas Beaumont *et al.*, *Air traffic controllers were initially offered buyouts and told to consider leaving government*, ABC News (Jan. 31, 2025), https://abcnews.go.com/US/wireStory/air-traffic-controllers-initially-offered-buyouts-told-leaving-118330627.

40.     Nor did OPM consider the programmatic or other impacts on government service of dramatically—and with almost no advance warning—reducing the size of the federal workforce. OPM offered no plan or analysis as to how many employees they expected to take advantage of the program, or how the hundreds of agencies and their components across the government would

ensure continuity of expertise and operations in light of the sudden unplanned administrative leave of some untold number of federal workers.

41.    Indeed, OPM acknowledges that some federal agencies actually require larger workforces to function, stating that "a few [unspecified] agencies . . . are likely to see increases in the size of their workforce." *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025). But the Fork Directive is addressed in an overwhelmingly blanket fashion to millions of employees without targeting or analysis. OPM's program can only be expected to cause resignations and resultant staff reductions at even the unspecified agencies it acknowledges will require increases in the size of their workforce at a time of low unemployment.

### *The Directive, which provides conflicting information regarding employees' rights and obligations if they accept the government's offer, does not reflect reasoned decision-making*

42.    The Directive and related materials offer conflicting information about employees' rights and obligations if they accept the government's offer.

43.    Following the original communication, OPM began publishing Frequently Asked Questions (FAQs) concerning the program, and sent a follow-up email on the evening of January 30, 2025 to encourage federal employees to resign, facetiously citing their ability to travel to "a dream destination" and asserting that "The way to greater American prosperity is encouraging people to move from lower productivity jobs in the public sector to higher productivity jobs in the private sector." Kate Kelly, Michael C. Bender, and Zolan Kanno-Youngs, *Official Email Urges Federal Workers to Find 'Higher Productivity' Jobs* (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/us/politics/federal-workers-opm.html; Fork in the Road, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025).

44.     The FAQs continue to be changed, with OPM adding and changing material on the FAQ over the following days. *See Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://web.archive.org/web/20250000000000*/https://www.opm.gov/fork/     (internet     archive showing numerous changes to Fork Directive FAQs).

45.     This guidance continues to shift in a way that obscures the true nature of the Directive from Plaintiffs, federal employees, and the public.

46.     For example, OPM has repeatedly shifted its position as to whether and when employees who accept the offer in the Fork Directive will be expected to work.

47.     The initial communication from OPM on January 28, 2025 suggested that employees would be required to continue working, but "will be exempted from all applicable in-person   work   requirements," *Fork   in   the   Road*, U.S.   Office   of   Pers.   Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025).

48.     And, among other things, OPM purported to reverse its positions regarding whether employees would be required to work during the deferred resignation period, stating that "[e]xcept in rare cases determined by your agency," employees were "not expected to work." @Elonmusk, X (Jan. 29, 2025, 8:56 AM), https://x.com/elonmusk/status/1884601571347943773.





*See also* https://web.archive.org/web/20250129012319/https://www.opm.gov/fork/faq (same).

49.    But OPM provided no guidance as to the "rare" circumstances under which employees would be expected to work.

50.    OPM sent a second email on January 30, 2025 that purported to provide clarity. @News_MTorres, X (Jan. 31, 2025, 9:26 AM), https://x.com/News_MTorres/status/1885333873766080615 (post on X showing OPM email providing "Fork in the Road FAQs").

51.    At some point, OPM subsequently revised this guidance yet again, apparently in an effort to sweeten the deal and encourage employees to resign. As of February 1, 2025, OPM's response to a question about whether employees will be expected to work their government jobs during the deferred resignation period simply reads, "No." Fork in the Road, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork(last visited Feb. 4, 2025).

## Frequently Asked Questions

| Am I expected to work at my government job during the deferred resignation period? | — |
| --- | --- |
| No. | |

52.    Beginning on or about January 30, 2025, agencies across the federal government advised federal employees by mass emails, at OPM's direction, that the Fork in the Road program

was "valid, lawful, and will be honored." Anne Flaherty, Mary Alice Parks, and Soo Youn, *Federal workers told offer to get paid through September if they resign is 'valid,' 'lawful'*, ABC News (Jan 31, 2025), https://abcnews.go.com/Politics/federal-workers-told-offer-paid-september-resign-valid/story?id=118317566.

53.     OPM's decision to issue a "deferred resignation" program that gave employees— and Plaintiffs who advise them—little more than a week to decide the future of their career is unprecedented.

54.     Particularly in light of the extremely compressed timeline to participate in the Fork Directive, OPM's continual changing of the contours of that program—and the rights and obligations of employees under it— reflects the opposite of reasoned decision-making.

55.     OPM's need to broadly and flatly assert that the exploding offer in the Fork in the Road directive was "lawful" and "valid" only demonstrates the agency's awareness of the tremendous extent of uncertainty surrounding the directive's validity, and an effort to rush federal employees to make a decision in a matter of days despite that uncertainty. *See* Andrea Hsu, *Legal questions surround Trump's federal worker resignation offer*, NPR (Jan. 31, 2025), https://www.npr.org/2025/01/31/nx-s1-5282075/trump-federal-employees-resignation-offer-legal-questions.

***The Directive fails to consider or adequately explain how it is consistent with long-standing ethics rules concerning outside employment, which place agency-specific restrictions on employees' ability to obtain additional employment***

56.     OPM's FAQs following the issuance of the Directive flatly stated that federal employees could obtain a "second job" if they submitted their resignation. Indeed, OPM stressed that employees could "Absolutely!" obtain additional employment during the period they would

be placed on administrative leave. *Frequently Asked Questions*, U.S. Office of Pers. Mgmt.,

https://www.opm.gov/fork/faq (last visited Feb. 4, 2025).

| Am I allowed to get a second job during the deferred resignation period? |
|---|
| Absolutely! We encourage you to find a job in the private sector as soon as you would like to do so. The way to greater American prosperity is encouraging people to move from lower productivity jobs in the public sector to higher productivity jobs in the private sector. |

57.    But this bald assertion contradicts longstanding regulations and nuanced rules that federal employees must consider when engaging in outside employment while still employed by the federal government.

58.    Federal ethics regulations provide that federal employees who seek outside employment must comply with numerous conditions, including "[a]ny agency-specific requirement for prior approval of outside employment or activities." 5 C.F.R. § 2635.801. And the regulations further provide that agencies may impose a prior-approval requirement before individuals employed at the agency can accept outside employment. *Id*. at § 2635.803. Some agencies have codified their requirement for prior approval by regulation and these policies could hardly be expected to change uniformly in the accelerated timeframe created by the Fork Directive. *See, e.g.*, 5 C.F.R. § 5701.101 (Federal Trade Commission regulations).

59.    There are further restrictions on outside employment for federal employees, including a prohibition on receiving dual pay from federal employment. *See* 5 U.S.C. § 5533. But OPM informs employees that, should they resign from their positions, doing so "does not affect your ability to work for the federal government in the future." *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Feb. 4, 2025).

60.    OPM's blanket assertions that all federal employees who accept the exploding deferred resignation offer can "Absolutely!" obtain a second job are simply incorrect.

***The Fork Directive is contrary to reasoned practices of restructuring and seeds chaos, not effective government functioning***

61.    On information and belief, the Fork in the Road directive is based on a staff reduction approach of the same name conducted by Elon Musk shortly after taking over Twitter (now X). Mr. Musk is reportedly deeply involved in OPM's operations, has close ties to senior OPM staff politically appointed by the new Administration, and has repeatedly commented publicly on the Fork Directive.

62.    OPM's rapid adoption of Musk's private-sector program confirms that the agency took very little time to consider the suitability of applying an approach used with questionable success in a single for-profit entity to the entirety of the federal workforce. *See, e.g.*, Dave Lawler, *The Elon-ification of the federal government*, Axios (Jan. 30, 2025), https://www.axios.com/2025/01/30/elon-musk-government-takeover-federal-workers ("A workforce discombobulated by chaotic recent events receives an email with the subject line 'Fork in the Road.' Inside, a deadline to quit or commit to the new mission. That's the scenario Twitter employees faced in November 2022 — and the one now confronting some 2.3 million government workers."); Clare Duffy, *The 'Muskification' of the federal government is in full swing*, CNN (Jan. 30, 2025), https://www.cnn.com/2025/01/29/tech/elon-musk-government-cuts-twitter-takeover/index.html.

63.    The "Fork in the Road" approach at Twitter was widely regarded as chaotic, and the company's value declined precipitously after it was implemented. As one report summarized, "While Mr. Musk ultimately transformed Twitter, reducing staff by 80 percent and minimizing its real estate footprint, its business has declined. Advertisers have fled the site in droves, and at least

one major asset management firm, Fidelity Investments, estimates the company is now worth 72 percent less than the $44 billion he paid for it." Kate Conger and Ryan Mac, *Déjà Vu: Elon Musk Takes His Twitter Takeover Tactics to Washington*, N.Y. Times (Jan. 30, 2025), https://www.nytimes.com/2025/01/30/technology/musk-doge-x-playbook.html.

64.    The Directive offers no rationale for translating a questionable private-sector experiment into a program for virtually the entire federal civilian workforce.

***As the Fork Directive rashly replicates the chaotic private-sector approach employed at Twitter, it eschews the reasoned, logical, and congressionally authorized approach used for federal workforce reduction through voluntary departure in the recent past.***

65.    In the mid-1990s, then-President Clinton and his Administration undertook a significant effort to streamline and reduce the size of the federal workforce to increase efficiency and reduce the deficit. *See* https://www.presidency.ucsb.edu/documents/statement-the-buyout-program-for-federal-employees.

66.    President Clinton charged Vice President Gore with first leading a National Performance Review to gather information and make reasoned recommendations concerning government efficiency.

67.    After the National Performance Review conducted information-gathering and analysis, the Administration sought and received approval from Congress to offer buyouts to certain federal employees, with targeted offers.

68.    The offers were designed to reduce unproductive layers of management, with 70 percent of buyout uptake coming from managerial employees.

69.    This approach led to a reduction of more than 100,000 federal government positions a little more than a year after obtaining congressional authorization.

70.    The buyout authorities obtained from Congress in the Clinton Administration, *see* Public Law No. 103-226, 108 Stat. 111 (1994), generally gave agencies a calendar year—not nine days—to make and accept buyout offers from employees using considered principles articulated both by statute and in Office of Management and Budget guidance. These principles required the use of strategic plans before offering buyouts, ensuring the maintenance of productivity and ability to achieve agency objectives, and targeting to specific positions and integrating the efforts into restructuring plans. *See* U.S. Gov't Accountability Off., GGD-97-124, *Federal Downsizing: Effective Buyout Practices and Their Use in FY 1997*, https://www.gao.gov/products/ggd-97-124.

### *The Directive's deadline is arbitrary*

71.    Federal employees must weigh whether to accept the Fork Directive in short order, by February 6, 2025. But the Directive comes with a questionable legal basis, continually changing guidance, and with no clear mechanism to ensure that its promise will be fulfilled. Employees are advised if they forgo the offer—even with all of this attendant lack of clarity— they risk unemployment.

72.    The February 6, 2025 deadline to respond to the Fork Directive is not mandated by law. It is an arbitrary date Defendants selected to put maximum pressure on the federal workforce so that they would accept the offer, in many cases contrary to federal agency and federal employee interests.

### *The Directive is pretext to remove career federal civil servants and replace them with staff who are politically aligned with the Administration*

73.    The Fork Directive itself concedes that some agencies require more—not less— less staffing.

19

74.    Statements made by the Administration and their surrogates make clear that they intend to reduce the size of the government in part so that they can replace career federal employees with individuals ideologically aligned with the Administration.

75.    The President has pledged to fire wide swaths of civil servants, promising to "throw off the political class that hates our country." Donald J. Trump, Speech at Conservative Political Action Conference (March 4, 2023), https://tinyurl.com/2hjrs5ah. As he explained, "you'll see that on the first day of my presidency, the deep state which is destroying our nation. The tables will turn and we will destroy the deep state. We're going to destroy the deep state." Donald J. Trump, Speech at South Carolina GOP Dinner (Aug. 5, 2023), https://tinyurl.com/36uhbe74.

76.    President Trump has singled out Democrats and so-called "RINOs" (Republicans In Name Only) for termination. For example, in one video post from May 2023, Trump told a reporter that he would make "very big changes" to the FBI in a potential second term. Donald J. Trump (@realDonaldTrump), Truth Social (May 15, 2023, 11:04 PM ET), https://tinyurl.com/bdesuz3w. The DOJ and FBI, Trump said, personify the "deep state" as they are filled with "thousands and thousands" of "RINOs and with Democrats" that have been there for decades. Rebecca Jacobs, *Trump Has Said He Wants to Destroy the "Deep State" 56 Times On Truth Social*, CREW (Aug. 1, 2024), https://tinyurl.com/36z27phm. In another speech, he criticized the "deep state" workers who "work with the with the Democrats and the Republicans, and those are the Republicans I don't like." Donald Trump, *Speech at Political Rally in Sarasota*, Florida (July 3, 2021), https://tinyurl.com/58r46v4a.

77.    Vice President Vance reiterated that President Trump should "[f]ire every single midlevel bureaucrat, every civil servant in the administrative state, replace them with our people."

Andrew Prokop, *J.D. Vance's Radical Plan to Build a Government of Trump Loyalists*, Vox (July 18, 2024), https://tinyurl.com/4rsvn7xv.

78.     The scattershot approach of the Fork Directive—which does not set a target for specific goals, agencies, positions or functions—can only be understood as an effort to hollow out the federal government to allow the Administration to make room for the Administration's partisan hiring.  *See* The White House, Reforming the Federal Hiring Process and Restoring Merit to Government Service, https://www.whitehouse.gov/presidential-actions/2025/01/reforming-the-federal-hiring-process-and-restoring-merit-to-government-service/ (directing agencies to make federal "recruitment and hiring processes more efficient" by, *inter alia*, involving political appointees "throughout the full hiring process" and prioritizing hiring of individuals "passionate about the ideals of our American republic").

### *The Fork Directive is contrary to law as it was promulgated with no clear statutory basis or authorization and violates the Antideficiency Act*

79.     OPM has offered no explanation or statutory basis for offering the Directive, nor has it identified how the federal government intends to pay an unspecified number of workers for not performing work for the next eight months.

80.     Nor has OPM offered a justification for this apparently unprecedented use of administrative leave.

81.     The Antideficiency Act prohibits federal officials from making or authorizing an expenditure or obligation exceeding an amount available in an appropriation or from contracting or obligating for the payment of money before an appropriation is made (31 U.S.C. § 1341(a)). This is precisely what Defendants are purporting to do via the Fork Directive.

82.     The government is currently operating on a continuing resolution that expires on March 14, 2025. There is currently no appropriation in place to cover the salaries of federal

employees after that date. The Directive, however, unequivocally promises all pay and benefits until September 30, 2025. As written, Defendants are making or authorizing an obligation for the payment of money before an appropriation is made. *See* Fork in the Road, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025) (original communication to employees, explaining that workers will "maintain [their] current compensation…until [their] final resignation date").

83.    Following significant concerns about whether, in light of the lack of appropriations and other concerns, employees would "really" receive "full pay and benefits through September 30," OPM doubled down in its FAQs without reservation, stating, "Yes." *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Feb. 4, 2025)

> **Will I really get my full pay and benefits during the entire period through September 30, even if I get a second job?**    —
>
> Yes. You will also accrue further annual leave, sick leave, etc. and be paid out for unused leave at your final resignation date.

84.    These questionable assertions led to public concerns about the lawfulness of the Fork Directive given the lack of government appropriations beyond March 14, 2025, Andrea Hsu, *Legal questions surround Trump's federal worker resignation offer*, NPR (Jan. 31, 2025), https://www.npr.org/2025/01/31/nx-s1-5282075/trump-federal-employees-resignation-offer-legal-questions.

85.    In response, OPM— changed the contours of the Directive's guidance. OPM added a statement to the FAQ that asserts that a lapse in funding could affect employees' pay regardless of whether they submit a deferred resignation. OPM nonetheless unequivocally assured employees that they will be entitled to back pay in case of a lapse in appropriations under the Government

Employee Fair Treatment Act of 2019. *Compare Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (retrieved February 3, 2025. 8:49 AM) (explaining that a government shutdown could impact pay, but assuring employees that they would be entitled to backpay after any shutdown) *with id at* *https://web.archive.org/web/20250131184447/https://www.opm.gov/fork/faq* (extant version at 6:44 PM, Jan. 31, 2025) (FAQ does not include any equivocation on the entitlement to pay). In adding this new FAQ, OPM neither rescinded previous communications to federal employees nor changed its other unequivocal statements that employees "really" will be paid through September 30, 2025.

86.     Whether or not an employee is guaranteed backpay following Congress's issuance of an appropriation, the Antideficiency Act forbids OPM from guaranteeing payment without an appropriation. Particularly where, as here, OPM does not know the contours of future appropriations or funding levels, this promise is improper. If Congress decides to not fund certain offices after March 14, for example, employees in those offices who accepted the Fork Directive would have no appropriation to satisfy their promised pay.

**Plaintiffs have been, and will continue to be, harmed by the Fork Directive.**

87.     AFGE, on its own and in conjunction with its affiliated councils and locals, represents members and bargaining unit employees in agencies and departments across the federal government for which it has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

88.     Local 3707 represents members and bargaining unit employees consisting of most civilian employees of the Westover Airforce Reserve Base in Chicopee, Massachusetts, for which it has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

89.    AFSCME, through its affiliated District Council 20 and its constituent local unions, represents members and bargaining unit employees in agencies and departments across the federal government for which AFSCME District Council 20 has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

90.    NAGE, on its own and in conjunction with its locals, represents members and bargaining unit employees in agencies and departments across the federal government for which it has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

91.    Membership in AFGE, Local 3707, AFSCME, and NAGE is voluntary.

92.    The leadership of AFGE, Local 3707, AFSCME, and NAGE are democratically elected by and from their respective members.

93.    The activities of AFGE, AFSCME, and NAGE are funded by their respective members through voluntary membership dues.

94.    AFGE members who are federal employees work in a wide variety of positions, in every U.S. state and the District of Columbia, and in agencies including the Environmental Protection Agency, the Department of Labor, the Department of Veterans Affairs, the Social Security Administration, the Department of Defense, and the Department of Homeland Security.

95.    AFSCME members who are federal employees work in a wide variety of positions at multiple federal agencies including AmeriCorps, the Department of Agriculture (USDA), the Department of Justice (DOJ), the Federal Aviation Administration (FAA), the Peace Corps, and Voice of America.

96.    NAGE members who are federal employees work in a wide variety of positions in 43 states, in agencies including the Department of Veterans Affairs, the Department of Defense, the Department of Transportation, the Environmental Protection Agency, and the National Park

Service.

97.     AFGE members are located in all fifty states. AFGE has several affiliates across the State of Massachusetts, representing approximately 2,900 federal workers at various agencies, including the Department of Veterans Affairs, the Department of Defense, the Social Security Administration, and the Environmental Protection Agency.

98.     Among AFSCME's thousands of affiliated subordinate bodies throughout the country, AFSCME Council 93 and its affiliated local unions represent employees of public and private employers in the State of Massachusetts including but not limited to employees of the City of Springfield and the Springfield Housing Authority.

99.     NAGE has multiple units in Massachusetts, representing approximately 7,000 federal employees at various federal agencies, including the Department of Veterans Affairs, Department of Defense, and Department of Transportation.

***Plaintiffs have already expended significant resources responding to the Directive and will be forced to continue to expend and divert resources to respond to the Directive.***

100.     One of AFGE, AFSCME, and NAGE's core services is responding to inquiries and concerns, both from individual members of the union and the union affiliates who directly represent those members, as well as counseling union members about issues that relate to the workplace. In general, AFGE, AFSCME, and NAGE, through their affiliates, work to ensure that all member inquiries receive a response, whether by email, phone, or meeting.

101.     One of AFGE's core functions is to provide guidance, legal representation, training, and other services to its over 800 affiliates.

102.     AFGE has over 150 employees who regularly receive inquires directly from members and affiliates.

103.     Core to Local 3707's mission is providing advice and guidance to the civilian

employees at Westover Airforce Reserve Base.

104.    Local 3707 provides guidance and representation to its members through elected and volunteer union officers and stewards.

105.    AFSCME has over 100 employees in its Organizing and Field Services Department whose role is to provide member relations services; they regularly receive calls and emails from members and affiliates, including from federal employee members of AFSCME District Council 20 and its subordinate bodies.

106.    AFSCME represents its members through its constituent local unions, councils and other affiliates. Within this structure, one of AFSCME's core functions is to provide resources and guidance to its affiliates for organizing, bargaining, political action and education, legal issues of national significance, and the administration of members-only benefits.

107.    NAGE provides guidance, legal representation, training, and services to its locals, members, and bargaining unit employees.

108.    NAGE has employees who regularly receive inquiries directly from federal local affiliates and federal employees.

109.    Since the Fork Directive, AFGE, Local 3707, AFSCME, and NAGE have been inundated by members and affiliates seeking advice and information about the Fork Directive.

110.    For example, since January 28, 2025, AFGE has received thousands of emails from members and affiliates asking about the Fork Directive. AFGE has received countless additional inquiries through other channels, including phone calls, town hall meetings, and site visits. AFGE members and affiliates have asked about the implications of the Fork Directive and guidance on how to respond to OPM's email. AFGE affiliates have also asked for services and support in responding to member and press inquiries about the Fork Directive.

111.    Since January 28, 2025, Local 3707 has received numerous inquiries about the Directive. Responding to these questions has demanded a significant amount of time from the union's limited group of volunteer officers and stewards—time that would have otherwise been spent representing members, organizing new members, and addressing other important issues.

112.    OPM's unclear and ever-changing guidance on the Directive has made it particularly challenging to provide accurate advice. An example of how this has been particularly difficult for Local 3707 involves the impact of accepting the Fork Directive on dual-status Air Reserve Technician employees represented by Local 3707. Specifically, it is unclear whether acceptance would make them ineligible for continued military service.

113.    Since the Directive, AFSCME District Council 20 and its constituent local unions have also received emails and phone calls from members asking about the implications of the Fork Directive. AFSCME local unions have been requesting guidance about the legality of the Fork Directive, the implications of the Fork Directive on the future of AFSCME members' work, and whether AFSCME members should respond to OPM's email.

114.    Since January 28, 2025, NAGE has received hundreds of inquiries, emails, and telephone calls from locals and federal employees asking about the Directive and seeking guidance. NAGE members have questions about the legality of the Directive, its implications, effects on their benefits, their options, and how to respond.

115.    Responding to these concerns has required AFSCME, Local 3707, AFGE, and NAGE to devote substantial additional resources into counseling members and affiliates and responding to inquiries.

116.    For example, at least one AFGE attorney and one AFGE communications staff member spent almost the entirety of their working day on January 29, 2025, working on Fork

27

Directive-related issues. Several other staff members have spent a significant portion of each day since the 28th responding to and researching Fork Directive related issues. These staffers would ordinarily be performing other necessary work, such as preparing for affiliate arbitrations, reviewing affiliate requests for legal and communications advice, and drafting newsletters and other AFGE communications.

117.    Because of the volume of inquiries, AFGE has held 2 virtual town halls for its affiliates. Each town hall took place in the evening and required over 25 staff members to perform duties outside their normal working hours.

118.    Likewise, because of numerous inquiries by AFSCME members, AFSCME attorneys and communication department staff have had to devote resources to preparing a Frequently Asked Questions ("FAQ") document to address AFSCME member questions about the Fork Directive, diverting these AFSCME employees from performing other necessary work servicing AFSCME members and affiliates in other jurisdictions nationwide. And AFSCME local unions of federal employees have scheduled special meetings with their bargaining-unit members to discuss the Fork Directive and provide guidance.

119.    NAGE has utilized several attorneys and representatives to receive questions, research issues, prepare a FAQ, and host two webinar-style town halls. Each town hall lasted over an hour and required multiple staff members to present materials and answer live questions. These NAGE staff would ordinarily perform other necessary work, including legal representation and union representational assistance with grievances, bargaining, communications, and other matters.

120.    In addition to directly responding to inquiries from affiliates and members, AFGE, AFSCME, and NAGE employees have invested significant time and effort into researching issues related to the Fork Directive. These efforts have been necessary to develop written guidance to

help members and affiliates, to try to ensure as well-informed an approach to addressing these issues as is possible under the circumstances.

121.    The substantial increase in volume of inquiries and counseling requests from members and affiliates has required AFGE and NAGE to divert resources from other work. For example, the attorney time spent developing guidance and responding to inquiries has resulted in delays in preparing for arbitration hearings and responding to non-Directive-related affiliate inquires.

122.    In addition, media outlets have contacted AFGE, AFSCME, and NAGE seeking comment or information about the Fork Directive. These inquiries continue.

123.    These resource challenges are particularly acute because of the very limited timeframe and changing guidance surrounding the Directive. Members need answers to their questions by the impending deadline presented by the Fork Directive, and are urgently reaching out to Plaintiffs for advice.

### The Directive impedes Plaintiffs' ability to perform their missions.

124.    Core to Plaintiffs' mission is fighting for fairness and full protection of the law on behalf the employees they represent.

125.    Because of the paucity of information about the Fork Directive, it is challenging for Plaintiffs to adequately advise their members or affiliates as to many of their questions.

126.    For example, it is unclear whether members will really be guaranteed full payment of wages through September 30, 2025, even if appropriations lapse, the government shuts down, or Congress passes a law that forbids employees to be paid when they are not working.

127.    Dual employment is unclear, and whether members could seek outside employment while in this "deferred resignation" period, in light of prior guidance and ethics rules limiting

29

federal workers' ability to work for others while on the federal payroll.

128.    It is unclear whether members could leave the country while in "deferred resignation" status given prior government guidance about leaving the country or the commuting area while employed.

129.    It is unclear what authority or appropriations the government has to provide this program and to guarantee that employees will be paid without working.

130.    The potential effect of a government shutdown on a "deferred resignation" if a budget or continuing resolution is not passed in the future is unclear.

131.    It is unclear what will happen there are later reductions in force or other layoffs, and whether members would continue to be paid.

132.    The implications for pensions, health insurance, retirement eligibility, service tenure requirements and other issues are unclear.

133.    It was unclear whether members would retain competitive status or reinstatement rights, whether they will continue to accrue annual leave and sick leave, and whether they will receive their annual leave payout.

134.    Given the very limited information available about the Fork Directive, and the absence of a clear statutory basis for some of the claims in the January 28, 2025 email, it is challenging for Plaintiffs to adequately counsel or advise their members as to many of these issues.

135.    The difficulty in responding to inquiries, and time spent addressing concerns, is amplified by the inconsistent guidance provided to Plaintiffs' affiliates and members by different federal agencies and OPM, and the changing nature of that guidance.

136.    The Directive's lack of clarity and shifting contours thus directly undermine Plaintiffs' core mission of serving and counseling their members.

137.    The substantial increase in volume of inquiries and counseling requests from members and affiliates has required AFSCME, Local 3707, AFGE, and NAGE to divert resources from being otherwise used to further their mission by organizing and representing employees, negotiating with employers, and advocating for improved employment conditions.  For example, AFGE and NAGE attorneys are not preparing for arbitrations and answering other affiliate concerns, and AFGE field representatives (also known as national representatives) are able to devote less time handling grievances and bargaining issues. Likewise, an AFSCME attorney working on the union's efforts to counsel members and affiliates about the Fork Directive would otherwise be engaged in supporting other AFSCME affiliates in preparing for arbitrations in other jurisdictions, filing unfair labor practices against non-federal employers, and other AFSCME core services for its affiliates nationwide.

138.    In addition, Plaintiffs will likely lose revenue because of the Fork Directive. Members currently pay voluntary dues through payroll deductions. The vast majority of members who leave federal service for reasons other than retirement cease being members of their respective unions and cease paying dues. Members' deferred resignations will reduce Plaintiffs' membership rolls, thereby reducing the revenue available to further Plaintiffs' mission.

139.    Further, as members look to AFSCME, Local 3707, AFGE and NAGE to provide answers about the Fork Directive and its unclear and ever-changing guidance, AFSCME, Local 3707, AFGE and NAGE are at risk of reputational harm among their membership, and more broadly among other federal employees, due to the difficulty of providing satisfactory answers to members concerning an agency policy with enormous potential consequences for members' interests.

140.    Given the short timeline attendant to the Directive, and the ongoing lack of clarity,

Plaintiffs will not be able to improve on their advice to members, or offer further clarity, in the future – the time will have simply expired.

## CLAIMS FOR RELIEF

### Count One
### (Administrative Procedure Act - Arbitrary, Capricious)

141.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

142.    Under the APA, a court shall "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

143.    The Fork Directive is arbitrary and capricious for a host of reasons.

144.    Defendants have failed to consider innumerable potential consequences of the Fork Directive, which was sent a mere week after the beginning of the new Administration to millions of federal employees, including the impact on continuity and effectiveness of government functioning.

145.    The Directive and related materials offer conflicting information regarding employees' rights and obligations if they accept the government's offer.

146.    The Directive adopts a questionable approach from the private sector, without considering whether it is applicable in the federal context or consistent with prior history relating to restructuring.

147.    The Directive aims to entice federal employees to relinquish their livelihoods on the basis of barely-veiled threats of future termination.

148.    The Directive runs contrary to long-standing rules and requirements for federal employees, including prior guidance and ethics rules regarding outside employment.

149.    The Directive provides an arbitrarily short deadline for decision that is not based in any articulated need or statutory requirement and—particularly in light of open questions and changing guidance—puts Plaintiffs in an impossible position in advising their members and developing guidance.

150.    The Directive is pretext for removing federal workers on an ideological basis to replace them with staff who are politically aligned with the Administration.

151.    The arbitrary and capricious nature of OPM's decision has harmed Plaintiffs.

**Count Two**
**(Administrative Procedure Act – not in accordance with law,**
**and exceeding statutory authority)**

152.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

153.    The Fork Directive and related communications include no indication as to the statutory or appropriations basis for OPM's "deferred resignation" program.

154.    The Appropriations Clause of the Constitution commands that "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., Art. I, § 9, cl. 7.

155.    The Antideficiency Act forbids an agency from authorizing or obligating the payment of money before an appropriation is made.

156.    The Fork Directive purports to obligate payment until September 30, 2025 to civil servants who accept the deferred resignation offer, even though the federal government's current appropriations will expire on March 14, 2025.

157.    By purporting to obligate payments for six months past the March 14, 2025 continuing resolution deadline, the Fork Directive violates the Antideficiency Act, and is therefore

not in accordance with law and is beyond statutory authority, in violation of the Administrative

Procedure Act. 5 U.S.C. 706(2).

158.    Defendants' violation causes ongoing harm to the Plaintiffs.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court:

A.  Declare that the Fork Directive, as currently drafted, is arbitrary, capricious, and not in
    accordance with law in violation of the Administrative Procedure Act;

B.  Vacate the Fork Directive and remand to OPM to provide a reasoned basis as required by
    the APA for the Directive and extend the purported deadline for the Fork Directive
    accordingly;

C.  Preliminarily and permanently enjoin Defendant Charles Ezell, Acting Director of the
    Office of Personnel Management; Defendant Office of Personnel Management; and their
    agents and successors from implementing or otherwise giving effect to the February 6,
    2024 deadline in the Fork in the Road Directive until such time as Defendants can
    provide adequate legal justification for the Fork Directive and adequate legal assurance of
    its terms;

D.  Order Defendant Charles Ezell, Acting Director of the Office of Personnel Management;
    Defendant Office of Personnel Management; and their agents and successors to prepare
    and submit for Court approval a corrective communication to send all government
    workers who received the Fork in the Road Directive, advising them that the Directive is
    suspended and the deadline is held in abeyance for a reasonable period of not less than 60
    days following OPM's completion of the required consideration of the Directive's legal
    basis, justifications, and funding.

E.  Award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

F.  Grant any other relief this Court deems appropriate.

DATED this 4th day of February, 2025.

By:  /s/ Nicolas F. Mendoza
Michael T. Anderson (BBO #645533)
Nicolas F. Mendoza (BBO #703711)
MURPHY ANDERSON PLLC
1401 K Street N.W., Suite 300
Washington, DC 20005
Telephone: (202) 223-2620
manderson@murphypllc.com
nmendoza@murphypllc.com
*Counsel for Plaintiffs*

Elena Goldstein* (NY Bar No. 4210456)
Michael C. Martinez* (D.C. Bar No. 1686872)
Daniel McGrath* (D.C. Bar No. 1531723)
Skye Perryman* (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Facsimile: 202-796-4426
egoldstein@democracyforward.org
mmartinez@democracyforward.org
dmcgrath@democracyforward.org
sperryman@democracyforward.org
*Counsel for Plaintiffs*

Teague P. Paterson* (D.C. Bar No. 144528)
Matthew S. Blumin* (D.C. Bar No. 144528)
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO
1625 L Street N.W.
Washington, DC 20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
*Counsel for American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME)*

Rushab B. Sanghvi* (D.C. Bar No. 1012814)
Andres M. Grajales* (D.C. Bar No. 476894)
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, DC 20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928
SanghR@afge.org
Grajaa@afge.org
*Counsel for Plaintiff American Federation
of Government Employees, AFL-CIO (AFGE)
and Local 3707*

Sarah Suszczyk* (M.D. Bar No. 0512150240)
NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, SEIU
LOCAL 5000
NAGE/IBPO/IAEP/IBCO
159 Burgin Parkway
Quincy, MA 01269
Telephone: (202) 639-6426
Facsimile: (617) 376-0285
Ssuszczyk@nage.org
*Counsel for Plaintiff National Association of
Government Employees, SEIU Local 5000*


*pro hac vice pending*

## **Verification**

Cory Bythrow being first duly sworn hereby affirm and state under the penalties

of perjury the following:

I am the Chief of Staff of the American Federation of Government Employees, AFL-CIO

(AFGE), Plaintiff in the above-entitled action. I have read the foregoing complaint and know the

contents thereof. I verify under penalty of perjury that the foregoing paragraphs relating to AFGE

are true and correct.


Dated: February 4, 2025
Washington, DC
(City)          (State)

Cory Bythrow
Chief of Staff
American Federation of Government
Employees, AFL-CIO

## **Verification**

Fernando Colon being first duly sworn hereby affirm and state under the penalties

of perjury the following:

I am the Associate General Counsel of the of State, County, and Municipal Employees,

AFL-CIO (AFSCME), Plaintiff in the above-entitled action. I have read the foregoing complaint

and know the contents thereof. I verify under penalty of perjury that the foregoing paragraphs

relating to AFSCME are true and correct.

Dated: February 4, 2025
Washington, DC
(City)            (State)

Fernando Colon
Associate General Counsel
American Federation of State,
County, and Municipal Employees,
AFL-CIO (AFSCME)

**<u>Verification</u>**

Lee Sutton being first duly sworn hereby affirm and state under the penalties

of perjury the following:

I am the Federal Director of the National Association of Government Employees, Inc.

(NAGE), Plaintiff in the above-entitled action. I have read the foregoing complaint and know the

contents thereof. I verify under penalty of perjury that the foregoing paragraphs relating to NAGE

are true and correct.


Dated: February 4, 2025                           *Lee Sutton*
<u>Alexandria, Virginia</u>       _____
                                                  Lee Sutton
                                                  Federal Director
                                                  National Association of Government
                                                  Employees, Inc.

James Johnson being first duly sworn hereby affirm and state under the penalties of perjury the following:

I am the President of American Federation of Government Employees, AFL-CIO (AFGE), Local 3707, Plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I verify under penalty of perjury that the foregoing paragraphs relating to AFGE, Local 3707 are true and correct.


Dated: February 4, 2025
Springfield, MA
(City)          (State)

_____
James Johnson
President
American Federation of Government
Employees, AFL-CIO, Local 3707