**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSSETTS**

|  |  |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.<br><br><br>*Plaintiffs*,<br><br>v.<br><br>CHARLES EZZELL, ACTING DIRECTOR, OFFICE OF PERSONNEL MANAGEMENT, et al..<br><br><br>*Defendants*. | Civil Action No. 1:25-cv- 10276 |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

LEGAL STANDARDS ...........................................................................................................5

ARGUMENT ...........................................................................................................................6

    I.      Plaintiffs Will Likely Succeed on the Merits...........................................................6

          A.      The Fork Directive Is Arbitrary and Capricious. .........................................7

          B.      The Fork Directive Violates the Antideficiency Act. ...............................11

          C.      The Court Has Subject Matter Jurisdiction……………………………...13

                *i. There is No Administrative Mechanism under the CSRA to Review Plaintiffs' Claims…………………………………………………...............13*

                *ii. Jurisdiction is needed for meaningful review, and Plaintiffs' claims are Collateral to any CSRA Proceeding and Outside Those Agencies' Expertise* ...............................................................................................15

    II.      Absent injunctive relief, Plaintiffs Will Suffer Immediate, Irreparable Harm. ....................................................................................................................16

                *i. Irreparable Diversion of Resources* ......................................................17

                *ii. Irreparable Loss of Members and Resulting Revenue*..........................18

                *iii. Irreparable Reputational Harm*............................................................19

    III.     The Balance of Equities and the Public Interest Weigh in Favor of a Stay...........19

CONCLUSION.......................................................................................................................20

# TABLE OF AUTHORITIES

*Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9 (D. Mass. 2024)................................. 18

*Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359 (1998) ........................... 11

*Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997); *see also Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42 (1st Cir. 2016) ........................................................................................................................... 7

*Atieh v. Riordan*, 727 F.3d 73 (1st Cir. 2013).................................................................... 8

*Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023) ................................ 14, 16

*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984)......................................................... 13

*Boustany v. Boston Dental Group* , 42 F. Supp. 2d 100 at 104(D. Mass. 1999) .............. 19

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ..................................... 7, 8

*Catholic Legal Immigr. Network, Inc. v. Exec. Office for Immigr. Rev.* *("CLINIC")*, No. 20-cv-03812 (APM), 2021 WL 184359 (D.D.C. Jan. 18, 2021) ......................................................................................................................... 5

*Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442 (Fed. Cir. 1997)...................................... 11

*Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, No. 23 Civ. 486, 2024 WL 3650089 (D.N.H. Aug. 5, 2024) ........................................................................ 17

*Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233 (D. Mass.) ........................................ 16

*Crowley v. Local No. 82, Furniture & Piano Moving*, 679 F.2d 978 (1st Cir.1982) ....... 20

*Dickson v. Sec'y of Def.*, 68 F.3d 1396 (D.C. Cir. 1995)................................................... 10

*Doe v. Mills,* 16 F.4th 20 (1st Cir. 2021) .................................................................... 6, 19

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ................................................... 18

*Feds for Med. Freedom v. Biden*, 63 F.4th 366 (5th Cir.) ................................................ 14

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)....................... 16

*Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)................. 15

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ................................................... 16

*Heckler v. Ringer*, 466 U.S. 602 (1984) ............................................................... 13

*Hercules Inc. v. United States*, 516 U.S. 417 (1996) ......................................... 11

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO by Negron v. Union De Carpinteros De Puerto Rico*, 615 F. Supp. 3d 87 (D.P.R. 2022)................................ 18

*Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Loc. Lodge No. 1244*, No. 87 Civ. 442, 1988 WL 114590 (N.D. Ind. 1988) ......................................................................................................... 18

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ....................... 18

*McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991) ............................................. 15

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........................................................................................................ 7, 8, 11

*NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1 (1st Cir. 2019) .............................................................................................................. 18

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................... 6, 19

*Orkin v. Albert*, 579 F. Supp. 3d 238 (D. Mass. 2022) ...................................................... 6

*Philip Morris USA Inc. v. Scott*, 561 U.S. 1301 (2010) ................................................... 17

*Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020) ............................. 7

*Public Citizen, Inc. v. FAA*, 988 F.2d 186 (D.C. Cir. 1993) ............................................. 10

*Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31 (1st Cir. 2002) .... 13, 16

*Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12  (1st Cir.1996)................. 19

*Ruggieri v. M.I.W. Corp.*, 826 F. Supp. 2d 334 (D. Mass. 2011) ....................................... 5

*Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9 (1st Cir. 2020) ................................ 16

*Seafreeze Shoreside, Inc v. United States Dep't of Interior*, No. 1:22-CV-11091-IT, 2023 WL 3660689 (D. Mass. May 25, 2023) ......................................................... 5

*Stop & Shop Supermarket Co. v. Big Y Foods, Inc.*, 943 F. Supp. 120 (D. Mass. 1996) .......................................................................................................................... 19

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994).............................. 13, 15, 16

*Traynor v. Turnage*, 485 U.S. 535 (1988) ........................................................................ 13

*Union of Concerned Scientists v. Wheeler*, 954 F.3d 11 (1st Cir. 2020) ........................... 8

*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009) ........................... 6

*Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F.Supp.2d 98 (D. Mass. 2003) ................................................................................................................... 20

**Statutes**

31 U.S.C. §§ 1341-42, 1349-51, 1511-19 ........................................................................ 11

31 U.S.C. § 1341 ........................................................................................................... 12

5 U.S.C. § 5533 ............................................................................................................... 9

5 U.S.C. § 706(2) ........................................................................................................... 6

5 U.S.C. § 7114 ....................................................................................................... 14, 15

5 U.S.C. § 7117(a)(1) .................................................................................................... 15

5 U.S.C. § 7512 ............................................................................................................. 14

**Other Authorities**

Alayna Treene & Katie Lobosco, *Trump Administration Drafting Executive Order to Initiate Department of Education's Elimination*, CNN (Feb. 4, 2025, 5:29 PM), https://www.cnn.com/2025/02/04/politics/education-department-trump-executive-order/index.html ............................................................................................. 12

Andrew Prokop, *J.D. Vance's Radical Plan to Build a Government of Trump Loyalists*, Vox (July 18, 2024, 12:03 AM), https://tinyurl.com/4rsvn7xv ................... 11

Exec. Order (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/reforming-the-federal-hiring-process-and-restoring-merit-to-government-service/ ...................................................................................................... 11

*Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025) .................................................................................................. 8, 12

Jennifer Hansler, et al., *Rubio Says He's Acting Director of USAID as Humanitarian Agency Is Taken over by the State Department*, CNN (Feb. 4, 2025, 8:35 AM), https://www.cnn.com/2025/02/03/politics/usaid-washington-workers/index.html ....................................................................................................... 12

Kate Conger & Ryan Mac, *Déjà Vu: Elon Musk Takes His Twitter Takeover Tactics to Washington*, N.Y. Times (Jan. 30, 2025), https://www.nytimes.com/2025/01/30/technology/musk-doge-x-playbook.html. .......................................................................................... 10

U.S. Const., Art. I, §9, cl. 7........................................................................................ 11

U.S. Gen. Acct. Off., GGD-97-124, Fed. Downsizing Effective Buyout Practices and Their Use in FY 1997 (1997), https://www.gao.gov/assets/ggd-97-124.pdf ........ 10

William J. Clinton, Statement on the Buyout Program for Fed. Empls., The Am. Presidency Project https://www.presidency.ucsb.edu/node/221790 (last visited Feb. 4, 2025) ............................................................................................................ 10

**Rules**

Fed. R. Civ. P. 65(b) ................................................................................................... 5

**Regulations**

5 C.F.R. § 2635.801(b)(2)............................................................................................ 9

5 C.F.R. § 5701.101 ..................................................................................................... 9

5 C.F.R. § 630.1403 ................................................................................................... 13

5 C.F.R. §2635.803 ...................................................................................................... 9

**INTRODUCTION**

The continued success of government is based, in large part, on the institutional memory of its career civil servants who are committed to the missions of their agencies and the prospect of working for the American people. These civil servants are professionals and subject matter experts, many of whom have worked diligently and impartially through successive administrations of both major parties to implement changing priorities. If these employees leave or are forced out *en masse* and without regard to their role or function, the country will suffer a dangerous one-two punch. First, the government will lose expertise in the complex fields and programs that Congress has, by statute, directed the Executive to faithfully implement. And second, when vacant positions become politicized, as this administration seeks to do, partisanship will be elevated, to the detriment of agency missions and the American people.

On January 28, 2025, Defendant Office of Personnel Management (OPM) surprised nearly all federal employees with an email entitled "Fork in the Road," announcing what OPM called a "deferred resignation … program," offering employees the ability to resign now and purportedly retain all pay and benefits until September 30, 2025 ("the Fork Directive" or "Directive"). Federal employees were only given ten days—until tomorrow, February 6— to decide whether to take the "offer" or face the prospect of losing their employment without pay through the "downsize[ing]" and "reductions in force" also threatened by the Directive.

The Directive is unlawful: OPM offers no basis for its authority to adopt this program and OPM purports to guarantee funds that Congress has not appropriated, in clear violation of the Antideficiency Act.

The Directive is also stunningly arbitrary. OPM has given federal workers just days to make critical decisions about their futures and livelihood, even as OPM has repeatedly changed

the contours of the program. OPM has recklessly ignored the Directive's significant adverse consequences on the continuing functioning of government, encouraging the potential departure of broad swaths of employees without regard to their agency, job duties, or institutional memory. The Directive also skips past the rules and processes of governance, including long-standing rules governing federal employees, the availability of alternative models of reasoned government downsizing, and the sheer chaos seeded by importing Elon Musk's questionable private-sector business model to the federal government. At the same time, OPM's Directive is pretext for removing and replacing government workers on an ideological basis.

Plaintiffs, who collectively represent over 800,000 federal workers, have a direct interest in counseling their members to allow them to make informed decisions about their employment, and Plaintiffs' ability to do so is compromised by OPM's irrational and illegal offer made on such a compressed and arbitrary timetable.

Plaintiffs are likely to succeed on the merits of their Administrative Procedure Act (APA) claim. And, in the absence of a TRO, Plaintiffs will be irreparably harmed by long-lasting impacts of the rushed and ill-informed choice the Fork Directive has foisted upon their members: as Plaintiffs expend resources that cannot be recovered trying to help their members make sense of OPM's ever-shifting ultimatum, they are thwarted in counseling members for lack of consistent information, and they stand to lose members in significant numbers. Accordingly, Plaintiffs seek a Temporary Restraining Order staying the February 6th deadline to accept the "fork," while Plaintiffs seek further relief ensuring that OPM completes the required consideration of the Directive's legal basis, justification, and funding.

## STATEMENT OF FACTS

On the afternoon of January 28, 2025, OPM sent an email directly to nearly all federal

employees with the subject line, "Fork in the Road." ECF No. 1 ("Compl.") ¶ 32. The email purported to offer a blanket "program" of "deferred resignation" to millions of civil servants. *Id.* OPM directed employees to respond to the email with a single word—"RESIGN"— within little more than a week, by February 6, if they wished to receive pay through September 30. *Id.* ¶ 33.[1]

The Directive suggested that failure to take this offer could result in the loss of employment without pay. OPM threatened that "the majority of federal agencies are likely to be downsized" and that career civil servants would likely lose their employment protections in large numbers through "the reclassification to at-will status." *Id.* ¶¶ 37, 39. For those who declined to resign, OPM made clear that it offered no "assurance regarding the certainty of your position." *Id.* ¶ 7. At the same time, the Administration has made clear that it seeks to quickly fill newly open positions with individuals who are politically aligned with the current administration. *Id.* ¶¶ 74-78.

OPM's shifting guidance and implementation has offered conflicting information about employees' rights and obligations under the Directive, sowing mass confusion across the government. For example, as recently as *February 4*—two days before the acceptance deadline— OPM sent the Directive to individuals it had deemed ineligible to participate. *Id.* ¶¶ 39, 112. OPM has continued to revise its position on whether employees would be required to work if they accepted the deferred resignation offer, initially requiring employees to work but be "exempted from all applicable in person work requirements," *id.* ¶¶ 33, 47, then stating that only in unspecified "rare cases" would employees be required to work, *id.* ¶¶ 48-49, and finally—in an apparent attempt to sweeten the deal —stating flatly that no work was required, *id.* ¶ 51. OPM even encouraged workers to seek other employment during the deferred resignation period, stating that

---

[1] OPM announced that "deferred resignation is available to all full-time federal employees" except those in certain national security roles and at the U.S. Postal Service and "any other positions specifically excluded by your employing agency." Compl. 34.

employees were "[a]bsolutely" "allowed to get a second job." *Id.* ¶ 56.

Likewise, OPM's guidance on employees' entitlement to pay has also shifted. In the Directive and initial guidance, OPM originally stated, without equivocation, that "Yes," employees would "really" receive "full pay and benefits through September 30." *Id.* ¶¶ 82-83. OPM later explained that while a lapse in funding may occur, employees would be unequivocally entitled to back pay in case of a lapse in appropriations. *Id.* ¶¶ 85-86. And on February 4, OPM issued yet another piece of guidance, this time saying that promises of full pay and benefits were binding, but also stating that, "[w]ere the government to backtrack on its commitments, an employee would be entitled to request a rescission of" their resignation. S*ee* Memorandum from Charles Ezell, Acting Dir., U.S. Office of Pers. Mgmt., Legality of Deferred Resignation Prog. at 2 (Feb. 4, 2025), https://tinyurl.com/4hv2p9ku. Particularly in light of the dramatically compressed timeline, guidance continues to shift in a way that obscures the true nature of the Directive from Plaintiffs, federal employees, and the public. OPM did not look to historic predicates for government downsizing, instead adopting a questionable private sector model championed by Elon Musk. In the mid-90s, President Clinton sought to reduce government staffing and increase efficiency. Compl. ¶¶ 65-70. After an extensive information-gathering process, legislative approval by Congress, and a targeted and orderly approach to buyouts, the Clinton Administration reduced more than 100,000 federal government positions. *Id.* In contrast, the Directive appears to incorporate a wholesale staff-reduction approach of the same name conducted by Elon Musk shortly after taking over Twitter (now X). *Id.* ¶ 61. But that program is widely regarded as having seeded chaos, and the company's value declined precipitously after it was implemented. *Id.* ¶¶ 62-64.

OPM has offered no explanation as to the legal basis or authority for the Directive, or any

appropriation to fund it. Indeed, the Directive purports to obligate agencies across the federal government to guarantee pay and benefits until September 30, 2025, for employees who accept the deferred resignation offer by February 6, 2025. But Congress has not appropriated funds for the executive branch beyond March 14, 2025. *Id.* ¶ 82.

Plaintiffs, who are routinely called upon to advise their federal employee members, as well as affiliated unions who directly represent federal employees, are unable to render dependable advice because basic information is absent from the Directive. *Id.* ¶ 8. Plaintiffs are expending significant resources to counsel members and affiliated unions about the effects of the directive. *Id.* ¶ 11.

## LEGAL STANDARDS

The Federal Rules of Civil Procedure authorize this Court to enter a temporary restraining order enjoining implementation of an agency action for a limited duration. *See* Fed. R. Civ. P. 65(b). "In deciding whether to grant a temporary restraining order," the court must weigh four factors: "(1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant if relief is not granted; (3) a balancing of equities; and (4) whether granting such relief is in the public interest." *Ruggieri v. M.I.W. Corp.*, 826 F. Supp. 2d 334, 336 (D. Mass. 2011).[2] The analysis of the balance of the equities and the public interest "merge[s] when the

---

[2] While the court awaits full briefing and argument, it may issue a brief "administrative stay" under 5 U.S.C.§ 705. *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring). An administrative stay "buys the court time to deliberate" when issues are not "easy to evaluate in haste." *Id.* The factors considered in granting a 705 stay are substantially similar to those considered when deciding a motion for a temporary restraining order. *See Seafreeze Shoreside, Inc v. United States Dep't of Interior*, No. 1:22-CV-11091-IT, 2023 WL 3660689, at *3 (D. Mass. May 25, 2023). Indeed, the Court may enter both forms of relief. *Catholic Legal Immigr. Network, Inc. v. Exec. Office for Immigr. Rev. ("CLINIC")*, No. 20-cv-03812 (APM), 2021 WL 184359, at *16 (D.D.C. Jan. 18, 2021) (granting motion for stay under 5 U.S.C. § 705 or, in the alternative, preliminary injunction by staying the effective date of the challenged provisions and enjoining Defendants from enforcing those provisions pending final adjudication of the action).

government is the [defendant]." *Doe v. Mills,* 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Courts in this circuit "measure irreparable harm on 'a sliding scale, working in conjunction with a moving party's likelihood of success on the merits.'" *Orkin v. Albert*, 579 F. Supp. 3d 238, 245 (D. Mass. 2022) (quoting *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009)).

## ARGUMENT

Plaintiffs are entitled to a Temporary Restraining Order. *First*, Plaintiffs are highly likely to prevail on the merits given the myriad ways in which OPM's action is arbitrary and capricious and in clear violation of the Antideficiency Act. *Second*, Plaintiffs will be irreparably injured absent injunctive relief because they have had to, and continue to, divert substantial resources that cannot be recovered to counsel employees about the Directive, are hamstrung in their ability to deliver their core service of counseling their members who look to Plaintiffs for guidance about this ever-shifting directive, and risk losing members who resign. *Third*, the balance of equities and the public interest favor relief, as the public has no interest in an arbitrary and capricious program that obligates federal resources without appropriations, fails to take account of its impacts, and is irrational even judged by its own logic.

## I.    PLAINTIFFS WILL LIKELY SUCCEED ON THE MERITS.

Under the Administrative Procedure Act (APA), a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). Here, the Directive fails this standard in multiple respects, and Plaintiffs can more than satisfy the requirement of showing a likelihood of success on the merits.

A.      **The Fork Directive Is Arbitrary and Capricious.**

An agency action is "arbitrary and capricious if the agency lacks a rational basis," which includes instances where "the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997); *see also Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). "It is axiomatic that the APA requires an agency to explain its basis for a decision." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020). The agency's explanation must "include[e] a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). OPM's rash solicitation to nearly all federal workers across hundreds of federal agencies and components is arbitrary and capricious in numerous respects.

*First*, OPM has failed to consider obvious and vital considerations attendant to the Directive. Most notably, and perhaps not surprising for a "program" that was established mere days after the new administration took office, the Directive fails to address critical concerns of continuity and effective governmental operations that will predictably flow from the Directive. OPM appears to have conducted no analysis as the necessity of particular positions or expertise, the optimal number of resignations, which agencies were likely to experience high levels of resignations, or where staffing was already woefully insufficient such that resignations would be incontrovertibly harmful to government operations. Nor did OPM consider how hundreds of agencies and their components across the government would ensure continuity of expertise and

operations given the sudden administrative leave of some untold number of federal workers. The Directive creates no mechanism to ensure critical continuity of services or expertise—the offer largely blankets the entire federal workforce, regardless of job title and expertise.

OPM's own statements in the Directive acknowledge that there is not a "rational connection between the facts found and the choice made" to solicit resignations from nearly every federal employee. *State Farm Mut. Auto. Ins.* , 463 U.S. at 43 (quoting *Burlington Truck Lines,* 371 U.S. at 168)). OPM writes that some unidentified federal agencies require larger workforces to function, stating that "a few [unspecified] agencies . . . are likely to see increases in the size of their workforce." Compl. ¶ 41; *see also Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025). But the Directive is offered in blanket fashion to millions of employees without targeting or analysis. This glaring failure to consider federal agency needs for crucial operations, retention of expertise, and continuity of services cannot "be attributed to a difference of opinion," and instead reflects that OPM "failed to consider pertinent aspects" of the purported problem it sought to address with the Fork Directive. *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 21 (1st Cir. 2020) (quoting *Atieh v. Riordan*, 727 F.3d 73, 75-76 (1st Cir. 2013)).

*Second*, OPM has repeatedly offered conflicting and shifting information about the Directive and employees' rights and obligations if they accept the government's offer, in contravention of reasoned decision-making. In addition to sending the Directive to employees that the government ultimately deemed ineligible, OPM has repeatedly changed the contours of the Directive. As outlined above, over the course of less than a week, employees were given conflicting information as to whether they would be required to work if they accepted the Directive's offer. Likewise, information regarding whether employees would "really" receive full

pay continues to shift. Just two days before the deadline, OPM changed course again, claiming the Directive's promises of pay are binding, but that an employee could "request" rescission of their resignation "[w]ere the government to backtrack." Memorandum from Charles Ezell, Acting Dir., U.S. Office of Pers. Mgmt., Legality of Deferred Resignation Prog. at 2-3 (Feb. 4, 2025), https://tinyurl.com/4hv2p9ku. Particularly in light of the extremely compressed timeline to participate in the Directive, OPM's continual changing of the contours of that program—and the rights and obligations of employees under it—reflects the opposite of reasoned decisionmaking.

*Third*, OPM's Directive is inconsistent with other federal requirements. The Directive fails to adequately explain how it is consistent with longstanding ethics rules that place agency-specific restrictions on employees' ability to obtain outside employment. OPM has explained that employees may "[a]bsolutely!" obtain additional employment while on administrative leave. Compl. ¶ 15. But this bald assertion contradicts federal ethics regulations that provide that federal employees who seek outside employment must comply with numerous conditions, including "agency-specific" requirements. 5 C.F.R. § 2635.801(b)(2). Those regulations further provide that agencies may impose a prior-approval requirement before individuals employed at the agency can accept outside employment. *Id*. §2635.803. Some agencies have codified their requirement for prior approval by regulation and these policies could hardly be expected to change uniformly in the accelerated timeframe created by the Fork Directive. *See, e.g.*, 5 C.F.R. § 5701.101 (Federal Trade Commission). Nor does the Directive grapple with other restrictions for federal employees, including statutory restrictions on receiving dual pay from federal funds. *See* 5 U.S.C. § 5533.

*Fourth*, the Directive ignores prior models of reasoned and effective government downsizing to adopt wholesale a chaotic private sector model without considering its applicability to the federal sector. The federal government has effectively downsized in the past, but has done

so only following a careful gathering of information and targeted offers designed to ensure continuity and effective government operations, Congressional approval of funds, and reasonable timeline for workers and government alike. *See* U.S. Gen. Acct. Off., GGD-97-124, Fed. Downsizing Effective Buyout Practices and Their Use in FY 1997 (1997), https://tinyurl.com/bde7p7k9; William J. Clinton, Statement on the Buyout Program for Fed. Empls., The Am. Presidency Project https://tinyurl.com/25pzjp8w. In contrast, and without any indication that the Administration considered this history or evidence of effectiveness, OPM has appeared to have adopted wholesale, without testing or analysis, Elon Musk's chaotic approach from Twitter (now X). But that approach was widely regarded as seeding chaos, resulting in the company's value sharply declining, as it is now "worth 72 percent less than the $44 billion he paid for it." Kate Conger & Ryan Mac, *Déjà Vu: Elon Musk Takes His Twitter Takeover Tactics to Washington*, N.Y. Times (Jan. 30, 2025), https://tinyurl.com/3fecwpsr. OPM did not even attempt to "explain its result" in- diverging from a well-established, recent precedent for achieving its aims, much less provide "a reasoned explanation for its decision[]" to create a short-fuse, blanket resignation program without limits or targeting. *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (quoting *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)).

*Fifth*, the Fork Directive sets a deadline of just more than a week for employees to make critical decisions about their lives. This is an arbitrary date Defendants selected to put maximum pressure on the federal workforce.

*Finally*, the Directive appears to be pretext for the Administration's desire to rapidly remove career civil servants and replace them with individuals ideologically aligned with the Administration. The Directive concedes that some agencies require more—not less— staffing, and the Administration is simultaneously seeking to speed up and politicize the federal hiring process.

*See* Exec. Order (Jan. 20, 2025), https://tinyurl.com/yc7cup4x (directing agencies to make federal "recruitment and hiring processes more efficient" by, *inter alia*, involving political appointees "throughout the full hiring process" and prioritizing hiring of individuals "passionate about the ideals of our American republic"). As Vice President Vance has stated, President Trump should "[f]ire every single midlevel bureaucrat, every civil servant in the administrative state, replace them with our people." Andrew Prokop, *J.D. Vance's Radical Plan to Build a Government of Trump Loyalists*, Vox (July 18, 2024, 12:03 AM), https://tinyurl.com/4rsvn7xv. This—not efficient functioning of government—is the goal.

In sum, Congress requires that agency action "must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998). Programs like the Fork Directive must be the product of a process of "reasoned decisionmaking." *Id.* (quoting *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 52). But the Directive—an unprecedented adoption of a chaotic private-sector program to the near entirety of the federal workforce—is anything but that.

### B. The Fork Directive Violates the Antideficiency Act.

The Appropriations Clause of the Constitution commands that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., Art. I, §9, cl. 7. And in 1870, Congress enacted the Antideficiency Act (31 U.S.C. §§ 1341-42, 1349-51, 1511-19) to address the increasingly common problem of the executive branch obligating funds in advance of appropriations, which pressured Congress to then appropriate those funds so that creditors would be paid. *See Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1448-49 (Fed. Cir. 1997). The Antideficiency Act "bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation." *Hercules Inc. v. United States*, 516 U.S. 417, 427 (1996).

To induce resignations, OPM has not only promised that they will be paid through March 14, the time period in which the government has existing appropriations, but through September 30, 2025. Compl. ¶ 82. This is contrary to the Antideficiency Act, which prohibits government employees from obligating expenditures prior to an appropriation. *See* 31 U.S.C. § 1341.

And OPM's later effort to clean things up—stating that a lapse may occur, but that employees would receive back pay, Memorandum from Charles Ezell, Acting Dir., U.S. Office of Pers. Mgmt., Legality of Deferred Resignation Program (Feb. 4, 2025), https://tinyurl.com/4hv2p9ku, —cannot cure it's Antideficiency violation. *First*, the untimely addition of sentences does not change that OPM promises that pay and benefits will be honored past the March 14 appropriations deadline, which is contrary to the Antideficiency Act. Whether furloughed employees may receive back pay by statute *after* an appropriation does not change the bar on obligating expenditures *before* an appropriation.[3] And OPM's Directive and accompanying FAQs continue to commit the government *unequivocally* to pay employees who resign.

*Second*, there is no guarantee that Congress will fund, past March 14th, the salaries of those who accept the Fork Directive's offer. Indeed, the current administration and Congress are calling into serious doubt the continued near-term *existence* of some government agencies that employ the workers subject to the Fork Directive. *See* Jennifer Hansler, et al., *Rubio Says He's Acting Director of USAID as Humanitarian Agency Is Taken over by the State Department*, CNN (Feb. 4, 2025, 8:35 AM), https://tinyurl.com/mr2twthx; Alayna Treene & Katie Lobosco, *Trump Administration Drafting Executive Order to Initiate Department of Education's Elimination*, CNN (Feb. 4, 2025, 5:29 PM), https://tinyurl.com/4a9w4k5e. It is not at all certain that Congress will appropriate

---

[3] OPM's new FAQ briefly references the Government Employee Fair Treatment Act, but that law only directs that federal employees "furloughed" or who perform excepted work be compensated "*subject to the enactment of appropriations Acts* ending the lapse." 31 U.S.C. § 1341(c)(2) (emphasis added).

taxpayer funds to pay large numbers of employees for no services, or whether Congress would place restrictions on such funds.[4]

### C.    The Court Has Subject Matter Jurisdiction

To the extent that Defendants argue that the APA's broad grant of judicial review should be displaced in this case by the Civil Service Reform Act of 1978 (CSRA), they are wrong. The strong "presumption of judicial review 'may be overcome "only upon a showing of clear and convincing evidence of a contrary legislative intent."'" *Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 41-42 (1st Cir. 2002) (quoting *Traynor v. Turnage*, 485 U.S. 535, 542 (1988)). As a threshold matter, an administrative review scheme like the CSRA's does not restrict judicial review unless that scheme displays a "fairly discernible" intent to limit jurisdiction, and the claims at issue "are of the type Congress intended to be reviewed within th[e] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)). And, even where an administrative review scheme exists to review the claims at issue, courts must still consider (i) whether "a finding of preclusion could foreclose all meaningful judicial review"; (ii) if the suit is "'wholly collateral' to a statute's review provisions"; and (iii) if the claims are "outside the agency's expertise." *Id.* at 212–13 (quoting *Heckler v. Ringer*, 466 U.S. 602, 618 (1984)).

### i.    There is No Administrative Mechanism under the CSRA to Review Plaintiffs' Claims

"The ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Axon*

---

[4] Congress enacted a statute in 2016 intended to cabin the use of administrative leave, and OPM itself recently issued implementing regulations under that statute reinforcing that view with the position that "[a]dministrative leave is appropriately used for brief or short periods of time—usually for not more than 1 workday."  5 C.F.R. § 630.1403.

*Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023). Here, there is no administrative mechanism under the CSRA to review Plaintiffs' claims, and so the analysis ends there. *See Feds for Med. Freedom v. Biden*, 63 F.4th 366, 378-79 (5th Cir.), *judgment vacated as moot*, 144 S. Ct. 480 (2023). In fact, Plaintiff unions seek to prevent the harm that the Fork Directive has caused, and continues to cause, their organizations—and therefore the Complaint's claims do not concern personnel actions or labor-management relations covered by the CSRA at all. *Id.* at 383 ("Plaintiffs are challenging the President's vaccine mandate—not any personnel action that may or may not be taken in conjunction with that mandate. And the CSRA's implicit effects on jurisdiction depend on the claims plaintiffs choose to bring.").

*First*, review in the Merits Systems Protection Board (MSPB) is not available to Plaintiffs because the Complaint does not challenge a personnel action as defined by the CSRA. Under the CSRA, challenges to personnel actions are typically channeled to the MSPB. However, the Fork Directive is not an adverse or prohibited personnel action within the meaning of Sections 2302, 4303, or 7512, both because it (1) is not among the specifically reviewable adverse "actions" expressly listed in the statute, and (2) is not an adverse action at all, and instead purports to offer a *benefit* to employees, or an invitation to employees to make their own decision. *See also* 5 U.S.C. § 7512 (CSRA does not allow an employee to appeal a voluntary resignation); *Feds for Medical Freedom*, 63 F.4th at 375 ("government-wide mandates" are not personnel actions).

*Second*, Federal Labor Relations Authority (FLRA) review is not available to Plaintiffs to challenge the Fork Directive because the CSRA's channeling of labor-management relations disputes to the FLRA provides for remedies against individual employing agencies, *not against OPM.* Plaintiffs negotiate and sign collective bargaining agreements with each employing agency where the union represents employees. *See* 5 U.S.C. § 7114. Accordingly, Plaintiffs are not able

to file a contractual grievance against OPM under § 7121 and petition for review of an arbitration decision thereof under § 7123, or to appeal to the FLRA alleging a failure to negotiate by OPM under § 7117(c)(1).  Put otherwise, in issuing the Fork Directive to virtually all federal employees, OPM is acting in its capacity as the government's human resources manager, not as an employer of union members, and therefore there is no administrative review process available against OPM under the Federal Service Labor-Management Relations Statute (FSLMRS).[5]

     ii.     *Jurisdiction is needed for meaningful review, and Plaintiffs' claims are Collateral to any CSRA Proceeding and Outside Those Agencies' Expertise*

Furthermore, a finding that the case is not reviewable could foreclose all meaningful judicial review, the claims are "wholly collateral to [the] statute's review provisions," and the claims would fall "outside the agency's expertise." *Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212-13). *First*, "as a practical matter," plaintiffs would be unable to "obtain meaningful judicial review" if they are "not allowed to pursue their claims in the District Court." *Thunder Basin*, 510 U.S. at 213 (quoting *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991)). For one, plaintiffs would be irreparably harmed if denied immediate judicial process. *See Free Enterprise Fund*, 561 U.S. at 490-91 (no "meaningful" judicial review where plaintiffs would risk serious harm to go through administrative channels).

---

[5] Moreover, this case is not subject to the FLRA because Plaintiffs negotiate and sign collective bargaining agreements with each employing agency where the union represents employees—and *not with OPM.*  5 U.S.C. § 7114.  Accordingly, Plaintiffs are not able to file a contractual grievance against OPM under § 7121 and petition for review of an arbitration decision thereof under § 7123, or to appeal to the FLRA alleging a failure to negotiate by OPM under § 7117(c)(1).  In any case, there is no duty to bargain over "any Government-wide rule or regulation," § 7117(a)(1), such as OPM's Directive, and therefore Plaintiffs could not file an unfair labor practice complaint for refusal to negotiate under § 7116 even if OPM did have a duty to bargain with the union.  Put otherwise, in issuing the Fork Directive to virtually all federal employees, OPM is acting in its capacity as the government's human resources manager, not as an employer of union members, and therefore there is no administrative review process available under the Federal Service Labor-Management Relations Statute (FSLMRS).

*Second*, any resolution of Plaintiffs' claims through agency review would be "wholly collateral to [the] statute's review provisions and outside the agency's expertise." *Rhode Island Dep't of Env't Mgmt.*, 304 F.3d at 43 (quoting *Thunder Basin*, 510 U.S. at 212) (applying *Thunder Basin* collateralism doctrine to administrative whistleblower scheme and holding that complex sovereign immunity issues were "wholly collateral" to the scheme). Plaintiffs' claims—that the Directive violates tenets of reasoned agency decision-making and is contrary to the Antideficiency Act—are not of the kind that these agencies adjudicate. *Axon*, 598 U.S. at 194 ("The Commission knows a good deal about competition policy, but nothing special about separation of powers.").

## II.    ABSENT INJUNCTIVE RELIEF, PLAINTIFFS WILL SUFFER IMMEDIATE, IRREPARABLE HARM.

In evaluating the irreparable injury necessary to obtain the relief sought here, the Court must consider "whether and to what extent the movant will suffer irreparable harm in the absence of . . . injunctive relief." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). Showing irreparable harm requires "an actual, viable, presently existing threat of serious harm" that cannot be later remedied. *Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 242 (D. Mass.) (citations omitted), *aff'd*, 731 F.3d 6 (1st Cir. 2013).

Plaintiffs will suffer irreparable harm without a stay of OPM's February 6 deadline.[6] The Directive is impeding their ability to fulfill their missions, including through significant

---

[6] Plaintiffs can also establish standing to challenge the Directive. Indeed, where, as here, a defendant's action "directly affected and interfere[s] with" a plaintiff's core business activities, standing will lie. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("*AHM*"). As in *Havens*, cited approvingly in *AHM*, the Directive directly interferes with the Plaintiffs' ability to perform one of their core, pre-existing services: providing advice and counsel to their affiliates and members. In *Havens*, the defendants' actions undermined the plaintiffs' ability to "provide counseling" and other services for homebuyers. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Likewise, in this case, OPM's unreasoned guidance, proffered without explanation or authority, likewise impairs the Plaintiffs' ability to provide counseling and guidance for their constituents.

expenditures of resources that cannot be recovered, reputational harms that cannot be remedied, and imminent significant losses of members that cannot be regained, each of which constitutes irreparable injury sufficient for the requested relief.

i.    *Irreparable Diversion of Resources*

Since OPM's issuance of the Fork Directive last week, Plaintiffs have been inundated with varied inquiries from their members about the Directive's validity, legality, interaction with other federal requirements, changing nature, and the possible implications of responding to the directive's ultimatum. Compl. ¶¶ 100-23. This flood of inquiries has caused Plaintiffs to divert resources from their missions and core work of organizing and representing employees, negotiating with employers, preparing for arbitrations, handling grievances, and bargaining to respond to tremendous uncertainty created by OPM's action. *Id*. This irreparably harms Plaintiffs in at least two ways.

*First*, it imposes direct economic costs on Plaintiffs that will not be recoverable. When expenditures of resources "cannot be recouped, the resulting loss may be irreparable." *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010). Here, because Plaintiffs are proceeding against an agency protected by sovereign immunity, they have no mechanism to recover monetary damages in the future. *See Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, No. 23 Civ. 486, 2024 WL 3650089, at *24 (D.N.H. Aug. 5, 2024) (finding irreparable injury where "sovereign immunity would bar plaintiff from obtaining a damages award").

*Second*, the diversion of resources required by Defendants' unlawful action materially burdens Plaintiffs' existing work and interferes with Plaintiffs' ability to carry out their core institutional missions. Compl. ¶¶ 124-39. Courts have long recognized that organizational plaintiffs may suffer injury where a challenged action "directly affect[s] and interfere[s] with

[their] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see also, e.g.*, *Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9, 49, 49-50 (D. Mass. 2024) (finding standing where challenged action impaired plaintiff's "ability to provide its regular programming and resources to immigrant communities" and forced it to divert staff and resources from other core functions, in part by providing false and misleading information to immigrant communities).

Where those "new obstacles unquestionably make it more difficult for [organizational plaintiffs] to accomplish their primary mission … , they provide injury for purposes both of standing *and* irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (emphasis added). In particular, labor unions suffer irreparable harm where the challenged action would leave them "unable to protect the rights of [their] members in their relationship with their employer." *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO by Negron v. Union De Carpinteros De Puerto Rico*, 615 F. Supp. 3d 87, 95 (D.P.R. 2022) (quoting *Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Loc. Lodge No. 1244*, No. 87 Civ. 442, 1988 WL 114590, at *5 (N.D. Ind. 1988)).

### ii.    *Irreparable Loss of Members and Resulting Revenue*

An organization's prospective "significant loss of members" can also constitute irreparable harm. *NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1, 6 (1st Cir. 2019). The Directive threatens to induce Plaintiffs' membership to resign in large numbers as a result of the arbitrarily short timeline and completely untargeted design. Compl ¶¶ 123, 138. It is likely that members will make this choice who would otherwise choose to stay in federal employment—and thus remain active members of Plaintiffs' organizations—under a reasoned and lawful process. Once members have resigned, Plaintiffs will have no available remedy to repair that harm because those members presumably will no longer be employed in government.

iii.    *Irreparable Reputational Harm*

This circuit has affirmed that temporary restraining orders are appropriate where a party "would lose incalculable revenues *and sustain harm to its goodwill*." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009) (emphasis added; quoting *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir.1996). Indeed, "[b]y its very nature[,] injury to goodwill and reputation is not easily measured or fully compensable in damages," and is often held to be irreparable. *Ross-Simons*, 102 F.3d at 20. Plaintiffs stand to suffer irreparable reputational harm and the resulting loss of members and revenues without preliminary relief. As members look to the Plaintiff Unions to provide answers about the Fork Directive and its related unclear and ever-changing guidance, Plaintiffs risk reputational harm among their membership as they are hamstrung in their ability to provide authoritative guidance about this rash and arbitrary agency action that is of enormous consequence to their members' interests. Compl ¶ 139.

## III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF A STAY.

The analysis of the balance of the equities and the public interest merges when the government is the defendant. *Mills*, 16 F.4th at 37 (citing *Nken*, 556 U.S. at 435). The Court must balance the public's interest in maintaining the status quo—staying the short-fuse deadline—against the government's interest in obtaining, potentially, mass resignations of federal employees in an untargeted fashion in days' time. Here, the balance tips decidedly in favor of issuing the requested relief.

*First*, when the movant, as here, has "a likelihood of success on the merits," preliminary relief "will be found to be beneficial to the public interest." *Boustany v. Boston Dental Group,* 42 F. Supp. 2d 100, 104 (D. Mass. 1999) (quoting *Stop & Shop Supermarket Co. v. Big Y Foods, Inc.*, 943 F. Supp. 120, 122 (D. Mass. 1996)). *Second*, the public has a strong interest in the effective

operation of the federal government and the functioning of its critical agencies. OPM's ultimatum threatens untargeted and irrational disruption. *Third*, the harm on the other side of the ledger is, if it exists at all, slight. OPM issued a rash, quickly drafted directive to millions of federal employees within days of the administration's assumption of office and planned for it to be fully executed hardly more than a week later. OPM's interests will not be significantly harmed by being required to issue a rational and legally authorized alternative or version of its directive, or by a short stay of this incredibly rapid timeframe while the merits are considered. *Fourth*, any administrative burdens to OPM implicated by a stay or preliminary injunctive relief are minimal. The agency has already changed its representations to federal employees multiple times and is capable of communicating further adjustments with mass direct email messages.

All told, the balance of equities thus tips strongly in favor of granting Plaintiffs' requested preliminary injunctive relief or administrative stay.[7]

## CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that the Court enter a Temporary Restraining Order directing Defendants to pause the February 6th deadline for acceptance of the Directive while Plaintiffs seek further relief ensuring that OPM completes the required consideration of the Directive's legal basis, justification, and funding before further proceeding.

---

[7] Plaintiffs have also requested that a bond not be required as the First Circuit has recognized an exception to the security bond requirement in Fed.R.Civ.P. 65(c) in "suits to enforce important federal rights or 'public interests.'" *Crowley v. Local No. 82, Furniture & Piano Moving*, 679 F.2d 978, 1000 (1st Cir.1982), rev'd on other grounds, 467 U.S. 526 (1984) (citation omitted); *Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F.Supp.2d 98, 129 (D. Mass. 2003).

DATED this 5th day of February, 2025.

By:  /s/ Michael T. Anderson
    Michael T. Anderson (BBO #645533)
    Nicolas Mendoza (BBO #703711)
    MURPHY ANDERSON PLLC
    1401 K Street N.W., Suite 300
    Washington, DC 20005
    Telephone: (202) 223-2620
    manderson@murphypllc.com
    nmendoza@murphypllc.com
    *Counsel for Plaintiffs*

    Elena Goldstein* (NY Bar No. 4210456)
    Michael C. Martinez* (D.C. Bar No. 1686872)
    Daniel McGrath* (D.C. Bar No. 1531723)
    Skye Perryman* (D.C. Bar No. 984573)
    DEMOCRACY FORWARD FOUNDATION
    P.O. Box 34553
    Washington, D.C. 20043
    Telephone: (202) 448-9090
    Facsimile: 202-796-4426
    egoldstein@democracyforward.org
    mmartinez@democracyforward.org
    dmcgrath@democracyforward.org
    sperryman@democracyforward.org
    *Counsel for Plaintiffs*

    Teague P. Paterson* (D.C. Bar No. 144528)
    Matthew S. Blumin* (D.C. Bar No. 144528)
    AMERICAN FEDERATION OF STATE,
    COUNTY, AND MUNICIPAL
    EMPLOYEES, AFL-CIO
    1625 L Street N.W.
    Washington, DC 20036
    Telephone: (202) 775-5900
    Facsimile: (202) 452-0556
    tpaterson@afscme.org
    mblumin@afscme.org
    *Counsel for American Federation of State,*
    *County, and Municipal Employees, AFL-CIO*
    *(AFSCME)*

    Rushab B. Sanghvi* (D.C. Bar No. 1012814)

Andres M. Grajales* (D.C. Bar No. 476894)
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, DC 20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928
SanghR@afge.org
Grajaa@afge.org
*Counsel for Plaintiff American Federation
of Government Employees, AFL-CIO (AFGE)
and Local 3707*

Sarah Suszczyk* (M.D. Bar No. 0512150240)
NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, SEIU
LOCAL 5000
NAGE/IBPO/IAEP/IBCO
159 Burgin Parkway
Quincy, MA 01269
Telephone: (202) 639-6426
Facsimile: (617) 376-0285
Ssuszczyk@nage.org
*Counsel for Plaintiff National Association of
Government Employees, SEIU Local 5000*

*pro hac vice pending*

**CERTIFICATE OF SERVICE**

Counsel for Plaintiffs certify that they have sent—through Defendants' counsel Christopher Hall at the U.S. Department of Justice Federal Programs Branch —notice of this motion after conferred in good faith with Defendants' counsel concerning this motion before filing. Plaintiffs' counsel will immediately send electronically copies of the filing to Defendants' counsel and will serve subsequent registered participants electronically and paper copies will be sent to any non-registered participants.


Dated: February 5, 2025                    /s/ Michael T. Anderson

                                           Michael T. Anderson