**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| AMERICAN FEDERATION OF | ) | |
| GOVERNMENT EMPLOYEES, AFL-CIO, | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-10276 |
| | ) | |
| CHARLES EZELL, ACTING DIRECTOR, | ) | |
| OFFICE OF PERSONNEL | ) | |
| MANAGEMENT, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER
### Leave to File Granted on February 6, 2025

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

I.    FACTUAL AND LEGAL BACKGROUND ................................................................ 3

    A.    OPM's Voluntary Resignation Program ......................................................... 3

    B.    Standards for Emergency Relief ..................................................................... 5

II.   PROCEDURAL HISTORY ......................................................................................... 6

ARGUMENT ........................................................................................................................ 6

I.    PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM OR ARTICLE III
    STANDING ................................................................................................................. 6

    A.    Plaintiffs' Requested TRO Would Not Address, and Indeed Would
        Exacerbate, Their Claimed Harms ................................................................. 6

    B.    Plaintiffs' Alleged Loss of Members and Accompanying Revenue is Highly
        Speculative, and Might Increase from a TRO ................................................. 8

    C.    Plaintiffs' Vague Assertions of Reputational Injury Are Too Tenuous to
        Support Irreparable Harm ................................................................................ 9

    D.    Plaintiffs Cannot Establish Article III Standing ........................................... 11

II.   PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE
    MERITS .................................................................................................................... 12

    A.    Plaintiffs' Claims Are Precluded By the CSRA and the FSL-MRS. ............. 12

        1.    Congress Intended to Preclude District Court Jurisdiction ............... 13

        2.    These Claims Are of the Type Congress Intended to be Reviewed
            Within the Scheme ........................................................................... 15

    B.    Plaintiffs' Have Failed To Challenge Final Agency Action Reviewable Under
        the APA ......................................................................................................... 20

    C.    Plaintiffs' APA Challenge Concerning the Anti-Deficiency Act Lacks Merit ............ 21

III.  THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGHS
    HEAVILY AGAINST THE IMPOSITION OF A TEMPORARY
    RESTRAINING ORDER ........................................................................................... 22

IV.   ANY INJUNCTIVE RELIEF IN THIS CASE SHOULD BE LIMITED TO THE
    PLAINTIFFS ............................................................................................................. 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*AFGE v. Sec'y of the Air Force,*
    716 F.3d 633 (D.C. Cir. 2013)............................................................................13

*Allscripts Healthcare, LLC v. DR/Decision Resources, LLC,*
    592 F. Supp. 3d 1 (D. Mass. 2022) ....................................................................5

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
    929 F.3d 748 (D.C. Cir. 2019)....................................................................*passim*

*Amoco Prod. Co. v. Vill. of Gambell,*
    480 U.S. 531 (1987) ..........................................................................................23

*Axon Enter. v. FTC,*
    598 U.S. 175 (2023) ...............................................................................*passim*

*Bennett v. Spears,*
    520 U.S. 154 (1997) ..........................................................................................21

*Ca. Communities Against Toxics v. EPA,*
    934 F.3d 627, 640 (D.C. Cir. 2019) ................................................................21

*Cherokee Nation of Oklahoma v. Leavitt,*
    543 U.S. 631 (2005) ..........................................................................................22

*Elevate Group, LLC v. DataScience.codes, LLC,*
    Civ. A. No. 1:20-12084-PBS, 2021 WL 6108288 (D. Mass. Nov. 23, 2021) ........................9

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012)................................................................... 13, 14, 16, 18

*Evans v. Thompson,*
    518 F.3d 1 (1st Cir. 2008) ..............................................................................11

*Fed. L. Enf't Officers Ass'n v. Ahuja,*
    62 F.4th 551 (D.C. Cir. 2023) ................................................................ 16, 17

*Filebark v. DOT,*
    555 F.3d 1009 (D.C. Cir. 2009)........................................................... 14, 19

*Food & Drug Administration v. Alliance for Hippocratic Medicine,*
    602 U.S. 367 (2024) ..........................................................................................10

*Fornaro v. James,*
    416 F.3d 63 (D.C. Cir. 2005)...........................................................................17

*Friends of Merrymeeting Bay v. U.S. Dep't of Commerce,*
   810 F. Supp. 2d 320 (D. Me. 2011) ........................................................................21

*FTC v. Standard Oil Co.,*
   449 U.S. 232 (1980) ..............................................................................................21

*Gonzalez-Droz v. Gonzalez-Colon,*
   573 F.3d 75 (1st Cir. 2009) .....................................................................................5

*Graham v. Ashcroft,*
   358 F.3d 931 (D.C. Cir. 2004) ......................................................................... 12, 19

*Heckler v. Ringer,*
   466 U.S. 602 (1984) ..............................................................................................17

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO by Negron v. Union De Carpinteros De*
   *Puerto Rico,*
   615 F. Supp. 3d 87 (D.P.R. 2022) ...........................................................................7

*Jalbert v. SEC,*
   327 F. Supp. 3d 287 (D. Mass. 2018) .....................................................................15

*Jarkesy v. SEC,*
   803 F.3d 9 (D.C. Cir. 2015) ............................................................................. 11, 12

*La Simple Co., Ltd. v. SLP Enters, LLC,*
   Civ. A. No. 21-10058, 2021 WL 1648762 (D. Mass. Apr. 27, 2021) ........................5

*Lasure v. MSPB,*
   657 F. App'x 994 (Fed. Cir. 2016) .........................................................................16

*Lewis v. Casey,*
   518 U.S. 343 .........................................................................................................24

*Lyons v. VA,*
   273 F. App'x 929 (Fed. Cir. 2008) .........................................................................16

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ..............................................................................................24

*Marshall v. HHS,*
   587 F.3d 1310 (Fed. Cir. 2009) ..............................................................................16

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012) ..............................................................................................21

*Monsanto Co. v. Gerston Seed Farms,*
   561 U.S. 139 (2010) ..............................................................................................24

*N.Y. Republican State Comm. v. SEC,*
  799 F.3d 1126 (D.C. Cir. 2015) ............................................................................ 11

*NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.,*
  927 F.3d 1 (1st Cir. 2019) ...................................................................................... 7

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................................................ 5, 23

*Parrott v. MSPB,*
  519 F.3d 1328 (Fed. Cir. 2008) ...................................................................... 15, 16

*Peoples Fed. Sav. Bank v. People's United Bank,*
  672 F.3d 1 (1st Cir. 2021) ...................................................................................... 5

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
  102 F.3d 12 (1st Cir. 1996) ................................................................................. 8, 9

*Sackett v. EPA,*
  566 U.S. 120 (2012) .............................................................................................. 17

*Safari Club Int'l v. Jewell,*
  47 F. Supp. 3d 29 (D.D.C. 2014) ......................................................................... 7, 8

*Salazar v. Ramah Navajo Chapter,*
  567 U.S. 182 (2012) .............................................................................................. 22

*Terban v. DOE,*
  216 F.3d 1021 (Fed. Cir. 2000) ............................................................................ 15

*Thomas v. Warden, Fed. Corrections Inst., Berlin,*
  596 F. Supp. 3d 331 (D.N.H. 2022) ....................................................................... 5

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) .............................................................................................. 12

*Town of Chester v. Laroe Estates, Inc.,*
  137 S. Ct. 1645 (2017) .......................................................................................... 24

*United States v. Fausto,*
  484 U.S. 439 (1988) .................................................................................. 12, 13, 14

*Vaqueria Tres Monjitas, Inc. v. Irizarry,*
  587 F.3d 464 (1st Cir. 2009) .................................................................................. 9

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.,*
  645 F.3d 26 (1st Cir. 2011) .................................................................................... 5

*Winter v. Nat. Res. Def. Counsel, Inc.,*
  555 U.S. 7 (2008)..................................................................................................5, 8, 9, 23

**STATUTES**

5 U.S.C. § 704...........................................................................................................................21

5 U.S.C. § 2302.........................................................................................................................16

5 U.S.C. § 7103.........................................................................................................................19

5 U.S.C. § 7105.........................................................................................................................12

5 U.S.C. § 7117.........................................................................................................................19

5 U.S.C. § 7121.........................................................................................................................18

5 U.S.C. § 7123.........................................................................................................................12

5 U.S.C. § 7703...................................................................................................................12, 17

31 U.S.C. §§ 1341 *et seq.*.......................................................................................................2, 3

31 U.S.C. § 1341....................................................................................................................4, 22

**REGULATIONS**

5 C.F.R. Part 2635......................................................................................................................4

Privacy Act of 1974, as amended: New System of Records,
  80 Fed. Reg. 72,455 (Nov. 19, 2015) ....................................................................................3

Privacy Act of 1974; System of Records,
  88 Fed. Reg. 56,058 (Aug. 17, 2023) ....................................................................................3

**OTHER AUTHORITIES**

Chief Human Capital Officers Council, Legality of Deferred Resignation Program,
  https://www.chcoc.gov/content/legality-deferred-resignation-program .....................................4, 5

OPM, *Fork in the Road* (Jan. 28, 2025),
  *www.opm.gov/fork* ...............................................................................................................2, 3, 23

OPM, *Frequently Asked Questions,*
  *www.opm.gov/fork/faq* ..............................................................................................................4

## INTRODUCTION

Upon his reelection to office, President Trump immediately set to work to transform the federal work force. Among other things, he issued directives to require a return to in-person work, to restore accountability for federal workers who have policy-making authority and to senior career executives, and to reform the federal hiring process to focus on merit. Animating these and other critical reforms is the recognition that the federal workforce must be streamlined to be more efficient and to better serve the American people.

In that vein, on January 28, 2025, the Office of Personnel Management ("OPM"), sent an email to the federal workforce announcing a deferred resignation program whereby eligible federal employees could voluntarily choose to resign their positions by February 6, 2025, and would, consistent with federal law, retain all pay and benefits through September 30, 2025 and be exempt from in-person work requirements.

Plaintiffs, four national and local labor unions, disagree with the Administration's policy choice to reduce the size of the federal workforce by offering inducements to voluntary resignation and seek the extraordinary remedy of a temporary restraining order to extend the deadline for federal employees to accept the government's deferred resignation program offer—an offer which expires today. That last-minute maneuver would have remarkably disruptive and inequitable repercussions. And Plaintiffs' motion falls far short of establishing an entitlement to a temporary restraining order bringing about those results. Their motion should be denied.

For starters, Plaintiffs fail to establish any harm—irreparable or otherwise—from allowing the acceptance deadline for the election of deferred resignation to expire today. None of the harms raised by Plaintiffs are legally cognizable. But more fundamental, all of the key harms Plaintiffs allege from the deadline—the expenditure of resources to counsel union members as to whether to accept the offer and the loss of dues from paying members who do accept—would presumably only be *exacerbated*

1

if that deadline were extended and the Plaintiffs' members had even more time to accept the offer. Simply put, on their *own account*, Plaintiffs' requested temporary restraining order would make matters worse; it would not offer any remedy to the injuries Plaintiffs assert.

Moreover, Plaintiffs fail to establish a likelihood of success for numerous reasons. First, Plaintiffs' alleged diversion of resources from the announced deferred resignation program fails to establish Article III standing as a matter of law—as the Supreme Court expressly held, rejecting an identical theory of harm pressed just last Term. Second, Plaintiffs' claims are foreclosed by the comprehensive remedial scheme enacted by Congress in the Civil Service Reform Act of 1978 ("CSRA"), including the portions of the CSRA that specifically govern federal labor relations, the Federal Service Labor-Management Relations Statute ("FSL-MRS"). Third, Plaintiffs' Administrative Procedure Act ("APA") claim fails at the outset because the deferred resignation program does not constitute final agency action—it is a matter of pure internal governmental administration and, in all events, imposes no legal right or obligation on anyone, let alone Plaintiffs. Fourth, Plaintiffs' APA claim that the deferred resignation program violates the Anti-Deficiency Act, 31 U.S.C. 1341, *et seq.*, is misplaced, as the offers were made in accordance with applicable law, including the availability of funds appropriated by Congress.

In addition, Plaintiffs seek a disfavored mandatory injunction that would disrupt—rather than preserve—the status quo. And the balance of the equities tips sharply in OPM's favor. Extending the deadline for the acceptance of deferred resignation on its very last day will markedly disrupt the expectations of the federal workforce, inject tremendous uncertainty into a program that scores of federal employees have already availed themselves of, and hinder the Administration's efforts to reform the federal workforce. Those serious repercussions only underscore the import of holding Plaintiffs to their high burdens on the other prongs at issue; and confirm that their last-minute request for extraordinary relief cannot succeed.

At bottom, Plaintiffs fail to establish any of the requirements entitling them to a temporary restraining order, and Plaintiffs' motion should be denied.

## I.    FACTUAL AND LEGAL BACKGROUND

### A.    OPM's Voluntary Resignation Program

On January 28, 2025, OPM sent an email to federal employees informing them of a "deferred resignation program." *www.opm.gov/fork*. The email explained that President Trump issued several directives during the first week of his administration, including requiring that federal employees return to in-person work, restoring accountability for employees who have policy-making authority, restoring accountability for senior career executives, and reforming the federal hiring process to focus on merit. *Id.* The email explained that if federal employees choose to remain in their current positions, their service was appreciated but that "we cannot give you full assurance regarding the certainty of your position or agency but should your position be eliminated you will be treated with dignity and will be afforded the protections in place for such positions." *Id.* The email further announced a deferred resignation program, effective January 28, that would be available to most federal employees[1] until February 6, 2025. *Id.* Under this program, employees who resign "will retain all pay and benefits regardless of your daily workload and will be exempted from all applicable in-person work requirements until September 30, 2025 (or earlier if you choose to accelerate your resignation for any reason." *Id.* The email explained that to take advantage of the program, an employee needed to respond to the email from their work computer with the word "Resign" in the body of the reply email. *Id.* The email included a deferred resignation letter, which, among other things, explained that OPM was authorized to send the email under "Executive Order 9830 and 5 U.S.C. §§ 301, 1103, 1104, 2951,

---

[1] The email explained that the voluntary resignation program was not available for military personnel, employees of the Postal Service, and those in positions related to immigration enforcement and national security, and those in any other positions specifically excluded by the employee's employing agency.

3301, 6504, 8347, and 8461," and further explained that OPM intended to use the responses to the email "to assist in workforce reorganization efforts in conjunction with employing agencies." *Id.* (citing 88 Fed. Reg. 56058; 80 Fed. Reg. 72455). Finally, the email noted that a response to the email was voluntary. *Id.*

In the days following OPM's January 28, 2025 email to the federal workforce, OPM provided a list of Frequently Asked Questions ("FAQs") concerning the deferred resignation program. *www.opm.gov/fork/faq*. Among other things, the FAQs explained that for those who are eligible for the deferred resignation program and accept, the employing agency could execute paperwork reflecting all the terms of the agreement. *Id.* The FAQs further explained that any government shutdown could potentially affect an employee's pay regardless of whether the employee accepted the deferred resignation letter, but that employees who accepted the deferred resignation offer would still be entitled to the backpay available under the Government Employee Fair Treatment Act of 2019. *Id.* (citing 31 U.S.C. 1341(c)(2)).

On February 4, 2025, OPM provided a memorandum to all heads and acting heads of Departments and agencies regarding the legality of the deferred resignation program. Legality of Deferred Resignation Program, https://www.chcoc.gov/content/legality-deferred-resignation-program. The February 4 memorandum explained "why concerns regarding the program's legality are misplaced and offers clarifying guidance on certain aspects of the plan." *Id.*

Among other things, the February 4 memorandum explained that Congressional approval of the deferred resignation program was unnecessary because employees would remain in duty status and entitled to their regular pay and benefits. *Id.* The memorandum further explained that the program does not promise employees any additional compensation that might require special congressional appropriations. *Id.*

The February 4 memorandum also clarified that although employees who take advantage of

4

the deferred resignation program may pursue a second job outside the federal government, employees had to comply with the Standards of Ethical Conduct for Employees of the Executive Branch at 5 C.F.R. Part 2635 and other applicable federal laws, as well as any agency-specific regulations. *Id.* Finally, the February 4 memorandum included as an appendix a template deferred resignation agreement that could be used by agencies. *Id.*

### B.    Standards for Emergency Relief

A temporary restraining order, like a preliminary injunction, "is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2021). A movant may be awarded such an extraordinary remedy only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 22 (2008). To establish entitlement, Plaintiffs bear the burden of establishing (1) a likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) the balance of the equities favor the movant, and (4) an injunction is in the public interest. *Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*, 592 F. Supp. 3d 1 (D. Mass. 2022). The last two factors "merge when the Government is the party opposing the preliminary injunction." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Irreparable harm "constitutes a necessary threshold showing for an award of preliminary injunctive relief," *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009), and is "the basis for injunctive relief." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc,* 645 F.3d 26, 32 (1st Cir. 2011)). In addition, where, as here, Plaintiffs seek to alter the status quo through a disfavored mandatory injunction, the "moving party must make an even stronger showing of entitlement to relief than is typically required." *Thomas v. Warden, Fed. Corrections Inst., Berlin*, 596 F. Supp. 3d 331, 336-37 (D.N.H. 2022) (quoting *La Simple Co., Ltd. v. SLP Enters, LLC*, 2021 U.S. Dist. LEXIS 81209 at *10-*11, 2021 WL 1648762, at *4 (D. Mass. Apr. 27, 2021) (quotation omitted)).

## II.    Procedural History

Plaintiffs filed this suit on February 4, 2025, raising two claims under the Administrative Procedure Act ("APA"). ECF No. 1. Plaintiffs moved for a temporary restraining order on February 5, 2025. ECF No. 12. That same day, the Court scheduled a hearing on Plaintiffs' motion for a temporary restraining order for February 6, 2025. ECF No. 28.

## ARGUMENT

### I.    Plaintiffs Cannot Establish Irreparable Harm or Article III Standing

Plaintiffs claim they will be irreparably harmed absent a stay of OPM's February 6 deadline for three reasons: first, they will suffer a diversion of resources; second, they will lose members and resulting revenue; and third, they will suffer reputational harm. Mot. at 16–19. None of those reasons establishes irreparable harm sufficient to entitle them to the extraordinary remedy of a temporary restraining order. Indeed, for similar reasons, Plaintiffs even cannot establish Article III standing.

### A.    Plaintiffs' Requested TRO Would Not Address, and Indeed Would Exacerbate, Their Claimed Harms

Plaintiffs first assert that due to OPM's January 28 email offering the voluntary resignation program, they have been "inundated with varied inquiries from their members about the Directive's validity, legality, interaction with other federal requirements, changing nature, and the possible implications of responding to the directive's ultimatums." Mot. at 17. These inquires, they contend, impose some unidentified economic costs on Plaintiffs that will not be recoverable, and impose a burden on their existing work and the ability to carry out their core institutional missions. *Id.*

As an initial matter, it is unclear why Plaintiffs are requesting a TRO *extending* a deferred resignation program they claim is unlawful. As explained below, Plaintiffs' claims are baseless, but even if otherwise, the appropriate remedy would be a cessation of the program, not its forced continuance. But even Plaintiffs do not claim that this Court can or should halt the program entirely— they seek its extension, a form of redress that is entirely inconsistent with their fundamental complaint.

Plaintiffs' arguments are at war with themselves. On the one hand, Plaintiffs' temporary restraining order seeks only a stay of the February 6 deadline for accepting voluntary resignations, rather than the voluntary resignation offers themselves. *Id.* at 20 ("Plaintiffs respectfully request that the Court enter a Temporary Restraining Order directing Defendants to pause the February 6th deadline for acceptance of the Directive[.]"). But a stay of that deadline would not address Plaintiffs' alleged harm, as presumably they will continue to receive inquiries from their members about the voluntary resignation program, and presumably they will continue to respond. Indeed, if anything, staying the acceptance date for the voluntary resignation program would exacerbate Plaintiffs' claimed harm, as, under their theory, their expenditure of resources in response to inquiries will only increase. But such self-inflicted injuries cannot constitute irreparable harm. *See San Francisco Real Est. Invs. v. Real Est. Inv. Tr. of Am.*, 692 F.2d 814, 818 (1st Cir. 1982) (Breyer, J.) ("Under these circumstances, any 'harm' caused . . . would seem largely self-inflicted; it was not only not irreparable in the absence of [a temporary restraining] order."); *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 35–36 (D.D.C. 2014).[2] For this reason alone, Plaintiffs' claimed irreparable harm should be rejected.[3]

## B. Plaintiffs' Alleged Loss of Members and Accompanying Revenue is Highly Speculative, and Might Increase from a TRO

Next, Plaintiffs assert that they face irreparable harm from an anticipated "significant loss of members," *see NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1, 6 (1st Cir. 2019),

---

[2] Because Plaintiffs' entire theory of injury is the resources expended to respond to inquiries from union members regarding the deferred resignation program, even a viable claim would be moot after the February 6 deadline to accept the deferred resignation offer. But Plaintiffs cannot seek injunctive relief to extend the deadline to accept the deferred resignation offer in an attempt to maintain an otherwise moot claim.

[3] Plaintiffs' contention that "labor unions suffer irreparable harm where the challenged action would leave them 'unable to protect the rights of [their] members in their relationship with their employer," is beside the point. Mot. at 18 (quoting *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO by Negron v. Union De Carpinteros De Puerto Rico*, 615 F. Supp. 87, 95 (D.P.R. 2022)). Plaintiffs fail to establish that the February 6 deadline to accept a voluntary resignation prevents them from protecting the rights of their members.

who may "resign in large numbers as a result of the" deferred resignation program, Mot. at 18. Moreover, Plaintiffs allege that they will "likely lose revenue" because some dues-paying members may leave federal service early under the program. Compl. ¶ 138.

But this does not work. To start, a loss of membership from the free choices of individual members is not a cognizable harm. "It is not enough for plaintiffs to simply identify a governmental action that ultimately affected them through the independent responses and choices of third parties." *City of New York v. DOD*, 913 F.3d 423, 431 (4th Cir. 2019) (Wilkinson, J.). Unions have no preexisting legal entitlement to members choosing to stay in their ranks; and when they choose to leave, that is not a redressable legal harm.

Anyway, this theory is entirely speculative, and amounts to little more than an allegation that "[i]t is likely," Mot. at 18, that some members will leave federal service who might otherwise stay, potentially reducing Plaintiffs' revenue. That falls far short of the "significant loss of members" at issue in *NACM-New England*, where there was evidence that the plaintiff might go out of business due to the loss of members to a competitor. 927 F.3d at 6 (affirming district court finding of irreparable harm where "significant loss of members, . . . about 20%, could cause [plaintiff] to become insolvent" (citation omitted)). And there the loss of membership was not the product of voluntary, independent action, but instead a plant closure—not even one removed. Here, by contrast, the program turns entirely on the speculative free choices of individual employees asserting their own interests.

Moreover, as with Plaintiffs' burden argument, Mot. at 17, there is every reason to think that Plaintiffs' requested relief may increase the number of members who ultimately seek to pursue the deferred resignation program—although we ultimately do not know. *See* Mot. at 20 (requesting the February 6, 2025 deadline be paused). Pausing the February 6 deadline would not stop Plaintiffs' members from accepting the deferred resignation program offer. It would simply provide additional time for more individuals, including Plaintiffs' members, to consider and accept the deferred

resignation program offer than would have under the original February 6 deadline. This falls far short of the required "clear" showing of irreparable harm, *Winter*, 555 U.S. at 22, and again appears to ask the Court for a self-inflicted injury. *See Safari Club*, 47 F. Supp. 3d at 35–36.

Finally, if Plaintiffs are concerned about members departing their rolls and taking their fees with them after September 30, 2025, there is more than enough time to shed light on those concerns through ordinary litigation prior to that date without the need for the kind of extraordinary injunctive relief Plaintiffs seek in their Motion.

## C. Plaintiffs' Vague Assertions of Reputational Injury Are Too Tenuous to Support Irreparable Harm

Finally, Plaintiffs assert that they "are at risk of reputational harm among their membership, and more broadly among other federal employees, due to the difficulty of providing satisfactory answers to members concerning an agency policy with enormous potential consequences for members' interests." Compl. ¶ 139. As above, extending the deadline would exacerbate this harm, not address it. This allegation plainly does not suffice for at least three additional reasons. First, this alleged reputational injury is both speculative and vague, and thus cannot meet the "clear" showing required to carry Plaintiffs' burden for irreparable harm. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). Reputational harm can be difficult to measure, *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996), but Plaintiffs do not even attempt to connect the dots between their demanded injunctive relief and any alleged injury to their reputations, and this Court should decline to fill in the gaps for them. *See Winter*, 555 U.S. at 22; *cf. Elevate Group, LLC v. DataScience.codes, LLC*, Civil Action No. 1:20-12084-PBS, 2021 WL 6108288, at *5 (D. Mass. November 23, 2021) ("[i]t does not follow . . . that a party is exempted from providing evidence of harm to goodwill simply because it 'has not put a specific number on the loss of goodwill'" (citation

omitted)).

Further, Plaintiffs' allegations of reputational harm fall far short of the standard established in relevant caselaw. In *Vaqueria Tres Monjitas, Inc. v. Irizarry*, the reputational injury at issue was the goodwill lost by Puerto Rican milk producers forced to prop up a competitor while losing market share due to an anticompetitive subsidy. *See* 587 F.3d 464, 485 (1st Cir. 2009). That grave reputational harm is a far cry from Plaintiffs' vague assertion that their members and other federal employees will think less of them for not having all the answers about the deferred resignation program. *See* Compl. ¶ 139; Mot. at 19. To show irreparable harm from reputational injury, a plaintiff must make a more specific showing of injury than anything found in these allegations. *See, e.g., Ross-Simons of Warwick.*, 102 F.3d at 19–20 (holding reputational harm to bridal registry company irreparable when barred from selling luxury crystal brand that was already depicted for sale in catalogues in circulation among potential customers and "it could never be shown" later what the loss in goodwill and sales would amount to) (collecting cases). Meanwhile, Plaintiffs offer "a tenuous or overly speculative forecast of anticipated harm," *id.* at 19, which could ultimately be ascertained at a later date if any such loss exists.

Finally, if courts were to recognize as irreparable harm a reputational injury based on an entity's inability to "provid[e] satisfactory answers to members concerning agency policy," Compl. ¶ 139, then any trade association, attorney, or regulatory advisory organization could meet the irreparable harm showing for injunctive relief any time an agency took a novel or complex action. This would turn an "extraordinary remedy," *Winter*, 555 U.S. at 22, into a routine and absurd one. That cannot be right.

## D. Plaintiffs Cannot Establish Article III Standing

Plaintiffs dedicate a single footnote in their motion to their standing to sue. *See* Mot. at 16 n.6. Plaintiffs contend that "OPM's unreasoned guidance, proffered without explanation or authority, likewise impairs [their] ability to provide counseling and guidance for their constituents." *Id.* This standing theory is squarely foreclosed by the Supreme Court's recent decision in *Food & Drug*

10

*Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).

In *Hippocratic Medicine*, the Court rejected the argument by various medical associations that they had standing by claiming that the FDA had "impaired" their "ability to provide services and achieve their organizational mission" by approving the abortion-inducing drug mifepristone. *Id.* at 394 (citation omitted). The plaintiffs claimed that they incurred costs due to the FDA's actions, including a need to perform their own studies on mifepristone to better inform their members and the public about the drug's risks. *Id.* The plaintiffs further claimed that they had to spend "time, energy, and resources" drafting citizen petitions to FDA and engaging in public advocacy and public education. *Id.* This, the plaintiffs alleged, resulted in them spending "considerable resources" to the detriment of other spending. *Id.* The Court rejected this capacious standing theory and explained that, if accepted, it would mean that "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those polices." *Id.* at 395.

This broad theory of standing rejected by the Supreme Court is precisely what Plaintiffs allege here. Plaintiffs contend that since the voluntary resignation program was announced they have been "inundated with varied inquiries from their members about" the program, and that this has caused a "diversion of resources" resulting in burdens to their existing work. Mot. at 17. But this sort of "impairment" of their ability to provide services to their union members and the claimed expenditure of time, without more, is insufficient as a matter of law to establish Article III standing. As the Supreme Court put it: An "organization" does not satisfy Article III when it simply "diverts its resources in response to a defendant's actions."  602 U.S. at 395. But that is precisely what Plaintiffs allege, and they make no effort to explain why that restriction does not apply here. On this ground alone, Plaintiffs' motion for a temporary restraining order should be denied.

## II.  PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  Plaintiffs' Claims Are Precluded by the CSRA and the FSL-MRS.

Even moving past the Article III standing issues, Plaintiffs cannot show subject-matter jurisdiction because Congress has divested the federal district courts of jurisdiction over federal employment matters like this one. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("*AFGE*"), 929 F.3d 748, 752 (D.C. Cir. 2019) (ordering a jurisdictional dismissal of a federal-employee-union suit because of the comprehensive statutory scheme governing federal employment review, the FSL-MRS). The legal basis for this divestiture is both well-settled and constitutionally significant. "While the authority of the federal courts comes from Article III of the Constitution, the existence of the lower federal courts, including this court, and the extent of [its] jurisdiction depend entirely on statutory grants from Congress." *Evans v. Thompson*, 518 F.3d 1, 5 (1st Cir. 2008). Thus, "Congress has great leeway to expand or restrict the jurisdiction of the lower federal courts." *Id.* at 6.

Congress has broadly empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331's grant of jurisdiction." *Axon Enter. v. FTC*, 598 U.S. 175, 185 (2023). Nonetheless, "[a] special statutory review scheme, . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.* Thus, when a statute sets out "a particular procedure and time period" for challenging agency actions, a plaintiff may be precluded from relying on a district court suit. *See N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135–36 (D.C. Cir. 2015). That includes arbitrary and capricious challenges under the APA. *AFGE*, 929 F.3d at 756 (D.C. Cir. 2019).

Congress can preclude district court review two different ways. The first is explicitly. *Axon*, 598 U.S. at 185 ("[P]roviding in so many words that district court jurisdiction will yield."). The second, applicable here, is implicitly. In cases of implicit preclusion, Congress impliedly divests district courts of jurisdiction "by specifying a different method to resolve claims about agency action." *Axon*, 598 U.S. at 185. To resolve an implicit preclusion question, the Court must determine whether "(i) such

intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)). These can be considered the two steps of a *Thunder Basin* analysis of implied preclusion.

### 1. Congress Intended to Preclude District Court Jurisdiction

The first step, Congress's intent to preclude, is well satisfied here: Congress established a detailed statutory scheme for adjudicating disputes relating to federal employment. Taken as a whole, it is "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988). That scheme satisfies the first step for discerning implied preclusion.

The FSL-MRS and CSRA, of which the FSL-MRS is a part, together provide for "administrative and judicial review" regarding disputes between employees and their federal employers and disputes between unions representing those employees and the federal government. *AFGE*, 929 F.3d at 752 (discussing the FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (discussing the CSRA more broadly). Congress decided, through these statutes, that most federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the Merit Systems Protection Board ("MSPB") for employment disputes or the Federal Labor Relations Authority ("FLRA") for labor disputes. Judicial review, if any, is available only in a court of appeals. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham*, 358 F.3d at 934 (citing *Fausto*, 484 U.S. at 448–50); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

"Congress typically chooses . . . review in a court of appeals following the agency's own review process" when designing an implicit preclusion scheme. *Axon*, 598 U.S. at 185. That is exactly what

this scheme includes. Accordingly, as the D.C. Circuit has repeatedly recognized, the CSRA precludes jurisdiction in the district courts over federal employee and federal union disputes. *See AFGE*, 929 F.3d at 754. This "enormously complicated and subtle scheme to govern employee relations in the federal sector" does not permit a district court runaround. *See id.* at 755 (quoting *AFGE v. Sec'y of the Air Force* ("*Air Force*"), 716 F.3d 633, 636 (D.C. Cir. 2013)).

Plaintiffs' argument to the contrary runs squarely into the Supreme Court's pronouncements on the CSRA's preclusive effect. When the Court applied the *Thunder Basin* inquiry directly to the CSRA, it held that the scheme "forecloses judicial review" for employees "to whom the CSRA grants administrative and judicial review." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012).

Plaintiffs impliedly respond to that point in their memorandum. They assert that "review in the [MSPB] is not available to Plaintiffs" and "[FLRA] review is not available to Plaintiffs." Mot. at 14. Therefore, in Plaintiffs' view, Congress must not have expressed an intent to preclude. Bracketing whether Plaintiffs are correct on that assertion, which Defendants address below, Congress's choice to exclude Plaintiffs from the review scheme would itself be indicative of an intent to preclude district court review altogether.

The Supreme Court has thoroughly rebuked any theory that exclusion of a matter from a comprehensive review scheme means Congress did not intend to create a set of preclusive statutes. In another case examining preclusion under the CSRA, the Court explained that the scheme's "deliberate exclusion of [a group] from the provisions establishing administrative and judicial review for personnel action of the sort at issue [] prevents [the group] from seeking review." *Fausto*, 484 U.S. at 455. Thus, even the exclusion of a subject matter, or group, from the scheme should suffice for Congressional intent of preclusion. Later, in the *Thunder Basin* context, the Court applied this prior holding. It explained that "the CSRA's 'elaborate' framework demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA denies statutory review." *Elgin*, 567 U.S. at 11

14

(quoting *Fausto*, 484 U.S. at 443). Thus, if it is true that the CSRA excludes administrative review options for Plaintiffs, it supports, rather than detracts from, evidence of Congress's intent to preclude.

Indeed, given the abundant precedent on this issue, a CSRA-related challenge rarely focuses on this first step. *See AFGE*, 929 F.3d at 755. Through the scheme Congress intended the CSRA to foreclose judicial review in the mine run of circumstances. "[T]his comprehensive employment scheme preempts judicial review under the more general APA even when that scheme provides no judicial relief—that is, what you get under the CSRA is what you get." *Filebark v. DOT*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) (Talel, J.) (internal quotation marks and citation omitted). That suffices to satisfy the first *Thunder* Basin step.

It is the second *Thunder Basin* step, whether the particular claims in a suit are of the type Congress intended to be reviewed in this scheme, that ultimately matters. That is, "Congress's creation of a 'comprehensive review process' like th[is] one[] here ousted district courts of jurisdiction." *See Axon*, 598 U.S. at 186. So this Court must "ask[] another question: whether the particular claims brought were of the type Congress intended to be reviewed within this statutory structure." *Id.* (internal quotation marks and citation omitted). As explained below, the answer to that question is yes.

### 2. These Claims Are of the Type Congress Intended to be Reviewed Within the Scheme

To determine whether Congress's preclusion scheme reaches the claims in this case, the Court must consider "three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Id.* The factors are: (1) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim"; (2) "is the claim wholly collateral to the statute's review provisions"; and (3) "is the claim outside the agency's expertise?" *Id.* (internal quotation marks, citation, and alteration omitted). These "considerations" are ultimately merely guideposts to "best []] understand what Congress has done—whether the statutory review scheme, though exclusive where

it applies, reaches the claim in question." *Id.* And it is critical to remember that a plaintiff may not "repackage[]" its claim "under the heading of an APA claim" to "exempt it from the exclusive channeling regime Congress prescribed." *Jalbert v. SEC*, 327 F. Supp. 3d 287, 299 (D. Mass. 2018). It is the content of the claim that matters—not the manner in which a plaintiff attempts to raise it.

Plaintiffs bring two claims. First, they assert an arbitrary and capricious claim—alleging a combination of conflicting information and threats, Compl. ¶¶ 145–47, 149, conflict with rules and guidance, Compl. ¶ 148, failure to consider ¶¶ 144, 146, and political animus, Compl. ¶ 150. Second, they assert an excess of statutory authority argument for appropriations. Compl. ¶¶ 152–58. Both are precluded under the *Thunder Basin* factors.

First, the scheme provides for meaningful judicial review of these areas. This is so even if the statutory scheme Congress has established does not allow the unions "to obtain 'pre-implementation' review" "or immediate relief barring all agencies from implementing" the deferred resignations. *See AFGE*, 929 F.3d at 755. Indeed, meaningful judicial review is still available for purposes of this prong even if the statutory scheme "ma[kes] it *impossible* to obtain particular forms of review or relief." *Id.* at 756. Here, as in *AFGE* itself, certain parties can bring certain claims through the administrative process "in the context of concrete . . . disputes." *Id.* at 757.

Start with the allegations about conflicting information and threats. If an employee believes that he resigned under coercion or misrepresentation, he may utilize the statutory scheme to challenge his departure. *See Terban v. DOE*, 216 F.3d 1021, 1024 (Fed. Cir. 2000) (explaining the scope of MSPB and judicial review of involuntary retirement). For example, in the context of MSPB review, the Federal Circuit has considered whether "a short time period within which to accept" an "attractive [resignation] option" sufficed to make a resignation involuntary. *Parrott v. MSPB*, 519 F.3d 1328, 1334–

35 (Fed. Cir. 2008). In concrete cases, then, an employee may very well challenge the aspects of deferred resignations of which Plaintiffs complain.[4]

Similarly, if an employee thinks that the resignation was accomplished in conflict with some extant federal rule, guidance, or statute, he may assert that within the administrative scheme. *See, e.g.*, *Marshall v. HHS*, 587 F.3d 1310, 1318 (Fed. Cir. 2009) (reversing based on an erroneous statutory interpretation); *Lyons v. VA*, 273 F. App'x 929, 931 (Fed. Cir. 2008) (considering whether a regulation was violated); *Fed. L. Enf't Officers Ass'n v. Ahuja* ("*FLEOA*"), 62 F.4th 551, 560 (D.C. Cir. 2023) (noting challenges to OPM guidance through the MSPB system). An allegation that the deferred resignation program was based in political animus may be appropriately channeled through a complaint to the Office of Special Counsel ("OSC"). 5 U.S.C. § 2302(a)(2)(A)(iii), (ix), (xii) (covering "a decision concerning pay . . . or awards," and "other significant change[s] in duties, responsibilities, or working conditions"). The OSC can hear complaints about "discriminat[ion] for or against any employee or applicant for employment—on the basis of . . . political affiliation, as prohibited under any law, rule, or regulation." *See id.* § 2302(b)(1)(E). These claims could, at times, make their way through the MSPB. *See, e.g.*, *Lasure v. MSPB*, 657 F. App'x 994, 995 (Fed. Cir. 2016) (considering claim of prohibited animus under Section 2302(b) for a union-member federal employee). Challenges to the lawfulness of an appropriation may also be available. *See Elgin*, 567 U.S. at 16–17 ("That issue, . . . could be meaningfully addressed in the Court of Appeals that Congress had authorized to conduct judicial review." (internal quotation marks omitted)). Any remaining claims should fall within the Federal Circuit's authority to "review the record and hold unlawful and set aside any agency action, findings, or conclusions" that are "obtained without procedures required by law, rule, or regulation having been followed" or that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[4] The well-settled rules permitting review of whether a resignation is voluntary puts to rest Plaintiffs' assertion that no MSPB review would be available for resignations, including "one that offered benefits." *See Parrott*, 519 F.3d at 1335.

accordance with law;" so long as the challenge properly flows through the administrative regime. 5 U.S.C. § 7703(c)(1), (2).

These example pathways demonstrate that Congress understood there to be certain methods, for certain parties, to obtain certain relief under these circumstances. The certain parties are those individual federal employees who have chosen to resign based on the option provided to them. As Plaintiffs put it, the deferred resignation "purports to offer a benefit to employees, or an invitation to employees to make their own decision." Mot. at 14. That is exactly right.

The fact that a separate group, the federal unions, may not be included in these pathways for this particular subject matter is no issue. "Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not subject to the administrative process, is strong." *Sackett v. EPA*, 566 U.S. 120, 130 (2012). Indeed, "[w]ere [the Court] to hold otherwise, a union [employee] could circumvent the CSRA's strictures by requesting that a [federal] union file general APA claims outside the CSRA on [his] behalf." *See AFGE*, 929 F.3d at 639. And it would be natural for Congress to preclude those not receiving a benefit—indeed those unions who may be opposed for their own reasons to a federal employee choosing to resign—from filing a separate attack on that agreed resignation. That is particularly true for a "'pre-implementation' review" seeking to preclude all federal employees from receiving and finalizing a desired benefit. *See AFGE*, 929 F.3d at 755. And "[n]othing about the fact that plaintiffs' action is a systemic challenge to OPM policy mitigates" this preclusion. *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (Roberts, J.) (holding an APA challenge asserted against an OPM policy precluded).

Second, the asserted claims are not wholly collateral. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *FLEOA*, 62 F.4th at 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 615 (1984)).

As the Supreme Court recently explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices," and "business merger" that constituted the subject matter of the agency actions. *See id.* Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.*

No such separation exists here. The claims challenge issues like the effect of alleged coercive resignations, illegality, animus, and related questions on the timing and quality of an employee's choice to resign. But those are all the kinds of federal employment issues that lie at the heart of the CSRA.

Third, and for similar reasons, the agency may bring its expertise to bear on many of the questions raised. Indeed, *Elgin* directly addresses the point. As the Court noted: "preliminary questions unique to the employment context" include fact questions about a "resignation" (there whether it "amounted to a constructive discharge") as well as "statutory or constitutional claims that the MSPB routinely considers." *See Elgin*, 567 U.S. at 22–23. Even if some of the claims could move beyond the administrative expertise of the agency these "threshold questions" may "alleviate [the other] concerns." *See id.*

\* \* \*

So all the guideposts indicate Congress's intent to preclude these kinds of claims from district court review. Instead, they are channeled through the CSRA or the FSL-MRS.

If the Court has any lingering questions because these Plaintiffs may be unable to challenge these particular claims in this type of way, it should be unbothered. Congress provided federal unions a particular method to raise issues under the FSL-MRS. As they note, Mot. at 14–15 & n.5, Plaintiffs may seek to file a grievance under preexisting collective bargaining agreements. 5 U.S.C. § 7121(a)(1). The complaint can be "concerning any matter relating to the employment of any employee;" "the

effect or interpretation, or a claim of breach, of a collective bargaining agreement; or" "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." *Id.* § 7103. They may also seek to challenge a failure to negotiate. 5 U.S.C. § 7117(c). The success of these endeavor will depend on a variety of threshold and substantive questions to be addressed by the FLRA. Plaintiffs assert that they will fail. Mot. at 14–15 & n.5. But that is ultimately of no matter.

As then-Judge Roberts explained for the D.C. Circuit in *Graham v. Ashcroft*, the CSRA in some circumstances will properly provide a plaintiff "no relief and preclude[] other avenues of relief." 358 F.3d at 935. There, for example, the aggrieved employee lacked any recourse for an alleged failure of the agency to follow its own regulations. *Id.* And Judge Tatel held in *Filebark* that the CSRA precluded "use [of] the APA to litigate [a] pay dispute with the Federal Aviation Administration" even though "the CSRA provide[d plaintiffs] no protection." 555 F.3d at 1010. This is not a bug of the CSRA. It is a feature. "[W]e treat the CSRA and Congress's related employment statutes as covering the field of federal employee claims, and so our cases expressly teach that those left out of this scheme are left out on purpose." *Id.* at 1014.

Congress has provided Plaintiffs with the exclusive method to resolve questions related to federal employment. These APA claims are wholly outside of that plan. The Court should accordingly deny the motion for a TRO.

**B. Plaintiffs Have Failed To Challenge Final Agency Action Reviewable Under the APA**

Even if Plaintiffs' claims were not precluded under the comprehensive schemes set forth in the CSRA and the FSL-MRS, their claims would still fail because the voluntary resignation program is not final agency action subject to judicial review under the APA. The APA subjects "final agency action" to judicial review. 5 U.S.C. 704. To qualify as a reviewable "final" agency action, the challenged action must both mark the consummation of the agency's decision-making process and be one by

which "rights or obligations have been determined" or from which "legal consequences may flow." *Bennett v. Spears*, 520 U.S. 154, 177-78 (1997). Under the second prong, agency action typically has legal consequences where it has the status of law and immediate compliance with its terms is expected. *FTC v. Standard Oil Co.*, 449 U.S. 232, 239-40 (1980).

Regardless, if Plaintiffs could establish that the January 28 email reflects the consummation of OPM's decision-making process, that email announcing the voluntary resignation program does not determine any rights or obligations, and no legal consequences flow from the program itself. Rather, any legal consequences would flow from a federal employee's choice in accepting the voluntary resignation offer. *See Friends of Merrymeeting Bay v. U.S. Dep't of Commerce*, 810 F. Supp. 2d 320, 327 (D. Me. 2011) (drawing distinction between an Endangered Species Act consultation, which did not constitute final agency action, and any subsequent safe harbor that flowed from the consultation, which would constitute final agency action). Indeed, the voluntary resignation program "does not require anyone to do anything" and certainly does not demand any sort of compliance—let alone immediate compliance—with its terms. *See Ca. Communities Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019). Accordingly, because the voluntary resignation program does not determine any rights or obligations, and no legal obligations flow from the existence of the program, as opposed to a federal employee's acceptance of the offer, Plaintiffs cannot succeed under the APA and their request for a temporary restraining order should be denied.

## C.  Plaintiffs' APA Challenge Concerning the Anti-Deficiency Act Lacks Merit

For the reasons explained above, Plaintiffs' claims fail due several independent bars on this Court's review of them. But if the Court should even reach Plaintiffs' fallback Anti-Deficiency Act argument, it should reject that too. Plaintiffs allege that OPM entered into contracts or obligated expenditures "prior to an appropriation" in contravention of the Anti-Deficiency Act. Mot. at 11–12; see also 31 U.S.C. § 1341(a)(1)(B) (prohibiting entering into a "contract or obligation for the payment

of money before an appropriation is made unless authorized by law"). But there is nothing new about what OPM has done here. Any person who has chosen a deferred resignation has received no new position—the individual merely continues working pursuant to the same appropriation that had already authorized the employee position. There is nothing unlawful about the government hiring an individual for employment that can last far into the future. Nor are there Anti-Deficiency Act concerns with retention of employees on tenure—making it potentially impossible to remove them between one appropriation and another. For the same reason, a deferred resignation lacks any Anti-Deficiency Act flaw.

This is reaffirmed by the standard understanding of government obligations. "Although the agency itself cannot disburse funds beyond those appropriated to it, the Government's 'valid obligations will remain enforceable.'" *See Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 191 (2012) (citation omitted). While it is possible that the "the Government commits its appropriations in a manner that leaves contractual obligations unfulfilled," often a counterparty is "free to pursue appropriate legal remedies arising because the Government broke its contractual promise." *Id.* at 198 (quoting *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 642 (2005)). While there are contours to this doctrine, it supports the commonsense understanding of how a deferred resignation may lawfully operate.

## III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGHS HEAVILY AGAINST THE IMPOSITION OF A TEMPORARY RESTRAINING ORDER

The balance of equities and public interest also weigh heavily against Plaintiffs. These final two factors of the preliminary injunction analysis merge where relief is sought from the government. *Nken*, 556 U.S. at 435. "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

Plaintiffs first contend that the balance of the equities and public interest supports a temporary restraining order because it has demonstrated a likelihood of success on the merits. Mot. at 19. But as explained in detail above, Plaintiffs face numerous, insurmountable hurdles to relief in this case that makes their likelihood of success extremely low.

Plaintiffs next contend that the public has "a strong interest in the effective operations of the federal government and the functioning of its critical agencies." Mot. at 19-20. This is simply a rearticulation of their first argument that they have demonstrated a likelihood of success on the merits. Once again, that contention is incorrect.

Finally, Plaintiffs contend that any harm to OPM in staying the closing date for acceptance of the deferred resignation offer would be minimal. Mot. at 20. Plaintiffs' argument is misplaced. The federal government has clearly and repeatedly informed the federal workforce that they had to accept the deferred resignation offer by today, February 6, 2025. Presumably, numerous federal employees have relied upon this representation in making their voluntary decision whether to accept or decline the offer. Extending that deadline on the expiration date would not just engender confusion and upset expectations, but perhaps more importantly, would disrupt a critical priority of the Executive Branch to reform the federal workforce. *See opm.gov/fork* (explaining President Trump's directives concerning the reformation of the federal workforce). Accordingly, the serious harm to the federal government in effectuating these important reformations to the federal workforce far exceeds any claimed harm to the Plaintiffs and strongly cautions against the imposition of a temporary restraining order or an administrative stay.

## IV.    ANY INJUNCTIVE RELIEF IN THIS CASE SHOULD BE LIMITED TO THE PLAINTIFFS

Finally, even if Plaintiffs had standing and made the showing required for extraordinary preliminary relief, the nationwide injunction they seek would be inappropriate. Despite only representing certain federal employees in certain agencies, Plaintiffs improperly seek a nationwide

temporary restraining order that would broadly apply to all federal employees—including those who are not represented by these unions and including those who do not want any relief. ECF No. 11-1 (proposing that "the February 6 Deadline for federal employees to accept the Fork in the Road Directive is stayed," and that "within 24 hours of this Order, Defendants must provide written notice of this Order to all federal employees who have received the Directive[.]").

Both constitutional and equitable principles require that injunctive relief be limited to redressing Plaintiffs' own cognizable injuries. Article III demands that "a plaintiff must demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). "The remedy" sought must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey,* 518 U.S. 343. 357 (1996). "The actual-injury requirement would hardly serve [its] purpose . . . of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc..*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. V. Gerston Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin an order on the ground that it might cause harm to other parties"). Accordingly, any preliminary injunctive relief in this case should be limited to only addressing the claimed harms of the Plaintiffs and go no further.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for a temporary restraining order.

Dated: February 6, 2025

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General

DIANE KELLEHER
Director, Federal Programs Branch


*/s/ Joshua E. Gardner*
JOSHUA E. GARDNER
(FL Bar No. 302820)
Special Counsel

JASON ALTABET
Trial Attorney
KEVIN BELL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 305-7583
E-mail: Joshua.E.Gardner@usdoj.gov

**CERTIFICATE OF SERVICE**

On February 6, 2025, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court for the District of Massachusetts, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ Joshua E. Gardner
JOSHUA E. GARDNER
(FL Bar No. 302820)
Special Counsel

26