**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSSETTS**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.<br><br><br>*Plaintiffs*,<br><br>v.<br><br>CHARLES EZELL, ACTING DIRECTOR, OFFICE OF PERSONNEL MANAGEMENT, et al.<br><br><br>*Defendants*. | Civil Action No. 1:25-cv- 10276 |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A**
**TEMPORARY RESTRAINING ORDER**
**[Leave to File Granted by Court Order on Feb. 6, 2025]**

# TABLE OF CONTENTS

Introduction ............................................................................................................................ 1

Factual Developments ........................................................................................................... 2

    I.    Plaintiffs Have Standing and Will Suffer Irreparable Harm ................................... 4

      A.    Plaintiffs face irreparable harm without a Temporary Restraining Order. .................... 4

      B.    Defendants are wrong that a TRO would exacerbate, rather than prevent, Plaintiffs' harms. ................................................................................................................................ 8

    II.    This Court Has Jurisdiction ................................................................................. 10

    III.   The Fork Directive is Final Agency Action ......................................................... 15

    IV.   The Fork Directive Violates the Antideficiency Act ............................................ 15

    V.    The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor ............. 17

    VI.   Plaintiffs Have Requested Appropriate and Workable Relief .............................. 18

Conclusion .......................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*AFGE v. Sec'y of the Air Force,* 716 F.3d 633 (D.C. Cir. 2013) ..................................... 11

*AFGE v. Trump*, 929 F.3d. 748 (D.C. Cir. 2019) ........................................... 11

*Axon Enterprise, Inc. v. Fed. Trade Comm'n*, 598 U.S. 175  (2023) ................... 12, 13, 14

*Boustany v. Boston Dental Grp.*, 42 F. Supp. 2d 100 (D. Mass. 1999) ........................... 17

*Braintree Labs. Inc. v. Citigroup Global Mkts. Inc.*, 622 F.3d 36 (1st Cir. 2010) ........... 18

*Caicedo v. DeSantis*, No. 6:23-cv-2303, 2024 WL 4729160 (M.D. Fla. Nov. 8, 2024) ..................................................................................................................... 6

*California Communities Against Toxics v. EPA*, 934 F.3d 627 (D.C. Cir. 2019) ........... 15

*Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631 (2005) ................................................. 16

*E.E.O.C. v. Preferred Lab. LLC*, No. CIV A 06-40190-FDS, 2009 WL 415429 (D. Mass. Feb. 13, 2009) .................................................................................................. 18

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) .................................................... 10, 11, 14

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) .......................................... 5, 6, 7

*Fed. Law Enf't Officers Ass'n v. Ahuja* (*FLEOA*), 62 F.4th 551 (D.C. Cir. 2023) ..... 10, 12

*Feds for Medical Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023) .................................. 13

*Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009 (D.C. Cir. 2009) ................................ 13

*Friends of Merrymeeting Bay v. U.S. Dep't of Com.*, 810 F. Supp. 2d 320 (D. Me. 2011) ................................................................................................................................ 15

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ..................................................... 6

*Hercules Inc. v. United States*, 516 U.S. 417 (1996) ....................................................... 16

*HIAS v. Trump*, 985 F. 3d 309 (4th Cir. 2021) ................................................................ 18

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO by Negron v. Union De Carpinteros De Puerto Rico*, 615 F. Supp. 3d 87 (D.P.R. 2022) .................................. 7

*Jalbert v. SEC,* 327 F. Supp. 3d 287 (D. Mass 2018) ...................................................... 13

*La Union Del Pueblo Entero v. Abbott*, No. 5:21-cv-0844, 2024 WL 4488082
(W.D. Tex. Oct. 11, 2024) ........................................................................ 6

*Nat'l Treasury Emps. Union v. Devine*, 733 F.2d 114 (D.C. Cir. 1984) ......................... 13

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) .................................................. 10

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390 (4th
Cir. 2024) .............................................................................................. 6

*Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153 (1st Cir. 1995) ............................................ 6

*Sacket v. EPA,* 566 U.S. 120 (2012) ................................................................ 11

*Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012)................................................. 16

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015)...................................................... 17

*United States v. Fausto*, 484 U.S. 439 (1988) ................................................... 11

**Statutes**

5 U.S.C. § 705.......................................................................................... 18

5 U.S.C. § 706.......................................................................................... 18

5 U.S.C. § 7103......................................................................................... 14

5 U.S.C. § 7114......................................................................................... 12

**Other Authorities**

@USOPM, X (Feb. 6, 2025, 5:03 PM),
https://x.com/USOPM/status/1887623232586719591 .................................. 3

Daniel Arkin et al., *Anxiety mounts as U.S. government workers face buyout
deadline*, NBC News (Feb. 6, 2025), https://tinyurl.com/4bbyzkaw ...................... 3, 7

Emma Colton & Brooke Singman, *White House expecting 'spike' in federal
resignations as at least 20K take buyouts*, Fox News (Feb. 4, 2025),
https://tinyurl.com/s59dhnvt ...................................................................... 2

*Executive Branch Civilian Employment Since 1940,* U.S. Office of Pers. Mgmt ,
https://www.opm.gov/policy-data-oversight/data-analysis-
documentation/federal-employment-reports/historical-tables/executive-branch-
civilian-employment-since-1940/ (last visited Feb. 7, 2025) ...................... 17

*Frequently Asked Questions*, U.S. Office of Pers. Mgmt.,
https://www.opm.gov/fork/faq (last visited Feb. 7, 2025) ...................................... 8, 16

Gregory Korte, *Musk 'Buyout' Taken by 40,000 Federal Workers as Deadline
Nears*, Yahoo (Feb. 5, 2025), https://tinyurl.com/372tnjwu ......................................... 2

Jason Miller, *More questions than answers about possible RIFs, deferred
resignation program*, Fed. News Network (Feb. 6, 2025),
https://tinyurl.com/v2tnwu7s ................................................................................... 3, 15

Jenna McLaughlin, *CISA staffers offered deferred resignations, extending
broader cybersecurity fears*, NPR (Feb. 6, 2025), https://tinyurl.com/y6zft5nn .......... 3

Jory Heckman, *Some IRS employees taking OPM's 'deferred resignation' offer
told to keep working until May 15*, Fed. News Network (Feb. 5, 2025),
https://tinyurl.com/3hy7cpj2 ........................................................................................ 3

Marisa Kabas (@marisakabas.bsky.social), Bluesky (Feb. 7, 2025, 10:05 AM),
https://bsky.app/profile/marisakabas.bsky.social/post/3lhlurp7p4s2h .......................... 4

Memorandum from Charles Ezell, Acting Dir., U.S. Office of Pers. Mgmt.,
Legality of Deferred Resignation  Prog. (Feb. 4, 2025),
https://tinyurl.com/4hv2p9ku ....................................................................................... 4

Zach Montague & Madeleine Ngo, *Judge Delays Program Offering Federal
Workers Incentives to Quit*, N.Y. Times (Feb. 6, 2025),
https://tinyurl.com/bdeatzhd ........................................................................................ 3

## INTRODUCTION

OPM's Fork Directive is a sweeping and stunningly arbitrary action to solicit blanket resignations of federal workers. Defendants have not even argued—nor could they—that the Fork Directive was the product of rational or considered decision-making.

Instead, Defendants primarily argue that this Court cannot hear or remedy Plaintiffs' challenge to a slapdash resignation program with ever-shifting guidance and conditions that has inundated them with urgent calls for counsel from their members—who face an unlawful ultimatum. That is wrong. The harms that Plaintiffs face are sufficient both for emergency preliminary relief and for standing. And this Court plainly has jurisdiction to provide relief to Plaintiffs who are suing in their organizational capacity to challenge agency actions that are unrelated to the administrative schemes.

Defendants also implausibly argue that their ultimatum to federal workers—in which OPM *directly* emailed solicitations for resignations to be submitted *directly* to OPM—is not a final agency action because "the program does not determine any rights or obligations." But Defendants' ultimatum divides federal workers into two groups: (1) those who submit their resignations to OPM for a promised period of pay without the requirement to work, and (2) those who have not and are therefore subject to threat of mass termination. Regardless, employees in both groups are subject to legal implications, whether they have accepted the Directive's offer or not.

Finally, Plaintiffs have shown a likelihood of success that the Fork Directive is contrary to the Antideficiency Act. Defendants argue parties may *enforce* obligations that were created unlawfully by the federal government due to the lack of appropriations. But a party's potential

subsequent right to enforce an unlawful obligation does nothing to cure the Antideficiency Act violation that created the unlawful obligations in the first place, as Plaintiffs have alleged here.

Accordingly, Plaintiffs seek a Temporary Restraining Order ("TRO") staying OPM's deadline to accept the "Fork" and enjoining further solicitations of resignation pursuant to the Directive in order to avoid irreparable harm and allow this Court to consider further preliminary relief.[1]

## FACTUAL DEVELOPMENTS

Over the past several days, since Plaintiffs' complaint and motion were filed with the Court, there have been several relevant developments.

As intended, the pressure of OPM's short-fuse ultimatum has driven resignations. As of late Tuesday evening, public data suggested 20,000 federal workers had resigned in response to the Fork Directive, and a Trump Administration official reportedly said that the number of resigning employees was "rapidly growing," with the Administration "expecting the largest spike [of resignations] to come 24-48 hours before the deadline." Emma Colton & Brooke Singman, *White House expecting 'spike' in federal resignations as at least 20K take buyouts*, Fox News (Feb. 4, 2025), https://tinyurl.com/s59dhnvt.  One day later, the Administration reported that the number of resignations had doubled. Gregory Korte, *Musk 'Buyout' Taken by 40,000 Federal Workers as Deadline Nears*, Yahoo (Feb. 5, 2025), https://tinyurl.com/372tnjwu.

In an apparent attempt to further accelerate the number of resignations in the face of the ultimatum, Defendants sent an email to millions of federal employees at approximately 1 a.m. on

---

[1] While Plaintiffs originally sought only a pause of the deadline pending resolution of this motion, Defendants continue to communicate with employees to encourage them accept the Fork Directive's offer.  In light of the confusion this conduct is generating, and the changing contours of the Directive, Plaintiffs request that the Court order OPM to cease soliciting resignations.

February 6—hours before this Court's initial hearing—emphasizing that, "There will **NOT** be an extension of this program." Jason Miller, *More questions than answers about possible RIFs, deferred resignation program*, Fed. News Network (Feb. 6, 2025), https://tinyurl.com/v2tnwu7s (emphasis in original). By the time of yesterday's hearing, 60,000 workers had reportedly resigned in response to the Fork Directive. Daniel Arkin et al., *Anxiety mounts as U.S. government workers face buyout deadline*, NBC News (Feb. 6, 2025), https://tinyurl.com/4bbyzkaw. At that time, the White House Press Secretary also further encouraged federal workers to resign, noting that the Administration will "find highly competent individuals who want to fill these roles" indicating an intention to *replace* existing civil servants. Zach Montague & Madeleine Ngo, *Judge Delays Program Offering Federal Workers Incentives to Quit*, N.Y. Times (Feb. 6, 2025), https://tinyurl.com/bdeatzhd.

Even as OPM's guidance continues to unequivocally promise that workers who reply "Resign" to the Fork Directive will not have to work during the deferred resignation period, those crucial terms are being changed even for employees who have already accepted, with extended work requirements imposed during the deferred resignation period. *See* Jory Heckman, *Some IRS employees taking OPM's 'deferred resignation' offer told to keep working until May 15*, Fed. News Network (Feb. 5, 2025), https://tinyurl.com/3hy7cpj2; *see also* Jenna McLaughlin, *CISA staffers offered deferred resignations, extending broader cybersecurity fears*, NPR (Feb. 6, 2025), https://tinyurl.com/y6zft5nn (reflecting last minute eligibility changes just hours before Defendants' deadline).

And even after the Court's Order pausing the Fork Directive's deadline, OPM continues to encourage resignations. *See* @USOPM, X (Feb. 6, 2025, 5:03 PM), https://x.com/USOPM/status/1887623232586719591. Moreover, the Administration continues to

assure the federal workforce that it will abide by its promise to pay, even as the Government's brief and recent OPM guidance makes clear that if the Administration "backtrack[s] on its commitments," and workers are not paid in line with OPM's promises, they can simply request a rescission of their resignation agreement or "appropriate legal remedies." Memorandum from Charles Ezell, Acting Dir., U.S. Office of Pers. Mgmt., Legality of Deferred Resignation Prog. at 2 (Feb. 4, 2025), https://tinyurl.com/4hv2p9ku; Defs.' Resp. in Opp. To Pls.' Mot. For TRO 22, ECF No. 39-1 ("Opp'n"). *See also* Marisa Kabas (@marisakabas.bsky.social), Bluesky (Feb. 7, 2025, 10:05 AM), https://bsky.app/profile/marisakabas.bsky.social/post/3lhlurp7p4s2h (posting email from HHS sent after the Court's Order, stating "Agencies will stick to the deal.")

## I. PLAINTIFFS HAVE STANDING AND WILL SUFFER IRREPARABLE HARM.

Defendants dispute that Plaintiffs have shown they are likely to suffer irreparable harm without this Court's intervention, and even dispute Plaintiffs' standing to pursue this case at all. *See* Opp'n. 6-11. Defendants' arguments, however, rest on a faulty understanding of the Plaintiffs' claims and the injuries they face as a result of the Fork Directive.

Plaintiffs ultimately seek to secure final relief in this case that would include, among other things, remanding the Fork Directive to OPM to provide an adequate legal justification and assurance of its terms. At this preliminary stage, however, and given the imminent deadline for employees to accept or decline the Fork offer (with uncertain consequences either way), Plaintiffs seek narrower relief that would have the effect of at least temporarily defusing Defendants' exploding offer. Such relief is needed to prevent irreparable harm to Plaintiffs.

### A. Plaintiffs face irreparable harm without a Temporary Restraining Order.

The Fork Directive injures Plaintiffs in several well-established ways and, if Plaintiffs' request for a TRO is denied, will cause them irreparable harm.

*First,* the Fork Directive severely disrupts Plaintiffs' ability to carry out their core mission of advising and assisting their members with respect to issues arising in their employment. As Plaintiffs have explained, Mem. in Supp. TRO Mot. 17-18, ECF No. 12 ("Pls. Br."), the Directive's unclear and constantly changing terms make it impossible for them (or anyone else) to provide informed guidance about even the most basic aspects of the program. That harm is exacerbated by the fact that Defendants gave federal employees just days to evaluate the offer and a hard deadline by which to decide. The consequence of that intentional time pressure has been to overwhelm Plaintiffs' capacities with far more inquiries and demands on their resources—demands that themselves detract from Plaintiffs' ability to carry out other important aspects of their core missions—than would be needed if Defendants had pursued a reasonable timetable. And Plaintiffs must spend their resources handling this tidal wave of inquiries—resources that are unrecoverable due to the government's sovereign immunity.

Defendants do not dispute that the Fork Directive is likely to have this effect—they merely claim that such an effect is insufficient to establish an injury sufficient for Article III standing. Opp'n 11. Defendants are incorrect, and the sole case on which they rely, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ("*AHM*"), does not help them. *AHM* held that the plaintiff, an advocacy organization, lacked standing where all it had shown was that it had spent money to oppose and advocate against the government policy it sought to challenge. *Id.* at 394. The Court rejected the idea that an organization that has not itself been directly affected by a policy it opposes could "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*

The Court also re-affirmed, however, that "actions [that] directly affected and interfered with [a party's] core business activities" *do* constitute an injury-in-fact. *Id.* at 395 (discussing

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Specifically, the Court reiterated and left undisturbed its prior holding in *Havens*, which considered the standing of a housing counseling organization that, "[c]ritically, . . . not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* The action challenged in *Havens*—the defendant's giving of false information about the availability of apartments—directly interfered with the plaintiff's core work of providing housing counseling and referral services and thus injured the plaintiff. *Id.*

Plaintiffs provide direct counseling to their members as part of their core mission. That mission has been and will continue to be materially thwarted by the Fork Directive in the same way the plaintiffs alleged their injury in *Havens*. Plaintiffs therefore have been directly injured by the Fork Directive and are not akin to the plaintiff in *AHM*, which merely alleged that it had spent money "to gather information and advocate against the defendant's action." *Id.* at 394. *AHM* therefore supports Plaintiffs' position, not Defendants.[2]

*Second*, the Fork Directive will directly harm Plaintiffs by eroding their membership and, ultimately, their ability to bargain on behalf of their members. The result is both a classic routinely recognized type of pocketbook injury and also irreparable harm in the form of diminished ability of "to bargain effectively on behalf of [their] employees." *See Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 164 (1st Cir. 1995) (affirming finding of irreparable harm to union where "the potential

---

[2] Other courts to consider organizational standing since *AHM* have similarly confirmed the standing of organizational plaintiffs to challenge actions that directly impede their core missions. *See Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 395-97 (4th Cir. 2024) (finding standing where plaintiffs showed that the challenged action "concretely impaired their core missions" of "organizing lawful voters and encouraging them to support Republican candidates"); *Caicedo v. DeSantis*, No. 6:23-cv-2303, 2024 WL 4729160, at *4-5 (M.D. Fla. Nov. 8, 2024) (finding standing and recognizing that "an organization may have standing under a diversion-of-resources theory when the defendant's 'actions directly affect[ ] and interfere[ ] with [the organization]'s core business activities'" (quoting *AHM*, 602 U.S. at 395)); *La Union Del Pueblo Entero v. Abbott*, No. 5:21-cv-0844, 2024 WL 4488082, at *33-34 (W.D. Tex. Oct. 11, 2024) (finding standing on same theory and noting that the affected "'business activities' need not be profit-driven" and further that "[t]he effect on the organization's activities need not be great" (internal citation omitted)).

effect of [a] large scale employee lockout" could diminish union support and bargaining power); *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO by Negron v. Union De Carpinteros De Puerto Rico*, 615 F. Supp. 3d 87, 95 (D.P.R. 2022) (finding irreparable harm where union was "unable to protect the rights of [their] members in their relationship with their employer"). These injuries will only be exacerbated by the reputational injuries Plaintiffs previously described. *See* Pls.' Br 19.

Defendants do not dispute the general point that Plaintiffs would be harmed through the loss of members. Instead, they contend that any such loss would be the result of "free choices of individual members" and thus, apparently, not attributable to the Fork Directive. Opp'n 8. That argument overlooks the program's clear purpose and intent to drive employees out of the federal government. *See supra* pp. 2-3; Pls.' Br. 2-5, 18. Individual employees' role in ultimately choosing whether to accept the offer hardly means that Defendants can disclaim causation when their program produces its clearly intended effect, just as a government subsidy or tax on certain activity can plainly be said to "cause" changes in aggregate behavior. *See AHM*, 602 U.S. at 383 (explaining causation satisfied where it is "sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs").

Defendants further claim that the loss of membership is too "speculative" in these circumstances to constitute irreparable harm. Opp'n 8. Not so. On February 6, shortly after the Court's order pausing the Fork Directive, an Administration official reported that more than 60,000 federal workers had accepted the offer. Arkin, *supra* p. 3. Given the normal tendency to defer decisions until a deadline, the government's escalating efforts to assure employees that the terms of the offer would be honored, and, crucially, the pressure of OPM's short-fuse deadline, and admonitions that it would not extend it, *see  Frequently Asked Questions*, U.S. Office of Pers.

Mgmt., https://www.opm.gov/fork/faq (last visited Feb. 7, 2025), it is not "speculative" to conclude that the number of acceptances would grow even larger if the clock once again began ticking; stopping the clock from expiring no doubt stems the flow of last-minute resignations.

Defendants finally resort to trying to shift the focus from the looming deadline to September 30, 2025, the final day that employees will purportedly retain pay and benefits if they accept the Fork offer. Opp'n 9. But because there is no guarantee that anyone who takes the offer will later be able to rescind, *see Frequently Asked Questions*, *supra* p. 7, Plaintiffs are likely to be harmed by the reintroduction of a short-fuse deadline, and the September 30th date is irrelevant to the analysis.

### B.    Defendants are wrong that a TRO would exacerbate, rather than prevent, Plaintiffs' harms.

Defendants' key arguments go not to the existence of an injury but rather to the fit between the alleged injuries and the preliminary remedy sought by Plaintiffs s. Opp'n 6-10. Although Plaintiffs ultimately seek broader relief, all they have asked for at this preliminary stage is that the Court stay the Fork Directive's looming deadline (and related solicitations) to remove the time pressure from this case and the decision that Defendants have put before federal workers. Defendants say that pause will actually increase the harm to Plaintiffs, but their arguments are unpersuasive.

As an initial matter, Defendants incorrectly characterize the relief Plaintiffs seek in this motion as a request to "extend[] a deferred resignation program they claim is unlawful." Opp'n 6. In fact, what Plaintiffs seek is a pause as to the central dilemma the Fork Directive forces on federal workers—decide by the deadline either to accept the offer and take their chances or, by not accepting, effectively decline it and risk consequences—in order to permit the parties to fully brief, and the Court to consider, OPM's flawed promulgation of the Directive as alleged in the

8

Complaint.

Defendants argue that the requested stay would not address the harms to Plaintiffs stemming from the tidal wave of inquiries and counseling requests that the Fork Directive has caused. Opp'n 7. That argument overlooks that the diversion of resources, monetary costs, and interference with Plaintiffs' core missions that this deluge has produced is directly tied to the short time frame that Plaintiffs' members must decide and the lack of clarity the government has provided during that period. A more reasonable implementation period—and the pause sought here—would directly address those harms by giving the government more time to articulate its program consistently and in turn, Plaintiffs more time to analyze it and advise their members. To be clear: Plaintiffs' objection here is not to counseling and advocating for their members—far from it—but rather, to the interference with those duties and their other core missions caused by the Fork Directive's ill-considered and unreasonable time frame.

Defendants argue that the requested relief might increase Plaintiffs' loss in membership. Opp'n 8-9. But the obvious purpose of the Fork Directive's exploding offer—as is true of such deadlines in other contexts—is to increase the pressure to accept and, with it, the total number of acceptances. There is no reason to expect a stay of the deadline to meaningfully increase the uptake rate, and good reason to expect the opposite, particularly as more light is shed on the Fork Directive through this litigation and otherwise.

Defendants' throwaway assertion that "Plaintiffs fail to establish that the … deadline … prevents them from protecting the rights of their members," Opp'n 7 n.3, is similarly unpersuasive. As Plaintiffs have explained, the deadline harms their ability to protect the rights of their members by, among other things, substantially interfering with Plaintiffs' carrying out of their ordinary core missions and, ultimately, depleting their membership through resignations.

9

## II.    THIS COURT HAS JURISDICTION

Defendants' contention that this Court should not exercise jurisdiction is flawed in numerous respects, but one is glaring: it ignores that Plaintiffs have alleged standing to file this case *not* in their capacity as a membership association or representative of employees, but solely in Plaintiffs' organizational capacity.  Compl. ¶ 24 (Plaintiffs "bring this action on behalf of themselves as organizations").[3]

A membership organization need not bring suit "to assert the rights of its members" in order to bring "suit on its own behalf so long as it can independently satisfy the requirements of Article III standing."  *Nnebe v. Daus,* 644 F.3d 147, 156 (2d Cir. 2011).  Because plaintiffs have organizational standing and because Plaintiffs have not asserted standing on behalf of employees they represent, Defendants' preclusion arguments aim at a straw plaintiff. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 13 (2012) (explaining that the court's first step is to determine whether a "covered" plaintiff is challenging a "covered action").

Indeed, Plaintiffs' organizational standing places a strong check on Defendants' concerns about CSRA circumvention.  Here, Plaintiffs do not suffer *organizational* harm in the typical collective bargaining context. This case is not typical. It is an unprecedented program, implemented on an explosive timeline that has, most unusually, caused direct and irreparable harm to Plaintiffs as organizations.  In contrast, the unions in Defendants' cited cases could not plausibly assert the harms found here, nor did they try. *See*, *e.g.*, *Fed. Law Enf't Officers Ass'n v. Ahuja* (*FLEOA*), 62 F.4th 551, 555 (D.C. Cir. 2023) (where unions did not—and could not have —alleged organizational harm, finding that challenge to OPM retirement benefit policies had

---

[3] Defendants do appear to recognize the distinction between associational standing and organizational standing insofar as they attack Plaintiffs' organizational standing as failing to satisfy Article III.  Yet they ignore that distinction entirely in addressing this Court's subject matter jurisdiction.

clear channel for administrative review of individual claims filed with OPM directly); *AFGE v. Sec'y of the Air Force,* 716 F.3d 633, 637 (D.C. Cir. 2013) (union's garden variety challenge to a specific agency employer's dress code could just as easily be filed as a grievance under the union's collective bargaining agreement with that very agency).

Similarly, Defendants' claim that the absence of meaningful judicial relief somehow signals that Congress intended Plaintiffs to be simply out of luck is unavailing.  Opp'n 14. Defendants' cases concern individual adverse employment actions that are squarely in the scope of the CSRA.  *See United States v. Fausto*, 484 U.S. 439, 455 (1988) (individual challenging their suspension); *Elgin*, 567 U.S. at 11 (individuals challenging their job termination).  But Plaintiffs are not employees and they do not challenge covered personnel actions.  Moreover, the other authority cited by Defendants for this proposition, *Sacket v. EPA,* 566 U.S. 120 (2012), is dicta from a case in which the Court *allowed* an APA claim to proceed *without* administrative preclusion. While Plaintiffs do not dispute that Congress intended the CSRA to preclude some parties and some claims from judicial review, this case presents neither issue.[4]

---

[4] Defendants' citations of non-binding precedent involving union plaintiffs are distinguishable. Opp'n 13-14, 17-18. First, in *AFGE v. Trump,* the D.C. Circuit held that unions should challenge executive orders that "set goals agencies must pursue during [collective] bargaining" by filing complaints with the FLRA after seeing how each agency implemented the executive orders.  929 F.3d 748, 753 (D.C. Cir. 2019). But (1) unlike in the instant case, the plaintiff unions in *AFGE v. Trump* conceded on appeal that their claims were "of the type Congress intended to be reviewed within the statutory scheme" and thus satisfied the first step of *Thunder Basin, id.* at 754-55, and (2) unlike the Fork Directive, the executive orders at issue in *AFGE v. Trump* were intentionally aimed squarely at influencing the collective bargaining process itself, thus leading the court to conclude that "the unions…can ultimately obtain review and relief from the executive orders by litigating their claims in the context of collective bargaining disputes." *Id.* at 759.  Second, in *AFGE v. Secretary of the Air Force,* the D.C. Circuit merely held that a labor union wishing to challenge a specific employer's personnel policy (a dress code) had three readily-available administrative challenges to do precisely that: file a contractual grievance against the employer that the dress code violates the employer's collective bargaining agreement and appeal any arbitration thereof to the FLRA, file an unfair labor practice complaint against the employer with the FLRA, or seek to bargain with the employer over the dress code and file a negotiability appeal with the FLRA if the employer refuses.  *See* 716 F.3d at 637. In contrast, Plaintiffs cannot access any of those administrative routes because OPM (who issued and controls the Directive) is not the employer with whom Plaintiffs negotiate and sign each CBA—the individual employing agency is.  Finally, *Federal Law Enforcement Officers Association v. Ahuja (FLEOA)* involved the preclusive effect of a retirement statute pursuant to which provides that OPM retirement benefit policies and calculations be challenged directly by

Indeed, Defendants fail to grapple with Plaintiffs' argument that because the Fork Directive is not itself a covered adverse "personnel action," CSRA preclusion would be misplaced here. Pls' Br. 14. If anything, Defendants concede that point. *See* Opp'n 18 ("As Plaintiffs put it, the deferred resignation 'purports to offer a benefit to employees, or an invitation to employees to make their decision.' That is exactly right."). It is therefore immaterial whether, as Defendants insist, an employee might possibly, *after* accepting the Fork Directive's "Deferred Resignation" offer, be able to challenge their resignation as a personnel action through administrative channels. Opp'n. 16-18. Rather, Plaintiffs challenge—not as employees or their representatives, but in their own capacity— the OPM action that offered the "fork in the road" to employees in the first place, and the CSRA does not preclude Plaintiffs from doing so. For this same reason, Plaintiffs' collective bargaining relationships—which are with the individual employing agencies, not with OPM—are irrelevant to Plaintiffs' ability to challenge OPM's ultimatum directly in Plaintiffs' independent organizational capacity.

But even were the Court to consider the three *Thunder Basin* factors (it doesn't need to), *each* weigh heavily in Plaintiffs' favor, as these claims are not of the type that Congress intended to be precluded from this Court's jurisdiction. *See Axon Enterprise, Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023). Plaintiffs do not seek relief for covered personnel actions, but for OPM's failure to comply with the Antideficiency Act and failure to engage in a reasoned agency decision-making process. *See* Pls' Br. 1-2, 6-12. This case is thus most analogous to *Feds for*

---

filing a claim with OPM, which is then appealable to the MSPB and ultimately the Federal Circuit Court of Appeals. 62 F.4th at 555. In contrast, there is no way for Plaintiffs to file a claim against OPM for its Fork Directive, since the FLRA only allows administrative challenges against the employing agency, because Plaintiffs negotiate and sign collective bargaining agreements with each employing agency where the union represents employees. 5 U.S.C. § 7114. Accordingly, Plaintiffs are not able to file a contractual grievance against OPM under § 7121 and petition for review of an arbitration decision thereof under § 7123, or to appeal to the FLRA alleging a failure to negotiate by OPM under § 7117(c)(1).

*Medical Freedom v. Biden,* where, as here, a labor union brought suit in federal district court to challenge a government-wide personnel policy as "not in accordance with law under the APA." 63 F.4th 366, 369 (5th Cir. 2023).  The Fifth Circuit held the union was challenging a government-wide policy—"not any personnel action that may or may not be taken in conjunction with that [policy]"—and therefore the "challenge does nothing to trigger the CSRA" because the challenge is "separate and apart from any personnel action" that may later be taken in reliance thereon.  *Id.* at 383, 378 (identifying a "long line of cases" in which unions were *not* precluded from bringing "facial, pre-enforcement actions against federal policies"); *Nat'l Treasury Emps. Union v. Devine*, 733 F.2d 114, 117 n.8 (D.C. Cir. 1984) (affirming union's APA challenge to OPM regulation on appropriations grounds and rejecting the contention that "a detailed scheme of administrative adjudication impliedly precludes preenforcement judicial review of rules"). Plaintiffs have not, as Defendants assert (Opp'n 16, 19-20), repackaged a CSRA claim as an APA claim, but rather have pled a distinct APA claim in its own right.  *Cf. Jalbert v. SEC,* 327 F. Supp. 3d 287 (D. Mass 2018) (plaintiffs, who had a right to appeal a disgorgement order through the SEC, could not relitigate the issue by suing under the APA rather than filing the available appeal); *Filebark v. U.S. Dep't of Transp.,* 555 F.3d 1009, 1011 (D.C. Cir. 2009) (individual who filed unsuccessful grievance regarding his pay under the CSRA could not relitigate his personnel action claim under the APA).

Absent the exercise of jurisdiction, Plaintiffs would lack "meaningful judicial review" of their claims.  *See Axon*, 598 U.S. at 186 (recognizing that "the first *Thunder Basin* factor recognizes that Congress rarely allows claims about agency action to escape effective judicial review"). Here, Plaintiffs lack any meaningful way to seek relief before the administrative tribunals in question given the "here-and-now" harm from OPM's action.  *Id.* at 191; *see* Pls.'

13

Br. at 13-15.  Defendants' assertion that the labor relations administrative avenues available to federal sector unions are sufficient, Opp'n. 19-20, is wrong.  Defendants rest their arguments on the collective bargaining process, *id.,* but Plaintiffs can only file a grievance under the provisions of a collective bargaining agreement with the employing agency, and any grievance must relate specifically to "conditions of employment," 5 U.S.C. § 7103, not freestanding harms caused by OPM against Plaintiffs as organizations.  Nor do these channels allow for the filing of any grievance or unfair labor practice ("ULP") against, or collective bargaining with, OPM itself—because OPM is not the employing agency.  Pls.' Br. 14-15.  Therefore, any relief Plaintiffs might pursue would be limited to a grievance, ULP, or negotiability appeal filed against an entity other than OPM; this could not meaningfully address OPM's government-wide directive, and would fail to address Plaintiffs' irreparable harm, *see* Pls.' Br. 13-16, because OPM – not the agencies – control the Directive.

Finally, Defendants are wrong that Plaintiffs' claims are not wholly collateral to the administrative scheme and outside agency expertise.  Defendants assert that Plaintiffs' claims raise "the kinds of federal employment issues that lie at the heart of the CSRA," Opp'n. 19, but that is a myopic view of the Complaint.  Plaintiffs' "not in accordance with law" APA claim is based on the Appropriations Clause of the Constitution and the Antideficiency Act, not any personnel-related matter.  *Compare Elgin,* 567 U.S. at 22 ("petitioners' constitutional claims are the vehicle by which they seek to reverse . . . precisely the type of personnel action regularly adjudicated by the MSPB" and obtain "precisely the kinds of relief that the CSRA empowers the MSPB" to provide) with *Axon*, 143 S. Ct. at 893 ("The challenges to the Commissions' authority have nothing to do with either the enforcement-related matters the Commissions regularly adjudicate or those they would adjudicate[.]").  And likewise, Plaintiffs' claims relating to the

rationality of the agency process here – or lack thereof – bear on questions wholly outside the employment relationship, and outside of agency expertise.

## III.    THE FORK DIRECTIVE IS FINAL AGENCY ACTION

Legal consequences plainly flow from the Fork Directive, regardless of which path employees take (accept or do nothing). The Directive effectively divides the federal workforce into two groups—those who accept the offer, and whose salaries are purportedly prioritized and protected for a specific time, and those who do not, and who may nevertheless be subject to consequences. Indeed, Defendants seek to have it both ways — on the one hand, they argue that no legal consequences flow from the Directive, Opp'n 21), and on the other, they make clear that consequences do flow from the Directive's deadline, which they emphasize will *not* be extended, and that employees who accept have no right to rescind their resignation, *Frequently Asked Questions*, *supra* at p.7; Miller, *supra* p.3.

The cases cited by Defendants are inapposite, because OPM has not merely begun a consultation process or issued a non-binding memo to consider creating a deferred resignation program.  Here, OPM has created and implemented the Directive and is seeking to enforce it – a far cry from the inchoate actions taken in Defendant's cited cases. *See* Opp'n 21 (citing *Friends of Merrymeeting Bay v. U.S. Dep't of Com.*, 810 F. Supp. 2d 320, 327 (D. Me. 2011) (no final action where agency consultation was an "informal" and "tentative" step prior to issuing a formal agency opinion); *California Communities Against Toxics v. EPA*, 934 F.3d 627, 639 (D.C. Cir. 2019) (guidance memo had no legal consequences and covered entities were free to "ignore" it).

## IV.    THE FORK DIRECTIVE VIOLATES THE ANTIDEFICIENCY ACT

The Fork Directive promised federal employees *unequivocally* that, in exchange for their resignations, they would receive pay through September 30, 2025, even though Congress has

appropriated funds only through March 14, 2025. This promise plainly created an obligation of unappropriated funds in unlawful contravention of the Antideficiency Act's bar on "entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation." *Hercules Inc. v. United States*, 516 U.S. 417, 427 (1996).

Defendants (somewhat stunningly) contend that employees can simply sue the government if OPM later breaches their promise to pay individuals who accept the Directive because Congress fails to appropriate the funds.[5] Opp'n 22. But the *enforceability* of government obligations has no bearing on the lawfulness of making an unequivocal obligation without an appropriation. *Cf. Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012) (discussing enforceability of government obligations); *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 642 (2005) (same). Even if a court makes a *post hoc* determination that a party has a legal right to enforce an obligation created by the government without an appropriation, that does not cure the *ex ante* illegality of the unappropriated obligation in the first instance.

Nor is Defendants' unequivocal guarantee of payment to those who resign consistent with typical government practice with respect to federal employees. Absent adequate appropriations, agencies must furlough workers or reduce the size of their workforce. In contrast, Defendants purport to exempt deferred resignees from the implications—or existence—of an appropriation. This is contrary to the purpose and operation of the Act.

---

[5] *Cf. Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Feb. 7, 2025) (Q: "Will I really get my full pay and benefits during the entire period through September 30…?" A: "Yes.").

## V.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN PLAINTIFFS' FAVOR

The balance of equities and public interest tip sharply in Plaintiffs' favor. Defendants' rushed Directive risks serious, irreversible harm to Plaintiffs, *see supra* at pp. 3-9, and the public, while a brief stay would cause little, if any, harm to the Defendants.[6]  OPM's arbitrary and rushed deadline harms the public by threatening untargeted mass resignations, loss of expertise, and disruption of government functioning inherent in an exploding and shape-shifting offer sent to millions of federal employees. In contrast, Defendants' claim of comparable harm attendant to a short extension of Directive is implausible. While Defendants are no doubt entitled to implement the Administration's priorities within the bounds of the law, they have no entitlement to do so in an arbitrary fashion at unprecedented speed— less than two weeks—and have identified no concrete harm attendant to a short delay.  *See Texas v. United States*, 809 F.3d 134, 186-87 (5th Cir. 2015) (dismissing the government's contention that a proposed nationwide injunction "obstructs a core Executive prerogative" as vague). Defendants cannot credibly claim that maintaining the status quo while the Court considers the propriety of preliminary relief to assess OPM's compliance with its legal obligations would undermine the government's policy objective to "reform the federal workforce" or create more confusion than OPM has already sown.[7]

---

[6] Plaintiffs also have demonstrated a likelihood of success on the merits, which strongly supports preliminary relief in the public interest. *Boustany v. Boston Dental Grp.*, 42 F. Supp. 2d 100, 104 (D. Mass. 1999)) (citation omitted) (explaining a likelihood of success on the merits means "the preliminary injunction will be found to be beneficial to the public interest.").

[7] Federal staffing levels have remaining relatively stable from year to year. *See Executive Branch Civilian Employment Since 1940,* U.S. Office of Pers. Mgmt ,https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/historical-tables/executive-branch-civilian-employment-since-1940/ (last visited Feb. 7, 2025).

## VI.    PLAINTIFFS HAVE REQUESTED APPROPRIATE AND WORKABLE RELIEF

This Court plainly has the authority to order OPM to permit the federal workforce more than two weeks to respond to the Fork Directive while the Court considers whether preliminary relief is appropriate. [8]  "[T]he question of what equitable relief is appropriate or necessary is left to the sound discretion of the District Court. *E.E.O.C. v. Preferred Lab. LLC*, No. CIV A 06-40190-FDS, 2009 WL 415429, at *4 (D. Mass. Feb. 13, 2009).  A comprehensive extension of the deadline is particularly appropriate here, as the "government relies on a 'categorical policy, and [] the facts would not require different relief for others similarly situated to the plaintiffs." *HIAS v. Trump*, 985 F. 3d 309, 326 (4th Cir. 2021).  Indeed, the plain text of the APA contemplates relief that sets aside unlawful agency action – remedying the underlying agency misconduct – not merely providing relief to the litigants.  The APA empowers courts to "postpone the effective date" of agency action pending judicial review where "justice so requires," 5 U.S.C. § 705, and ultimately to "hold unlawful and set aside agency action,"5 U.S.C. § 706(2) (emphasis added).

And here, a consistent pause of the effective date, and notice of the same, is necessary to prevent further confusion and disruption, and avoid further harms to Plaintiffs attendant to such disruption. Plaintiffs— who represent more than 800,000 federal workers in every state across the country— have witnessed firsthand the deep confusion engendered by OPM's repeatedly shifting guidance as to the contours and details of the directive, including as to who is eligible for the program, whether individuals must work during the deferred resignation period, and other

---

[8] Defendants erroneously characterize Plaintiffs' requested relief as seeking a "mandatory injunction." Opp'n 2, 5. Plaintiffs, however, seek to preserve the status quo.  *See Braintree Labs. Inc. v. Citigroup Global Mkts. Inc.*, 622 F.3d 36, 40-41 (1st Cir. 2010) (describing difference between prohibitory preliminary injunctions to preserve status quo and the higher burden for mandatory preliminary injunctions to alter the status quo).

key issues. This widespread confusion, along with the arbitrarily compressed timeframe for the Directive, is a problem of OPM's own making. Pausing the deadline for just some of the impacted civil servants would only engender further uncertainty.

## CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that the Court enter a Temporary Restraining Order directing Defendants to pause the February 6th deadline for acceptance of the Directive while Plaintiffs seek further relief ensuring that OPM completes the required consideration of the Directive's legal basis, justification, and funding before further proceeding.

DATED this 7th day of February, 2025.

By:  /s/ Elena Goldstein _____
Elena Goldstein (NY Bar No. 4210456)
Michael C. Martinez (D.C. Bar No. 1686872)
Daniel McGrath (D.C. Bar No. 1531723)
Skye Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Facsimile: 202-796-4426
egoldstein@democracyforward.org
mmartinez@democracyforward.org
dmcgrath@democracyforward.org
sperryman@democracyforward.org
Counsel for Plaintiffs

Michael T. Anderson (BBO #645533)
Nicolas Mendoza (BBO #703711)
MURPHY ANDERSON PLLC
1401 K Street N.W., Suite 300
Washington, DC 20005
Telephone: (202) 223-2620
manderson@murphypllc.com
nmendoza@murphypllc.com
*Counsel for Plaintiffs*

Teague P. Paterson (D.C. Bar No. 144528)
Matthew S. Blumin (D.C. Bar No. 1007008)
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO
1625 L Street N.W.
Washington, DC 20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
*Counsel for American Federation of State,*
*County, and Municipal Employees, AFL-CIO*
*(AFSCME)*

Rushab B. Sanghvi (D.C. Bar No. 1012814)
Andres M. Grajales (D.C. Bar No. 476894)

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, DC 20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928
SanghR@afge.org
Grajaa@afge.org
*Counsel for Plaintiff American Federation*
*of Government Employees, AFL-CIO (AFGE)*
*and Local 3707*

Sarah Suszczyk (M.D. Bar No. 0512150240)
NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, SEIU
LOCAL 5000
NAGE/IBPO/IAEP/IBCO
159 Burgin Parkway
Quincy, MA 01269
Telephone: (202) 639-6426
Facsimile: (617) 376-0285
Ssuszczyk@nage.org
*Counsel for Plaintiff National Association of*
*Government Employees, SEIU Local 5000*

## Certificate of Service

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: February 7, 2025                    /s/ Elena Goldstein

                                           Elena Goldstein
                                           (NY Bar No. 4210456)