1

<pre>
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2


 3


 4     AMERICAN FEDERATION OF          )
       GOVERNMENT EMPLOYEES, AFL-CIO,  )
 5                      Plaintiffs,    )
                                       )
 6                                     )  Civil Action
       vs.                             )  No. 25-10276-GAO
 7                                     )
                                       )
 8     CHARLES EZELL, ACTING DIRECTOR, )
       OFFICE OF PERSONNEL             )
 9     MANAGEMENT, et al,              )
                                       )
10             Defendants.             )


11


12     BEFORE:  THE HONORABLE GEORGE A. O'TOOLE


13


14                        MOTION HEARING


15


16


17          John Joseph Moakley United States Courthouse
                        Courtroom No. 22
18                       1 Courthouse Way
                        Boston, MA 02210
19


20
                        February 10, 2025
21                          2:03 p.m.


22


23                      Valerie A. O'Hara
                      Official Court Reporter
24          John Joseph Moakley United States Courthouse
                        1 Courthouse Way
25                      Boston, MA 02210
                    E-mail: vaohara@gmail.com
</pre>

```
 1    APPEARANCES:

 2    For the Plaintiffs:

 3         Democracy Forward Foundation, by ELENA GOLDSTEIN, ESQ.,
      and DANIEL ALEXANDER MCGRATH, ESQ., P.O. Box 34553,
 4    Washington, D.C. 20043;

 5         Murphy Anderson PLLC, by NICOLAS MENDOZA, ESQ.,
      1401 K Street NW, Suite 300
 6    Washington, D.C. 20005;

 7         Murphy Anderson, PLLC, by MICHAEL T. ANDERSON, ESQ.,
      33 Harrison Ave, 7th Floor, Boston, MA 02111;
 8
           NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES,
 9    SEIU LOCAL 5000, by SARAH SUSZCZYK, ATTORNEY,
      159 Burgin Parkway, Quincy, Massachusetts 01269;
10
      For the Defendants:
11
           Department of Justice - Civil Division,
12    by JOSHUA E. GARDNER, ESQ., and JASON ALTABET, ESQ.
      Poc Agostinho, Jean, 1100 L St., N.W., Suite 12200
13    Washington, D.C. 20530;

14         U.S. Department of Justice, ERIC HAMILTON, ESQ.,
      950 Pennsylvania Avenue NW, Washington, D.C. 20530;
15
           United States Attorney's Office, by
16    RAYFORD A. FARQUHAR, ASSISTANT UNITED STATES ATTORNEY,
      1 Courthouse Way, Suite 9200, Boston, Massachusetts 02210.
17

18

19

20

21

22

23

24

25
```

<u>PROCEEDINGS</u>

1

2         THE CLERK:  All rise.  Court is now in session.  Your

3  Honor, this is Civil Matter of 25-cv-10276, American Federation

4  of Government Employees, AFL-CIO vs. Ezell, et al., motion

5  hearing.

6         Would the parties identify themselves for the Court

7  and the record beginning with the plaintiff, please.

8         MS. GOLDSTEIN:  Elena Goldstein for the Democracy

9  Forward Foundation for the plaintiffs.

02:03PM 10         MR. McGRATH:  Daniel McGrath for the Democracy Forward

11  Foundation for the plaintiffs, your Honor.

12         MR. ANDERSON:  Michael Anderson, Murphy Anderson for

13  the plaintiffs.

14         MS. SUSZCZYK:  Sara Suszcyk for National Association

15  of Government Employees, Inc., plaintiff.

16         MR. HAMILTON:  Good afternoon, your Honor,

17  Eric Hamilton, Deputy Assistant Attorney General, the Civil

18  Division, Department of Justice for defendants.

19         MR. GARDNER:  Good afternoon, your Honor, Josh Gardner

02:03PM 20  for the United States Department of Justice on behalf of the

21  defendants.

22         MR. ALTABET:  Good afternoon, your Honor,

23  Jason Altabet with the Department of Justice on behalf of the

24  defendants.

25         MR. FARQUHAR:  Good afternoon, your Honor,

4

1   Ray Farquhar, United States Attorney's Office for defendants.

2          THE COURT:  Good afternoon.  The earlier submission

3   was a request for a temporary restraining order.  I think it's

4   more proper now at this point where there's an issue joined on

5   both sides that we can refer to it as a preliminary injunction

6   question.  I don't think there's any substantive difference

7   with the label.

8          Everybody is being heard on both sides, just so

9   there's no ambiguity about that.  One thing -- never mind.  For

02:04PM 10   the plaintiff.

11          MS. GOLDSTEIN:  Good afternoon, your Honor, and may it

12   please the Court.

13          THE COURT:  Good afternoon.

14          MS. GOLDSTEIN:  And I represent the plaintiffs.  Over

15   the course of the last two weeks, confusion has reigned for

16   millions of career civil servants after defendants rationally

17   delivered an ultimatum to nearly all federal workers, resign

18   within 10 days or face the prospect of unemployment without

19   compensation.

02:05PM 20          OPM's directive, which they entitled, "Fork In The

21   Road," stunning the architect.  OPM issued it in federal

22   fashion without even a cursory consideration or an analysis of

23   which portions across hundreds of federal agencies were no

24   longer needed or which positions were vital to government

25   functioning or to the ramifications of continuing functioning

1    of government of a nearly unsolicited application for

2    resignations.

3         What's more, the directive unlawfully committed the

4    government to expending funds to pay for resigning employees

5    six months past the conclusion of existing appropriations, and

6    OPM continues to unequivocally assure employees that they will

7    be paid for this time period if they resign, notwithstanding

8    this administration's efforts to shutter existing agencies and

9    uncertainty about forthcoming appropriations.

02:06PM 10         So to understand this slap shot about defendant's

11   actions, one need only look at the constantly changing nature

12   of OPM's guidance here and the representations to the employees

13   that they are asking to resign, changes to the very contours of

14   the program.

15         Take work requirements as one example, your Honor.  At

16   first, defendants informed millions of employees by mass email

17   that they would be exempted from in-person, in-office work

18   requirements until September 30th if they submitted a deferred

19   resignation.

02:07PM 20         Within a day or two, employees were told that they

21   would only have to work in rare, though unspecified

22   circumstances, and days later, on February 1st, defendants

23   shifted position yet again to say that, no, resigning employees

24   would not have to work during their deferred resignation

25   period, however, since just February 1st, this guidance

1    continues to change, and reporting has indicated that at the

2    IRS, for example, employees, including those who have already

3    accepted the deferred representation program, are being told

4    that they must work until the middle of May.

5         These changes have been communicated to employees in

6    uneven fashion, often just put in buried FAQs on OPM's website

7    or in memoranda addressed to agency heads.  But every

8    indication from the past 10 days or two weeks suggests that

9    defendants may continue to change the terms of their ultimatum

02:07PM 10   right up until the last moment before the short fuse deadline

11   that they've set for millions of workers today.

12        Plaintiffs in their role as unions, their core

13   organizational mission is about counseling and advising their

14   members and their affiliates, and plaintiffs have

15   unsurprisingly been inundated with requests for guidance from

16   their members and affiliates as a result of the shifting and

17   chaotic process.

18        They've deferred unrecoupable resources responding to

19   these inquiries and harmed their mission and the changing and

02:08PM 20   slap shot guidance from defendants likewise undermines their

21   ability to counsel their members, and they will lose more

22   members if that exploding deadline is reinstated by the Court.

23        Today, as this deadline approaches --

24        THE COURT:  Why would they lose more if the time is

25   extended?  There's more opportunity for people to change their

1    minds and sign up for it?

2         MS. GOLDSTEIN:  Your Honor, the nature of the

3    ultimatum is designed to, and as the facts in the record

4    reflect, increase the number of those employees who accept this

5    under the high pressure terms of just that two-week period.

6         As the evidence in the record reflects, those numbers

7    have increased dramatically as that deadline comes to a point,

8    and that is indeed the point of having only a two-week or

9    10-day period for employees to respond.

02:09PM 10        In addition, right now, employees don't know what they

11    are accepting, and it is very likely that to the extent that

12    plaintiffs are able to fulfill their organizational mission of

13    providing clear advice and counsel about what it is that

14    employees are actually accepting, that fewer folks,

15    particularly accepted from this slap shot exploding deadline,

16    would accept that offer.

17         Accordingly, your Honor, as this deadline approaches

18    in mere hours, we ask only for modest relief that this Court

19    continue to pause the deadline for folks to accept this

02:09PM 20    deferred resignation offer and that defendants immediately

21    communicate that stay to all federal employees.

22         In addition, we ask that defendants cease soliciting

23    and encouraging other agents either directly or indirectly from

24    through other agencies soliciting individuals to take advantage

25    of this program while this Court considers the merits.

1          I'm happy to answer questions, your Honor, or go

2     through some of the major questions in the case.

3          THE COURT:  Go ahead.

4          MS. GOLDSTEIN:  Thank you, your Honor.  So one of the

5     questions here, your Honor, is whether or not defendants have

6     overcome the strong statutory presumption in favor of

7     reviewability offered by the Administrative Procedure Act.

8     They have not.

9          What defendants are arguing here is that Congress has

02:10PM 10     implicitly precluded plaintiffs from bringing their action in

11     federal court.  They aren't arguing that Congress has expressly

12     intended to staff them because they can't, and I think all

13     parties agree that there is no expressed implication from

14     Congress that plaintiffs's claims are precluded, so they're

15     arguing that Congress impliedly intended this.  That is

16     incorrect.

17          This is a program of unprecedented magnitude that

18     raises serious questions as to the rationality of eight OPM's

19     decision-making and the legality of that decision-making that

02:11PM 20     has caused a deluge of inquiries to plaintiffs's unions and

21     irreparable harm to them as organizations.

22          This is not what Congress intended to preclude through

23     the Civil Service Reform Act administrative schemes that it set

24     up, and I think to understand that, it's helpful to talk a

25     little bit about what Congress really did intend with respect

1    to those administrative schemes.

2         There are two of them under the Civil Service Reform

3    Act or CSRA.  The first is the Merits Systems Protection Board

4    or the MSPB, so the MSPB is set up to hear claims from covered

5    employees about covered adverse employment action, things like

6    suspensions, terminations, demotions, and the like,

7         But plaintiffs here are not employees, they are

8    organizations asserting harm to themselves in their capacity as

9    organizations, and the claims here are not about covered

02:12PM 10   employment actions or covered adverse employment actions, they

11   are about the rationality of OPM's decision-making process,

12   they are about the legality of that decision-making process.

13        And, indeed, defendants argue that there is no adverse

14   employment action here at all because what they proffer is a

15   benefit, not an adverse action, but these claims by plaintiffs

16   are nothing like as in *Feds for Medical Freedom v. Biden*, the

17   claims that are heard through the MSPB.

18        So what about the second scheme, that is the scheme

19   involving the Federal Labor Relations Authority or the FRLA.

02:12PM 20   The FRLA hears collective bargaining disputes between agents

21   that employ employees and unions as their representatives of

22   their members, of those employees employed by those agencies.

23        But, here, plaintiffs are asserting their claims are

24   not in the representative capacity but as organizations that

25   are being harmed and the agencies that they have collective

1    bargaining with, those are not in this case, and those, they

2    cannot seek relief there.

3        This is a program that was promulgated by OPM, that

4    OPM sent directly more than 2 million federal civil servants,

5    and OPM directed those civil servants to reach directly back

6    out to OPM.  But plaintiffs don't have collective bargaining

7    agreements with OPM, and OPM is not acting in the capacity as

8    the employer of employees.  These issues do not involve

9    bargaining, they do not involve the collective bargaining

02:13PM 10   relationship between agencies that employ employees and unions

11   in their representative capacity.

12       And so for all those reasons, your Honor, this case is

13   not precluded under just the first step of the *Thunder Basin*

14   test.  There is no indication that Congress impliedly intended

15   these kinds of cases to go through the MSPB or the FRLA

16   process, and maybe it's helpful to think about a hypothetical.

17       You can imagine a situation in which let's say the

18   administration decides to shutter the Department of Education,

19   and in so doing, fires all of the individuals who administer

02:14PM 20   federal Pell grants.  These are the low income financial

21   assistance that goes to families to help their kids go to

22   college.

23       Now, if you had a group of families that wanted to

24   challenge the loss of those statutorily required grants, would

25   they be precluded from going to federal court to challenge the

1    rationale of that decision just because it involved

2    terminations from their upstream?  No, your Honor, and so here,

3    too.

4            Now, even if this Court were to conclude that the

5    first step of *Thunder Basin* that Congress intended to preclude

6    these kinds of plaintiffs in these kinds of situations from

7    going into federal court and availing ourselves of

8    jurisdiction, you go to the second step of the *Thunder Basin*

9    test, and that is a three-question analysis, three equitable

02:15PM 10    factors.  All of them here weigh in favor of jurisdiction.

11            The first question is whether preclusion would take

12    out all meaningful judicial review.  First, for the reasons I

13    just gave, that unions cannot avail themselves in their

14    organizational capacity or against this defendant for these

15    kinds of claims.

16            All of those reasons mean that there is no meaningful

17    judicial relief, but there's a second reason why meaningful

18    judicial review would be precluded absent jurisdiction, your

19    Honor, and that is because of irreparable harm.

02:15PM 20            As the Supreme Court said in *Axon,* this is a here and

21    now injury, and absent this Court's relief, that injury will be

22    irreparable, and this is unlike the cases that defendants cite,

23    like *Filebark* or *Jalbert*.

24            THE COURT:  Say that again.

25            MS. GOLDSTEIN:  *Filebark*.  That was the case where

1    folks had filed a grievance of their low salaries and then they

2    tried to relitigate those in federal court.  There was a

3    pathway for those claims to be heard, unlike here.

4         So, too, *Jalbert*.  That was the case where the SEC,

5    again, there was a pathway of relief that they could have

6    followed through the administrative scheme but chose not to.

7         So, too, FLEOA.  That's the case where the union

8    waited three years to challenge an OPM regulation regarding

9    retirement benefits, and the regulation and the statutory

02:16PM 10    scheme again set up a procedure by which the union could

11    receive and the individuals could receive review of that claim.

12         So, your Honor, the first factor, meaningful

13    preclusion of judicial review weighs in favor of plaintiffs.

14    So, too, do the last two factors, whether these claims are

15    collateral to the agencies here and whether they are within the

16    agency's expertise.

17         Defendants urge somehow that a factual record about a

18    particular termination would ultimately help a court decide the

19    merits of this action, but that can't be right.  This is not

02:17PM 20    about employees and those kinds of questions, this is about the

21    rationality of OPM's process and the legality of it:  Did OPM

22    properly consider history?  Did OPM do a proper analysis in

23    sending out this mass resignation solicitation?

24         This is about the Administrative Procedure act, about

25    the Anti-Deficiency Act, not statutes in which these agencies

1    have any expertise and not facts relating to individual

2    employment actions.

3         Your Honor, I'm happy to answer questions about the

4    jurisdictional issue, but if not, I will move on.

5         THE COURT:  All right, go ahead.

6         MS. GOLDSTEIN:  So your Honor asked a moment ago

7    effectively a question about why we need a temporary

8    restraining order right now and wouldn't an extension lead to

9    an increase in the number of folks who are taking, who are

02:18PM 10    submitting their deferred resignation?

11         I think that's not correct for a few reasons, and I

12    think first it's helpful to review the kinds of irreparable

13    harm that plaintiffs are here alleging, and there are three:

14         The first is that they have expended unrecoupable

15    resources to respond to the deluge of inquiries regarding this

16    deferred resignation program.

17         The second is that this has harmed their mission in

18    two ways:

19         First, it has required diversion of resources away

02:18PM 20    from other core organizational activities, like preparing for

21    arbitrations and bargaining and the like.

22         And then, second, undermining their mission because

23    they are not able to provide adequate and appropriate advice of

24    counsel to their members and affiliates, again, a core

25    organizational function because of the poor and shifting

1    information that they're receiving from OPM.

2         In this way, this case is on all fours with the

3    *Havens Realty* case, which the Supreme Court cited favorably and

4    the *Alliance for Hippocratic Medicine* cases.

5         In *Havens*, you have plaintiffs who are an organization

6    that were providing counseling, as do plaintiffs in this case,

7    regarding real estate transactions.  The harm that they alleged

8    was they were receiving bad, in that case, racist information

9    from the defendants that made it more difficult for them to

02:19PM 10    adequately counsel their clients regarding their purposes of

11    real estate.

12         It's strikingly similar to this one.  You have an

13    organization, and we have an organization.  One of their core

14    functions is providing advice and counsel, but defendants

15    provisionally offer poor information or in this case also

16    shifting information, which makes it impossible to fulfill that

17    organizational mission effectively.

18         And then the third harm, your Honor, is the loss of

19    membership that is triggered by the pressure that comes with

02:20PM 20    that short-term exploding deadline, here, just two weeks for

21    employees to decide a question about their livelihoods.

22         Now, without a temporary restraining order, your

23    Honor, irreparable harm will continue for several reasons.  The

24    first is that the questions will continue that individuals will

25    be asking and affiliates will be asking plaintiffs what is it

1    that they actually accepted, what are the terms of this

2    deferred resignation program, and that makes sense because OPM

3    appears to be making this up as they are going along.

4         As set forth in our papers, the contours of this

5    program continue to shift and have continued to shift even in

6    the last several days.

7         And we can expect to the extent that your Honor would

8    like to put this on for a preliminary injunction hearing after

9    this, we would be happy to provide more factual development

02:20PM 10   about the ways in which this guidance continues to shift.

11        Your Honor, in addition, defendants argue that this is

12   not final agency action, but, here, two tests for final agency

13   action, is it the consummation of the agency's process and do

14   legal consequences flow?

15        Defendants don't dispute that this is the consummation

16   of the agency's process, so the question is just whether legal

17   consequences flow from The Fork Directive, and here legal

18   consequences flow from the ultimatum.  What the ultimatum does

19   is it effectively divides the federal work force into two

02:21PM 20   categories, two parts of the fork.

21        On the one hand, you have the folks who have accepted

22   the deferred resignation offer and who are protected from rifts

23   from layoffs and so forth.

24        On the other hand, for employees who do nothing, they

25   are prioritized for those rifts.  They are prioritized for

1    those layoffs, and in such a way, regardless of whether they

2    accept an offer or not, legal consequence flow to them, but, in

3    many ways, your Honor, defendants seek to have it both ways.

4    One the one hand, they're saying that this program is not final

5    agency action, that it has no effect, but for the tens of

6    thousands of employees who have accepted this purported offer

7    from defendants, they are bound to it, they have no unilateral

8    right to rescind their resignations.  They can request a

9    resignation, but that does not remain in their control.

02:22PM  10         The cases that defendants cite are inapposite.  You

11    have the *Merrimack Bay* case, your Honor, which concerned agency

12    consultation that was tentative by intention and was going to

13    come later, come final agency opinion.  That's nothing like

14    this.  There is no tentative nature about this program.

15    Indeed, defendants repeatedly said that they will not, absent

16    this Court's intervention, extend it or pause it in any way.

17         Likewise, the other case defendants cite, the

18    California case, that was about an agency guidance document

19    that had no legal effect for anyone.  That's the opposite of

02:23PM  20    what's happening in this case.

21         Your Honor, I will not belabor the arbitrary and

22    capricious nature of defendant's actions.  I don't think either

23    that defendants are really disputing this, but I will just

24    outline very briefly a couple of the categories of the

25    arbitrary and capricious nature of their action, the first that

1    they have failed to consider the continued functioning of

2    government in numerous respects, you know, seeking this broad

3    solicitation of resignations without any analysis with respect

4    to who will take it or who should be taking it or how to

5    improve government functioning.

6        There's been recent reporting cited or cases about,

7    for example, veterans hospitals and how veterans nurses, an

8    in-demand profession, may well choose to go elsewhere leaving

9    these hospitals without the staff that they need to function

02:23PM 10   and to provide essential services.

11       Second, as I've already talked about the shifting

12   contours of this program, even as they are asking employees to

13   rely on this, quote, "serious questions about their

14   livelihood."

15       Third, that it is inconsistent with the rules

16   governing outside employment.

17       Fourth, that it's contrary to historical evidence,

18   both with respect to how this Fork in the Road Directive worked

19   with Elon Musk's private program and private business as well

02:24PM 20   as the historical evidence that when the government wants to

21   downsize, there are ways to do this correctly, to do this with

22   study and analysis and Congressional approval, none of which

23   happened here in the two weeks that they have tried to run this

24   program.

25       Fifth, that this program, the deadline is arbitrary.

1          And, lastly, that this is pretext to remove

2    individuals and fill them, fill these positions with folks who

3    are ideologically aligned with this administration.

4          Next, your Honor, plaintiffs allege that this program

5    violates the Anti-Deficiency Act.  They have made an

6    unequivocal promise to individuals who have accepted the

7    deferred compensation offer that they will be paid through

8    September, even past the expiration of the existing

9    appropriations, so that promise is still on the front page of

02:25PM 10   OPM's website, "You will be paid."  They continue to double

11   down on that representation.

12         If you look at their FAQ, your Honor, there's a

13   question that says, "Will I really be paid?"  The answer on the

14   FAQ is yes.  Now, that is a promise that they cannot make

15   because they cannot -- because the ADA prohibits obligating

16   money like this in the absence of an appropriation, and it's

17   not how other employees are treated.

18         Typically employees do work for the government for

19   many years as appropriations change, but when Congress does

02:25PM 20   reduce appropriations or does not provide adequate funding for

21   the government, agencies are forced to furlough individuals,

22   agencies are forced to do reductions, but what defendants have

23   done by making this unequivocal promise to this subset of

24   individuals is to say that they will be exempted from all that.

25         That's not a promise that they can make.  It's not a

1    promise that Congress is bound by, particularly in light of the

2    fact that defendants are suggesting that some of these agencies

3    be shuttered particularly in light of the fact that Congress

4    may not want to pay workers for doing no work and particularly

5    in light of the purpose of the Anti-Deficiency Act, which is

6    precisely to avoid the executive putting pressure on Congress

7    because they have already obligated funds in the absence of an

8    appropriation.

9        Your Honor, I am happy to distinguish their cases if

02:26PM 10   that would be helpful or happy to let opposing counsel go and

11   respond after they've gone.

12       THE COURT:  Go ahead.

13       MS. GOLDSTEIN:  Sure.  So defendants cite a whole host

14   of cases, mostly arguing that this Court should not exercise

15   jurisdiction here, but those cases have no applicability,

16   largely because they apply in situations involving adverse

17   employee actions and also because they do not involve

18   situations where plaintiffs's labor unions are proceeding in a

19   representative capacity.

02:27PM 20       The case they seem to rely upon the most is *AFGE*, but

21   that case, which is not binding on this Court, is inapposite

22   for several reasons:

23       The first is that it did not include an APA claim, and

24   the Administrative Procedure Act includes a presumption in

25   favor of this Court's reviewability.

1          Indeed, I don't think any of their cases in which

2     defendants rely rely on an Administrative Procedure Act claim

3     and with it its presumption of judicial reviewability.

4          Second, *AFGE* did not involve unions in their

5     organizational capacity, only in a representational capacity.

6          And, third, in that case, plaintiffs conceded that

7     they were bound by *Thunder Basin,* Step 1 of the test, so

8     plaintiffs actually conceded that Congress intended them to be

9     precluded unless an exception applies from judicial review.

02:28PM 10          And, fourth, that case involved a whole host of

11     executive orders that were both to be implemented by agencies,

12     the agencies with which the unions have collective bargaining

13     contracts, unlike this situation, which is about OPM and not

14     about the collective bargaining rights of individual agencies,

15     and those executive orders at issue were specifically targeting

16     and about the collective bargaining process.  They were about

17     official time and similar kinds of issues, not about this

18     government-wide solicitation of resignations, nothing like this

19     case here.

02:29PM 20          And *AFGE v. Air Force*, your Honor, this is a dress

21     code where a court held that there was no jurisdiction, and

22     that makes sense.  With a dress code that was held by one

23     agency, that union could have filed a grievance or could have

24     filed other claims against that agency and obtained relief, but

25     that's not the case here, where OPM, not the agencies with whom

1    these defendants contract, OPM is the one that is sending out

2    the directive and is promulgating the directive.

3            *FLEOA* that I previously mentioned involved waiting

4    three years before folks filed a review request and where the

5    agency scheme had a specific way in which relief could be

6    obtained.  I think one case that defendants don't grapple with

7    at all is *NTEU vs. Devine.*  This is a case in D.C. Circuit

8    where a union brought a claim, a pre-enforcement challenge like

9    this one to an OPM regulation on appropriation grounds like

02:30PM 10   this, and the D.C. Circuit held that there was jurisdiction.

11           This case is talked about at length in the *Feds For*

12   *Medical Freedom v. Biden* case, another case which defendants do

13   not grapple and which stands for the proposition that where

14   government action may have employees somewhere in the

15   background but is not about covered employees challenging

16   covered adverse employment actions, then Congress did not

17   intend preclusion to apply.

18           Now, one of defendant's main arguments is that, sure,

19   plaintiffs as unions cannot go to these administrative

02:30PM 20   tribunals, but that suggests even more that Congress didn't

21   want them to be heard or to obtain any relief at all, and they

22   cite a number of cases for that proposition, but those cases

23   are all about claims that are coherently inside the CSRA

24   scheme.

25           So, for example, *Fausto*, that case involved an

22

1    individual suspension.  Now, if that individual -- that

2    individual did not have procedural due process rights, could

3    not go to the MSPB, it's true, and so the Court held that that

4    individual was precluded from going to federal court because

5    then they would have even more rights than if they were just in

6    a slightly different category of employee within that CSRA

7    program.

8          It is very different from plaintiffs's challenge to

9    what we are hearing is the directive toady.  Plaintiffs are not

02:31PM 10  employees.  They are not challenging agency action, and they

11    are not challenging covered adverse employment actions.

12          Likewise, *Elgin* on which defendants rely, this was a

13    termination for individuals terminated because they didn't want

14    to comply with the statute, but those individuals were

15    challenging their adverse employment action, not a

16    government-wide policy promulgated by a separate agency as this

17    one.

18          And the last one, the *Gordon v. Ashcroft* case, this is

19    the FBI case that involved a letter of censure, that individual

02:32PM 20  couldn't go to the MSPB because the MSPB was too low of a --

21    not harmful enough or big enough adverse employment action,

22    but, again, you had a covered employee and the kind of action

23    that was contemplated by the MSPB and by Congress in

24    promulgating the CSRA.  That is not what you have here.

25          The last case that I'll mention, which I don't think

1    is cited in defendant's brief but may come up today is the

2    *Payne* case.  That case also considered President Biden's

3    vaccine mandate case, as did *Feds For Medical Freedom* vs.

4    Biden.

5            Now the Fifth Circuit in *Feds for Medical Freedom v.*

6    *Biden* concluded that there was jurisdiction including for a

7    union proceeding in its representative capacity because

8    plaintiffs were challenging a government-wide program about

9    vaccines, that it was not about the covered adverse personnel

02:33PM 10   action.

11           The D.C. Circuit in contrast held that jurisdiction

12   would be precluded, but, there, the plaintiff there, Mr. Payne,

13   was precluded, premised his standing on the fourth coming

14   adverse employment action that he would experience if this

15   policy went into effect, so meaningfully distinguishable, and,

16   in addition, we would argue that the Fifth Circuit has the

17   better of this argument.

18           Your Honor, I'm happy again to answer questions

19   following opposing counsel's presentation.

02:33PM 20           THE COURT:  All right.  Thank you.

21           MS. GOLDSTEIN:  But thank you.

22           MR. HAMILTON:  Good afternoon, your Honor.  My name is

23   Eric Hamilton.  This Court should deny plaintiffs's motion, but

24   before getting into the arguments that support that outcome, I

25   thought I would take a moment to talk about the voluntary

24

1      resignation program, why it exists and how it operates.

2            President Trump campaigned on a promise to reorganize

3      the federal work force, and shortly after taking office, he

4      made two important announcements to the federal work force.

5      One, he announced a change to the remote work policies that had

6      been in effect and said that much of the federal work force

7      would be required to return to in-person work.

8            Second, he announced he'd be reducing the overall size

9      of the federal government work force and that there would be

02:34PM 10     reductions in force in some federal agencies and departments.

11           We understand that these announcements may have come

12     as a disappointment to some in the federal work force, and so

13     the voluntary resignation program offers a humane off-ramp to

14     federal government employees who might have structured their

15     life around having a remote work opportunity.

16           This gives those employees seven months to seek new

17     employment that might still be remote work without having a

18     change to their federal salary and benefits, and we also

19     understand that the announcement of a reorganization of the

02:35PM 20     work force may have come as a disappointment.

21           Employees not wanting to deal with the uncertainty of

22     that have this also as a main off-ramp to have the certainty of

23     no change to their salary and benefits during the programming.

24           Turning to the motion, your Honor, this is the rare

25     motion for a temporary restraining order that I think does not

1    require the Court to even get to the four-element *Winter* test,

2    and the reason is that the relief that plaintiffs propose is

3    legally incoherent and at odds with their theory of their case.

4         Your Honor, plaintiffs are asking the Court to hold

5    that it is likely that the voluntary resignation program is

6    unlawful, and on that premise, to extend the program out into

7    time.  That does not make any sense, and the Court should not

8    consider that possibility.  In addition, it is a fundamentally

9    inequitable outcome.

02:36PM 10    Plaintiffs's complaint signals that their plan for the

11    case is for the Court to vacate the voluntary resignation

12    program.  In other words, plaintiffs want the Court today to

13    hold open the program, allow continued participation in the

14    program only so that at the end of this case, all of that can

15    be wiped away.  That would be inequitable.

16         Turning though to the four-element test under *Winter*

17    that controls requests for preliminary equitable relief, I want

18    to start with irreparable harm because it is the element that

19    is most obviously absent here.

02:37PM 20    Plaintiffs claim irreparable harm in the form of the

21    questions that they're receiving from their members about how

22    the program works, and they also worry that the program will

23    result in more uptake and then those individuals who choose to

24    participate will decide to end their membership in plaintiffs's

25    unions.

1          Well, both of those harms would only increase if the

2     Court enters a temporary restraining order that extends the

3     program out into time.  It would not mitigate that harm.  In

4     addition, I think recognizing the fundamental flaws in their

5     proposed temporary restraining order, plaintiffs have attempted

6     to rework their request in their reply brief attaching to that

7     reply brief a brand new proposed TRO that also asks the Court

8     to enjoin defendants from soliciting participation in the

9     program.

02:38PM 10          Your Honor, that proposal is forfeited, arguments

11     raised for the first time in a reply brief are forfeited, and

12     that is only more true for new proposals for injunctive relief

13     that are raised for the first time in a reply brief.

14          The proposal that plaintiffs make also doesn't make

15     any sense.  They never explain why the Court should act to stop

16     the defendants from soliciting participation in the program but

17     at the same time require defendants to continue to operate the

18     program and permit participation in it.

19          This suggestion also raises administrability problems.

02:39PM 20     It isn't clear exactly what would and would not qualify for

21     defendants as soliciting resignations.  For example, would

22     answering questions about the program to federal government

23     employees constitute solicitation?

24          I'll turn next to the likelihood of success on the

25     merits.  The plaintiffs lack standing here, and I would note

27

1       that there's a decision from just Friday on the standing of one

2       of the plaintiffs here, which is the AFL-CIO.  This is in the

3       Federal District Court in Washington D.C., and because it's a

4       decision that came after we filed our brief, I'm just going to

5       read it into the record of the case caption.  It's AFL-CIO,

6       Department of Labor, Number 1:25-cv-339.

7           On Friday, Judge Bates held that the AFL-CIO lacked

8       organizational standing to challenge the Department of

9       Government Efficiency's access to Department of Labor data

02:40PM 10   based on the loss of trust with members.  The union there

11      claimed that this would result in some change of trust, but

12      that's a very similar theory standing with the one that

13      plaintiffs are relying on today.

14          They rely on this diversion of resources theory that

15      they are receiving questions about the program, and as a

16      consequence, that is diverting resources.  The most important

17      authority on that is the U.S. Supreme Court's very recent

18      decision in *FDA against Alliance For Hippocratic Medicine*.

19      There, an organization similarly claimed that the FDA's

02:41PM 20   approval of a drug would require that organization to study the

21      drug and then for the organization to provide information to

22      its members about that drug's risk.

23          U.S. Supreme Court held that was not a valid theory of

24      standing, and if that were the case, organizations could will

25      themselves into becoming plaintiffs in federal litigation

1    through their own conduct, and it's a similar theory to the one

2    plaintiffs rely on here.  Their voluntary choice to provide

3    information to their members, it's a self-inflicted harm like

4    the *Clapper* case, and there also is no limiting principle on

5    plaintiffs's theory for standing.

6         If this really did suffice for standing, changes to,

7    for example, the general schedule pay scales, timekeeping

8    rules, travel and reimbursement policies, and ethics rules

9    would all become reasons for unions to bring litigation in

02:42PM 10   federal trial courts on the idea that those changes generate

11   questions to the union from its members and that those policy

12   changes could conceivably cause employees to leave federal

13   employment and then the unions.

14        In the end, the unions are the wrong plaintiffs.  To

15   the extent federal employees are disappointed with their

16   participation in the voluntary resignation program and have

17   legal claims to submit, those claims should be run through the

18   statutes that Congress established in the CSRA and FSLMRS,

19   which turns to the jurisdictional question on which there is

02:43PM 20   substantial briefing from both sides.

21        This Court lacks jurisdiction because CSRA and the

22   FSLMRS implicitly preempt plaintiffs's claims.  I won't repeat

23   our briefing on that, but I'll just highlight that at bottom.

24   Our argument is that it is absurd that the Congress developed

25   these carefully created schemes for the litigation of claims

1    between federal employers and their employees about workplace

2    conditions and rules but that Congress would also have wanted

3    federal employee employment unions to be able to come into

4    court on the allegation that they have received questions from

5    their members about a policy and initiate litigation in any

6    federal trial court of their choosing.

7           Turning to the APA, there is no final agency action

8    here, which is a requirement for every APA action, and that is

9    because the voluntary resignation program does not impose a

02:44PM 10   right or obligation on anyone.  That standard is met when

11   something basically has the status of law and a right or

12   obligation would only happen in this context once an employee's

13   participation in the program has been finalized.

14          Next is the Anti-Deficiency Act.  Two points on this,

15   your Honor.  Nothing about the voluntary resignation program

16   changes any of the federal government's financial obligations,

17   it simply changes what employees are expected to do or not do

18   during their period of federal employment.

19          If plaintiffs were right about the Anti-Deficiency

02:45PM 20   Act's application here, your Honor, it would mean that today in

21   February, the federal government could not make an offer to an

22   employee to begin new employment in April, and that offer could

23   not say that an employee would receive a salary from the

24   Federal Government.  Surely, that is not the case.

25          Our second point on the Anti-Deficiency Act is that

1   compliance with the Anti-Deficiency Act is, of course, implicit

2   in contracts and also the government's representations about

3   the voluntary resignation program.  Irreparable harm is another

4   factor under the *Winter* test.  Plaintiffs cannot show

5   irreparable harm here because, if anything, the injuries that

6   they claim would only be exacerbated by entry of a temporary

7   restraining order.

8           The voluntary resignation program was slated to end

9   the day after plaintiffs filed a lawsuit and sought a temporary

02:46PM 10   restraining order.  It is only open today because plaintiffs

11   filed this lawsuit.  If no injunctive relief is entered, the

12   program will close, and plaintiffs's complaints about the

13   questions they are receiving and the possibility of members

14   joining and leaving their unions will end.

15           Finally is the balance of the equities as well as the

16   public interest.  Both of these elements favor the defendants.

17   Your Honor, equitable relief here would be enormously

18   disruptive for the federal government.  The OPM plans to take

19   next steps in its reorganization once this program closes.  It

02:46PM 20   needs to close to move forward with its plans, and it also

21   needs this program to close for OPM to engage in the planning

22   that is required to rebalance and reorganize the federal work

23   force.

24           OPM needs to know who is not and who is not going to

25   participate in the program, and it can't have the answer to

1    that question as long as this remains open.

2        Equitable relief would also be hugely disruptive for

3    federal employees.  OPM has always expected that most of the

4    uptake would happen in the last 24 to 48 hours of the program,

5    and holding the program open in time into the future would only

6    inject more uncertainty into the program.

7        Finally is the President's Article II powers in this

8    space because this is in the end a policy about the federal

9    government managing its work force, and for plaintiffs to

02:48PM 10    remake this program into something of their own choosing with a

11    longer participation period and where OPM is prohibited from

12    soliciting participation but must receive participation, that

13    is an intrusion on the Article II interests at stake here.

14        I'm happy to answer any of your Honor's questions.  If

15    there are none, I just conclude by asking the Court to deny

16    plaintiffs's motion.

17        THE COURT:  All right.  Thank you.  Briefly.

18        MS. GOLDSTEIN:  Thank you, your Honor.  Just a few

19    points with respect to opposing counsel's arguments here.

02:48PM 20    First, defendants claim that the plaintiffs have forfeited the

21    ability to request the relief that they now seek, but

22    plaintiffs would have no way of knowing at the time that we

23    filed our initial TRO and at the time that the Court ordered

24    that plaintiffs were enjoined from implementation of the

25    directive that they would use that opportunity to further

1    pressure employees into taking the deferred resignation offer.

2         In fact, that's exactly what they did.  The emails

3    went out from OPM and from their surrogates notifying employees

4    that this directive had been extended and soliciting and

5    encouraging and seeking additional resignations.

6         Your Honor, that is why plaintiffs are seeking

7    additional relief here because it is plain that OPM, not

8    plaintiffs, is seeking to use any additional relief to put

9    additional pressure on employees, something that will cause

02:49PM 10   additional irreparable harm to plaintiffs.

11        Second, your Honor, they cite the TRO from

12   Judge Bates.  I will read from that decision right here.

13   Judge Bates states that, "Nowhere does the record state that

14   the union in question or any other plaintiff will use its

15   resources to counteract the harm caused by the defendant's

16   challenged conduct."  That is in direct contrast to numerous

17   paragraphs of plaintiffs's verified complaint.

18        Next, Judge Bates's decision notes that nor does

19   plaintiffs's motion even allege that any of them will divert

02:50PM 20   resources.  Again, that is in direct contrast to the

21   allegations that plaintiffs have raised here.  That TRO denial

22   has no bearing on plaintiffs's allegations in this case in

23   which we have outlined very specifically the harm that

24   plaintiffs will experience absent a TRO.

25        Second, your Honor, they argue that plaintiffs, or,

1    third, they argue that plaintiffs lack standing, that the

2    plaintiffs are essentially spending their way into standing in

3    this case, and they cite the *Alliance for Hippocratic Medicine*

4    case, but that case was different.  That organization did not

5    have organizational business streams.  They were an

6    organization that was solely an advocacy organization in

7    contrast with the *Havens* plaintiffs that had as one of their

8    core business functions providing advice and counseling.

9         Here, this is not a self-inflicted harm.  Plaintiff

02:51PM 10    unions have a duty to provide advice and counsel, a duty of

11    fair representation to their members, and a duty to provide

12    these services to their affiliates, and this is something that

13    these unions have been doing for many years.  It is part of

14    their core business function, and it is that core business

15    function, one of them that is being undermined here.

16         And the issue here is not that plaintiffs object to

17    getting questions or counseling their members or affiliates,

18    that is what they do, that it is a part of what they do, but

19    what they are experiencing now in an unprecedented two-week

02:52PM 20    period, where defendants have put this explosive offer

21    concerning their members and employees's very livelihoods, and

22    given them just days to make that decision, and then repeatedly

23    change the guidance as to what was being offered day by day as

24    that offer continued.  That is a different situation than the

25    vast majority.

1          And that is part, your Honor, why they're concerned

2    that this would somehow result in circumventing standing,

3    unions turning up to challenge every little thing is not the

4    case.

5          The question of injury and fact is an essential part

6    of this test, and in the vast majority of typical cases, unions

7    as organizational plaintiffs will not be able to show that they

8    have suffered organizational harm, but this case is not

9    typical, your Honor, this is an unprecedented program

02:52PM 10    promulgated not by agencies but by OPM under a short two-week

11    deadline that has caused harm to the plaintiffs as

12    organization.

13          Your Honor, I believe I've adequately covered

14    jurisdiction, but I do want to talk for a moment about their

15    Anti-Deficiency Act argument.  They're saying that their action

16    here does not change the federal government's obligations to

17    employees, but that is not what they are telling employees, and

18    that is not the agreement that individuals are accepting.

19          Their website, even now, in the FAQ asks, "Will I

02:53PM 20    really get paid?"  The answer to that is an unequivocal yes,

21    your Honor.  That is not how regular employees are treated.

22    You may make a job offer to someone to start in April, but the

23    form job offers that I've received from the federal government

24    say that that is subject to appropriation, and as we've seen,

25    the federal government has shown no reluctance to rescind job

35

1    offers from individuals before they've actually started, even

2    not subject to appropriations.  They are prioritizing these

3    individuals and putting them in a separate category and saying

4    that they will receive all of their benefits and pay through

5    September 30th in an unequivocal fashion.  That is what the APA

6    recognizes.

7         Lastly, your Honor, or almost lastly, your Honor, they

8    make the same argument with respect to irreparable harm that it

9    will only be exacerbated here, but here, as defendants have

02:54PM 10   just conceded in their argument, they anticipate that in the

11   last hours of the program, they will receive the most uptick to

12   the program.

13        That concession alone, your Honor, is sufficient to

14   find that there is irreparable harm if this Court reinstates

15   that deadline now.

16        In addition, they overlook the constantly changing

17   guidance that means that even if there is no injunctive relief,

18   we're effectively locking in and continuing the harm that

19   plaintiffs will continue to get questions about what it is that

02:55PM 20   folks agreed to, questions about what they've accepted, and

21   they will not be able to counsel folks effectively.

22        The last argument or the second to last argument, your

23   Honor regards balance of equities.  They say that it will be

24   enormously disruptive to the government to extend the deadline

25   on this case.

1          Defendants have no right to rush out a program in two

2     weeks that does not comply with requirements of reasoned agency

3     decision-making and the Anti-Deficiency Act, and, in fact, the

4     public's interest in the smooth functioning of government,

5     particularly in light of this conduct, cuts against that

6     argument.

7          The last argument they make is a new argument with

8     respect to the President Article II arguments that does not

9     appear in this brief.  We would argue, as they do, that that

02:56PM 10    argument would be waived, but even if it were not, your Honor,

11    it is irrelevant.

12         This case is not about executive power, this case is

13    about agency action, and agencies under the APA are held to

14    requirements of reasoned decision-making.  This is also, their

15    argument also ignores the fact that Congress has had a lot to

16    say with respect to how the federal workplace works and what

17    rules govern that, both with respect to requiring agencies like

18    OPM to be bound by the Administrative Procedure Act and by the

19    CSRA itself, which sets a host of requirements and due process

02:56PM 20    protections and others on employees and on the federal

21    workplace.

22         Your Honor, in conclusion, this is an unprecedented

23    action taken on an unprecedented timeline that is causing

24    serious and irreparable harm to plaintiffs in their capacity as

25    organizations, and we ask that this Court enjoin that action

37

1    here.

2             THE COURT:  I'll give you a brief response if you

3    want.

4             MR. HAMILTON:  Thank you, your Honor.

5             THE COURT:  I can see you looking that way.  Emphasis

6    on briefly.

7             MR. HAMILTON:  Yes, two very quick points.  One on the

8    scope for relief in the temporary restraining order.

9    Plaintiffs suggested that there's no way that they could have

02:57PM 10    known that the OPM and Mr. Ezell would have implemented the

11    Fork In The Road Voluntary Resignation Program after your Honor

12    entered his Thursday order orally, but I will just read from

13    the proposed temporary restraining order, Docket 11.1.  They

14    wanted the February 6th deadline for federal employees to

15    accept the directive stayed, which is exactly what defendants

16    did, and the attachment to their reply brief is a revision of

17    that request.

18             On the DDC decision of Judge Bates on Friday, the

19    theory that Judge Bates rejected is very similar to the

02:58PM 20    reputational harm that plaintiffs are claiming here that their

21    questions and need to answer them is going to negatively affect

22    the reputation they have with union membership.

23             And, finally, I just wanted to respond to some of

24    plaintiffs's questions about how the program works by

25    explaining that the Telework Enhancement Act gives the federal

1    government substantial discretion in determining who is and who

2    is not subject to an in-office work policy, and, as I said,

3    nothing about financial obligations of the federal government

4    is changing, instead it is that work responsibilities are

5    eliminated for those who choose to participate, and that is

6    carried out by placing employees on administrative leave.

7        There's additional discussion of this in the

8    February 4th OPM memo, of which there is a hyperlink in our

9    brief.

02:59PM 10        And, finally, I would just ask your Honor about

11    comments that your Honor shared at the beginning of the hearing

12    and the status of this and that your Honor is converting the

13    requests for a TRO to a preliminary injunction?

14        THE COURT:  Well, sort of.  The TRO will continue

15    until I resolve the issues that are presented, but I guess what

16    I was saying, this is equivalent to a preliminary injunction

17    because it's thorough, it's contested, and so on, so it's not

18    converted right yet, but after something happens in the order,

19    it may or may not, depending.

03:00PM 20        MR. HAMILTON:  Thank you for that clarification, your

21    Honor.

22        THE COURT:  A little mix-up in the terminology, I

23    guess.  We'll be in recess, thank you.

24        THE CLERK:  All rise for the Honorable Court.

25        (Whereupon, the hearing was adjourned at 3:00 p.m.)

1                   C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript,

8    Pages 1 through 39 inclusive, was recorded by me

9    stenographically at the time and place aforesaid in Civil

10   Action No. 25-10276-GAO, AMERICAN FEDERATION OF GOVERNMENT

11   EMPLOYEES, AFL-CIO vs. CHARLES EZELL, ACTING DIRECTOR,

12   OFFICE OF PERSONNEL MANAGEMENT, and thereafter by me reduced to

13   typewriting and is a true and accurate record of the

14   proceedings.

15            Dated February 11, 2025.

16

17                    s/s Valerie A. O'Hara

18            _____

19                 VALERIE A. O'HARA

03:06PM 20             OFFICIAL COURT REPORTER

21

22

23

24

25