## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, 80 F Street N.W., Washington, D.C. 20001, <br><br> AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, 1625 L Street, N.W. Washington, D.C. 20036, <br><br> and <br><br> NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC., 159 Thomas Burgin Parkway Quincy, MA 01269, <br><br>            Plaintiffs, <br><br>    v. <br><br> CHARLES EZELL, in his official capacity as Acting Director of the Office of Personnel Management, 1900 E Street, N.W. Washington, D.C. 20415, <br><br> and <br><br> OFFICE OF PERSONNEL MANAGEMENT, 1900 E Street, N.W. Washington, D.C. 20415, <br><br>           Defendants. | Case No. 1:25-cv-10276 |

## AMENDED COMPLAINT

2885998

## AMENDED COMPLAINT

Plaintiffs American Federation of Government Employees, AFL-CIO ("AFGE"), American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME"), and National Association of Government Employees, Inc. ("NAGE") bring this action against the Office of Personnel Management ("OPM") and the Acting Director of OPM and allege as follows:

1.    The Office of Personnel Management's January 28, 2025 decision to offer a purported "deferred resignation" program to federal career employees was the opening salvo in this Administration's unlawful campaign to usurp agencies' Congressionally delegated powers in its pursuit of drastically reducing the nonpartisan career civil service upon which this country has depended and under which it has thrived for more than 140 years.

2.    The continued success of government is based, in large part, on the institutional memory of its career civil servants who are committed to the missions of their agencies and the prospect of working for the American people. These civil servants are professionals and subject matter experts, many of whom have worked diligently and impartially through successive administrations of both major parties to implement changing administration priorities. The departure or expulsion of these employees *en masse* and without reasoned consideration deals this country a dangerous one-two punch.

3.    First, the government loses expertise in the complex fields and programs that Congress has, by statute, directed the Executive to faithfully implement. The government will have fewer qualified employees to execute the statutorily required tasks that still remain.

4.    Second, when vacant positions become politicized, as this Administration seeks to do, political partisanship is elevated over competence, experience, and facts, to the detriment of agency missions and the American people. That is why Congress, since 1883, has established rights and processes for protecting these employees from undue political influence and has granted

employees who have completed a probationary period, or prior applicable service, protections from termination.

5.      The Administration has purported to wipe away longstanding civil service protections and merit system principles mandated by Congress with strokes of a pen. On Inauguration Day, the President signed an executive order, quickly followed by an OPM memorandum, that would make it possible for him to convert large swaths of the civil service to at-will employment, in contravention of the Civil Service Reform Act ("CSRA") and OPM regulations. *See* 89 Fed. Reg. 24982 (Apr. 9, 2024). The President signed an executive order declaring that career members of the Senior Executive Service serve at the pleasure of the President, even though Congress specifically granted these civil servants adverse-action rights. *See* 5 U.S.C. §§ 7541–43. Daily, the President is also attempting to eliminate offices, programs, and full agencies that are supported by Congressional appropriations and tasked by Congress with specific functions.

6.      In line with these efforts, on January 28, 2025, Defendants sent federal employees an email titled "Fork in the Road," offering employees what they called a "deferred resignation . . . program"—a termination program that purports to grant workers the ability to resign now and retain all pay and benefits until September 30, 2025. *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited March 15, 2025) (hereinafter, "the Directive" or "the Fork Directive").

7.      The Fork Directive did not originate with federal employees' supervisors, or even from their respective agencies. Rather, it was a government-wide missive that OPM sent to more than two million federal employees across all sectors and agencies within the federal workforce.

2885998

8.      Employees were initially given a little more than a week, until February 6, 2025, to accept or reject the offer. *Id.*

9.      To leverage employees into accepting the offer and resigning, the Fork Directive threatened workers with eventual job loss in the event that they refused to resign. OPM stated that "the majority of federal agencies are likely to be downsized through restructurings, realignments, and reductions in force," and Defendants "cannot give you full assurance regarding the certainty of your position or agency." *Id.*

10.      The Court temporarily extended this short-fuse deadline in response to the Plaintiffs' motion for a temporary restraining order ("TRO"). When the Court dissolved the TRO on February 12, OPM—without warning or advance notice of any kind, to this Court, to the Plaintiffs, or to any federal agencies or workers—closed the program.

11.      Federal employees were right to feel threatened by the email—within hours of the end of the sign-up period for the Fork Directive, Defendants fired tens of thousands of federal workers *en masse*. Days later, OPM emailed most remaining federal workers, demanding they defend their professional worth in a few short bullet points, and again threatening termination if they did not comply with the short-fuse deadline.

12.      The Fork Directive is a final agency rule and a government-wide OPM program. Only OPM is responsible, and only OPM can be held accountable. OPM did not receive input for the Directive's development, implementation, or execution from any other employing agency. Agencies were caught off guard by the initial announcement, unable to answer their workers' questions as they struggled to address their own concerns about critical staffing shortages and other consequences created by the rash enactment of this program.

13.     Compounding the problems with the Directive, OPM failed to comply with even the most basic legal requirement: notice and comment rulemaking. Had OPM taken the time to publish notice in the Federal Register, accept and review comments, and wait the required period before implementation, Plaintiffs and their members would have been able to provide comment, seek answers, be subject to a fully thought-out program, and prepare for reductions to the federal workforce consistent with the rulemaking process Congress has contemplated and approved.

14.     This failure was intentional. OPM and its Acting Director sought to sow chaos and create confusion and fear to push workers to leave the federal government. They did so by implementing a program that was arbitrary and capricious in almost every regard: they (1) failed to consider possible adverse consequences to the continuing functioning of government by providing a termination program to millions of federal employees at once; (2) offered conflicting information about employees' rights and obligations if they accepted the government's offer; (3) violated longstanding rules and requirements for federal employees; (4) acted contrary to reasoned practices of government restructuring; (5) ignored history and practices around effective workforce reduction; (6) set an arbitrarily short deadline; (7) imposed an arbitrary eight-month period for continuation of pay and benefits; and (8) acted on a pretext for removing and replacing government workers on an ideological basis.

15.     The Fork Directive is also contrary to law. There is no statutory basis for OPM's proposal. Though Congress created two separate legal procedures for downscaling the federal workforce—the reduction in force ("RIF") procedure and the voluntary incentive payment plan—OPM used neither. Nor could it. OPM does not have the statutory authority to terminate non-OPM workers or guarantee them pay for no work.

16.     Further, at the time of implementation, Congress had appropriated no money for the Directive; the program offered to pay workers through September 30, 2025, yet the appropriation for most federal agencies expired six months prior. The Antideficiency Act forbids such a guarantee. And while Congress passed and the President signed a Continuing Resolution on March 15, 2025, it did not clearly appropriate funds specifically for the Fork program.

17.     The Fork Directive also exceeds statutory authority and is *ultra vires* in violation of the Administrative Procedure Act and the Constitution. Congress granted each agency, not OPM, the power to terminate employees and create and implement separation plans. Congress has never granted OPM the power to commandeer funds appropriated by Congress to other agencies, or to commit those agencies to paying the salaries of non-working federal employees for eight months.

18.     Plaintiffs are labor organizations that collectively represent more than 800,000 federal civil servants. Plaintiffs bring these claims on behalf of themselves and on behalf of their injured members. Plaintiffs have a direct interest in ensuring that their members make informed decisions about their employment and that the ability to make those decisions is not compromised by an irrational and illegal offer made on such an arbitrary and compressed timetable. Plaintiffs also seek to vindicate the financial, emotional, and reputational injuries suffered by their members as a result of this Directive—interests that are critical to Plaintiffs' missions to protect and advocate for the workers they represent.

19.     Plaintiffs' members—employees across multiple federal agencies—are suffering ongoing injuries from OPM's Fork Directive and its unlawful, chaotic rollout. Some signed up for deferred resignation yet were treated inconsistently with the Directive, including by being subsequently fired. Likewise, others accepted the offer and informed their teams, only to have their

eligibility for Fork revoked and their professional standing and reputations unalterably damaged. Still others wanted to accept the offer to resign but could not obtain basic information about whether their benefits, such as parental leave, would be affected, whether they could take second jobs, or whether the program was even lawful (it's not).

20.    Plaintiffs are routinely called upon to advise both their federal employee members and other Plaintiff-affiliated unions who directly represent federal employees. They are—still— unable to render dependable advice because basic information was and is absent from the Directive. It is far from clear, for example, what happens to their members' pensions, health insurance, retirement eligibility, service tenure requirements, and reinstatement rights. It is unclear whether workers can seek outside employment before the end of the Fork Directive. It is not even clear whether Congress's most recent Continuing Resolution will fund the paychecks of these non-working employees for the next six months. And critically, Plaintiffs cannot advise or reassure their members that these programs were lawful from the start; nor can Plaintiffs advise whether their members may be subjected to even more unlawfulness from OPM in the future.

21.    Because the Fork Directive is a final agency action that, as written and implemented, violates procedural rulemaking requirements, is arbitrary and capricious, is an abuse of discretion, is contrary to law, exceeds OPM's statutory authority, and is *ultra vires*, the Court should, *inter alia*, declare that the Directive is unlawful and vacate and remand the Directive to OPM to ensure that any such program complies with the law.

## PARTIES

22.    The American Federation of Government Employees, AFL-CIO ("AFGE") is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington,

D.C. 20001. AFGE, the largest federal employee union, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.

23.     AFGE members include nurses caring for our nation's veterans, border patrol agents securing our borders, correctional officers maintaining safety in federal facilities, scientists conducting critical research, health care workers serving on military bases, civilian employees in the Department of Defense supporting our military personnel and their families, and employees of the Social Security Administration making sure retirees receive the benefits they have earned.

24.     AFGE was founded in 1932 by federal employees seeking to create a right to fair employment and pay during the Great Depression. As the union grew, it advocated for and secured numerous victories for career civil servants, including the passage of the CSRA in 1978.

25.     AFGE is dedicated to fighting for dignity, safety, and fairness on the job for its members, and promoting efficiency and the improvement of government service so that government can more effectively serve the American people.

26.     The American Federation of State, County & Municipal Employees, AFL-CIO ("AFSCME") is a national labor organization and unincorporated membership association headquartered at 1625 L Street N.W., Washington, D.C. 20036. AFSCME is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils, and other affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME, through its affiliate District Council 20 and its constituent local unions, represents federal civilian employees in agencies and departments across the federal government.

27.     AFSCME was founded in 1932 by civil servants seeking to combat state efforts to replace a competitive civil service system with political patronage, united by a simple idea: that a

professional civil service is essential to a strong democracy, and public service should be delivered by individuals dedicated to serving their communities, not those who have close connections to politicians. This idea has sustained AFSCME through nearly nine decades, as the union has succeeded in its efforts to pass or strengthen civil service laws across the United States.

28.    AFSCME members include nurses, corrections officers, childcare providers, emergency medical technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with one thing in common: a dedication to making our communities stronger, healthier, and safer. Its members working for the federal government make our communities stronger, healthier, and safer by working to ensure aviation safety at the Federal Aviation Administration, agricultural sustainability at the Department of Agriculture, criminal justice through the Department of Justice, and more.

29.    The National Association of Government Employees, Inc. ("NAGE") is a national labor organization and is affiliated with the Service Employees International Union. NAGE is incorporated in the state of Delaware with its place of business at 159 Thomas Burgin Parkway, Quincy, MA 02169. NAGE and its local units are the certified exclusive bargaining representative of approximately 125,000 employees, including nearly 75,000 federal employees in 43 states, including Massachusetts.

30.    NAGE members, many of whom are veterans, include health care workers, police officers, scientists, office workers, researchers, childcare providers, janitorial staff, drivers, and more, working at many federal agencies such as the Department of Defense, the Department of Veterans Affairs, the Department of Transportation, and the National Park Service.

31.     Founded in 1961, NAGE is an organization of members united by the belief in the dignity and worth of workers and the services they provide, dedicated to improving the lives of workers and their families, and creating a more just and humane society.

32.     AFGE, AFSCME, and NAGE bring this action on behalf of themselves as organizations and on behalf of their members via their standing as associations.

33.     Defendant Office of Personnel Management ("OPM") is a federal agency that serves as the chief human resources agency and personnel policy manager for the federal government.

34.     Defendant Charles Ezell is the Acting Director of OPM. He is sued in his official capacity.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.*, and the Administrative Procedure Act, 5. U.S.C. § 701 *et seq*.

36.     Venue is proper in the District of Massachusetts pursuant to both 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff NAGE is a resident of this district, and a substantial part of the events or omissions giving rise to this First Amended Complaint occurred and continue to occur within the District of Massachusetts, where thousands of Plaintiffs' members received, and many members accepted, the Fork Directive.

## LEGAL FRAMEWORK

37.     Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law."

2885998

5 U.S.C. § 706(2)(D). The APA likewise requires a court to hold unlawful and set aside agency actions that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). And the APA mandates that a court hold unlawful and set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(B).

38.     Under the APA, an agency must undertake notice and comment before publishing a rule, and an agency must publish a rule 30 days before its effective date. 5 U.S.C. § 553(b)–(d). OPM is subject to these notice and comment rulemaking requirements. *See* 5 U.S.C. § 1105.

39.     Congress vested federal agencies and their heads with the authority to employ, regulate, and manage the agency's federal employees. 5 U.S.C. §§ 301–302, 3101.

40.     Congress has also made federal agencies subject to the civil service employment requirements of the CSRA. Agencies and agency heads have a Congressional mandate to comply with the CSRA, including the statutes that govern termination of employment. *See* 5 U.S.C. §§ 7512–7513.

41.     Congress created a statutory scheme by which employing agencies can create plans for "voluntary separation incentive payments." 5 U.S.C. § 3521 *et seq.* These plans must include specific mandatory criteria, must receive OPM approval before implementation, and must be paid in lump sums. 5 U.S.C. §§ 3522–23.

42.     The Code of Federal Regulations provides a detailed process by which agencies may undertake reductions in force ("RIFs"). *See* 5 C.F.R. § 351 *et seq.* The employing agencies are granted the rights and responsibilities to determine how to carry out a RIF and comply with the relevant statutes and regulations. *See, e.g.,* 5 C.F.R. §§ 351.201, 351.204. OPM may "prescribe regulations" for RIFs to account for tenure, veteran status, and other considerations, 5 U.S.C.

§ 3502, and may provide employing agencies with "guidance and instructions for the planning, preparation, conduct, and review" of RIFs, 5 C.F.R. § 351.205.

43.     There is no statute that provides a process or procedure for carrying out a "deferred resignation program." There is also no statute that grants OPM the authority to commit other agencies' funds to paychecks for non-working employees.

44.     The Appropriations Clause of the Constitution commands that "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., Art. I, § 9, cl. 7. In 1870, Congress enacted the Antideficiency Act, 31 U.S.C. §§ 1341, 1342, 1349–1351, 1511–1519, to address the increasingly common problem of the executive branch obligating funds in advance of appropriations, which put pressure on Congress to then appropriate those funds so that creditors would be paid.

45.     The Antideficiency Act protects Congress's constitutional power of the purse. Section 1341 of the Act provides, in relevant part, that a federal official may not (1) "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation"; or (2) "involve" the federal government "in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a).

## ALLEGATIONS

### *OPM commences rollout of its Fork Directive.*

46.     On the afternoon of January 28, 2025, OPM sent an email directly to all—or nearly all—federal employees with the subject title, "Fork in the Road," which announced a "deferred resignation" "program" to those employees—the "Fork Directive." *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Mar. 15, 2025).

2885998

47.    The Fork Directive instructed recipients to reply to the email with the word "RESIGN" to participate, sent directly to OPM at hr@opm.gov. Specifically, OPM's message stated:

> This program begins effective January 28 and **is available to all federal employees** until February 6. If you resign under this program, you will retain all pay and benefits regardless of your daily workload and will be exempted from all applicable in-person work requirements until September 30, 2025. . . .

*Id.* (emphasis added).

48.    OPM announced that "deferred resignation is available to all full-time federal employees" except those in certain national security and immigration roles and at the U.S. Postal Service and "any other positions specifically excluded by your employing agency." *Id.*

49.    In making this extraordinarily broad solicitation for resignations, OPM offered employees barely more than a single week to respond, demanding a single word response—"RESIGN"—by February 6, 2025. The only action required of employees who wished to accept this offer—to join the program and be paid through September 30 without working—was a reply to the email with this single word response.

50.    This incredibly short timeframe was accompanied by implicit threats of earlier termination for those who failed to accept a deferred resignation date of September 30, 2025, and substantial uncertainty about the legality and details of the newly announced program and the breadth of its exclusions.

51.    The Fork Directive itself made clear that "the majority of federal agencies are likely to be downsized," including through RIFs and furloughs. *Id.* The OPM website explained to workers that the "federal workplace is expected to undergo significant near-term changes" and

advises that employees "may wish to depart" "on terms that provide you with sufficient time and economic security to plan for your future." *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Mar. 15, 2025) ("Why am I being offered deferred resignation?").

52.     Upon information and belief, these thinly veiled threats, combined with the rapid timeline and general chaos effectuated by the Directive as explained at length below, were intentionally designed to coerce workers to feel helpless, scared, and confused. OPM intimidated and pressured workers to made life-altering professional and personal decisions, with little time or information, through this combination of threats and confusion.

53.     Within hours of the close of the sign-up period for the Fork Directive, the threats came to fruition. The federal government announced the mass termination of thousands of employees. *See, e.g.*, Andrea Hsu, *OPM alters memo about probationary employees but does not order mass firings reversed*, NPR (Mar. 4, 2025) (discussing mass firings of probationary employees that began February 13). Within days, thousands more were fired. *See, e.g.*, Michael Bender & Dana Goldstein, *Education Department Fires 1,300 Workers, Gutting Its Staff*, N.Y. Times (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/us/politics/trump-education-department-firings.html. Some of these fired workers are Plaintiffs' members who had signed up for the Fork Directive.

54.     OPM did not provide notice and comment before sending its email, initiating the Directive, requiring workers to make life-altering career and personal decisions, or impliedly mandating that agencies commit unappropriated funds to pay workers who signed up.

***OPM failed to consider numerous factors, including critical concerns of continuity and service across government operations, in promulgating the Directive.***

55.     In issuing the Directive across the government barely a week after the new Administration was sworn in, OPM did not conduct any analysis of which agencies were likely to experience high levels of resignations, the optimal number of resignations, or where staffing was already woefully insufficient such that soliciting resignations would be incontrovertibly harmful to government operations. *See, e.g.*, Dep't of Veterans Affairs, Off. of Inspector Gen., *OIG Determination of Veterans Health Admin.'s Severe Occupational Staffing Shortages Fiscal Year 2024* (Aug. 7, 2024), [https://www.vaoig.gov/reports/national-healthcare-review/oig-determination-veterans-health-administrations-severe-0](https://www.vaoig.gov/reports/national-healthcare-review/oig-determination-veterans-health-administrations-severe-0) (documenting 2,959 Veteran Health Administration medical facilities with "severe occupational staffing shortages" in the fiscal year 2024).

56.     Upon information and belief, OPM did not conduct any analysis or rely on any reasoned basis for selecting the eight-month time period for the duration of the Fork Directive. Upon information and belief, OPM conducted no agency or employee surveys, financial analyses, or research or outreach of any kind to make a rational determination of an optimal time period to continue to pay non-working federal employees.

57.     OPM also sent the Fork Directive to individuals that it later deemed ineligible to participate. For example, one of Plaintiffs' members is an Air Traffic Safety Inspector who accepted the Fork Directive, told his manager he was leaving, and learned ten days later that he was no longer eligible.

58.     Another of Plaintiffs' members is an Aviation Safety Inspector who decided to sign up for the Directive and learned *the day before the program closed* that he was no longer eligible; when he tried to sign up before the initial deadline, his acceptance was denied.

59.     Workers at the Transportation Security Administration ("TSA") received the Fork Directive email inviting participation in the program and were told over a week later that they were ineligible. *Compare* Janet Moore, *TSA workers at Minneapolis-St. Paul International Airport receive federal buyout offer*, Minn. Star Tribune (Jan. 29, 2025), https://www.startribune.com/tsa-workers-at-msp-airport-receive-federal-buyout-offer/601213770; *with* Mary Schlangenstein, *TSA Workers Were Told They Can't Take Musk's 'Buyout' Offer*, Bloomberg (Feb. 6, 2025), https://www.bloomberg.com/news/articles/2025-02-06/tsa-workers-were-told-they-can-t-take-musk-s-fork-in-the-road.

60.     On information and belief, even where OPM may have made determinations in advance to exclude employees in critical positions from the program, the agency failed to communicate this to the workers. For example, OPM provided different eligibility information to employees from what it provided to the public: air traffic controllers received the initial Fork email even as an OPM official told media that these workers were exempt from the program. *See* Thomas Beaumont *et al.*, *Air traffic controllers were initially offered buyouts and told to consider leaving government*, ABC News (Jan. 31, 2025), https://abcnews.go.com/US/wireStory/air-traffic-controllers-initially-offered-buyouts-told-leaving-118330627. OPM's lack of communication, lack of planning, and contradictory and inconsistent information created uncertainty even for ineligible workers, who received multiple emails soliciting their resignations and suggesting their employment could be in jeopardy if they did not resign. *See, e.g., Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Mar. 15, 2025) ("[T]he majority of federal agencies are likely to be downsized through . . . actions . . . likely to include the reclassification to at-will status for a substantial number of federal employees").

61.     Nor did OPM consider the programmatic or other impacts on government service of dramatically—and with almost no advance warning—reducing the size of the federal workforce. OPM offered no plan or analysis as to how many employees they expected to take advantage of the program, or how the hundreds of agencies and their components across the government would ensure continuity of expertise and operations in light of the sudden unplanned "administrative leave" of some untold number of federal workers.

62.     Indeed, OPM acknowledges that *some* federal agencies actually require larger workforces to function, stating that "a few [unspecified] agencies . . . are likely to see increases in the size of their workforce." *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025). But the Fork Directive is addressed in an overwhelmingly blanket fashion to millions of employees without targeting or analysis. OPM's program can only be expected to cause resignations and resultant staff reductions, at even the unspecified agencies it acknowledges will require increases in the size of their workforce, at a time of low unemployment.

***The Directive, which provides conflicting information regarding employees' rights and obligations if they accept the government's offer, does not reflect reasoned decision-making.***

63.     The Directive and related materials offer conflicting information about employees' rights and obligations if they accept the government's offer.

64.     Following the original communication, OPM began publishing Frequently Asked Questions ("FAQs") concerning the program. It sent a follow-up email on the evening of January 30, 2025 to again encourage federal employees to resign, facetiously citing their ability to travel to "a dream destination" and asserting that "[t]he way to greater American prosperity is encouraging people to move from lower productivity jobs in the public sector to higher productivity jobs in the private sector." Kate Kelly, Michael C. Bender, and Zolan Kanno-Youngs,

2885998

*Official Email Urges Federal Workers to Find 'Higher Productivity' Jobs* (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/us/politics/federal-workers-opm.html; Fork in the Road, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Mar. 15, 2025).

65.    The FAQs changed throughout the sign-up period, with OPM regularly adding and changing material. *See Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://web.archive.org/web/20250000000000*/https://www.opm.gov/fork/    (internet    archive showing numerous changes to Fork Directive FAQs).

66.    The shifting guidance obscured the true nature of the Directive from Plaintiffs, federal employees, and the public.

67.    For example, OPM repeatedly shifted its position as to whether and when employees who accept the offer in the Fork Directive would be expected to work.

68.    The initial communication from OPM on January 28, 2025 suggested that employees would be required to continue working, but "will be exempted from all applicable in-person work requirements." *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Mar. 15, 2025).

69.    OPM then purported to reverse its positions regarding whether employees would be required to work during the deferred resignation period, stating that "[e]xcept in rare cases determined by your agency," employees were "not expected to work." @Elonmusk, X (Jan. 29, 2025, 8:56 AM), https://x.com/elonmusk/status/1884601571347943773.



*See also* https://web.archive.org/web/20250129012319/https://www.opm.gov/fork/faq (same).

70.    But OPM provided no guidance as to the "rare" circumstances under which employees would be expected to work.

71.    OPM sent a second email on January 30, 2025 that purported to provide clarity. @News_MTorres, X (Jan. 31, 2025, 9:26 AM), https://x.com/News_MTorres/status/1885333873766080615 (post on X showing OPM email providing "Fork in the Road FAQs").

72.    At some point, OPM subsequently revised this guidance yet again, apparently in an effort to sweeten the deal and encourage employees to resign. As of February 1, 2025, OPM's response to a question about whether employees will be expected to work their government jobs

during the deferred resignation period simply reads, "No." Fork in the Road, U.S. Office of Pers.

Mgmt., https://www.opm.gov/fork (last visited Mar. 15, 2025).

## Frequently Asked Questions

| Am I expected to work at my government job during the deferred resignation period? | — |
|---|---|

No.

73.    OPM's FAQs failed to answer many of the Plaintiffs' members' questions about the Directive, and in fact created more confusion. One of Plaintiffs' members did not understand the impact of the Directive on her benefits, including her retirement. Another did not know whether she could participate in the Directive when she was about to start parental leave, including whether she would be expected to work while on the Directive—which she could not do while eight months pregnant. Another of Plaintiffs' members was unclear whether OPM had the statutory authority to pay her for eight months if she participated in the program. The FAQs did not answer these questions—yet OPM provided no other source for additional information or nuance about the Directive. This lack of information and communication does not reflect reasoned decision making.

74.    Beginning on or about January 30, 2025, agencies across the federal government advised federal employees by mass emails, at OPM's direction, that the Fork in the Road program was "valid, lawful, and will be honored." Anne Flaherty, Mary Alice Parks, and Soo Youn, *Federal workers told offer to get paid through September if they resign is 'valid,' 'lawful'*, ABC News (Jan. 31, 2025), https://abcnews.go.com/Politics/federal-workers-told-offer-paid-september-resign-valid/story?id=118317566.

75.    But these agencies were unable to answer questions about the lawfulness or contours of the Directive. Many of Plaintiffs' members could not determine whether the Directive

2885998

had any legal basis or would allow them to get paid, and their employing agencies were unable to address their questions.

76.    For example, one of Plaintiffs' members recounted how Jeffrey Vincent, an executive director at Federal Aviation Administration ("FAA"), told FAA employees the day after the first Fork email was sent that he could not answer questions about the program because he did not have any more information than they did.

77.    Upon information and belief, the agencies were unable to answer questions because OPM controlled all the information but failed to provide any to the agencies. This failure to anticipate and prepare for employees' questions and concerns about a massive and unprecedented program does not reflect reasoned decision making.

78.    To the extent that agencies attempted to answer employees' questions, their information sometimes conflicted with the communications from OPM. For example, in contrast to the FAQ post stating the employees would not need to work at all during the deferred resignation period, the VA told its employees on February 6 that they "must continue reporting to work" until the employees were instructed otherwise.

79.    OPM's need to broadly and flatly assert that the exploding offer in the Fork Directive was "lawful" and "valid" only demonstrates that the agency knew of the tremendous uncertainty surrounding the Directive's lawfulness and validity, and underscores that OPM rushed federal employees to make a decision, in a matter of days, despite that uncertainty. *See* Andrea Hsu, *Legal questions surround Trump's federal worker resignation offer*, NPR (Jan. 31, 2025), https://www.npr.org/2025/01/31/nx-s1-5282075/trump-federal-employees-resignation-offer-legal-questions.

80.     OPM's decision to issue a "deferred resignation" program that gave federal employees—and Plaintiffs who advise them—little more than a week to decide the future of their careers is unprecedented.

81.     Particularly in light of the extremely compressed timeline to participate in the Fork Directive, OPM's continual changing of the contours of that program—and the rights and obligations of employees under it— reflects the opposite of reasoned decision-making.

82.     Plaintiffs would have provided comments with input and suggestions about these issues, had OPM provided the legally required opportunity for notice and comment.

***The Directive fails to consider or adequately explain how it is consistent with longstanding ethics rules concerning outside employment, which place agency-specific restrictions on employees' ability to obtain additional employment.***

83.     OPM's FAQs following the issuance of the Directive flatly stated that federal employees could obtain a "second job" if they submitted their resignation. Indeed, OPM stressed that employees could "Absolutely!" obtain additional employment during the period they would be placed on administrative leave. *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Mar. 15, 2025).

> **Am I allowed to get a second job during the deferred resignation period?**　　—
>
> Absolutely! We encourage you to find a job in the private sector as soon as you would like to do so. The way to greater American prosperity is encouraging people to move from lower productivity jobs in the public sector to higher productivity jobs in the private sector.

84.     But this bald assertion contradicts longstanding regulations and nuanced rules that federal employees must consider when engaging in outside employment while still employed by the federal government.

22

85.    Federal ethics regulations provide that federal employees who seek outside employment must comply with numerous conditions, including "[a]ny agency-specific requirement for prior approval of outside employment or activities." 5 C.F.R. § 2635.801(b)(2). And the regulations further provide that agencies may impose a prior-approval requirement before individuals employed at the agency can accept outside employment. *Id.* § 2635.803. Some agencies have codified their requirement for prior approval by regulation; these policies could hardly be expected to change uniformly in the accelerated timeframe created by the Fork Directive. *See, e.g.*, *id.* § 5701.101 (Federal Trade Commission regulations).

86.    There are further restrictions on outside employment for federal employees, including a prohibition on receiving dual pay from federal employment. *See* 5 U.S.C. § 5533. But OPM informed employees that, should they resign from their positions, doing so would "not affect your ability to apply to work for the federal government in the future." *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Mar. 15, 2025).

87.    OPM's blanket assertions that all federal employees who accepted the exploding deferred resignation offer could "Absolutely!" obtain a second job were simply incorrect.

88.    Plaintiffs would have provided comments addressing these longstanding ethics rules, had OPM provided the legally required opportunity for notice and comment.

***The Fork Directive is contrary to reasoned practices of restructuring because it rashly implements a workforce reduction strategy that was chaotic and unsuccessful in the private sector, without any reason to believe it would enhance effective government functioning.***

89.    Upon information and belief, the Fork in the Road Directive is based on a staff reduction approach of the same name conducted by Elon Musk shortly after taking over Twitter (now X). On information and belief, Mr. Musk is deeply involved in OPM's operations, has close ties to senior OPM staff politically appointed by the new Administration, and has repeatedly commented publicly on the Fork Directive.

90.    OPM's rapid adoption of Musk's private-sector program confirms that the agency took very little time to consider the suitability of applying an approach used with questionable success in a single for-profit entity for the entirety of the federal workforce. *See, e.g.*, Dave Lawler, *The Elon-ification of the federal government*, Axios (Jan. 30, 2025), https://www.axios.com/2025/01/30/elon-musk-government-takeover-federal-workers ("A workforce discombobulated by chaotic recent events receives an email with the subject line 'Fork in the Road.' Inside, a deadline to quit or commit to the new mission. That's the scenario Twitter employees faced in November 2022 — and the one now confronting some 2.3 million government workers."); Clare Duffy, *The 'Muskification' of the federal government is in full swing*, CNN (Jan. 30, 2025), https://www.cnn.com/2025/01/29/tech/elon-musk-government-cuts-twitter-takeover/index.html.

91.    The "Fork in the Road" approach at Twitter was widely regarded as chaotic, and the company's value declined precipitously after it was implemented. As one report summarized, "While Mr. Musk ultimately transformed Twitter, reducing staff by 80 percent and minimizing its real estate footprint, its business has declined. Advertisers have fled the site in droves, and at least one investor, Fidelity, estimates the company is now worth 72 percent less than the $44 billion he paid for it." Kate Conger and Ryan Mac, Déjà Vu: *Elon Musk Takes His Twitter Takeover Tactics to Washington*, N.Y. Times (Jan. 30, 2025), https://www.nytimes.com/2025/01/30/technology/musk-doge-x-playbook.html.

92.    The Directive offers no rationale for translating a questionable private-sector experiment into a program for virtually the entire federal civilian workforce.

24

93.    Plaintiffs would have provided comment about the consequences of applying this private sector workforce reduction approach to public employees, had OPM provided the legally required opportunity for notice and comment.

### *The Fork Directive eschews the reasoned, logical, and congressionally authorized approach used for federal workforce reduction in the recent past through voluntary departure.*

94.    In the mid-1990s, then-President Clinton and his Administration undertook a significant effort to streamline and reduce the size of the federal workforce to increase efficiency and reduce the deficit. *See* https://www.presidency.ucsb.edu/documents/statement-the-buyout-program-for-federal-employees.

95.    President Clinton charged Vice President Gore with first leading a National Performance Review to gather information and make reasoned recommendations concerning government efficiency.

96.    After the National Performance Review conducted information-gathering and analysis, the Administration sought and received approval from Congress to offer buyouts to certain federal employees, with targeted offers.

97.    The offers were designed to reduce unproductive layers of management, with 70 percent of buyout uptake coming from managerial employees.

98.    This approach led to a reduction of more than 100,000 federal government positions a little more than a year after obtaining congressional authorization.

99.    The buyout authorities obtained from Congress in the Clinton Administration, *see* Pub. L. No. 103-226, 108 Stat. 111 (1994), generally gave agencies a calendar year—not nine days—to make and accept buyout offers from employees using considered principles articulated both by statute and in Office of Management and Budget guidance. These principles required the use of strategic plans before offering buyouts, ensuring the maintenance of productivity and ability

25

to achieve agency objectives, targeting specific positions, and integrating the efforts into restructuring plans. *See* U.S. Gov't Accountability Off., GGD-97-124, *Federal Downsizing: Effective Buyout Practices and Their Use in FY 1997,* https://www.gao.gov/products/ggd-97-124.

100.    Plaintiffs would have provided comment about reasoned prior approaches to workforce reduction, had OPM provided the legally required opportunity for notice and comment.

### *The Directive's deadline was arbitrary.*

101.    The OPM email gave federal employees until February 6, 2025, to weigh the consequences of the Fork Directive. In this *nine-day period*—during which time OPM did not answer questions directly and continued to post conflicting information to its website—federal workers were expected to assess the pros and cons of leaving their employment, talk with their loved ones about benefits and consequences, determine whether the program was lawful or viable, and decide if the risks of participating in a program without any apparent legal basis outweighed any possible benefit. At the same time, these public servants continued to work at their federal jobs.

102.    Every federal worker was forced to make a decision by the end of the Fork Directive: respond to the email with "resign" and hope the promises were true, or continue with their federal employment under the threat of pending terminations. Both actions carried enormous financial, personal, professional, and legal consequences. Though the closing date for the Directive was extended briefly by this Court, the extension did not affect the consequences of the Directive.

103.    The deadline to respond to the Fork Directive was not mandated by law. Indeed, statutes governing voluntary departures and reductions in force provide much longer timelines (and clearer guidelines). *See* 5 U.S.C. § 3521 *et seq.* (voluntary separation incentives); *id.* § 351.201 (RIFs).

104.    Instead, the deadline to respond was an arbitrary date Defendants selected to put maximum pressure on the federal workforce so that they would accept the offer, in many cases contrary to federal agency and federal employee interests. The brief extension of the deadline by this Court does not make the deadline any less arbitrary.

105.    Plaintiffs would have provided comment about the arbitrary, unreasonable, and unsound deadline OPM stated in connection with in the Fork Directive, had OPM provided the legally required opportunity for notice and comment.

***The Fork Directive is a pretext to remove career federal civil servants and replace them with staff who are politically aligned with the Administration.***

106.    The Fork Directive itself concedes that some agencies require more—not less— staffing.

107.    Statements made by the Administration and their surrogates make clear that they intend to reduce the size of the government in part so that they can replace career federal employees with individuals ideologically aligned with the Administration.

108.    The President has pledged to fire wide swaths of civil servants, promising to "throw off the political class that hates our country." Donald J. Trump, Speech at Conservative Political Action Conference (March 4, 2023), https://tinyurl.com/2hjrs5ah. As he explained, "you'll see that on the first day of my presidency, the deep state which is destroying our nation. The tables will turn and we will destroy the deep state. We're going to destroy the deep state." Donald J. Trump, Speech at South Carolina GOP Dinner (Aug. 5, 2023), https://tinyurl.com/36uhbe74.

109.    President Trump has singled out Democrats and so-called "RINOs" (Republicans In Name Only) for termination. For example, in one video post from May 2023, Trump told a reporter that he would make "very big changes" to the FBI in a potential second term. Donald J. Trump (@realDonaldTrump), Truth Social (May 15, 2023, 11:04 PM ET),

https://tinyurl.com/bdesuz3w. The DOJ and FBI, Trump said, personify the "deep state" as they are filled with "thousands and thousands" of "RINOs and with Democrats" that have been there for decades. Rebecca Jacobs, *Trump Has Said He Wants to Destroy the "Deep State" 56 Times On Truth Social*, CREW (Aug. 1, 2024), https://tinyurl.com/36z27phm. In another speech, he criticized the "deep state" workers who "work with the with the Democrats and the Republicans, and those are the Republicans I don't like." Donald Trump, *Speech at Political Rally in Sarasota*, Florida (July 3, 2021), https://tinyurl.com/58r46v4a.

110.    Vice President Vance reiterated that President Trump should "[f]ire every single midlevel bureaucrat, every civil servant in the administrative state, replace them with our people." Andrew Prokop, *J.D. Vance's Radical Plan to Build a Government of Trump Loyalists*, Vox (July 18, 2024), https://tinyurl.com/4rsvn7xv.

111.    The scattershot approach of the Fork Directive—which does not set a target for specific goals, agencies, positions or functions—can only be understood as an effort to hollow out the federal government to allow the Administration to make room for the Administration's partisan hiring. *See* The White House, Reforming the Federal Hiring Process and Restoring Merit to Government Service, https://www.whitehouse.gov/presidential-actions/2025/01/reforming-the-federal-hiring-process-and-restoring-merit-to-government-service/ (directing agencies to make federal "recruitment and hiring processes more efficient" by, *inter alia*, involving political appointees "throughout the full hiring process" and prioritizing hiring of individuals "passionate about the ideals of our American republic").

***The Fork Directive's Resignation Program is an OPM government-wide program and policy.***

112.    The Fork Directive was designed by OPM. No other agencies played any part in the design or substance of the Directive. No other agencies provided pre-rollout input about sufficient staffing levels, the impact of a high level of departures to their missions or effectiveness,

the ideal duration of the program, or the ability to commit agency funds to non-working employees for eight months. Nor were other agencies given information about the Directive's existence, duration, timing, or legal basis in advance, or provided any information in advance about their employees' eligibility for the program, the impact on employees' future government service, their ability to take other jobs during the program, or the likelihood that the Directive was lawful and would provide the benefits as advertised.

113.    The Fork Directive was implemented by OPM. The email announcement about the Directive came from OPM, not each worker's employing agency. Federal employees were required to email OPM directly, not their agencies, to participate. OPM, not the employing agencies, collected the workers' responses. It was an OPM decision to frame the offer as accepted, in full, as soon as the worker responded with, "Resign." OPM initially assessed workers' eligibility and notified workers when the OPM-chosen eligibility guidelines changed; it was apparently not until this approach became unworkable that the agencies themselves were allowed to determine whether their workers qualified.

114.    The Fork Directive was executed by OPM. Federal workers were directed to the OPM website for answers. Only OPM could edit and update the FAQs. Only OPM provided—or was even in the position to provide—answers to any questions about the program. Only OPM made changes to the Program during the execution, such as revisions to guidelines and communications to workers when the sign-up period was extended. Employing agencies did not— and could not, due to OPM's control of the program—provide any substantive support or feedback for their workers during the Program's execution.

115.    The Fork Directive was provided for federal workers across the entire federal workforce. It was not limited to specific agencies, and it certainly was not limited to OPM employees.

116.    The Fork Directive is a government-wide OPM policy and program.

***The Fork Directive was promulgated with no statutory basis or authorization and violated the Antideficiency Act.***

117.    OPM offered no explanation or statutory basis for offering the Directive. Nor did OPM identify how the federal government intends to pay an unspecified number of workers for not performing work for eight months. Nor has OPM offered a justification for this apparently unprecedented use of administrative leave.

118.    The Antideficiency Act prohibits federal officials from making or authorizing an expenditure or obligation exceeding an amount available in an appropriation or from contracting or obligating for the payment of money before an appropriation is made. 31 U.S.C. § 1341(a). This is precisely what Defendants did via the Fork Directive.

119.    When the Fork Directive was announced, the government was operating on a continuing resolution that was set to expire on March 14, 2025. No appropriation was in place to cover the salaries of federal employees after that date. The Directive, however, unequivocally promised all pay and benefits until September 30, 2025. As written, Defendants made or authorized an obligation for the payment of money before an appropriation is made. *See* Fork in the Road, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Mar. 15, 2025) (original communication to employees, explaining that workers will "maintain [their] current compensation…until [their] final resignation date").

120.    Following significant concerns about whether, in light of the lack of appropriations and other concerns, employees would "really" receive "full pay and benefits through September

30," OPM doubled down in its FAQs without reservation, stating, "Yes." *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Mar. 15, 2025)

> **Will I really get my full pay and benefits during the entire period through September 30, even if I get a second job?**   —
>
> Yes. You will also accrue further annual leave, sick leave, etc. and be paid out for unused leave at your final resignation date.

121.    These questionable assertions led to public concerns about the lawfulness of the Fork Directive given the lack of government appropriations beyond March 14, 2025. Andrea Hsu, *Legal questions surround Trump's federal worker resignation offer*, NPR (Jan. 31, 2025), https://www.npr.org/2025/01/31/nx-s1-5282075/trump-federal-employees-resignation-offer-legal-questions.

122.    In response, OPM changed the contours of the Directive's guidance. OPM added a statement to the FAQ that asserts that a lapse in funding could affect employees' pay regardless of whether they submit a deferred resignation. OPM nonetheless unequivocally assured employees that they will be entitled to back pay in case of a lapse in appropriations under the Government Employee Fair Treatment Act of 2019. *Compare Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (retrieved February 3, 2025. 8:49 AM) (explaining that a government shutdown could impact pay, but assuring employees that they would be entitled to backpay        after        any        shutdown)    *with        id        at* *https://web.archive.org/web/20250131184447/https://www.opm.gov/fork/faq* (extant version at 6:44 PM, Jan. 31, 2025) (FAQ does not include any equivocation on the entitlement to pay). In adding this new FAQ, OPM neither rescinded previous communications to federal employees nor

changed its other unequivocal statements that employees "really" will be paid through September 30, 2025.

123.    Whether or not an employee is guaranteed backpay following Congress's issuance of an appropriation, the Antideficiency Act forbade OPM from guaranteeing payment without an appropriation. Particularly where, as here, OPM could not know the contours of future appropriations or funding levels, this promise is improper.

124.    Plaintiffs would have provided comment addressing the failure to appropriate funds in connection with the Fork Directive, had OPM provided the legally required opportunity for notice and comment.

*Plaintiffs' members have been, and will continue to be, harmed by the Fork Directive.*

125.    Direct and appreciable legal consequences flowed from the Fork Directive email. Federal employees had no choice—they had to opt in and hope the promises would be kept, or opt out and hope the termination threats would not play out. Concrete consequences flowed from the Fork Directive's implementation, including financial, professional, reputational, personal, and emotional injuries.

126.    For example, one of Plaintiff AFSCME's members was employed by the USDA at the time of the Fork Directive. She accepted the Directive and resigned on February 10, 2025, by replying to OPM's email. She never received a response. Four days later, she was terminated as a probationary employee and received correspondence from the USDA that she was ineligible for the Fork Directive. A week after that, she was told by USDA that it was required to honor the Fork Directive for probationary employees. Days later, she received yet another email stating she was ineligible because of the nature of her appointment and because her position was funded by then-frozen USAID grants. She has yet to receive responses or clarification from OPM. She has yet to

be paid. Plaintiffs' member has suffered financial, professional, and emotional harm from the Directive and the obvious problems with its lawless design and shoddy execution.

127.    Another of Plaintiff AFSCME's members was also employed by the USDA. She was placed on administrative leave and received a pre-furlough notice on February 8. The next day, she accepted the Fork Directive and resigned. Yet on February 20, she was terminated as a probationary employee without any acknowledgement of her acceptance of the Fork Directive. A week later she was told that she was not eligible for the program because of the funding source for her position. Though she was reinstated pursuant to a court order on March 15, she was immediately furloughed. This member has not been able to receive any information about her acceptance. She has suffered financial, professional, and emotional harm from the Directive.

128.    Several of Plaintiff NAGE's members were employed by a component of the Department of Transportation ("DOT"). These members signed up for the Directive within the stated sign-up period. However, according to DOT, to participate in the Directive, the workers had to be placed on administrative leave—a requirement that was not included in the initial Fork email. But because the members' employers are fee-for-service and not directly funded from Congressional appropriations, they were not able to fund administrative leave for these workers. It was not until the week of March 17, 2025 that these members were part of the Fork Directive— six weeks after it was supposed to begin—despite accepting it under the terms of OPM's supposed offer. These members remained in limbo, uncertain about their employment status, incurring financial and emotional harms by the day.

129.    Another of Plaintiff NAGE's members was employed by the U.S. Department of Veterans Affairs ("VA").  She accepted the Fork Directive but received no response from the VA or OPM. She only later learned online *through Reddit* that her position was exempt. The employee

was in limbo, uncertain about her employment status, and incurred emotional and reputational harm.

130.    Another of Plaintiff NAGE's members was also employed by the VA. He accepted the Fork Directive, was told by HR that he was accepted into the program, and signed an agreement related to participating in the Fork Directive. A few weeks later, he was told he was ineligible because he was a reemployed annuitant—a status he has held for three years. Nowhere in the initial email, FAQs, or follow up correspondence did it indicate that this group of federal workers were categorically ineligible to participate in the Directive. This member suffered emotional and financial harm.

131.    One of Plaintiff AFGE's members was a civilian employee with the U.S. Air Force ("USAF"). He was a "term employee" whose appointment lasts through June 2025, but whose appointment is routinely extended as a matter of course. This member accepted the Fork Directive before the closure of the sign-up period. On March 18—*over a month* after the sign-up period closed—he was informed that would be terminated from the Fork program on June 16. Unlike other federal employees, including at USAF, who signed up for Fork and will be paid through September 30, this member will now receive only three months of benefits. He would not have accepted the offer to participate if he had known that he would not qualify for the full eight-month period. This member is suffering ongoing financial and emotional harm.

132.    Another of Plaintiff AFSCME's members was employed by the FAA. The rollout of the program caused him anxiety, but he discussed it at length with his wife. He accepted the Directive and resigned on February 3, 2025, telling his manager of his decision. Ten days later, he received an email from the FAA that his position was excluded from the program. This was an unfair bait-and-switch because had this member known that he was not eligible, he would not have

accepted the Directive or informed his manager. His anxiety has only increased since being forced back to work. He reasonably believes his initial acceptance affects his standing in the workplace, including with his manager, and his prospects for future promotions or performance awards. He has suffered reputational and emotional harm from the Directive and fears future financial harm. These injuries were caused by the Directive, including OPM's failure to establish clear or reasoned guidelines or provide clear or accurate information.

133.    Another of Plaintiff AFSCME's members was also employed at the FAA and was hired as a remote worker before the COVID-19 pandemic. His duty station is over 80 miles from his home, and he cannot commute there. This member was unsure whether he would soon be required to work in person, which he was not reasonably able to do, so he decided he would likely accept the Fork Directive. This member sought answers about the Fork Directive from FAA leadership and his supervisor; but they were unable to provide help given OPM's failure to provide clear, accurate, or consistent information. This member ultimately chose to accept the Fork Directive and resigned his position, the day before the program was set to close. The next day, the FAA notified this member he was not eligible to participate. This member has suffered professional, reputational, and emotional harm from the Directive's improper rollout and implementation.

134.    One of Plaintiff AFSCME's members worked for the USDA and considered accepting the Fork Directive but could not determine whether it was legitimate. She was concerned that her position would be eliminated by the Administration, both because of the news coverage of the attempted dismantling of USAID and because of the threatening nature of OPM's correspondence, particularly given the number and tone of its emails. She was concerned that the Directive was "too good to be true" and conducted her own research into its legitimacy. She was

reasonably concerned that she would be paid for a month or two, then terminated without pay for the remaining six months. She also was uncertain whether she would have to work if she accepted the Directive, given the conflicting guidance from OPM; she was eight months pregnant and about to start parental leave, so she would have been unable to work if required. She eventually received a sample Fork agreement from the FDA which stated that the agreement could be rescinded at any time. As a result of the uncertainty surrounding the program, she declined to participate in the Directive.

135.    Another of Plaintiff AFSCME's members at USDA considered the Fork Directive but could not determine whether it was legitimate. Her agency was unable to share any information about the program, so the only information she received was from OPM. She questioned the Fork Directive's legitimacy because OPM did not share terms of the agreements, because its guidance continued to change, and because OPM seemed ill-informed as to what it had the authority to offer or provide workers. This member tracked the litigation in this case and planned to accept the Fork Directive if she could be assured it was legitimate. The program closed before she was able to accept.

136.    Yet another of Plaintiff AFSCME's members worked at the FAA and considered taking the Fork Directive. But she was not sure about its legitimacy, particularly because all communications came only from OPM and at odd hours, after working hours. The Fork Directive was also dramatically different from the voluntary separation incentives she had previously seen. Its resemblance to the Twitter Fork program—which she knew had resulted in the workers who accepted being summarily fired without benefits—made her fear the same thing would happen to her if she participated in the Fork Directive. This fear was compounded by the knowledge that her agency was only funded through March, yet the Fork Directive promised to pay her through

September. Superiors at her agency were unable to answer any questions about the Directive. Ultimately, she declined to participate in the Directive. But she would have participated in the program if it bore any resemblance to the lawful, structured resignation programs she had seen in the past, or if she could have been otherwise assured of its legitimacy.

137.    Plaintiffs' members' injuries stem from the Fork Directive, particularly the short time period and the lack of reasoned decision making that went into its creation and execution. These injuries were caused because the Directive's substance and implementation were arbitrary and capricious, an abuse of discretion, and contrary to law, and because the Directive did not undergo the notice and comment process, which was the legally required mechanism for surfacing and addressing these and other members' questions and concerns.

138.    Based on their injuries from OPM's unlawful conduct, these members have standing to sue in their own right.

139.    The Plaintiffs also have associational standing to sue on behalf of their members and to vindicate their members' interests. The interests that the Plaintiffs seek to protect—their members' employment rights, protection from unlawful termination, stable and lawful workplaces, and paycheck protection, among others—are germane to the unions' purpose. The Plaintiffs regularly submit comments via the APA rulemaking process on behalf of their members to protect these kinds of interests.

140.    The claims and relief requested do not require the participation of union members.

***Plaintiffs have been, and will continue to be, harmed by the Fork Directive, by expending resources responding to the Directive and being forced to divert resources to respond to the Directive, and through loss of voluntary membership dues from employees who accepted the offer.***

141.    AFGE, on its own and in conjunction with its affiliated councils and locals, represents members and bargaining unit employees in agencies and departments across the federal

government for which it has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

142.    AFSCME, through its affiliated District Council 20 and its constituent local unions, represents members and bargaining unit employees in agencies and departments across the federal government for which AFSCME District Council 20 has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

143.    NAGE, on its own and in conjunction with its locals, represents members and bargaining unit employees in agencies and departments across the federal government for which it has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

144.    Membership in AFGE, AFSCME, and NAGE is voluntary.

145.    The leadership of AFGE, AFSCME, and NAGE are democratically elected by and from their respective members.

146.    The activities of AFGE, AFSCME, and NAGE are funded by their respective members through voluntary membership dues.

147.    AFGE members who are federal employees work in a wide variety of positions, in every U.S. state and the District of Columbia, and in agencies including the Environmental Protection Agency ("EPA"), the Department of Labor ("DOL"), the Department of Veterans Affairs ("VA"), the Social Security Administration ("SSA"), the Department of Defense ("DOD"), and the Department of Homeland Security ("DHS").

148.    AFSCME members who are federal employees work in a wide variety of positions at multiple federal agencies including AmeriCorps, the Department of Agriculture ("USDA"), the Department of Justice ("DOJ"), the FAA, the Peace Corps, and Voice of America.

149.    NAGE members who are federal employees work in a wide variety of positions in 43 states, in agencies including the VA, DOD, EPA, DOT, and the National Park Service ("NPS").

150.    AFGE members are located in all fifty states. AFGE has several affiliates across the State of Massachusetts, representing approximately 2,900 federal workers at various agencies, including the VA, DOD, SSA, and the EPA.

151.    Among AFSCME's thousands of affiliated subordinate bodies throughout the country, AFSCME Council 93 and its affiliated local unions represent employees of public and private employers in the State of Massachusetts including but not limited to employees of the City of Springfield and the Springfield Housing Authority.

152.    NAGE has multiple units in Massachusetts, representing approximately 7,000 federal employees at various federal agencies, including the VA, DOD, and DOT.

153.    Core services provided by AFGE, AFSCME, and NAGE include responding to inquiries and concerns from individual union members and union affiliates who directly represent those members, as well as counseling union members about issues that relate to the workplace. In general, AFGE, AFSCME, and NAGE, through their affiliates, work to ensure that all member inquiries receive a response, whether by email, phone, or meeting.

154.    One of AFGE's core functions is to provide guidance, legal representation, training, and other services to its over 800 affiliates.

155.    AFGE has over 150 employees who regularly receive inquires directly from members and affiliates.

156.    AFSCME has over 100 employees in its Organizing and Field Services Department whose role is to provide member relations services; they regularly receive calls and emails from

members and affiliates, including from federal employee members of AFSCME District Council 20 and its subordinate bodies.

157.    AFSCME represents its members through its constituent local unions, councils and other affiliates. Within this structure, one of AFSCME's core functions is to provide resources and guidance to its affiliates for organizing, bargaining, political action and education, legal issues of national significance, and the administration of members-only benefits.

158.    NAGE provides guidance, legal representation, training, and services to its locals, members, and bargaining unit employees.

159.    NAGE has employees who regularly receive inquiries directly from federal local affiliates and federal employees.

160.    As a result of the Fork Directive, AFGE, AFSCME, and NAGE were inundated by members and affiliates seeking advice and information about the Fork Directive.

161.    For example, within days of January 28, 2025, AFGE received thousands of emails from members and affiliates asking about the Fork Directive. AFGE received countless additional inquiries through other channels, including phone calls, town hall meetings, and site visits. AFGE members and affiliates asked about the implications of the Fork Directive and guidance on how to respond to OPM's email. AFGE affiliates also asked for services and support in responding to member and press inquiries about the Fork Directive.

162.    OPM's unclear and ever-changing guidance on the Directive has made it particularly challenging to provide accurate advice.

163.    As a result of the Directive, AFSCME District Council 20 and its constituent local unions received emails and phone calls from members asking about the implications of the Fork Directive. AFSCME local unions requested guidance from AFSCME International about the

legality of the Fork Directive, the implications of the Fork Directive on the future of AFSCME members' work, and whether AFSCME members should respond to OPM's email.

164.    Since January 28, 2025, NAGE has received hundreds of inquiries, emails, and telephone calls from locals and federal employees asking about the Directive and seeking guidance. NAGE members have had questions about the legality of the Directive, its implications, effects on their benefits, their options, and how to respond.

165.    Responding to these concerns has required AFSCME, AFGE, and NAGE to devote substantial additional resources into counseling members and affiliates and responding to inquiries.

166.    For example, at least one AFGE attorney and one AFGE communications staff member spent almost the entirety of their working day on January 29, 2025, working on Fork Directive-related issues. And for multiple weeks after January 28, several other staff members spent significant portions of each day responding to and researching Fork Directive related issues. These staffers would ordinarily be performing other necessary work, such as preparing for affiliate arbitrations, reviewing affiliate requests for legal and communications advice, and drafting newsletters and other AFGE communications.

167.    Because of the volume of inquiries, AFGE held at least two virtual town halls for its affiliates. Each town hall took place in the evening and required over 25 staff members to perform duties outside their normal working hours.

168.    Likewise, because of numerous inquiries by AFSCME members, AFSCME attorneys and communication department staff had to devote resources to preparing a Frequently Asked Questions ("FAQ") document to address AFSCME member questions about the Fork Directive, diverting these AFSCME employees from performing other necessary work servicing

AFSCME members and affiliates in other jurisdictions nationwide. And AFSCME local unions of federal employees scheduled and held special meetings with their bargaining-unit members to discuss the Fork Directive and provide guidance.

169.     On behalf of NAGE, several attorneys and representatives received questions, researched issues, prepared a FAQ, and hosted two webinar-style town halls. Each town hall lasted over an hour and required multiple staff members to present materials and answer live questions. These NAGE staff would ordinarily perform other necessary work, including legal representation and union representational assistance with grievances, bargaining, communications, and other matters.

170.     In addition to directly responding to inquiries from affiliates and members, AFGE, AFSCME, and NAGE employees invested significant time and effort into researching issues related to the Fork Directive. These efforts were necessary to develop written guidance to help members and affiliates, to try to ensure as well-informed an approach to addressing these issues as possible under the circumstances.

171.     The substantial increase in volume of inquiries and counseling requests from members and affiliates required AFGE and NAGE to divert resources from other work. For example, the attorney time spent developing guidance and responding to inquiries resulted in delays in preparing for arbitration hearings and responding to non-Directive-related affiliate inquires.

172.     In addition, in the weeks during and following the implementation of the Fork Directive, media outlets contacted AFGE, AFSCME, and NAGE seeking comment or information.

173.     These resource challenges were particularly acute because of the very limited timeframe and changing guidance surrounding the Directive. Members needed answers to their

questions by the impending deadline presented by the Fork Directive and were urgently reaching out to Plaintiffs for advice.

174.    And the resource challenges continue even after the closure of the program. As noted, Plaintiffs' members continue to have questions and issues related to the Fork Directive. Some members signed up for the program but were later told they are not eligible, yet they cannot contact OPM to learn about their appeal rights. Other members signed up but were subsequently fired without benefits, and they need help determining their rights and responsibilities, particularly because OPM refuses to answer questions. Still others fear that their paychecks and benefits may stop at any moment because they are not clear what legal basis exists to support the program; the Plaintiffs continue outreach and research to try to find answers for their members. These resources are being diverted because OPM did not follow the law, create reasoned plans, or execute a coherent program.

### *The Fork Directive impedes Plaintiffs' ability to perform their missions.*

175.    Core to Plaintiffs' mission is fighting for fairness and full protection of the law on behalf of the employees they represent.

176.    Because of the paucity of information about the Fork Directive, including after its closure, it has been challenging for Plaintiffs to adequately advise their members or affiliates as to many of their questions.

177.    For example, it is still uncertain that members will receive full payment of wages through September 30, 2025, even after the Continuing Resolution signed on March 15. It is likewise unclear whether the workers' employing agencies are willing or able to follow OPM's mandate that non-working employees must be paid for eight months.

178.    It is unclear whether members may seek outside employment during this "deferred resignation" period, in light of prior guidance and ethics rules limiting federal workers' ability to

work for others while on the federal payroll. It is also unclear whether workers who accept dual employment may be disqualified from later employment with the federal government.

179.    It is unclear whether members could leave the country while in "deferred resignation" status given prior government guidance about leaving the country or the commuting area while employed.

180.    It is unclear what authority or appropriations the government has to provide this program and to guarantee that employees will be paid without working.

181.    It is unclear what will happen if there are later reductions in force or other layoffs, and whether members would continue to be paid.

182.    The implications for pensions, health insurance, retirement eligibility, service tenure requirements, and other issues are unclear.

183.    It was unclear whether members would retain competitive status or reinstatement rights, whether they will continue to accrue annual leave and sick leave, and whether they will receive their annual leave payout.

184.    Given the very limited information available about the Fork Directive, and the absence of a clear statutory basis for some of the claims in the January 28, 2025 email, it is challenging for Plaintiffs to adequately counsel or advise their members as to many of these issues.

185.    The difficulty in responding to inquiries, and time spent addressing concerns, is amplified by the inconsistent guidance provided to Plaintiffs' affiliates and members by different federal agencies and OPM, and the changing nature of that guidance. This difficulty is ongoing: OPM has not provided answers or clarity to any of these questions despite the month that has passed since the closure of the program.

186.    On information and belief, OPM does not have answers to these questions because it did not undertake or execute a reasoned or considered process to execute the Fork Directive. Each of these questions and issues was foreseeable, had the federal government invested the time and resources into a lawful and reasoned rulemaking process under the APA that also complied with the Constitution. Indeed, the Plaintiffs regularly provide comments on these kinds of rules and raise these kinds of issues under the APA's lawful process.

187.    The Directive's lack of clarity and shifting contours directly undermine Plaintiffs' core mission of serving and counseling their members.

188.    The substantial increase in volume of inquiries and counseling requests from members and affiliates has required AFSCME, AFGE, and NAGE to divert resources from being otherwise used to further their mission by organizing and representing employees, negotiating with employers, and advocating for improved employment conditions. For example, AFGE and NAGE attorneys did not prepare for certain arbitrations or answer certain other affiliate concerns, and AFGE field representatives (also known as national representatives) were able to devote less time handling grievances and bargaining issues. Likewise, an AFSCME attorney working on the union's efforts to counsel members and affiliates about the Fork Directive would otherwise have been engaged in supporting other AFSCME affiliates in preparing for arbitrations in other jurisdictions, filing unfair labor practices against non-federal employers, and other AFSCME core services for its affiliates nationwide.

189.    Further, as members look to AFSCME, AFGE and NAGE to provide answers about the Fork Directive and its unclear and ever-changing guidance, AFSCME, AFGE and NAGE have suffered reputational harm among their membership, and more broadly among other federal

45

employees, due to the difficulty of providing satisfactory answers to members concerning an agency policy with enormous potential consequences for members' interests.

190.    Given the lack of reasoned decision making that went into the Fork Directive, the arbitrarily short timeline attendant to its execution, and the ongoing lack of clarity despite the end of the sign-up period, Plaintiffs cannot improve their advice to members or offer further clarity. Indeed, it is not clear that even OPM can offer clarity on any of these questions.

191.    Further, because members of each Plaintiff union accepted the Fork Directive's exploding offer and will purportedly cease employment by September 30, 2025, Plaintiffs will no longer collect voluntary union membership dues from these members, who would otherwise pay their union dues as a deduction from their federal paycheck. 5 U.S.C. § 7115. This loss of membership dues, which Plaintiffs use to fund their operations in service of their core mission, constitutes a concrete injury to all Plaintiffs.

***The Plaintiffs cannot file these claims with the FLRA, and their members cannot file these claims with the MSPB.***

192.    The Plaintiffs and their members cannot challenge the Fork Directive by filing claims with the Federal Labor Relations Authority ("FLRA") or with the Merit Systems Protection Board ("MSPB").

193.    First, the Plaintiffs challenge an OPM government-wide rule and program. They do not challenge any terminations or other workplace decisions, nor do they seek any substantive change to the Directive itself or even, ultimately, to the employment status of the workers who signed up or declined. Plaintiffs seek only compliance with the procedures required by law.

194.    There is no statutory process for non-OPM employees or their unions to file these kinds of procedural claims against OPM through the MSPB or FLRA. Nor is there a statutory

process for these employees or their unions to file claims against government-wide programs through these agencies.

195.    The FLRA and MSPB can adjudicate the claims of unions and workers that are related to workplace personnel issues. Neither body has the statutory authority to adjudicate claims challenging OPM rules or government-wide directives. Congress has never granted—nor has it intended to grant—either body the authority to adjudicate mass actions challenging these kinds of policies. Should these agencies take up these claims, their actions would be *ultra vires*—exceeding the scope of their Congressionally granted powers and usurping the powers of the federal courts.

196.    Second, this Administration is decimating the very agencies to which it seeks to channel personnel claims. The President has fired the heads of the MSPB and the FLRA without cause, taking the position that for-cause removal protections are unconstitutional. Though the D.C. District Court temporarily enjoined the terminations, the D.C. Circuit stayed the injunction with respect to the chair of the MSPB, meaning the agency remains without a leader or full quorum. *See Harris v. Trump*, No. 25-5037 (D.C. Cir., Mar. 28, 2025). The President also fired without cause the head of the Office of Special Counsel, who is also entitled to for-cause removal protections by statute. These terminations leave each agency incapable of functioning properly with decisionmakers protected from removal without cause as Congress intended, vitiating the employment claims that must go through these agencies before being appealed to federal court. As a result, even if any of these agencies were an appropriate channel for Plaintiffs' claims (and none is), none of them are operating in accordance with the statutory contours mandated by Congress.

197.    Forcing Plaintiffs to file claims with defunct or inoperative agencies would not simply delay justice, but would effectively bar any meaningful judicial review, because it is doubtful these agencies would *ever* be able to address the underlying claims. Further, even if these

agencies did exercise review, they would not be doing so in accordance with their Congressionally mandated design.

### *There is a live case and controversy.*

198.    Though the Fork Directive closed to new sign ups at 7:20 pm ET on February 12, 2025, the Directive itself runs through the end of September 2025. And the harms caused by the Directive and its unlawfulness are ongoing and will continue after that date.

199.    As described above, Plaintiffs' members continue to suffer financial, reputational, personal, and emotional injuries from the Directive, which will not be remedied merely by the "natural" ending of the Directive. For example, Plaintiffs' members who accepted the program and told their supervisors and colleagues but were deemed ineligible for the program continue to suffer reputational and emotional injuries and risk of financial loss. They will continue to fear retaliation and backlash. And the mere lapse of time will not address Plaintiffs' members' concerns that dual employment during the Directive precludes future federal government employment. Nor will the end of the program alleviate the ongoing financial and emotional harm caused to Plaintiffs' members who signed up for the program and resigned, then were fired and told they were ineligible. All of these harms are caused directly by the Directive's unlawfulness and failure to comply with the APA and the Constitution.

200.    Additionally, as described above, Plaintiffs continue to be hindered in their efforts to answer their members' questions, including about the Directive's unlawful implementation. And Plaintiffs continue to use their resources to try to help their members with these injuries, diverting limited time and money to stymie the harm caused by the Fork Directive.

201.    There is also nothing to stop OPM from taking similar unlawful action again. Indeed, there is a significant likelihood that the same Plaintiffs—including their federal employee members, particularly the ones that tried to take the Directive but were later deemed ineligible and

so still work for federal agencies—will be subject to the same unlawful actions again. This is not conjecture: since the Fork Directive, OPM has repeatedly eschewed the APA and defied powers that Congress granted non-OPM agencies, in order to carry out its plans to cull the federal workforce.

202.    For example, immediately after this Court lifted the TRO in this case, OPM closed the sign-up period for the Fork Directive and began directing federal agencies to fire all probationary workers. The mass firing of probationary workers at non-OPM agencies is a final agency rule that did not comply with the APA or undergo notice and comment rulemaking, ignored the Congressional grant of power to agencies and not OPM to hire and fire their own employees, and violated Separation of Powers principles—exactly like the Fork Directive. The lawless action is currently being challenged in federal court in California, in litigation brought by some of these same Plaintiffs, as well as in Maryland litigation brought by various attorneys general. *See AFGE, et al. v. United States OPM, et al.*, No. 3:25-cv-01780-WHA (N.D. Cal.) (preliminary injunction entered March 14, 2025); *Maryland, et al. v. U.S. Dep't of Agriculture, et al.*, No. 1:25-cv-00748-JKB (D. Md.) (temporary restraining order entered March 13, 2025).

203.    As another example, within two weeks of the closure of the Fork Directive, most federal employees received an email from OPM demanding they respond with a list of all the tasks they accomplished that week, along with the threat that failure to respond would "be taken as a resignation."



> week.
>
> Failure to respond will be taken as a resignation.
> 2/22/25, 11:46 AM

204.    Yet again, OPM attempted to implement a mass termination program, without notice and comment, in a wholly arbitrary manner, without providing any clear guidelines, any sources to support employees with questions, or any clear legal authority.

205.    This "bullet point" email was also a government wide OPM program. Not only did employing agencies have no input into or forewarning about the email, but some agencies even instructed their employees to ignore the request. *See, e.g.*, Hannah Natanson, *Several administration officials tell workers not to reply to Musk email*, Wash. Post (Feb. 23, 2025), https://www.washingtonpost.com/nation/2025/02/23/musk-email-government-agencies/    (DOD, DHS, FBI, NOAA, and HHS leaders, among others, instructed employees to not respond). Again, OPM was issuing directives to the whole of government, demonstrating that its recent rules and programs aimed at culling the federal workforce are not employment-related decisions or directives coming from employing agencies, but rather government wide policies promulgated by OPM.

206.    And yet again, despite immediate legal backlash, OPM doubled down and re-sent the email, threatening federal employees for the umpteenth time with termination. *See, e.g.*, Jenna McLaughlin, Andrea Hsu, & Shannon Bond, *Federal workers get a new email demanding their accomplishments*, NPR (Mar. 1, 2025), https://www.npr.org/2025/03/01/g-s1-51490/federal-workers-new-email-accomplishments.

207.    The Fork program *itself* was even reopened for employees of three agencies—the U.S. Agency for Global Media ("USAGM"), the Small Business Administration ("SBA"), and the

DOD. USAGM employees received a mass email on March 28, 2025, offering them the same

terms (to the extent they were explained at all) and with the same OPM FAQs as the Fork program

previously offered to other federal workers.

> From: **HR Customer Service** <HRCustomerService@usagm.gov>
> Date: Fri, Mar 28, 2025 at 2:25 PM
> Subject: USAGM Fork in the Road Opportunity (Deferred Resignation Program)
> To: HR Customer Service <HRCustomerService@usagm.gov>
>
> Hello,
>
> As part of the broader workforce reforms initiated by President Trump, the federal government is undergoing significant restructuring to enhance efficiency, accountability, and performance. These changes are designed to build a more effective, high-performing federal workforce.
>
> In alignment with these reforms, the agency is offering another opportunity for employees to voluntarily transition out of federal service through the **Deferred Resignation Program (DRP)**. This program will be available from **March 28 through April 9, 2025**. Employees who choose to participate in the DRP will retain **full pay and benefits** and will be **exempt from in-person work requirements until September 30, 2025**, unless they choose to depart earlier.
>
> We understand that this is a significant decision, and we encourage employees to review the **Fork in the Road: Frequently Asked Questions**.
>
> If you decide to apply for the DRP, please **type the word "Resign – Your Full Legal Name" in the subject line** of your email and send it to hrcustomerservice@usagm.gov. You may submit your request from either your work email address or personal email address.
>
> For any questions, please contact our Office of Human Resources (OHR) customer service team at hrcustomerservice@usagm.gov.

208.    SBA workers received a similar email on March 29.

> SBA recently announced its plans for an agency-wide reorganization. To return to its founding mission of empowering small businesses, and to restore accountability to taxpayers, the agency is about to enter into various restructuring initiatives including reductions in force (RIFs). The strategic reorganization will begin a turnaround for the agency by restoring the efficiency of the first Trump Administration, as well as its focus on promoting small businesses.
>
> Previously, OPM and SBA offered a Deferred Resignation Program (DRP).  SBA is currently offering a second DRP/Fork in the Road opportunity.
>
> If you choose to remain in your current position, we thank you for your renewed focus on serving the American people to the best of your abilities and look forward to working together as part of an improved federal workforce. At this time, we cannot give you full assurance regarding the certainty of your position.
>
> If you choose not to continue in your current role in the federal workforce and take SBA's Deferred Resignation Program, we thank you for your service.  This program begins effective March 31 and is available to all full-time and part-time SBA employees (i.e., permanent, temporary and term employees) until April 7. If you resign under this program, you will retain all pay and benefits regardless of your daily workload and will be exempted from all applicable in-person work requirements until September 30, 2025 (or earlier if you choose to accelerate your resignation for any reason). For avoidance of doubt, acceptance of your DRP will be subject to SBA's approval at its discretion, to ensure continuity of business operations as the agency thoughtfully executes the planned strategic reorganization.
>
> If you wish to participate in SBA's DRP/Fork in the Road please opt in using this form (https://forms.office.com/g/5AR56mhUEn) **by 11:59 pm EST on April 7.  There will be no extensions.**  Employees participating in this DRP will need to work with their supervisor to transition their work and be on Administrative Leave by June 1 at the latest, and in most cases by the end of April.

209.    Also on March 29, DOD announced the opening of the Fork via a memo signed by

the Secretary of Defense.  *See* Matthew Olay, *Hegseth Orders Civilian Workforce Realignment in*

*DOD,    Reopens    DRP*,    U.S.    Dep't    of    Defense    (Mar.    29,    2025),

https://www.defense.gov/News/News-Stories/Article/Article/4138965/hegseth-orders-civilian-

workforce-realignment-in-dod-reopens-drp/.

210.    No new analysis, no new reasoning, no new justifications, and certainly no notice and comment accompanied these targeted re-openings of the Fork Directive. Nor was there any recognition that these re-openings *again* contradicted the terms of OPM's first Fork Directive, which compelled workers to accept the Fork under threat that it would only remain open for nine days. Indeed, the fact that the announcements were released by each agency shows OPM knew it acted unlawfully when *it* implemented and released the Fork Directive the first time.

211.    Other mass layoff programs are also in the works. *See, e.g.*, Eileen Sullivan, *What to Know About Trump's Large-Scale Layoff Plans So Far*, N.Y. Times (Mar. 14, 2025), https://www.nytimes.com/article/trump-firings-layoffs-rif.html. There is no reason to believe that any will comply with the APA or other legal requirements.

212.    The lack of clarity and communication and the blatant disregard for the APA and the Constitution are wrongs of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

## CLAIMS FOR RELIEF

### Count One

### (Administrative Procedure Act – Notice and Comment Rulemaking)

213.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

214.    Plaintiffs' federal employee members are subject to the legal consequences of the Fork Directive. Plaintiffs and their members have suffered legal wrong from and have been adversely affected or aggrieved by OPM and the Acting OPM Director's actions under 5 U.S.C. § 702.

215.    OPM is subject to the APA via Congressional statute. 5 U.S.C. § 701.

216.    OPM's email announcement and commencement of the Fork Directive, sent to federal workers including Plaintiffs' federal employee members, constitutes final agency action under the APA. 5 U.S.C. § 704.

217.    OPM's email announcement and commencement of the Fork Directive, requiring federal agencies to continue to pay non-working employees who enter the program, prohibiting workers who accepted from working their federal jobs, rejecting the acceptances of workers who were found ineligible post hoc, and precluding all workers from taking time to consider critical professional and financial implications, is a "rule" for the purposes of the APA. 5 U.S.C. § 551(4).

218.    OPM's Fork Directive is not an interpretive rule, general statement of policy, or rule of agency organization, procedure, or practice. *See* 5 U.S.C. § 553(b)(A).

219.    Under the APA, an agency must undertake notice and comment before publishing a rule, and an agency must publish a rule 30 days before its effective date. 5 U.S.C. § 553(b)–(d). OPM is subject to these notice and comment rulemaking requirements. *See* 5 U.S.C. § 1105.

220.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

221.    OPM and its Acting Director did not comply with the express obligations to undertake notice and comment rulemaking pursuant to the APA before issuing the Fork Directive.

222.    OPM's Fork Directive violates the APA by failing to observe procedures required by law. 5 U.S.C. § 706(2)(D).

223.    The failure to provide notice and comment has harmed Plaintiffs and their members.

224.    Had OPM provided the lawfully required notice and comment opportunity, Plaintiffs would have provided comments on the Directive.

**Count Two**

**(Administrative Procedure Act – Arbitrary and Capricious)**

225.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

226.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

227.    The Fork Directive is arbitrary and capricious and an abuse of discretion for a host of reasons.

228.    Defendants failed to consider innumerable potential consequences of the Fork Directive, which was sent a mere week after the beginning of the new Administration to millions of federal employees, including the impact on continuity and effectiveness of government functioning.

229.    The Directive and related materials offered conflicting information regarding employees' rights and obligations if they accepted the government's offer.

230.    The Directive provided conflicting and shifting information regarding employees' eligibility to take the program.

231.    The Directive established an arbitrary time period for providing non-working federal workers with paychecks and benefits.

232.    The Directive adopted a questionable approach from the private sector, without considering whether it was applicable in the federal context or consistent with prior history relating to restructuring.

233.    The Directive aimed to entice federal employees to relinquish their livelihoods on the basis of barely veiled and retaliatory threats of future termination. Some of those threats came to fruition within hours of the closure of the program.

234.    The Directive runs contrary to longstanding rules and requirements for federal employees, including prior guidance and ethics rules regarding outside employment.

235.    The Directive provided an arbitrarily short deadline for decision that is not based on any articulated need or statutory requirement—particularly in light of the many questions and changing guidance. This deadline put Plaintiffs in an impossible position in advising their members and developing guidance. And it put Plaintiffs' members in the impossible position of choosing between accepting or declining a termination offer with a questionable legal basis, ever-changing eligibility requirements, and a host of unanswered questions, in the face of termination threats.

236.    The Directive was arbitrarily implemented without considering or finding a lawful source of funding. The Antideficiency Act forbids an agency from authorizing or obligating the payment of money before an appropriation is made. 31 U.S.C. §§ 1341 *et seq.* At the time the Directive was opened to workers, funding had not been appropriated by Congress, yet the Directive purported to obligate appropriations six months in advance. Requiring workers to decide to sign up for a program that may not be funded was arbitrary, capricious, and an abuse of discretion.

237.    The Directive is pretext for removing federal workers on an ideological basis to replace them with staff who are politically aligned with the Administration.

238.    The arbitrary and capricious nature of OPM's decision has harmed Plaintiffs and their members.

**Count Three**

**(Administrative Procedure Act – Not in Accordance with Laws Granting Agency Authority and Governing Reductions in Force and Voluntary Separation Incentive Payment Plans, and Exceeding Statutory Authority)**

239. Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

240. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A),(C).

241. Congress vested federal agencies and their heads with the authority to employ, regulate, and manage the agency's federal employees. 5 U.S.C. §§ 301, 302, 3101.

242. Congress created a statutory scheme by which employing agencies can create plans for "voluntary separation incentive payments." 5 U.S.C. § 3521 *et seq.* These plans must include specific mandatory criteria, must receive OPM approval before implementation, and must be paid in lump sums. 5 U.S.C. §§ 3522–3523.

243. The Code of Federal Regulations provides a detailed process by which agencies may undertake RIFs. *See* 5 C.F.R. § 351 *et seq.* The employing agencies are granted with the rights and responsibilities to determine how to carry out a RIF and comply with the relevant statutes and regulations. *See, e.g.*, 5 C.F.R. §§ 351.201, 351.204. The role of OPM is limited to "prescrib[ing] regulations" for RIFs to account for tenure, veteran status, and other considerations, 5 U.S.C. § 3502, and to providing employing agencies with "guidance and instructions for the planning, preparation, conduct, and review" of RIFs, 5 C.F.R. § 351.205.

244. The Fork Directive terminated employees at non-OPM agencies, implemented voluntary separation incentive payment plans in non-OPM agencies, and committed non-OPM

agencies' Congressionally appropriated funds for eight months to pay the salaries and benefits of federal employees who are not working.

245.    The Fork Directive also constitutes a RIF by another name, which was designed, implemented, and carried out by OPM, in non-OPM agencies, without complying with relevant RIF statutes or regulations.

246.    Congress did not grant OPM the power to terminate employees of other agencies, to create and implement voluntary separation incentive payment plans in other agencies, or to commandeer the Congressionally appropriated funds of other agencies for eight months to pay the salaries and benefits of federal employees who are not working.

247.    Congress did not grant OPM the power to independently design, implement, and carry out RIFs at non-OPM agencies. Congress did not grant OPM the power to carry out RIFs at all that do not comply with the relevant RIF statutes and regulations.

248.    OPM's actions with respect to the Fork Directive exceed any statutory authority granted to OPM by Congress and so are inconsistent with law and violate the APA. *See* 5 U.S.C. § 706(2)(A), (C).

## Count Four

### (*Ultra Vires* / Separation of Powers)

249.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

250.    Plaintiffs and their federal employee members have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

251.    The Fork Directive unlawfully conflicts with and overrides legislative power. It is an improper attempt to legislate a workforce reduction process different from those that Congress prescribed.

252.    The Constitution divides the delegated powers of the federal government into three distinct, defined categories: legislative, executive, and judicial. *INS v. Chadha*, 462 U.S. 919, 951 (1983). The Legislative and Executive Branches are "separate and wholly independent." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986). "[T]here can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates . . ." *Id.* (quoting *The Federalist No. 47*, p. 325 (J. Cooke ed. 1961)).

253.    Congress is the branch of the federal government with the power to legislate. U.S. Const., art. I. Under Article I, Congress must pass legislation in both chambers before the President can sign and before it becomes law. U.S. Const., art. I.

254.    The Executive is the branch of the federal government with the power to execute the law. U.S. Const., art. II. Under Article II, the President has the duty to "take Care that the Laws be faithfully executed." *Id.*

255.    Congress used its constitutionally designated legislative powers to create federal agencies, including OPM. *See generally* Title 5 of the U.S. Code. Congress delegated to agency heads the power to manage agency functions, including to employ workers, 5 U.S.C. § 3101, and to regulate and manage employees, 5 U.S.C. § 301. And Congress mandated federal agencies and agency heads comply with the CSRA, including the statutes that govern termination of employment. *See* 5 U.S.C. §§ 7512–7513.

256.    "Administrative agencies [like OPM] are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,

595 U.S. 109, 117 (2022). The Fork Directive allows OPM to unlawfully usurp the legislative authority of Congress by requiring agencies to comply with OPM's employment, termination, employee management, and implied budgetary decisions. It overrides the direct Congressional authorization of agency heads to manage the affairs and employees of their respective agencies. And it exceeds the statutory authorization granted to OPM by Congress, which did not confer upon OPM the authority to create or implement mass termination or resignation programs at non-OPM agencies.

257.    OPM's actions were not authorized by any Article II Executive power. Its Fork Directive for federal employees and their employing agencies was issued without legal authority and is *ultra vires*.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court:

A. Declare that the Fork Directive, as currently drafted, executed, and implemented, is unlawful;

B. Vacate the Fork Directive and remand to OPM to provide a reasoned basis as required by the APA for the Directive, to undertake notice and comment rulemaking as required by law, and to provide the legally required time period for public comment and before implementation of any revised Directive;

C. Declare that any employment-related retaliation against any current or former government worker for accepting or declining the Fork Directive is unlawful;

D. Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as appropriate for this action; and

E. Grant any other relief this Court deems appropriate.

DATED this 31st day of March, 2025.


By:   */s/   Michael T. Anderson*
     Michael T. Anderson (BBO #645533)
     Nicolas F. Mendoza (BBO #703711)
     MURPHY ANDERSON PLLC
     1401 K Street N.W., Suite 300
     Washington, D.C.  20005
     Telephone:  (202) 223-2620
     manderson@murphypllc.com
     nmendoza@murphypllc.com
     *Counsel for Plaintiffs*

     ERIN E. MEYER (BBO #677869)
     AJAY S. KRISHNAN* (CA Bar No. 222476)
     CODY S. HARRIS* (CA Bar No. 255302)
     BAILEY W. HEAPS* (CA Bar No. 295870)
     NIALL R. FRIZZELL* (CA Bar No. 311929)
     CHARLOTTE J. KAMAI* (CA Bar No. 344786)
     KEKER, VAN NEST & PETERS LLP
     633 Battery Street
     San Francisco, CA 94111-1809
     Telephone:  415 391 5400
     Facsimile:  415 397 7188
     emeyer@keker.com
     akrishnan@keker.com
     charris@keker.com
     bheaps@keker.com
     nfrizzell@keker.com
     ckamai@keker.com
     *Counsel for Plaintiffs*

2885998

Elena Goldstein** (NY Bar No. 4210456)
Michael C. Martinez** (D.C. Bar No. 1686872)
Daniel McGrath** (D.C. Bar No. 1531723)
Skye Perryman** (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C.  20043
Telephone:  (202) 448-9090
Facsimile:  (202) 796-4426
egoldstein@democracyforward.org
mmartinez@democracyforward.org
dmcgrath@democracyforward.org
sperryman@democracyforward.org
*Counsel for Plaintiffs*

Teague P. Paterson** (D.C. Bar No. 144528)
Matthew S. Blumin** (D.C. Bar No. 144528)
Georgina C. Yeomans* (D.C. Bar No. 1510777)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street N.W.
Washington, D.C.  20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
*Counsel for American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME)*

2885998

Rushab B. Sanghvi** (D.C. Bar No. 1012814)
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, D.C.  20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928
SanghR@afge.org
Grajaa@afge.org
*Counsel for Plaintiff American Federation of Government Employees, AFL-CIO (AFGE)*

Sarah Suszczyk** (M.D. Bar No. 0512150240)
NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, SEIU LOCAL 5000
NAGE/IBPO/IAEP/IBCO
159 Burgin Parkway
Quincy, MA  01269
Telephone: (202) 639-6426
Facsimile: (617) 376-0285
Ssuszczyk@nage.org
*Counsel for Plaintiff National Association of Government Employees, SEIU Local 5000*

*pro hac vice pending
**pro hac vice admission granted*

2885998

**CERTIFICATE OF SERVICE**

I, Michael T. Anderson, hereby certify that on March 31, 2025, a true copy of the foregoing document was electronically filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

Dated: March 31, 2025                    /s/  Michael T. Anderson

2885998