## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, <br><br>      *Plaintiffs*, <br><br> v. <br><br> CHARLES EZELL, ACTING DIRECTOR, OFFICE OF PERSONNEL MANAGEMENT, *et al.*, <br><br>      *Defendants*. | Civil Action No. 1:25-cv-10276 |

**Leave to file excess pages granted on (May 08, 2025)**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 2

I.    Factual and Procedural Background ......................................................................... 2

    A.    OPM's Deferred Resignation Program ........................................................... 2

    B.    This Suit and the Court's Prior Ruling ........................................................... 4

    C.    Further Developments for the Deferred Resignation Program ...................... 5

    D.    The Present Amended Complaint ................................................................... 6

II.   Standards for Motions to Dismiss Under Rule 12(b)(1) and Rule 12(b)(6) ............ 6

ARGUMENT ................................................................................................................... 7

DEFENDANTS' MOTION TO DISMISS SHOULD BE GRANTED ........................... 7

I.    The Court Lacks Subject-Matter Jurisdiction for the Reasons Previously Recognized ........ 7

    A.    Plaintiff's Claims Are Precluded by the CSRA and the FSL-MRS ............... 7

        1.    Congress Intended to Preclude District Court Jurisdiction .............. 9

        2.    These Claims Are of the Type Congress Intended to be Reviewed Within the Scheme ............................................. 11

    B.    Plaintiffs Lack Standing to Pursue their Claims ........................................... 16

        1.    Plaintiffs' Allegations of Injuries to Themselves Cannot Support Standing ....................................................... 17

        2.    Plaintiffs Lack Associational Standing. ............................. 19

            a.    Plaintiffs fail to demonstrate that their members would have standing to sue ....................................... 20

            b.    Plaintiffs' claims and the relief sought require the participation of individual members ........................ 22

II.   Plaintiff's APA and Ultra Vires Claims are Barred ............................................... 23

i

A.      Plaintiffs Identify No Final Agency Action Reviewable Under the APA ............... 23

B.      Ultra Vires Is Not Cognizable Here .......................................................................... 25

CONCLUSION .................................................................................................................... 27

## TABLE OF AUTHORITIES

**CASES**

*AFGE v. Sec'y of the Air Force,*
    *(*"Air Force"), 716 F.3d 633 (D.C. Cir. 2013).................................................................................passim*

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell,*
    No. 25-cv-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025).....................................8, 10, 14

*Am. Fed'n of Gov't Emps., AFL-CIO v. OPM,*
    No. 25-01780 WHA, 2025 WL 660053 (N.D. Cal. Feb. 28, 2025)*,*
    *reconsidering subject-matter jurisdiction* ---Fed. Supp.3d---, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025)*,*
    *stay granted,* No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025) .......................................................15

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump ("AFGE"),*
    929 F.3d 748 (D.C. Cir. 2019) .........................................................................................................passim*

*Am. Foreign Serv. Ass'n v. Trump,*
    ---Fed. Supp.3d---,  2025 WL 573762 (D.D.C. Feb. 21, 2025)...........................................................15

*Am. Postal Workers Union v. Frank,*
    968 F.2d 1373 (1st Cir. 1992) ...............................................................................................................19

*Armstrong v. Exceptional Child Ctr. Inc.,*
    575 U.S. 320 (2015) ................................................................................................................................27

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...........................................................................................................................6, 20

*Atieh v. Riordan,*
    727 F.3d 73 (1st Cir. 2013).......................................................................................................................7

*Axon Enter. v. FTC,*
    598 U.S. 175 (2023).............................................................................................................................passim*

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.,*
    502 U.S. 32 (1991) ..................................................................................................................................26

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................................................................6

*Bennett v. Spears,*
    520 U.S. 154 (1997)................................................................................................................................23

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.,*
    89 F.4th 46 (1st Cir. 2023)......................................................................................................................21

*Ca. Cmtys. Against Toxics v. EPA,*
    934 F.3d 627 (D.C. Cir. 2019) ...........................................................................24

*City of New York v. Dep't of Def.,*
    913 F.3d 423 (4th Cir. 2019) ...........................................................................18

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................................................... 16, 21

*Council of & Blind of Del. Cnty. Valley, Inc. v. Regan,*
    709 F.2d 1521 (D.C. Cir. 1983) .......................................................................27

*Dalton v. Specter,*
    511 U.S. 462 (1994) ..........................................................................................25

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) .....................................................................9, 10, 12, 14

*Evans v. Thompson,*
    518 F.3d 1 (1st Cir. 2008) ..................................................................................8

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024), *on remand to,* 117 F.4th 336 (5th Cir. 2024).................... 16, 18, 19, 21

*Fed. Express Corp. v. U.S. Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022) ...........................................................................27

*Fed. L. Enf't Officers Ass'n v. Ahuja* ("FLEOA"),
    62 F.4th 551 (D.C. Cir. 2023) ................................................................... 12, 13

*Filebark v. Dep't of Transp.,*
    555 F.3d 1009 (D.C. Cir. 2009) .................................................................10, 11, 16

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA,*
    313 F.3d 852 (4th Cir. 2002) ...........................................................................24

*Fornaro v. James,*
    416 F.3d 63 (D.C. Cir. 2005) ...........................................................................13

*Friends of Merrymeeting Bay v. U.S. Dep't of Com.,*
    810 F. Supp. 2d 320 (D. Me. 2011).................................................................24

*FTC v. Standard Oil Co.,*
    449 U.S. 232 (1980) ..........................................................................................23

*Graham v. Ashcroft,*
    358 F.3d 931 (D.C. Cir. 2004) ................................................................... 9, 15

*Griffith v. FLRA,*
    842 F.2d 487 (D.C. Cir. 1988) ........................................................................................26

*Heckler v. Ringer,*
    466 U.S. 602 (1984) ........................................................................................................13

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ..........................................................................................17, 19, 22

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
    110 F.4th 295 (1st Cir. 2024) ........................................................................................19

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock,*
    477 U.S. 274 (1986) ........................................................................................................19

*Jarkesy v. SEC,*
    803 F.3d 9 (D.C. Cir. 2015)..............................................................................................8

*Lepre v. Dep't of Lab.,*
    275 F.3d 59 (D.C. Cir. 2001) ........................................................................................26

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ..................................................................................................16, 21

*Lyons v. Dep't of Veteran,*
    *Affs.,* 273 F. App'x 929 (Fed. Cir. 2008)......................................................................12

*Marshall v. Health & Hum. Servs.,*
    587 F.3d 1310 (Fed. Cir. 2009) ....................................................................................12

*Maryland v. U.S. Dep't of Agric.,*
    ---Fed. Supp.3d---,  2025 WL 800216 (D. Md. Mar. 13, 2025)*,*
    *stay granted,* No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025)....................................15

*Murthy v. Missouri,*
    603 U.S. 43 (2024), *on remand to sub. nom., Missouri v. Biden,* 114 F.4th 406 (5th Cir. 2024) ........ 17, 20

*N.Y. Republican State Comm. v. SEC,*
    799 F.3d 1126 (D.C. Cir. 2015) ......................................................................................8

*Nat'l Treasury Emps. Union v. Trump,*
    ---Fed. Supp.3d---, 2025 WL 561080 (D.D.C. Feb. 20, 2025).............................................14

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ..................................................................................................23, 25

*Nyunt v. Chairman, Broad. Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) ......................................................................................26

*Parrott v. MSPB,*
    519 F.3d 1328 (Fed. Cir. 2008)............................................................................................12

*Pharm. Care Mgmt. Ass'n v. Rowe,*
    429 F.3d 294 (1st Cir. 2005), *cert. denied by*, 145 S.Ct. 15 (Dec. 9, 2024) .............................................21

*Puerto Rico v. United States,*
    490 F.3d 50 (1st Cir. 2007)........................................................................................23, 26, 27

*Sackett v. EPA,*
    566 U.S. 120 (2012) ............................................................................................................13

*Schroer v. Billington,*
    525 F. Supp. 2d 58 (D.D.C. 2007) ......................................................................................26

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ............................................................................................................16

*Terban v. Dep't of Energy,*
    216 F.3d 1021 (Fed. Cir. 2000)...........................................................................................12

*Terre Du Lac Ass'n v. Terre Du Lac, Inc.,*
    772 F.2d 467 (8th Cir. 1985)...............................................................................................22

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ..............................................................................................................8

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ............................................................................................................17

*United States v. Fausto,*
    484 U.S. 439 (1988) ........................................................................................................9, 10

*Warth v. Seldin,*
    422 U.S. 490 (1975) ............................................................................................................17

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ............................................................................................................16

**STATUTES**

5 U.S.C. § 551 ....................................................................................................................23

5 U.S.C § 702 .....................................................................................................................27

5 U.S.C. § 704 ...............................................................................................................23, 27

5 U.S.C. § 7103 ..................................................................................................................14

5 U.S.C. § 7105 ........................................................................................................9

5 U.S.C. § 7117 ......................................................................................................14

5 U.S.C. § 7121 ......................................................................................................14

5 U.S.C. § 7123 ........................................................................................................9

5 U.S.C. § 7703 ..................................................................................................9, 12

28 U.S.C. § 1331 ......................................................................................................8

31 U.S.C. § 1341 ......................................................................................................3

**RULES**

Fed. R. Civ. P. 12 .....................................................................................................6

Fed. R. Evid. 201 .....................................................................................................7

**REGULATIONS**

5 C.F.R. Part 2635 ....................................................................................................4

80 Fed. Reg. 72,455 (Nov. 19. 2015) .......................................................................3

88 Fed. Reg. 56,058 (Aug. 17, 2023) .......................................................................3

**OTHER AUTHORITIES**

Legality of Deferred Resignation Program,
    https://perma.cc/FZ27-ZEAW (captured May 07, 2025) ......................................3

OPM, FAQ,
    https://perma.cc/J85C-TPRH (captured May 07, 2025) .......................................3

OPM, Original Email to Employees,
    https://perma.cc/F7DQ-5EXE (captured May 07, 2025) ...................................2, 3

## INTRODUCTION

Upon his reelection to office, President Trump immediately set to work to transform the federal workforce. Among other things, he issued directives to require a return to in-person work, to restore accountability for federal workers who have policy-making authority and to senior career executives, and to reform the federal hiring process to focus on merit. Animating these and other critical reforms is the recognition that the federal workforce must be streamlined to be more efficient and to better serve the American people.

In that vein, on January 28, 2025, the Office of Personnel Management ("OPM"), sent an email to the federal workforce announcing a voluntary resignation initiative whereby eligible federal employees could voluntarily choose to resign their positions by February 6, 2025, and would, consistent with federal law, retain all pay and benefits through September 30, 2025 and be exempt from in-person work requirements.

Plaintiffs, national and local labor unions, disagree with the Administration's policy choice to reduce the size of the federal workforce by offering inducements to voluntary resignation. Originally, they sought the extraordinary remedy of a temporary restraining order to extend the deadline for federal employees to accept the government's offer. The Court ultimately denied relief—concluding that Plaintiffs lacked standing, and that jurisdiction was impliedly precluded. Plaintiffs have now filed an amended complaint. Despite the Court's prior ruling, they seek to continue challenging resignations and related issues under similar legal theories. Specifically, they bring three Administrative Procedure Act ("APA") claims and one claim titled "*Ultra Vires* / Separation of Powers."

Plaintiffs' claims continue to fall outside of district court jurisdiction for the same reasons that they did under the prior complaint. First and foremost, Plaintiffs' claims are foreclosed by the comprehensive remedial scheme enacted by Congress in the Civil Service Reform Act of 1978 ("CSRA"), including the portions of the CSRA that specifically govern federal labor relations, the

1

Federal Service Labor-Management Relations Statute ("FSL-MRS"). That Plaintiffs bring slightly different administrative law challenges now does not alter this conclusion. Second, Plaintiffs continue to lack standing both under the theories of harm they previously asserted as well as their newer proposed pathways. Both of those reasons alone require dismissal of this suit.

Beyond the reasons the Court credited last time, Plaintiffs' claims fail under additional threshold issues. Plaintiffs' APA claims fail because they have identified no final agency action—Plaintiffs have identified nothing from which legal rights and obligations flow, let alone for Plaintiffs. Additionally, their fourth claim, invoking nonstatutory ultra vires review, is foreclosed by the test governing when such review may be invoked.

At bottom, this Court concluded that it lacks jurisdiction two different ways when it rejected Plaintiffs' prior complaint. Plaintiffs' revisions have done nothing to change that reasoning. Consequently, Defendants' motion to dismiss should be granted.

## BACKGROUND

### I.    Factual and Procedural Background

#### A.    OPM's Deferred Resignation Program

On January 28, 2025, OPM sent an email to federal employees informing them of a "deferred resignation program." OPM, Original Email to Employees.[1] The email explained that President Trump issued several directives during the first week of his administration, including requiring that federal employees return to in-person work, restoring accountability for employees who have policy-making authority, restoring accountability for senior career executives, and reforming the federal hiring process to focus on merit. *Id.* The email explained that if federal employees choose to remain in their current positions, their service was appreciated but that "we cannot give you full assurance regarding the certainty of your position or agency but should your position be eliminated you will be

---

[1] https://perma.cc/F7DQ-5EXE (captured May 07, 2025).

treated with dignity and will be afforded the protections in place for such positions." *Id.* The email further announced a deferred resignation program, effective January 28, that would be available to most federal employees[2] until February 6, 2025. *Id.* Under this program, employees who resign "will retain all pay and benefits regardless of your daily workload and will be exempted from all applicable in-person work requirements until September 30, 2025 (or earlier if you choose to accelerate your resignation for any reason)." *Id.* The email explained that to take advantage of the program, an employee needed to respond to the email from their work computer with the word "Resign" in the body of the reply email. *Id.* The email included a letter, which, among other things, explained that OPM was authorized to send the email under "Executive Order 9830 and 5 U.S.C. §§ 301, 1103, 1104, 2951, 3301, 6504, 8347, and 8461," and further explained that OPM intended to use the responses to the email "to assist in federal workforce reorganization efforts in conjunction with employing agencies." *Id.* (citing 88 Fed. Reg. 56,058 (Aug. 17, 2023); 80 Fed. Reg. 72,455 (Nov. 19. 2015)). Finally, the email noted that a response to the email was voluntary. *Id.*

In the days following OPM's January 28, 2025 email to the federal workforce, OPM provided a list of Frequently Asked Questions ("FAQs") concerning the deferred resignation program. OPM, FAQ.[3] Among other things, the FAQs explained that, for those that send an acceptance email, and who are also found to be eligible for the deferred resignation program, the employing agency might execute paperwork reflecting all the terms of the agreement. *Id.* The FAQs further explained that any government shutdown could potentially affect an employee's pay regardless of whether the employee accepted the resignation letter, but that employees who accepted the offer would still be entitled to the backpay available under the Government Employee Fair Treatment Act of 2019. *Id.* (citing 31

---

[2] The email explained that the deferred resignation program was not available for military personnel, employees of the Postal Service, and those in positions related to immigration enforcement and national security, and those in any other positions that might be excluded by the employee's employing agency.

[3] https://perma.cc/J85C-TPRH (captured May 07, 2025)

U.S.C. 1341(c)(2)).

On February 4, 2025, OPM provided a memorandum to all heads and acting heads of Departments and agencies regarding the legality of the deferred resignation program. OPM, Legality of Deferred Resignation Program.[4] OPM's February 4 memorandum explained that the resignation offer "has generated considerable scrutiny and numerous questions from interested employees," and had been "subject to various legal critiques." *Id.* at 1. The February 4 memorandum explained "why concerns regarding the program's legality are misplaced and offers clarifying guidance on certain aspects of the plan." *Id.*

Among other things, the February 4 memorandum explained that Congressional approval of the program was unnecessary because employees would remain in duty status and entitled to their regular pay and benefits. *Id.* at 2. The memorandum further explained that the program does not promise employees any additional compensation that might require special congressional appropriations. *Id.*

The February 4 memorandum also clarified that although employees who take advantage of the resignation program may pursue a second job outside the federal government, employees had to comply with the Standards of Ethical Conduct for Employees of the Executive Branch at 5 C.F.R. Part 2635 and other applicable federal laws, as well as any agency-specific regulations. *Id.* at 3.  Finally, the February 4 memorandum included as an appendix a template agreement that could be used or adapted by agencies. *Id.* at 5.

### B. This Suit and the Court's Prior Ruling

Plaintiffs filed their complaint on February 4, 2025, alleging claims challenging the Deferred Resignation Program and seeking to freeze the deadline to enroll. Compl., ECF No. 1. The following day, they moved for a temporary restraining order. Mot. for TRO, ECF No. 11. Defendants responded

---

[4] https://perma.cc/FZ27-ZEAW (captured May 07, 2025).

to that motion on February 6, Mem. in Opp'n., ECF No. 45, and the Court subsequently entered, at a virtual hearing, an oral order temporarily barring termination of the enrollment period for the program in advance of a future motion hearing. *See* ECF No. 42.

On February 10, the Court held the motion hearing and verbally ordered that the enrollment period continue to be held open while the Court considered the arguments of both sides. *See* ECF No. 60. Two days later, the Court issued an opinion and order dissolving the Court's prior orders, denying preliminary injunctive relief, and concluding that the Court likely lacked subject-matter jurisdiction over Plaintiffs' suit on both standing and claim channeling grounds. Feb. 12, 2025 Op. and Order, ECF No. 66.

### C. Further Developments for the Deferred Resignation Program

As alleged by Plaintiffs, new signups were no longer accepted starting at 7:20 pm ET on February 12. Am. Compl. ¶ 198, ECF No. 77. Various employees who sought to utilize the program, and sent an email prior to closing, subsequently received communications about eligibility for the program and next steps. *See, e.g.*, *id.* ¶ 127 (USDA employee informed that employee was not eligible); *id.* ¶ 128 (fee-for-service employees at the Department of Transportation receive information about eligibility from the agency). This includes being offered an agreement to sign. *See id.* ¶ 130. Some who viewed sample agreements chose ultimately not to participate. *See id.* ¶ 134. However, those employees who voluntarily resigned, were eligible, and were finally accepted are set to finish their tenures on September 30, 2025. *See id.* ¶ 191.

Plaintiffs also allege that individual agencies have begun announcing additional programs for voluntary resignations using substantially similar terms to those provided during the deferred resignation program that is the subject of this suit. *See id.* ¶¶ 207–10.

### D. The Present Amended Complaint

On March 31, Plaintiffs filed an amended complaint. Plaintiffs' amended complaint brings four claims. First, that Defendants were required to follow notice and comment procedures related to the creation and implementation of the deferred resignation program. *Id.* ¶¶ 213–24. Second, that the program violates the APA's arbitrary and capricious standard for review of final agency action. *Id.* ¶¶ 225–38. Third, that Defendants violated statutory and perhaps regulatory requirements. *See id.* ¶¶ 239–48 (discussing various statutory and regulatory programs permitting different kinds of voluntary and mandatory separation programs). Fourth, that Defendants violated constitutional constraints by acting ultra vires. *Id.* ¶¶ 249–57. For relief, Plaintiffs seek to "vacate the Fork Directive and remand to OPM" declare the unlawfulness of "the Fork Directive" and "[d]eclare that any employment-related retaliation" related to "the Fork Directive" is unlawful. *Id.* Request for Relief at A–C.

Defendants now bring this motion to dismiss the amended complaint.

## II.    Standards for Motions to Dismiss Under Rule 12(b)(1) and Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint that fails to state a claim upon which relief can be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Generally, a court must construe a complaint in the plaintiffs' favor, conclusory allegations are not entitled to an assumption of truth, and even allegations pleaded with factual support need only be accepted insofar as "they plausibly give rise to an entitlement of relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). This plausibility showing "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation[,]" and it "asks for more than a sheer possibility that [the] defendant has acted unlawfully." *Id.* at 678. Legal conclusions, "'naked assertion[s]' devoid of 'further factual enhancement,'" and "a formulaic recitation of the elements of a cause of action" are legally insufficient to state a plausible claim. *Id.* (quoting *Twombly*, 550 U.S. at

555, 557). However, this plausibility pleading standard generally "does not apply to a complaint for judicial review of final agency action," *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013), unless the government alleges that the plaintiff's claim is legally flawed, *id.* at 76 n.4. That is because the factual material relevant to review of a final agency action is the administrative record. *Id.* at 76 & n.4.

Finally, the Court may take judicial notice of information posted on official public websites of government agencies as they are public records and appropriate subjects of judicial notice. *See* Fed. R. Evid. 201(b).

## ARGUMENT

## DEFENDANTS' MOTION TO DISMISS SHOULD BE GRANTED

### I.    The Court Lacks Subject-Matter Jurisdiction for the Reasons Previously Recognized

This Court previously held that subject-matter jurisdiction was foreclosed two ways. First, the Court explained that Congress precluded jurisdiction over this kind of employment-related dispute. Second, the Court held that Plaintiffs lack standing. While Plaintiffs have amended their complaint since that decision, none of the changes leads to a different outcome. Congress precluded the kinds of administrative law claims for which Plaintiffs seek immediate district court review. And Plaintiffs continue to lack standing to pursue their requested relief. Therefore, the Court should reaffirm its prior holding and dismiss.

### A.    Plaintiff's Claims Are Precluded by the CSRA and the FSL-MRS.

Plaintiffs cannot show subject-matter jurisdiction because Congress has divested the federal district courts of jurisdiction over federal employment matters like this one. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("*AFGE*"), 929 F.3d 748, 752 (D.C. Cir. 2019) (ordering a jurisdictional dismissal of a federal-employee-union suit because of the comprehensive statutory scheme). The legal basis for this divestiture is both well-settled and constitutionally significant. "While the authority of the federal courts comes from Article III of the Constitution, the existence of the lower federal courts,

7

including this court, and the extent of [its] jurisdiction depend entirely on statutory grants from Congress." *Evans v. Thompson*, 518 F.3d 1, 5 (1st Cir. 2008). Thus, "Congress has great leeway to expand or restrict the jurisdiction of the lower federal courts." *Id.* at 6.

It is true that Congress has broadly empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331[]." *Axon Enter. v. FTC*, 598 U.S. 175, 185 (2023). Nonetheless, "[a] special statutory review scheme, . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.* Thus, when a statute sets out "a particular procedure and time period" for challenging agency actions, a plaintiff may be precluded from relying on a district court suit. *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135–36 (D.C. Cir. 2015). That includes challenges under the APA. *AFGE*, 929 F.3d at 756.

Congress can preclude district court review two different ways. The first is explicitly. *Axon*, 598 U.S. at 185 ("[P]roviding in so many words that district court jurisdiction will yield."). The second, applicable here, is implicitly. In the latter case, Congress impliedly divests district courts of jurisdiction "by specifying a different method to resolve claims about agency action." *Id.* To resolve an implicit preclusion question, the Court must determine whether "(i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)). These can be considered the two steps of a *Thunder Basin* analysis of implied preclusion. And applying the inquiry here, jurisdiction over these claims is impliedly precluded.

Indeed, this Court found implied divestiture already for the matters in the original complaint and concluded that the Court lacked jurisdiction. *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025). Nothing has changed to upset that conclusion.

8

### 1.  Congress Intended to Preclude District Court Jurisdiction

The first step, Congress's intent to preclude, is well satisfied: Congress established a detailed statutory scheme for adjudicating disputes relating to federal employment. Taken as a whole, it is "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988) (analyzing the CSRA). It provides for "administrative and judicial review" regarding disputes between employees or unions and the federal government. *AFGE*, 929 F.3d at 752 (discussing the FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (discussing the CSRA more broadly). So federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the Merit Systems Protection Board ("MSPB") for employment disputes or the Federal Labor Relations Authority ("FLRA") for labor disputes. Judicial review, if any, is available only in a court of appeals. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham*, 358 F.3d at 934 (citing *Fausto*, 484 U.S. at 448–50); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

"Congress typically chooses . . . review in a court of appeals following the agency's own review process" for an implicit preclusion scheme. *Axon*, 598 U.S. at 185. That is exactly what this scheme does. Accordingly, as the D.C. Circuit has repeatedly recognized, the CSRA precludes jurisdiction in the district courts over federal employee and federal union disputes. *See AFGE*, 929 F.3d at 754. This "enormously complicated and subtle scheme to govern employee relations in the federal sector" does not permit a district court runaround. *Id.* at 755 (quoting *AFGE v. Sec'y of the Air Force* ("*Air Force*"), 716 F.3d 633, 636 (D.C. Cir. 2013)). Indeed, the Court has already held that the scheme "foreclose[s] judicial review" for employees "to whom the CSRA *grants* administrative and judicial review." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012).

9

Of course, Plaintiffs here are not employees. But that is no matter. The "deliberate exclusion of [a group] from the provisions establishing administrative and judicial review for personnel action of the sort at issue . . . prevents [the group] from seeking review." *Fausto*, 484 U.S. at 455. Later, in the *Thunder Basin* context, the Court applied this prior holding. It explained that "the CSRA's 'elaborate' framework demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA *denies* statutory review." *Elgin*, 567 U.S. at 11 (quoting *Fausto*, 484 U.S. at 443). Thus, if it is true that the CSRA excludes administrative review options for Plaintiff, it supports, rather than detracts from, evidence of Congress's intent to preclude. *See Air Force*, 716 F.3d at 638 ("[T]he fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts. Rather, it means that National AFGE may not raise the claim at all.").

Indeed, a CSRA-related challenge rarely focuses on this first step. *See AFGE*, 929 F.3d at 755. Through the scheme Congress intended the CSRA to foreclose judicial review. "[T]his comprehensive employment scheme preempts judicial review under the more general APA even when that scheme provides no judicial relief—that is, what you get under the CSRA is what you get." *Filebark v. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) (Tatel, J.) (citation omitted). That suffices to satisfy the first *Thunder* Basin step. Indeed, no changes in Plaintiffs' new complaint would upend this foundational step. *See Ezell*, 2025 WL 470459, at *2. It is only at the second *Thunder Basin* step, whether particular claims in a suit are of the type Congress intended to be reviewed in this scheme, that could save Plaintiffs' amended complaint. That is, "Congress's creation of a 'comprehensive review process' like th[is] one[] here ousted district courts of jurisdiction." *Axon*, 598 U.S. at 186 (citation omitted). So this Court must "ask[] another question: whether the particular claims brought were of the type Congress intended to be reviewed within this statutory structure." *Id.* (citation omitted). As explained below, the answer to that question is yes. And because it is yes, consideration of these claims is precluded.

10

### 2. These Claims Are of the Type Congress Intended to be Reviewed Within the Scheme

The Court must consider "three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Id.* (1) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim"; (2) "is the claim wholly collateral to the statute's review provisions"; and (3) "is the claim outside the agency's expertise?" *Id.* (cleaned up). These "considerations" are ultimately merely guideposts to "best [] understand what Congress has done— whether the statutory review scheme, though exclusive where it applies, reaches the claim." *Id.* And it is critical to remember that an APA claim is as amenable to channeling as any other type. *See, e.g.*, *Filebark*, 555 F.3d at 1010. It is the content of the claim that matters—not the manner it is raised.

Plaintiffs bring four claims. First, that Defendants were required to follow notice and comment procedures. Am. Compl. ¶¶ 213–24. Second, that the program violates the arbitrary and capricious standard for review. *Id.* ¶¶ 225–38. Third, that Defendants violated statutory and perhaps regulatory requirements. *See id.* ¶¶ 239–48 (discussing various statutory and regulatory programs permitting different kinds of separation programs). Fourth, that Defendants violated constitutional constraints. *Id.* ¶¶ 249–57. All fall comfortably within the administrative scheme.

First, it provides for meaningful judicial review. This is so even if the scheme Congress established does not allow for Plaintiffs "to obtain 'pre-implementation' review" "or immediate relief." *See AFGE*, 929 F.3d at 755. Indeed, meaningful judicial review is still available for purposes of this prong even if the statutory scheme "ma[kes] it *impossible* to obtain particular forms of review or relief." *Id.* at 756. Here, as in *AFGE* itself, certain parties can bring certain claims through the administrative process "in the context of concrete . . . disputes." *Id.* at 757.

Consider an employee aggrieved by the purported failure to follow statutory or regulatory requirements. It is well established that an employee may challenge an employment action as

conflicting with a federal rule, guidance, or statute within the administrative scheme. *See, e.g., Marshall v. Health & Hum. Servs.*, 587 F.3d 1310, 1318 (Fed. Cir. 2009) (reversing based on an erroneous statutory interpretation); *Lyons v. Dep't of Veteran Affs.*, 273 F. App'x 929, 931 (Fed. Cir. 2008) (considering whether a regulation was violated); *Fed. L. Enf't Officers Ass'n v. Ahuja* ("*FLEOA*"), 62 F.4th 551, 560 (D.C. Cir. 2023) (noting challenges to OPM guidance and rules through the MSPB system). The same would even be true for constitutional challenges to employment actions taken. *See Elgin*, 567 U.S. at 16–17 ("That issue, . . . could be meaningfully addressed in the Court of Appeals that Congress had authorized to conduct judicial review." (citation omitted)). Moreover, the MSPB continues to have the ability to review the voluntariness and legality of a resignation, or resignation offer. *See Terban v. Dep't of Energy*, 216 F.3d 1021, 1024 (Fed. Cir. 2000) (explaining the scope of MSPB and judicial review of involuntary retirement). For example, in the context of MSPB review, the Federal Circuit has considered whether "a short time period within which to accept" an "attractive [resignation] option" sufficed to make a resignation involuntary. *Parrott v. MSPB*, 519 F.3d 1328, 1334–35 (Fed. Cir. 2008). That also goes to some of the specific concerns raised by Plaintiffs about "employment-related retaliation" related to "the Fork Directive." Am. Compl. Request for Relief at C.

Finally, the broader administrative law claims, including a purported failure to comply with required notice and comment, or the arbitrary and capricious standard, fall comfortably within the court's authority to "review the record and hold unlawful and set aside any agency action, findings, or conclusions" that are "obtained without procedures required by law, rule, or regulation having been followed" or that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 7703(c)(1), (2). In sum, there are certain methods, for certain parties, to obtain certain relief on these very topics—statutory, regulatory, and constitutional. In concrete cases, then,

an employee may very well challenge the aspects of deferred resignations of which Plaintiffs have complained.

That a separate, non-employee group, Plaintiff, may not be included in these pathways is no issue. "Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not *subject* to the administrative process, is strong." *Sackett v. EPA*, 566 U.S. 120, 130 (2012). Indeed, "[w]ere [the Court] to hold otherwise, a union [employee] could circumvent the CSRA's strictures by requesting that a [federal] union file general APA claims outside the CSRA." *Air Force*, 716 F.3d at 639. And it would be natural for Congress to preclude those not directly involved in the federal employment relationship—whether they be nonaffiliated third-party entities or federal unions—from filing a separate attack on employment policies. That is particularly true for a "'pre-implementation' review" seeking to preclude hypothetical employment actions through a variety of administrative challenges. *AFGE*, 929 F.3d at 755. And "[n]othing about the fact that plaintiffs' action is a systemic challenge to [personnel] policy mitigates" this preclusion. *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (Roberts, J.) (holding an APA challenge asserted against an OPM policy precluded).

Second, the asserted claims are not wholly collateral. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *FLEOA*, 62 F.4th at 563 (quoting *Heckler v. Ringer*, 466 U.S. 602, 615 (1984)). As the Supreme Court recently explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices," and "business merger" that constituted the subject matter of the agency actions. *Id.* Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.*

No such separation exists here. The claim seeks to challenge actions as conflicting with the substantive statutory and regulatory requirements in the employment sphere; broader statutory and constitutional requirements; and administrative law standards like notice and comment and arbitrary and capriciousness. Those administrators are well versed in these questions, including the particulars of federal personnel policies and the interplay of federal employment authorities.

Third, and for similar reasons, the agency may bring its expertise to bear on many of the questions raised. Indeed, *Elgin* directly addresses the point. As the Court noted: "preliminary questions unique to the employment context" include fact questions about any action taken as well as "statutory or constitutional claims that the MSPB routinely considers." *Elgin*, 567 U.S. at 22–23. And these "threshold questions" may "alleviate [the other] concerns." *Id.*

\* \* \*

So all the guideposts indicate Congress's intent to preclude these kinds of claims from district court review. If the Court has any lingering questions because Plaintiffs may be unable to challenge these particular claims in this type of way, it should be unbothered. Congress provided federal unions a particular method to raise issues under the FSL-MRS. Plaintiffs may seek to file a grievance under preexisting collective bargaining agreements. 5 U.S.C. § 7121(a)(1). The complaint can be "concerning any matter relating to the employment of any employee;" "the effect or interpretation, or a claim of breach, of a collective bargaining agreement; or" "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." *Id.* § 7103. They may also seek to challenge a failure to negotiate. *Id.* § 7117(c). The success of these endeavors will depend on a variety of threshold and substantive questions to be addressed by the FLRA.

Indeed, several district courts have recently examined challenges to the legality of new employment policies by the Trump Administration and have rejected them under the *Thunder Basin* inquiry. This includes, for example, this Court. *See Ezell*, 2025 WL 470459, at \*2; *see also Nat'l Treasury*

14

*Emps. Union v. Trump*, ---Fed. Supp.3d---, 2025 WL 561080, at *3 (D.D.C. Feb. 20, 2025) (finding implied preclusion for "constitutional and statutory challenges to the firing of probationary employees, the deferred resignation program, and [an] Executive Order"); *Am. Foreign Serv. Ass'n v. Trump*, ---Fed. Supp.3d---,  2025 WL 573762, at *7–10 (D.D.C. Feb. 21, 2025) (same for "alleged unlawful dismantling of USAID" because "the alleged injuries on which plaintiffs rel[ied] in seeking injunctive relief flow essentially from their members' existing employment relationships with USAID" (cleaned up)). Another district court agreed that unions are barred from bringing these types of claims under *Thunder Basin*, even as it allowed another plaintiff to bring suit, although the court later reversed its decision. *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-01780 WHA, 2025 WL 660053, at *7 (N.D. Cal. Feb. 28, 2025)*, reconsidering subject-matter jurisdiction* ---Fed. Supp.3d---, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025) (reversing earlier holding that unions were channeled through the CSRA and FLRA)*, stay granted,* No. 24A904, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025). And a final district court concluded that non-union plaintiffs were not precluded. *Maryland v. U.S. Dep't of Agric.*, ---Fed. Supp.3d---,  2025 WL 800216, at *12–15 (D. Md. Mar. 13, 2025)*, stay granted,* No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025). Injunctive relief in both cases was subsequently stayed, with the Fourth Circuit and Supreme Court noting a likely lack of jurisdiction for various plaintiffs.

Regardless of the specifics in other cases, the matter here is clear. As this Court explained in its initial ruling, Plaintiffs are impliedly precluded from bringing claims here. Nor does it matter that they may not be able to bring precisely these claims, in precisely this way, within the administrative scheme.

As then-Judge Roberts explained for the D.C. Circuit in *Graham*, the CSRA in some circumstances will properly provide a plaintiff "no relief and preclude[] other avenues of relief." 358 F.3d at 935. There, for example, the aggrieved employee lacked any recourse for an alleged failure of the agency to follow its own regulations. *Id.* And Judge Tatel held in *Filebark* that the CSRA precluded

"use [of] the APA to litigate [a] pay dispute with the Federal Aviation Administration" even though "the CSRA provide[d plaintiffs] no protection." 555 F.3d at 1010. This is not a bug of the CSRA. It is a feature. "[W]e treat the CSRA and Congress's related employment statutes as covering the field of federal employee claims, and so our cases expressly teach that *those left out of this scheme are left out on purpose.*" *Id.* at 1014 (emphasis added); *accord Air Force*, 716 F.3d at 638 ("[T]he fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts[] . . . [it] may not raise the claim at all.").

### B. Plaintiffs Lack Standing to Pursue their Claims

Nor can Plaintiffs show standing to assert their claims. To establish standing, a plaintiff must show: (1) an "injury in fact[,]" that is, a violation of a legally protected interest that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical;" (2) a causal connection between the injury and the defendant's conduct such that the injury is "fairly . . . traceable to the challenged action;" and (iii) that it is "likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted). As the party invoking federal jurisdiction here, Plaintiffs "bear[] the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).

To demonstrate injury in fact, a plaintiff must show that the defendant's action affects him in a "personal and individual way," *Lujan*, 504 U.S. at 560 n.1, rather than being a "generalized grievance," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024), *on remand to*, 117 F.4th 336 (5th Cir. 2024). A plaintiff must show more than a "possible future injury;" he must show that harm has actually occurred or is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citation omitted). And "threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)

16

(cleaned up). In addition, "standing is not dispensed in gross," and "'plaintiffs must demonstrate standing for each claim they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)), *on remand to sub. nom.*, *Missouri v. Biden*, 114 F.4th 406 (5th Cir. 2024).

An organization has standing either (1) by "its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy," *Warth v. Seldin*, 422 U.S. 490, 511 (1975); or (2) as the representative of its members who have been harmed, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). Here, the amended complaint includes allegations of injury to the plaintiff organizations themselves, *see* Am. Compl. ¶¶ 141–91, and injuries that Plaintiffs assert on behalf of their members under a theory of associational standing, *see id.* ¶¶ 125–40. None of these allegations is sufficient to support standing.

### 1.  Plaintiffs' Allegations of Injuries to Themselves Cannot Support Standing

Plaintiffs contend that they were injured by the Deferred Resignation Program in three ways: (1) they "have suffered reputational harm . . . due to the difficulty of providing satisfactory answers" about the program, *id.* ¶ 189; (2) they will eventually lose membership dues from members who accept deferred resignation, *see id.* ¶ 191; and (3) they diverted resources to assist their members in responding to the program, *see id.* ¶¶ 141–88, 190. All three theories fail to show injury in fact.

First, any alleged reputational harm is wholly speculative and has no relation to the kinds of reputational injuries that may form the basis of a cognizable injury in fact. *Cf. TransUnion*, 594 U.S. at 432 (disclosure of inaccurate information with plaintiffs' credit reports caused "reputational harm associated with the tort of defamation" and supported injury in fact). Reputational harm can be difficult to measure, but Plaintiffs do not even attempt to connect the dots between their demanded injunctive relief and any alleged injury to their reputations, and this Court should decline to fill in the gaps for them.

Second, a loss of membership dues from the free choices of Plaintiffs' individual members is not a cognizable harm. "It is not enough for plaintiffs to simply identify a governmental action that ultimately affected them through the independent responses and choices of third parties." *City of New York v. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (Wilkinson, J.) (citation omitted). Unions have no preexisting legal entitlement to members choosing to stay in their ranks; and when members choose to leave, that is not a redressable legal harm. ECF No. 66 at 3. (rejecting Plaintiffs' dues argument).

Finally, Plaintiffs' diversion of resources theory is squarely foreclosed by the Supreme Court's decision in *Hippocratic Medicine*, 602 U.S. 367. In *Hippocratic Medicine*, the Court rejected the argument by various medical associations that they had standing by claiming that the FDA had "impaired" their "ability to provide services that achieve their organizational mission[]" by approving the abortion-inducing drug mifepristone. *Id.* at 394 (citation omitted). The plaintiffs claimed that they incurred costs due to the FDA's actions, including a need to perform their own studies on mifepristone to better inform their members and the public about the drug's risks. *Id.* The plaintiffs further claimed that they had to spend "time, energy, and resources" drafting citizen petitions to the FDA and engaging in public advocacy and public education. *Id.* This, the plaintiffs alleged, resulted in them spending "considerable resources" to the detriment of other spending. *Id.* The Court rejected this capacious standing theory, explaining that it would mean that "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395.

This rejected theory of standing is precisely what Plaintiffs allege here. Plaintiffs contend that since the program was announced they have been "inundated by members and affiliates seeking advice and information about" the program, Am. Compl. ¶ 160, and that "resources are being diverted" as a result, *id.* ¶ 174. But this sort of "impairment" of their ability to provide services to their union members and the claimed expenditure of time, without more, is insufficient to establish Article III

18

standing. As the Supreme Court put it: An "organization" does not satisfy Article III when it simply "diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. Plaintiffs cannot explain why that restriction does not apply here. Indeed, this Court denied Plaintiffs' request for preliminary injunctive relief in part because they lack standing to challenge the deferred resignation program on this precise basis. ECF No. 66 at 2–3. (sThe plaintiffs here are not directly impacted by the directive.") None of the new allegations in the amended complaint have cured this jurisdictional flaw, and as a result, Plaintiffs fail to allege a cognizable injury in fact based on injury to themselves that could give rise to Article III standing.

### 2. Plaintiffs Lack Associational Standing.

Plaintiffs' alternative theory of associational standing fares no better. *See* Am. Compl. ¶¶ 125–40. The associational standing doctrine permits "an organization that has not suffered an injury in fact to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 308 (1st Cir. 2024) (quoting *Hunt*, 432 U.S. at 343). "This doctrine does not eliminate the constitutional requirement of a live case or controversy between the parties, but it recognizes that injury to an organization's members may satisfy Article III and allow the organization to litigate in federal court on their behalf." *Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1375 (1st Cir. 1992) (citing *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281 (1986)). Plaintiffs fail to meet the criteria because (1) they fail to show that the members identified in the amended complaint would have standing to

sue on their own and (2) the claims at issue and the relief Plaintiffs seek require the participation of those individual members.[5]

### a. Plaintiffs fail to demonstrate that their members would have standing to sue.

Plaintiffs fail to show that their members would have standing to sue on their own. Recall that "standing is not dispensed in gross," and "'plaintiffs must demonstrate standing for each claim they press' against each defendant, 'and for each form of relief.'" *Murthy*, 603 U.S. at 61 (citation omitted). Plaintiffs specifically identify three forms of relief: "[v]acate the Fork Directive and remand to OPM" declare the unlawfulness of "the Fork Directive" and "[d]eclare that any employment-related retaliation" related to "the Fork Directive" is unlawful. Am. Compl. Request for Relief at A–C. The theories underpinning these requests are failure to follow notice and comment, arbitrary and capricious action, statutory and regulatory violations, and the ultra vires doctrine. *Id.* ¶¶ 213–57. But Plaintiffs have failed to show member standing under any of these identified claims and remedies.

The retaliation-related relief can be quickly dispensed with. The amended complaint does not plausibly allege that anyone has been retaliated against based on the alleged legal defects in the deferred resignation program. Because "bare assertions" and "conclusory" allegations are insufficient, *see Iqbal*, 556 U.S. at 681, Plaintiffs have failed to establish member standing for the retaliation relief.

The other relief requested is vacatur of the Fork Directive and declaration that it is unlawful. Plaintiffs' theory is that the deferred resignation program is unlawful so it must be terminated by the court and reconsidered by OPM. For many members, however, Plaintiffs have alleged that the deferred resignation program offered an otherwise unavailable benefit that the employee chose to

---

[5] Plaintiffs' reliance on the standing of their members reaffirms that the CSRA impliedly precludes review here. *Supra* Part IA. The unions have attempted to distinguish their amenability to CSRA preclusion by reference to their status as unions rather than employees. To then rely on their precluded employee-members for standing purposes demonstrates why that approach is incorrect. *Air Force*, 716 F.3d at 639 ("Were we to hold otherwise, a union local could circumvent the CSRA's strictures by requesting that a national union file general APA claims outside the CSRA on its behalf. We decline to allow National AFGE, which here asserts only the rights of its member-employees and member-union locals, to file a suit outside the CSRA simply because it cannot do so under the CSRA.").

accept—not an injury invoking the jurisdiction of the federal courts. *See* Am. Compl. ¶ 191. Indeed, it is Plaintiffs' chosen remedies that would ultimately harm these members by vacating the program and presumably wiping away the offer that they accepted.

What remains are Plaintiffs' allegations that certain members wanted to take the offer, but were ineligible, *see id.* ¶ 132, or otherwise "declined to participate in the program," *see id.* ¶ 134. Their injury appears to be inability or unwillingness to participate. But Counts 3 and 4 allege that the program is unlawful in a manner where it could not be reopened and offered to those members. *Id.* ¶¶ 239–57. So Plaintiffs have not shown that members have standing to assert those claims. As to the notice and comment and arbitrary and capricious claims, both groups lack standing for a universal reason—it is "merely speculative that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (citation omitted). To remedy the injury Plaintiffs claim for their members, the Court would have to vacate the deferred resignation program, then, despite the late date, OPM would have to decide to reopen the program. At that point, the criteria for the offers would have to be sufficiently different to allow those ineligible for the program to participate, or to satisfy those who chose not to participate. And, ultimately, the members would then have to voluntarily choose to participate in this new program, at the new date, with whatever terms are available following the requested reconsideration. Such an "attenuated link[]" is not cognizable. *See All. for Hippocratic Med.*, 602 U.S. at 383. And "self-inflicted" injuries do not give rise to standing, like choosing not to participate. *Clapper*, 568 U.S. at 418.

### b. Plaintiffs' claims and the relief sought require the participation of individual members.

"There is no well-developed test in this circuit as to how the third prong of the *Hunt* test— whether 'the claim asserted [or] the relief requested requires the participation of individual members in the lawsuit,'—applies in cases where injunctive relief is sought." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 89 F.4th 46, 55 (1st Cir. 2023) (quoting *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 313–14 (1st Cir. 2005) (Boudin, J. & Dyk, J., concurring)), *cert. denied by*, 145 S.Ct.

15 (Dec. 9, 2024). However, comparison with a case where individual participation was determined not to be necessary is instructive.

In *Boston Parent Coalition*, the First Circuit noted that granting the requested relief "would certainly require some factual showing that some or all of the five students would have been admitted to [one of three selective public schools] but for the adoption of the [admissions methodology]." *Id.* The student-specific facts were well documented and uncontested (e.g., student GPA and school preference), and "it seems unlikely that any of the students would need to do much, if anything, in the lawsuit." *Id.* Further, the requested relief would "clearly inure to the benefit of those members of the association actually injured," and the First Circuit determined that the students' participation was not required. *Id.* (citation omitted).

Here, in contrast, Plaintiffs allege diverse harms to members who held widely varying employment statuses at five different federal agencies, *see* Am. Compl. ¶¶ 126–36, and request a declaration that "any employment-related retaliation against any current or former government worker for accepting or declining the Fork Directive is unlawful," *id.*, Request for Relief at C. Plaintiffs allege that some of the members were probationary employees, *id.* ¶¶ 126–27, that one was a reemployed annuitant, *id.* ¶ 130, and that one member was "terminated from the Fork Program on June 16" and "will now receive only three months of benefits," *id.* ¶ 131. Another member was allegedly a remote worker who lived over 80 miles from his duty station, *id.* ¶ 133, while another was "eight months pregnant and about to start parental leave," and ultimately "declined to participate in the [program]," *id.* ¶ 134. Any assessment of the claims of these members would require individualized proof and it would be inappropriate to permit Plaintiffs to move forward without their participation. *See Terre Du Lac Ass'n v. Terre Du Lac, Inc.*, 772 F.2d 467, 471 (8th Cir. 1985). Similarly, the Court cannot even identify which of Plaintiffs' members have suffered "employment-related retaliation" in order to

provide the requested relief without the kind of individualized proof that would require the participation of the members in this litigation.

Because the vindication of the claims put forth and the relief requested in the amended complaint would require the participation in the litigation of the individual members allegedly affected, associational standing does not lie.

## II. Plaintiff's APA and Ultra Vires Claims are Barred

Plaintiffs bring a combination of APA and ultra vires claims. The APA claims are barred because Plaintiffs have not identified a final agency action. Meanwhile, ultra vires is a narrow and limited doctrine of last resort and Plaintiffs do not satisfy the strict test for its invocation.

### A. Plaintiffs Identify No Final Agency Action Reviewable Under the APA

Even if Plaintiffs' claims were not precluded under the comprehensive schemes set forth in the CSRA and the FSL-MRS and lack of standing, their APA claims would still fail because they have not challenged final agency action subject to judicial review under the APA. The APA subjects "final agency action" to judicial review. 5 U.S.C. 704. Agency action requires a specific "rule, order, license, sanction, relief or the equivalent[.]" *Id.* § 551(13). It must be a "discrete" act, and a plaintiff may not bring a "broad programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). To qualify as a reviewable "final" agency action, the challenged action must both mark the consummation of the agency's decision-making process and be one by which "rights or obligations have been determined" or from which "legal consequences may flow." *Bennett v. Spears*, 520 U.S. 154, 177-78 (1997) (citation omitted). Under the second prong, agency action typically has legal consequences where it has the status of law and immediate compliance with its terms is expected. *FTC v. Standard Oil Co.*, 449 U.S. 232, 239-40 (1980). The APA expressly excludes "preliminary, procedural, or intermediate agency action[s]or ruling[s]." *Id.* (citation omitted) The question is a matter of the "statutory" jurisdiction of the Court. *Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007).

23

Plaintiffs contend that "OPM's email announcement and commencement of the Fork Directive" constitutes "final agency action under the APA." Am. Compl. ¶ 216.[6] But even if Plaintiffs could establish that the January 28 email reflects the consummation of OPM's decisionmaking process, that email announcing the program does not determine any rights or obligations, and no legal consequences flow from the program itself. Rather, any legal consequences would flow from a federal employee's choice in accepting the voluntary resignation offer. *See Friends of Merrymeeting Bay v. U.S. Dep't of Com.*, 810 F. Supp. 2d 320, 327 (D. Me. 2011) (drawing distinction between an Endangered Species Act consultation, which did not constitute final agency action, and any subsequent safe harbor that flowed from the consultation, which would constitute final agency action). Indeed, "even when agency action significantly impacts the choices available to the final decisionmaker," it still "[would] not transform the challenged action into reviewable agency action under the APA." *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 860 (4th Cir. 2002). The program "does not require anyone to do anything" and certainly does not demand any sort of compliance—let alone immediate compliance—with its terms. *See Ca. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019).

Plaintiffs acknowledge as much in their amended complaint. For example, Plaintiffs contend that some of their members signed up for the deferred resignation program while others did not. Am. Compl. ¶ 36 (stating that "thousands of Plaintiffs' members received, and many members accepted, the Fork Directive"). They also agree that implementation involves particular decisions regarding particular employees. *See, e.g.*, Am. Compl. ¶ 127 (USDA employee informed that employee was not eligible); *id.* ¶ 128 (fee-for-service employees at the Department of Transportation receive information about eligibility from the agency weeks after February 12, 2025). Accordingly, Plaintiffs have

---

[6] Although Plaintiffs allege in their amended complaint that "[t]he mass firing of probationary workers at non-OPM agencies is a final agency rule that did not comply with the APA or undergo notice and comment rulemaking," Am. Compl. ¶ 202, this allegation does not appear to form the basis for any of Plaintiffs' four counts or their prayer for relief. Accordingly, because Plaintiffs do not seek any relief based on this allegation, Defendants need not separately move to dismiss it.

effectively explained that no APA claim can flow from their claims—acknowledging that no legal consequences flow from the purported final agency action that they themselves have chosen to identify. In other words, Plaintiffs seek the "broad programmatic attack" barred by longstanding precedent, and do not invoke the "discrete" review Congress provided. *Norton*, 542 U.S. at 64. Counts One, Two and Three should thus be dismissed.

### B. Ultra Vires Is Not Cognizable Here

Plaintiffs bring one claim for an "*Ultra Vires* / Separation of Powers" challenge; stating that Defendants have usurped legislative powers. *Id.* ¶¶ 249–57. Specifically, Plaintiffs argue that OPM's actions are not authorized by statute, conflict with statutes, and exceed statutory authority provided to OPM. *Id.* ¶ 256. That claim cannot succeed either.

As an initial matter, there is no freestanding constitutional claim that an executive actor has violated statutory authority. Indeed, the Supreme Court has squarely precluded the kind of nonstatutory constitutional "separation of powers" claim asserted in the amended complaint. In *Dalton v. Specter* the Court considered, in the context of nonstatutory review of Presidential and agency action, whether "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." 511 U.S. 462, 471 (1994). Specifically, the Court sought to determine whether nonstatutory review was applicable when the President and agency actors allegedly "violated the procedural requirements of the [authorizing] Act." *Id.* at 471–72. The Court rejected that contention. "Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. "[C]laims simply alleging that the President [or an executive offer] has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Id.* at 473.

Instead, arguments about statutory authority are generally litigated through review statutes that channel claims—like the CSRA—or the general scheme for review of agency action—the APA. Those

channels of review deal, in regular order, with claims that substantive statutory authority has not been followed. In other words, Congress has generally provided for how courts consider whether an executive official has breached the substantive authority Congress has provided.

The *nonstatutory* path to consider excess of statutory authority is often called "ultra vires" review. It is a "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). More specifically, ultra vires review of agency action outside of a particular statutory review scheme is available only when an agency's invocation of authority not granted is "so extreme that one may view it as jurisdictional or nearly so." *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988). "The basic premise behind nonstatutory review is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is *ultra vires*." *Puerto Rico*, 490 F.3d at 59 (citation omitted). It is thus an equitable cause of action, fashioned by courts in the most limited of circumstances, to review whether an executive official is entirely outside the bounds of his authority.

The First Circuit has identified "two critical factors that must be present to invoke nonstatutory review." *Id.* (cleaned up). "First, such review may occur only if its absence would wholly deprive the party of a meaningful and adequate means of vindicating its rights. Second, Congress must not have clearly intended to preclude review of the agency's particular determination." *Id.* (cleaned up). All that is to say: if a statutory scheme provides some review, or evinces an intent to preclude review, then the ultra vires claim comes to an end. *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (non-statutory review is available only when a party would be "wholly deprive[d] . . . of a meaningful and adequate means of vindicating its statutory rights"); *Lepre v. Dep't of Lab.*, 275 F.3d 59, 72 (D.C. Cir. 2001) (a "critical" requirement for ultra vires review is "the lack of any alternative means of judicial review"). These limitations derive from the fragile nature of judicially fashioned

26

equitable causes of action. *Armstrong v. Exceptional Child Ctr. Inc.*, 575 U.S. 320, 324–27 (2015). Thus even "implied statutory limitations" defeat a court's power to act. *Id.* at 327.

For the reasons discussed earlier, the CSRA provisions governing the directly impacted employees, and related review provisions for unions, defeats any freestanding nonstatutory claim. *Supra* Part IA. Moreover, the existence of APA review for excess of statutory authority challenges independently eliminates an additional ultra vires claim. This is true even if the APA bars present litigation by *these* Plaintiffs and the broad programmatic challenge that they seek to bring here. The APA has specific requirements, such as the need for final agency action and a party personally aggrieved, affected, or suffering a legal wrong. 5 U.S.C §§ 702, 704. Plaintiffs apparently seek to skirt these Congressionally designed safeguards through the nonstatutory review vehicle. But that "effort to dilute *ultra vires* review to the functional equivalent of the very APA action that Congress prohibited defies precedent and logic." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

That Plaintiffs cannot meet the APA's requirements, or are not provided the precise vehicle they prefer for review through an administrative scheme, does not license destroying Congress's procedural choices. *See id.*; *Puerto Rico* 490 F.3d at 59. "[T]he existence of the APA as a means for reviewing [Defendants'] actions at least implies that nonstatutory review is inappropriate." *Puerto Rico*, 490 F.3d at 60; *see also Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1532 (D.C. Cir. 1983) ("Even if we agreed that one nationwide suit would be *more effective* tha[t] several [discrete] suits, that does not mean that the remedy provided by Congress is *inadequate*"). Consequently, Plaintiffs' "*Ultra Vires* / Separation of Powers" claim should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated: May 8, 2025

Respectfully submitted,

ERIC J. HAMILTON
Deputy Assistant Attorney General

DIANE KELLEHER
Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

*/s/ Joshua E. Gardner*
JOSHUA E. GARDNER
(FL Bar No. 302820)
Special Counsel

JASON ALTABET
Trial Attorney
KEVIN BELL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 305-7583