## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
80 F Street N.W.,
Washington, D.C. 20001,

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO,
1625 L Street, N.W.
Washington, D.C. 20036,

and

NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, INC.,
159 Thomas Burgin Parkway
Quincy, MA 01269,

                Plaintiffs,

    v.

CHARLES EZELL, in his official capacity as
Acting Director of the Office of Personnel
Management,
1900 E Street, N.W.
Washington, D.C. 20415,

and

OFFICE OF PERSONNEL MANAGEMENT,
1900 E Street, N.W.
Washington, D.C. 20415,

                Defendants.

Case No. 1:25-cv-10276

**Leave to file excess pages granted on (May 8, 2025)**

2973542

**TABLE OF CONTENTS**

Page(s)

I.    INTRODUCTION ................................................................................................1

II.    BACKGROUND ................................................................................................2

    A.    The Fork Directive.................................................................................2

    B.    Plaintiffs' Injuries ................................................................................4

    C.    Neither the FLRA nor the MSPB are viable forums for relief. ..............6

III.    LEGAL STANDARD........................................................................................6

IV.    ARGUMENT ....................................................................................................7

    A.    This Court has jurisdiction to review Plaintiffs' claims. ........................7

        1.    The CSRA and FSLMRS do not preclude jurisdiction over claims
            challenging the Fork Directive, a government-wide OPM program. ..........9

        2.    The CSRA and FSLMRS do not preclude jurisdiction over
            Plaintiffs' claims seeking procedural and declaratory relief....................13

        3.    The Trump Administration has decimated the MSPB and stripped
            its leadership of statutory for-cause removal protections,
            eviscerating any congressional intent to channel these claims. ................16

    B.    Plaintiffs have standing to bring their claims. ......................................17

        1.    Plaintiffs have associational standing. ......................................17

        2.    Plaintiffs have organizational standing.....................................21

    C.    Plaintiffs have plausibly alleged their claims. ......................................23

        1.    Plaintiffs allege that the Fork Directive constitutes final agency
            action..........................................................................................23

        2.    Plaintiffs have stated an ultra vires claim. ...............................26

V.    CONCLUSION................................................................................................27

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AFGE v. Secretary of Air Force*,
    716 F.3d 633 (D.C. Cir. 2013) ...................................................................................12, 13

*AFGE v. Trump*,
    2025 WL 1482511 (N.D. Cal. 2025) ...................................................................................7

*AFGE v. Trump*,
    2025 WL 1541714 (9th Cir. 2025) .............................................................................10, 11

*AFGE v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019) .........................................................................................16

*AFGE v. U.S. Off. of Pers. Mgmt.*, ("*OPM I*"),
    2025 WL 900057 (N.D. Cal. 2025) ............................................................................ *passim*

*AFGE v. U.S. OPM*, ("*OPM II*"),
    2025 WL 1150698 (N.D. Cal. 2025) ....................................................................22, 26, 27

*Aguilar v. U.S. Immigr. & Customs Enf't Div. of DHS*,
    510 F.3d 1 (1st Cir. 2007) ................................................................................................17

*Am. Libr. Ass'n v. Sonderling*,
    2025 WL 1262054 (D.D.C. 2025) ....................................................................................22

*Arch Coal, Inc. v. Hugler*,
    242 F. Supp. 3d 13 (D.D.C. 2017) ...............................................................................13, 14

*Axon Enter. Inc. v. Fed. Trade Comm'n*,
    598 U.S. 175 (2023) ..................................................................................................... *passim*

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................................23, 24, 25

*Buck v. Am. Airlines, Inc.*,
    476 F.3d 29 (1st Cir. 2007) ................................................................................................8

*Caicedo v. DeSantis*,
    2024 WL 4729160 (M.D. Fla. 2024) ................................................................................22

*California Communities Against Toxics v. EPA*,
    934 F.3d 627 (D.C. Cir. 2019) ..........................................................................................25

*Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth.*,
   4 F.4th 63 (1st Cir. 2021) ................................................................................6

*Chamber of Com. of the U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) .........................................................................27

*Citizens of Karst, Inc. v. U.S. Army Corps of Eng'rs*,
   160 F. Supp. 3d 451 (D.P.R. 2016) ..................................................................22

*City of New York v. U.S. Dep't of Def.*,
   913 F.3d 423 (4th Cir. 2019) .....................................................................24, 26

*Commonwealth of P.R. v. United States*,
   490 F.3d 50 (1st Cir. 2007) .............................................................................27

*Debnam v. FedEx Home Delivery*,
   766 F.3d 93 (1st Cir. 2014) ...............................................................................6

*Dellinger v. Bessent*,
   2025 WL 717383 (D.C. Cir. 2025) ..................................................................16

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ...........................................................................................8

*E. Bridge, LLC v. Chao*,
   320 F.3d 84 (1st Cir. 2003) .............................................................................17

*Elgin v. Dep't of Treasury*,
   567 U.S. 1 (2012) ...............................................................................8, 9, 13

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018) ...........................................................................................8

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) .........................................................................................21

*Fed. Express Corp. v. U.S. Dep't of Com.*,
   39 F. 4th 756 (D.C. Cir. 2022) ..................................................................26, 27

*Feds for Med. Freedom v. Biden*,
   63 F.4th 366 (5th Cir.) ................................................................................9, 10

*Filebark v. U.S. Dep't of Transp.*,
   555 F.3d 1009 (D.C. Cir. 2009) ................................................................10, 15

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   110 F.4th 295 (1st Cir. 2024) .........................................................................17

*FLEOA v. Ahuja,*
    62 F.4th 551 (D.C. Cir. 2023) .................................................................................15

*Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. E.P.A.,*
    313 F.3d 852 (4th Cir. 2002) .................................................................................25

*Fornaro v. James,*
    416 F.3d 63 (D.C. Cir. 2005) .................................................................................14

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010)................................................................................... *passim*

*Graham v. Ashcroft,*
    358 F.3d 931 (D.C. Cir. 2004) ...............................................................................11

*Humphrey's Executor v. United States,*
    292 U.S. 602 (1935)..............................................................................................16

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977).................................................................................17, 20, 22

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO by Negron v. Union De*
    *Carpinteros De Puerto Rico,*
    615 F. Supp. 3d 87 (D.P.R. 2022) ....................................................................22, 29

*La Union Del Pueblo Entero v. Abbott,*
    2024 WL 4488082 (W.D. Tex. 2024)........................................................................22

*Lyons v. Dep't of Veterans Affs.,*
    273 F. App'x 929 (Fed. Cir. 2008) .....................................................................10, 15

*Marshall v. Dep't of Health & Hum. Servs.,*
    587 F.3d 1310 (Fed. Cir. 2009)..........................................................................10, 15

*McNary v. Haitian Refugee Ctr., Inc.,*
    498 U.S. 479 (1991).....................................................................................14, 15, 16

*Nat'l Ass'n of Immigr. Judges v. Owen,*
    2025 WL 1560373 (4th Cir. 2025) ........................................................................8, 16

*Nat'l Mining Ass'n v. Chao,*
    160 F. Supp. 2d 47 (D.D.C. 2001) ......................................................................14, 15

*Nat'l Mining Ass'n v. Dep't of Labor,*
    292 F.3d 849 (D.C. Cir. 2002) ...............................................................................14

*Nat'l Treasury Emps. Union v. Devine,*
    577 F. Supp. 738 (D.D.C. 1983)........................................................................14, 15

*Nat'l Treasury Emps. Union v. Whipple,*
    636 F. Supp. 2d 63 (D.D.C. 2009) ................................................................14, 15

*New York v. McMahon,*
    2025 WL 1463009 (D. Mass. 2025) .........................................................................7

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ..................................................................................................26

*Nulankeyutmonen Nkihtaqmikon v. Impson,*
    503 F.3d 18 (1st Cir. 2007) ..........................................................................17, 19, 22

*OCONUS DOD Emp. Rotation Action Grp. v. Cohen,*
    144 F. Supp. 2d 1 (D.D.C. 2000) ...............................................................14, 15

*OPM v. AFGE,*
    Sup. Ct. No. 24A904 (April 8, 2025) ...................................................................7, 10

*Parrott v. Merit Sys. Prot. Bd.,*
    519 F.3d 1328 (Fed. Cir. 2008) .................................................................10, 15

*PFLAG, Inc. v. Trump,*
    2025 WL 685124 (D. Md. Mar. 4, 2025) .............................................................27

*Pharm. Care Mgmt. Ass'n v. Rowe,*
    429 F.3d 294 (1st Cir. 2005) ...................................................................................20

*Republican Nat'l Comm. v. N.C. State Bd. of Elections,*
    120 F.4th 390 (4th Cir. 2024) .................................................................................22

*Rhode Island Dep't of Env't Mgmt. v. United States,*
    304 F.3d 31 (1st Cir. 2002) .......................................................................................8

*Rivera-Vega v. ConAgra, Inc.,*
    70 F.3d 153 (1st Cir. 1995) .....................................................................................22

*Saget v. Trump,*
    345 F. Supp. 287 (E.D.N.Y. 2018) .........................................................................27

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior,*
    2023 WL 6691015 (D. Mass. 2023) ...............................................................19, 22

*Serv. Emps. Int'l Union Loc. 200 United v. Trump,*
    420 F. Supp. 3d 65 (W.D.N.Y. 2019) ....................................................................14

*Terban v. Dep't of Energy,*
    216 F.3d 1021 (Fed. Cir. 2000) .................................................................10, 15

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994)................................................................................8

*Tilton v. S.E.C.*,
    824 F.3d 276 (2d Cir. 2016)...................................................................17

*Trump v. Wilcox*,
    2025 WL 1464804, 605 U.S. __ (2025)..................................................*16*

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016)..................................................................8, 23, 25

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996)...............................................................................20

*United States v. Fausto*,
    484 U.S. 439 (1988)...............................................................................10

*Warth v. Seldin*,
    422 U.S. 490 (1975)........................................................................17, 21

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018)....................................................................................8

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)...............................................................................23

*Widakuswara v. Lake*,
    2025 WL 1166400 (D.D.C. 2025) ......................................................7, 22

*Widakuswara v. Lake*,
    2025 WL 1288817 (D.C. Cir. 2025) ........................................................7

*Widakuswara v. Lake*,
    2025 WL 1521355 (D.C. Cir. 2025) ........................................................7

*Yershov v. Gannett Satellite Info. Network, Inc.*,
    820 F.3d 482 (1st Cir. 2016)....................................................................6

**Statutes**

5 U.S.C. §§ 553–559, Administrative Procedure Act ("APA").............................*passim*

5 U.S.C. §§ 701–706............................................................................................8

5 U.S.C. §§ 1103, 1105, 7134..............................................................................8

5 U.S.C. §§ 1202, 1211, 7104............................................................................16

5 U.S.C. §§ 2302, 7512.................................................................................................9, 10

5 U.S.C. § 7105.......................................................................................................12, 13

5 U.S.C. § 7111.............................................................................................................12

5 U.S.C. § 7114.......................................................................................................12, 22

5 U.S.C. § 7121.............................................................................................................12

5 U.S.C. §§ 7513, 7701............................................................................................9, 11

**PLAINTIFFS' OPPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

I.    **INTRODUCTION**[1]

For nearly 150 years, regardless of which party was in power, the federal government has depended on a nonpartisan career civil service. These dedicated federal employees have worked to promote their agencies' missions, in accordance with the laws Congress has passed to benefit, protect, and support the American people. One of the hallmarks of the American system of government has been a career civil service that has institutional memory, expertise, and a willingness to serve and implement the executive's policy priorities across administrations.

Like any president, President Trump has the power to set priorities and implement his policy agenda. But, like any president, his Administration's actions must comport with the law. When the Office of Personnel Management ("OPM") sent an email to every federal employee offering a "deferred resignation" program known as the "Fork Directive," it did so without any statutory authority and without having satisfied—or even attempting to satisfy—the processes in the Administrative Procedure Act ("APA"). The implementation was replete with internal contradictions, coercive threats, unreasonable deadlines, and FAQs offering more questions than answers. This chaotic rollout, devoid of any reasoned decision making or analysis, was designed to create fear and uncertainty among the 2.3 million federal workers on whom Americans rely to ensure that our government functions. OPM's action was unlawful and should be declared so.

In their motion to dismiss the Amended Complaint, Defendants make no effort to defend the program's legality. Instead, they primarily argue that this Court lacks jurisdiction to hear the case and that Plaintiffs lack standing to assert their claims. Defendants are wrong.

_____

[1] In all quotations, all internal quotation marks, citations, and alterations have been omitted, and all emphases added, unless otherwise noted.

1

*First*, neither the Civil Service Reform Act of 1978 ("CSRA") nor the Federal Service Labor-Management Relations Statute ("FSLMRS") precludes jurisdiction for the claims asserted here. Plaintiffs challenge a lawless, government-wide agency directive, not any personnel decisions covered by these statutes. And Plaintiffs' allegations and claims meaningfully differ from those in the initial complaint: Plaintiffs now seek pure procedural and declaratory relief under the APA and the U.S. Constitution, which district courts consider as a matter of course and which the Merit Systems Protection Board ("MSPB") and Federal Labor Relations Authority ("FLRA") are by no means designed to grant. What's more, the Administration has gutted both agencies, rendering any recourse to them illusory, futile, and contrary to Congressional intent.

*Second*, Plaintiffs have standing. The unions have associational standing to pursue claims on their members' behalf. And as other district courts have found in analogous cases, they have organizational standing to challenge a government-wide policy.

*Third*, Plaintiffs have adequately stated their claims, alleging both that the Fork Directive is a final agency action that is ripe for judicial review and that the Fork Directive was an *ultra vires* action that violates the separation of powers inherent in the U.S. Constitution.

The Fork Directive was a ham-fisted effort of breathtaking scope to gut the federal workforce without attempting to comply with basic procedural rules. The Court should not allow OPM to dodge accountability through technical jurisdictional arguments that have never applied to a federal action of this nature and magnitude. The Court should deny the motion.

## II.    BACKGROUND

### A.    The Fork Directive

On January 28, 2025, OPM sent an email directly to nearly all federal employees. Am. Compl. ("AC") ¶ 46, ECF No. 77. Entitled "Fork in the Road," the email purported to announce

a "deferred resignation" program for federal workers. *Id.* The Fork Directive mimicked Elon

Musk's program of the same name that he executed when he acquired Twitter. *Id.* ¶ 91. OPM

took this unprecedented approach, which was widely regarded as chaotic and inefficient even in

the private sector, and employed it across the entire federal government. *Id.* ¶ 90. OPM—and

OPM alone—designed, implemented, and executed the Fork Directive, targeting the entire

federal workforce. *Id.* ¶¶ 112–16. And OPM promised to pay workers through September 30,

2025, without any statutory authorization or appropriation to fund those payments. *Id.* ¶ 119.

   The Fork Directive email neither originated with employing agencies, nor were workers

instructed to respond to their employing agencies. *Id.* ¶ 47. Instead, OPM instructed them to

reply with the word "RESIGN" directly to OPM—the only authorized response aside from

ignoring the email. *Id.* ¶¶ 47, 49. The Fork Directive stated that the program would run from

January 28 to February 6, 2025, was "available to all federal employees," and, if accepted, would

allow workers to "retain all pay and benefits" regardless of their workload. *Id.*

   OPM threatened that many federal jobs could be eliminated, such that refusal to accept

the Fork Directive could lead to early termination or lack of "sufficient time and economic

security to plan for your future." *Id.* ¶ 51. OPM's threats, in conjunction with a chaotic rollout

and short fuse, coerced workers into making massively important employment decisions with no

understanding of the program's details or legality, let alone adequate time to obtain guidance

from counsel or union representatives. *Id.* ¶ 52. Shortly after sign-ups closed, the government

fired thousands of workers—including some who had signed up for the Fork Directive. *Id.* ¶ 53.

   OPM provided no notice-and-comment period before implementing the program. *Id.*

¶ 54. OPM conducted no analysis of how the Directive might impact different agencies, what an

optimal amount of resignations would be or from which departments, or how mass resignations

might affect critical government functions. *Id.* ¶ 55. OPM provided no reasoned basis for the Directive's eight-month duration, its fiscal impact, or its potential effects on services. *Id.* ¶¶ 56, 61–62. OPM offered the Fork Directive to employees, such as air traffic personnel, whom OPM later decided were ineligible. *Id.* ¶¶ 57–59. OPM's public statements about eligibility did not match its own communications to workers in critical government functions. *Id.* ¶ 60. These contradictions confused Plaintiffs and their members, with workers hearing they were ineligible only to be told later that failing to take the Directive could cause them to be fired. *Id.*

As the chaotic rollout proceeded, OPM sent emails and added FAQs to its website. *Id.* ¶ 64. The FAQs frequently changed, leaving Plaintiffs, their members, and the public confused about basic aspects, such as whether participating employees could work or could take other jobs, how the Directive affected benefits, retirement, and leave, or whether the program was legal or funded. *Id.* ¶¶ 65–73, 83–87. OPM was unwilling or unable to provide clear or consistent answers. *Id.* ¶ 75. Making it clear that this was an exclusively OPM initiative, an executive director at the FAA told one of Plaintiffs' members that he could provide no answers about the Directive because he had no more information than the employees did. *Id.* ¶ 76. When agency supervisors tried to answer questions, their answers sometimes contradicted OPM's. *Id.* ¶ 78.

If Defendants had followed the APA's notice-and-comment requirements, Plaintiffs would have provided input regarding the Fork Directive's scope, implementation, duration, consequences, effects on operations, ethical considerations, and legality. *Id.* ¶¶ 82, 93, 105, 124. OPM's failure to follow the law in rolling out the program was part of a concerted effort to purge nonpartisan career civil servants and "replace them with our people." *Id.* ¶¶ 109–11.

**B.    Plaintiffs' Injuries**

Plaintiffs are three public-sector unions: the American Federation of Government

Employees, AFL-CIO ("AFGE") the American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME"), and the National Association of Government Employees, Inc. ("NAGE"). Collectively, these unions represent more than 800,000 federal civil servants. AC ¶ 18. Plaintiffs' members work across a broad spectrum of federal agencies and live and work in all 50 states and the District of Columbia. *Id.* ¶¶ 147–50. Plaintiffs regularly submit comments pursuant to the APA's rulemaking process on their members' behalf. *Id.* ¶ 139.

The Fork Directive has injured Plaintiffs' members based on its lawless and chaotic rollout. One of Plaintiff AFSCME's members—a USDA employee—accepted the Directive and resigned, only to be fired four days later, told she was ineligible, then told she was eligible, and then told she was ineligible again. *Id.* ¶ 126. Another AFSCME member faced similar issues, having resigned, been fired, been reinstated, and then furloughed. *Id.* ¶ 127. Several of Plaintiff NAGE's members worked for the Department of Transportation and tried to resign only to be told they were ineligible for paid administrative leave, but then were added to the Fork Directive program six weeks later. *Id.* ¶ 128. A Veterans Affairs employee attempted to take the Directive, only to learn from Redditt (a public website) that her position was exempt. *Id.* ¶ 129. Another VA employee took the offer, signed an agreement related to the Directive, and then was told he was ineligible for reasons nowhere stated in any of OPM's correspondence. *Id.* ¶ 130. Other members considered taking the Directive but declined to do so due to legitimate questions about the program's legality and OPM's inability to provide clear, timely answers. *Id.* ¶¶ 131–36.

Plaintiffs' core functions include ensuring their members make informed decisions about their employment, and vindicating members' financial, emotional, personal, and reputational interests. AC ¶ 18. Crucial to these organizational missions is receiving and responding to member inquiries, including providing guidance, legal assistance, training, and other services. *Id.*

¶¶ 153–59. When OPM unveiled its Fork Directive, Plaintiffs were inundated with thousands of calls, emails, and inquiries seeking advice, guidance, and information. *Id.* ¶¶ 160–61. Plaintiffs diverted significant resources and time to dealing with the chaos OPM unleashed, from speaking with panicked members, to holding town halls, to conducting complex legal research, to responding to media inquiries. *Id.* ¶¶ 163–74. OPM's shifting descriptions and justifications have made it challenging for Plaintiffs to answer even basic questions about the Directive's scope and legality. This not only harms Plaintiffs and their members, but also undermines Plaintiffs' core missions and reputations. *Id.* ¶¶ 162, 175–89. More prosaically, OPM's coercive Directive caused thousands of Plaintiffs' members to commit to leave their employment in September 2025, depriving Plaintiffs of membership dues, further harming Plaintiffs. *Id.* ¶ 191.

> **C.    Neither the FLRA nor the MSPB are viable forums for relief.**

No statutory mechanism exists through the FLRA or MSPB for Plaintiffs to seek procedural relief related to a government-wide program. AC ¶ 194. Neither body has the authority to adjudicate claims against OPM challenging such a policy, or to issue the relief requested. *Id.* ¶ 195. And because the Administration is actively decimating the agencies to which it now seeks to channel these claims, neither agency can function properly. *Id.* ¶ 196.

## III.    LEGAL STANDARD

"A plaintiff's allegations are sufficient to overcome a Rule 12(b)(6) motion if they contain 'enough facts to state a claim to relief that is plausible on its face.'" *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016). The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Debnam v. FedEx Home Delivery*, 766 F.3d 93, 96 (1st Cir. 2014). "Rule 12(b)(1) motions challenging subject-matter jurisdiction are divided into two categories: facial challenges and factual challenges." *Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth.*, 4 F.4th 63, 69 (1st Cir.

2021). Where, as here, the movant makes a facial challenge raising a question of law without contesting the facts, "[t]he analysis is essentially the same as a Rule 12(b)(6) analysis: [courts] accept the well-pleaded facts alleged in the complaint as true and ask whether the plaintiff has stated a plausible claim that the court has subject matter jurisdiction." *Id.*

## IV.    ARGUMENT

### A.    This Court has jurisdiction to review Plaintiffs' claims.

Defendants' contention that "[n]othing has changed" since the TRO decision is wrong. Mot. at 8. To be sure, Plaintiffs recognize that this Court previously determined—on a compressed timeline, for an emergency motion that brought different claims and requested different relief—that Plaintiffs' claims likely must first proceed through the CSRA and FSLMRS channels. *See* ECF 66. But that preliminary ruling in no way ends the matter. Indeed, a federal district court in the Northern District of California reached the same decision in an emergency order only to reconsider that ruling after additional briefing and a better understanding of the facts and relevant law, ultimately finding that jurisdiction was proper. *See AFGE v. U.S. Off. of Pers. Mgmt.* ("*OPM I*"), 2025 WL 900057 (N.D. Cal. Mar. 24, 2025) ("After further briefing . . . this order holds that the district court does have subject-matter jurisdiction over these claims by public-sector unions and that my earlier ruling to the contrary was mistaken.").[2] Several other courts have likewise declined to channel federal union claims in recent months.[3] And on June 3,

_____

[2] Though the Supreme Court later stayed an early preliminary injunction granted to non-union plaintiffs, that injunction did not address the union plaintiffs' claims or channeling under the CSRA or FSLMRS. *See OPM v. AFGE*, No. 24A904, Dkt. No. 10 (Apr. 8, 2025).

[3] *See AFGE v. Trump*, 2025 WL 1482511, at *11–15 (N.D. Cal. May 22, 2025), *aff'd*, 2025 WL 1541714, at *3–5 (9th Cir. May 30, 2025); *Widakuswara v. Lake*, 2025 WL 1166400, at *11 (D.D.C. Apr. 22, 2025); *see also New York v. McMahon*, 2025 WL 1463009, at *20 (D. Mass. May 22, 2025) (favorably citing *OPM I* and *Widakuswara*). A motions panel stayed part of the *Widakuswara v. Lake* preliminary injunction pending appeal, 2025 WL 1288817, at *2 (D.C. Cir. May 3, 2025), and while the D.C. Circuit denied *en banc* reconsideration, *Widakuswara v. Lake*, 2025 WL 1521355 (D.C. Cir. May 28, 2025), the court explained its denial did not indicate any agreement with the government's argument that the district court lacked jurisdiction, *id.* Doc. 2117869, at 3 (Srinivasan, C.J., respecting denial of reconsideration).

the Fourth Circuit remanded a case to the district court to determine whether channeling is inappropriate because the CSRA "has been so undermined that the jurisdiction stripping scheme no longer controls." *Nat'l Ass'n of Immigr. Judges v. Owen*, 2025 WL 1560373, at *1 (4th Cir. June 3, 2025).

This case is especially appropriate for a renewed analysis because Defendants' jurisdictional argument is based entirely on a doctrine of *implied* preemption, and the Supreme Court has "devoted [many] decades to cabining" such doctrines. *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 37 (1st Cir. 2007). Importantly, agencies are not the arbiters of every claim tangentially related to their operations; district courts are often the proper venue for such challenges. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490–91 (2010); *Axon Enter. Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 180 (2023) (similar). Particularly here, where the APA "command[s]" judicial review of government action, *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019); 5 U.S.C. §§ 701–706, "[d]ivesting jurisdiction by mere implication" cannot have been Congress' intent, *Axon Enter.*, 598 U.S. at 208 (Gorsuch, J., concurring).[4]

When courts do assess implied preemption, they typically use a two-part test from *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). In this circuit, courts use the test only after applying the "strong presumption that Congress intends judicial review of administrative action." *Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 41 (1st Cir. 2002).

The *Thunder Basin* doctrine asks first whether it is "fairly discernable in the statutory scheme" that Congress intended to preclude jurisdiction. *Thunder Basin*, 510 U.S. at 207. To determine congressional intent, the court looks to the relevant statute's "text, structure, and

---

[4] The APA specifically requires reading narrowly exceptions to judicial review. *Dep't of Com.*, 588 U.S. at 771–72; *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22–23 (2018); *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 601–02 (2016). Indeed, the Congress that enacted the CSRA and FSLMRS referenced the APA at least three times, 5 U.S.C. § 1103, 1105, 7134, and would not have *silently* cut off APA review, *see Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow.").

purpose." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012). Second, courts assess whether "the claims at issue are of the type Congress intended to be reviewed within [the] statutory structure." *Free Enter. Fund.*, 561 U.S. at 489. Courts consider (i) whether precluding district court jurisdiction would "foreclose all meaningful judicial review"; (ii) whether the claim is "wholly collateral to [the] statute's review provisions"; and (iii) whether the claim is "outside the agency's expertise." *Axon Enter.*, 598 U.S. at 186.

> **1.      The CSRA and FSLMRS do not preclude jurisdiction over claims challenging the Fork Directive, a government-wide OPM program.**

This court has jurisdiction over Plaintiffs' claims because challenges to a government-wide OPM program fall outside the "text, structure, and purpose" of the CSRA and FSLMRS. *Axon. Enter.*, 598 U.S. at 186. And because these claims are entirely beyond the scope of the statutory scheme, they are "wholly collateral" to each statute's review provisions, beyond the agencies' expertise, and entirely foreclosed from judicial review. *See id.*

*First*, the CSRA's scope is limited to personnel decisions taken by employing agencies. The CSRA provides a process by which federal workers can challenge "personnel practice[s]," which are decisions about an *individual worker's* promotion, suspension, hiring, and the like. 5 U.S.C. §§ 2302, 7512; *see Elgin*, 567 U.S. at 11–13 (CSRA applies only to covered employees' challenges of "adverse personnel actions"). The CSRA contemplates that the challenged action must be taken by the worker's employing agency. *See, e.g.*, 5 U.S.C. § 7513(b) ("*[A]n agency* may take an action [like suspension or firing] against *an employee* only for [] cause . . . ."). And the MSPB can review any action "which is appealable to the Board," *id.* § 7701, meaning personnel actions, *id.* §§ 1214(a),(b), 7513. Thus, while the CSRA is broad and comprehensive, the statute applies to "covered federal employees [only] *when they are challenging CSRA-covered personnel actions.*" *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 372 (5th Cir.)

(emphasis in original), *cert. granted, judgment vacated on other grounds*, 144 S. Ct. 480 (2023).

Because Plaintiffs nowhere challenge any employing agency's personnel practices, their claims are beyond the CSRA's scope. *See id.*; *see also AFGE v. Trump*, 2025 WL 1541714, at *3 (9th Cir. May 30, 2025) (Plaintiffs challenged "Defendants' constitutional and statutory authority to direct the federal agencies to take such actions in the first place," not "employment decisions with respect to individual employees"). Plaintiffs challenge the Fork Directive's *creation* and *execution*, including OPM's astounding failure even to attempt to comply with the APA, 5 U.S.C. §§ 553–59. *See* AC ¶¶ 213–57. And they allege that the Fork Directive is an *OPM* program because it was designed, implemented, and executed by OPM, with no input from any employing agency. *See id.* ¶¶ 112–16. Defendants do not contest these allegations, which are not personnel actions over which Congress precluded jurisdiction, *see* 5 U.S.C. §§ 2302, 7512, nor are they decisions Congress intended to be—or even can be—appealed to the OSC or MSPB, *id.* §§ 1214(a),(b), 7513.

Rather than discussing the allegations or statutory text, Defendants cite inapposite cases to argue that the CSRA intentionally prevents some plaintiffs from bringing some claims. But each case features a federal worker who sued their employing agency for an employment-related decision. *See Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1014 (D.C. Cir. 2009) (workers sued employing agency to seek pay raise); *United States v. Fausto*, 484 U.S. 439, 443 (1988) (worker sued employing agency for backpay for suspension).[5] As the court concluded in *OPM I*,

---

[5] *See also Marshall v. Dep't of Health & Hum. Servs.*, 587 F.3d 1310, 1311–12 (Fed. Cir. 2009) (applicant sued would-be employing agency for hiring decision); *Parrott v. Merit Sys. Prot. Bd.*, 519 F.3d 1328, 1330 (Fed. Cir. 2008) (worker sued employing agency alleging involuntary resignation and improper removal); *Terban v. Dep't of Energy*, 216 F.3d 1021, 1023 (Fed. Cir. 2000) (similar); *Lyons v. Dep't of Veterans Affs.*, 273 F. App'x 929, 930 (Fed. Cir. 2008) (per curiam) (unpublished) (worker sued employing agency for termination based on misconduct).

claims like the ones presented here differ from "others that have attacked, substantively or procedurally, one agency's decision about one employee or its own workforce, which are the kinds of claims appellate courts have channeled into the CSRA." 2025 WL 900057, at *3; *see also Trump,* 2025 WL 1541714, at *4 ("It is telling that in nearly every case cited by Defendants in which a court channeled a constitutional or statutory claim through the CSRA, the plaintiffs raised at least one claim properly within the unquestioned jurisdiction of the MSPB or FLRA.").

Defendants' reliance on *Graham v. Ashcroft*, 358 F.3d 931 (D.C. Cir. 2004), also misses the mark. There, the court held that the CSRA precluded review of certain disciplinary measures because they did not constitute covered personnel actions that could be appealed to the MSPB. *Id.* at 932–35. But the claims fell within the scope of the statutory scheme, as they concerned the agency's workplace investigation that led to the plaintiff's letter of censure—a clear personnel action, even if not a covered one. *Id.* The CSRA may well be structured to deny review of certain claims within its scheme. But Plaintiffs' claims here fall outside the statutory scheme entirely.

For similar reasons, challenges to an OPM government-wide program are "wholly collateral" to the CSRA's review provisions and would never receive meaningful judicial review. *See Axon. Enter.*, 598 U.S. at 186. Though the MSPB can review appeals of personnel actions made by employing agencies, 5 U.S.C. §§ 7513, 7701, Plaintiffs' claims concern a government-wide OPM program, designed and implemented by OPM, without legal authority and in contravention of the APA. No case has held that such a challenge is related—and so not collateral—to the CSRA's review provisions. That is because, where the plaintiff challenges a "government-wide" policy, rather than "'any [one] personnel action,' [the] claims . . . remain[] in district court." *OPM I*, 2025 WL 900057, at *3.[6]

_____

[6] Because the MSPB cannot review these kinds of challenges, Plaintiffs can never receive a final

**Second**, the scope of the FSLMRS is limited to rules and procedures for labor-management relations. This includes union elections and recognition, 5 U.S.C. § 7111, representation, *id.* § 7114, unfair labor practices ("ULPs") by an employing agency or a labor organization, *id.* § 7116, and collective bargaining, *id.* § 7117. Collective bargaining agreements ("CBAs") provide the sole administrative procedures for resolving grievances. *Id.* § 7121. The FLRA can only issue decisions covered by the statute. *Id.* § 7105 (*e.g.*, elections and bargaining).

This statutory scheme evinces Congress' intent for the FSLMRS to encompass only claims related to *labor-management relations*. The Fork Directive in no way regulates or challenges labor rules, union elections, collective bargaining, or grievance procedures. And, contrary to Defendants' argument, no case provides otherwise. *See* Mot. at 9 (citing *AFGE v. Trump*, 929 F.3d 748, 753-54 (D.C. Cir. 2019)). In *AFGE*, the unions' constitutional and statutory claims arose out of executive orders that directly regulated *the unions' own collective bargaining rights*. *See id.* Although such bargaining claims "could carry with them . . . the [plaintiffs'] constitutional and statutory claims," "[t]he problem here, is that there are no bargaining claims to begin with." *OPM I*, 2025 WL 900057, at *4.

That Congress made CBAs and ULPs the only sources for grievance procedures also affirms that the statute covers claims only against *employing agencies*. *See* 5 U.S.C. § 7121. Nothing suggests that Congress intended grievances or ULPs to be filed against non-employing agencies, let alone to preclude district court jurisdiction over such claims (and Plaintiffs' claims here are not grievances or ULPs). And grievances filed with agencies with which Plaintiffs have CBAs cannot result in relief as to *OPM's* government-wide program. *AFGE v. Secretary of Air*

appealable order—precluding all judicial relief. *See Free Enter. Fund*, 561 U.S. at 490–91.

*Force*, 716 F.3d 633, 637–38 (D.C. Cir. 2013) ("*Air Force*"), is not to the contrary. There, the unions *had CBAs* with the defendant agency, and at least one plaintiff filed an unsuccessful grievance under the CBA. Because the claims were of the exact type channeled by statute and plaintiffs were in fact able to use the channel, the court determined that filing in district court would circumvent the administrative process. *See id.* Nothing of the sort is present here.[7]

**Third,** Plaintiffs' "*ultra vires* and APA claims [are not] intertwined with factual and policy questions that would benefit from the MSPB's or the FLRA's expertise." *OPM I*, 2025 WL 900057, at *2. The MSPB's expertise in personnel actions and the FLRA's in labor relations are wholly unrelated to Plaintiffs' claims. *See id.* The APA and *ultra vires* claims do not require addressing personnel actions, *see Elgin*, 567 U.S. at 22–23, or any "employer-agency policy choices that the MSPB or the FLRA commonly parse," *OPM I*, 2025 WL 900057, at *2. Whether OPM must comply with the APA or have statutory authority before implementing a government-wide policy are not questions that require agency expertise. They are best addressed by the federal courts. *See Axon Enter.*, 598 U.S. at 195.

> **2.      The CSRA and FSLMRS do not preclude jurisdiction over Plaintiffs' claims seeking procedural and declaratory relief.**

This Court has jurisdiction over Plaintiffs' complaint for another, independent reason: claims seeking purely procedural and declaratory relief, and not substantive benefits, fall outside the scope of the CSRA and FLMRS and are wholly collateral to the statutes' review provisions. *See Axon Enter.*, 598 U.S. at 186. Indeed, notice-and-comment claims "fall outside the scope of the administrative process." *Arch Coal, Inc. v. Hugler*, 242 F. Supp. 3d 13, 19 (D.D.C. 2017),

---

[7] For similar reasons, Plaintiffs' claims are "wholly collateral" to FSLMRS review provisions and cannot receive "meaningful judicial review." *See Axon. Enter.*, 598 U.S. at 186. The FLRA reviews only topics related to labor-management relations, 5 U.S.C. § 7105, and can neither review these claims nor provide a final appealable order, *Free Enter. Fund*, 561 U.S. at 490–91.

*aff'd sub nom. Arch Coal, Inc. v. Acosta*, 888 F.3d 493 (D.C. Cir. 2018). Courts have likewise held that claims challenging the constitutionality of an agency itself, *Axon*, 598 U.S. at 180; *Free Enter. Fund*, 561 U.S. at 490–91, as well as "generic challenges to agency action" or "general collateral challenges" to an agency's unconstitutional "practices and policies," *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849 (D.C. Cir. 2002), are properly asserted in district court.

"[F]undamentally," what matters is the relief sought. *See Arch Coal*, 242 F. Supp. 3d at 20, 22. The Supreme Court has long held that, so long as the plaintiff seeks procedural relief and not a substantive declaration of rights, the district court may hear the claim. *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 495 (1991).[8] For example, the district court has jurisdiction where the plaintiff seeks to "prohibit further use of the [challenged] regulation" but not "individual relief for specific employee claims." *Nat'l Treasury Emps. Union v. Whipple*, 636 F. Supp. 2d 63, 69 (D.D.C. 2009). District courts may hear claims that seek to enjoin enforcement of a final rule, *Nat'l Mining Ass'n v. Chao*, 160 F. Supp. 2d 47, 51 (D.D.C. 2001), *aff'd in part, rev'd in part sub nom. Nat'l Min. Ass'n*, 292 F.3d 849, as well as those that seek to generally "invalidate" a regulation, *OCONUS DOD Emp. Rotation Action Grp. v. Cohen*, 144 F. Supp. 2d 1, 7 (D.D.C. 2000); *see also Nat'l Treasury Emps. Union v. Devine*, 577 F. Supp. 738, 751 (D.D.C. 1983), *aff'd*, 733 F.2d 114 (D.C. Cir. 1984) (district court had jurisdiction where plaintiff sought declaration to void regulations, and injunction preventing their use).[9]

---

[8] Defendants cite *Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005), for the proposition that the CSRA channels even systemic challenges to personnel decisions. Mot. 13. But the court there specifically distinguished *McNary* because the plaintiffs had sought substantive benefits available under the statute, not procedural relief. *Fornaro*, 416 F.3d at 68.

[9] *See also Serv. Emps. Int'l Union Loc. 200 United v. Trump*, 420 F. Supp. 3d 65, 74 (W.D.N.Y. 2019) (finding jurisdiction "plausible" where plaintiffs sought general declaratory and injunctive relief, styled as a "purely procedural APA challenge—that is, a challenge to the process used to adopt a regulation, rather than the content thereof").

*National Mining Association* is instructive. There, the Black Lung Benefits Act ("BLBA") required challenges that sought substantive change to agency orders to be filed in an administrative channeling process before reaching federal court. *Nat'l Mining Ass'n*, 292 F.3d at 856. The court explained that these substantive challenges to *orders* differed from seeking general procedural relief for regulations, the latter of which the BLBA was "silent" on, and so the court had jurisdiction to hear. *Id.*; *see also McNary*, 498 U.S. at 495 (district court has jurisdiction where plaintiff sought redo of process, not substantive change to the outcome).

Plaintiffs seek procedural and declaratory relief regarding a general OPM program, not substantive determinations relating to an agency order or decision. Plaintiffs seek no substantive change to the Directive itself (just to vacate it), or, critically, to the employment status of any worker, whether part of the Directive or not. Rescinding the Fork Directive so that OPM can undertake notice and comment and otherwise comply with the APA is akin to the relief sought in *National Mining Association*, *McNary*, *Whipple*, *Chao*, *OCONUS*, *Devine*, and many other cases. The CSRA's silence regarding procedural relief, like the BLBA's silence on the same, shows that Congress did not intend to preclude jurisdiction over these kinds of claims.

Defendants' counterarguments misapprehend the law and facts, and none of their cited cases feature claims that were channeled despite seeking procedural relief.[10] In *Filebark*, 555 F.3d at 1014, the plaintiffs sued their employing agency for a pay raise—an obvious, substantive personnel benefit. Similarly, in *FLEOA v. Ahuja*, 62 F.4th 551, 556 (D.C. Cir. 2023), the APA claims challenged OPM's process for calculating benefits, but the court examined the requests

---

[10] *See, e.g.*, *Marshall*, 587 F.3d at 1311–12 (job applicant sought substantive remedies for agency's hiring decision); *Parrott*, 519 F.3d at 1330–32 (worker contested substantive lawfulness of his removal from employment); *Terban*, 216 F.3d at 1023 (similar); *Lyons*, 273 F. App'x at 930 (worker challenged substantive reasons for termination decisions).

15

2973542

and determined that the plaintiffs wanted not "notice and an opportunity to comment" but rather a wholesale change to the practice to recalculate their own individual monetary benefits. *Id.* at 564. These cases merely affirm that seeking substantive benefits is different from procedural relief.[11] But Plaintiffs here seek no substantive benefit. As in *McNary*, Plaintiffs merely ask that the government's procedure follows the law.

### 3.    The Trump Administration has decimated the MSPB and stripped its leadership of statutory for-cause removal protections, eviscerating any congressional intent to channel these claims.

Even if Congress had intended to channel claims like Plaintiffs' (it didn't), it would have intended to channel them to politically balanced administrative agency boards consisting of officers protected by for-cause termination requirements. But, after the Court's preliminary ruling in this case, this Administration fired the heads of these agency boards without cause, casting aside Congress' intended nonpartisan and balanced administrative review. As the Fourth Circuit recently concluded, "[d]uring the pendency of this case, whether the CSRA functions as Congress intended has been called into question." *Owen*, 2025 WL 1560373, at *6.

The CSRA is clear: Congress intended to preclude district court jurisdiction only over claims that would be heard by *independent boards* insulated by *for-cause removal protections*. *See* 5 U.S.C. § 1202(d) (MSPB), § 1211(b) (OSC), § 7104(b) (FLRA). But the current Administration fired—mid-term and without cause—the heads of the MSPB, FLRA, and OSC.[12] Ensuring these claims are heard by balanced review boards is part of Congress' enduring intent, "since 1883, [to] . . . establish[] rights and processes for protecting [federal] employees from undue political influence." AC ¶ 4. And while these protections now appear up for debate, *see*

---

[11] Defendants also cite *AFGE*, 929 F.3d 748, for the proposition that district courts are precluded from hearing APA suits, Mot. 8, but that case did not involve APA claims.

[12] The Supreme Court and D.C. Circuit refused to allow injunctions against not-for-cause terminations to take effect. *Trump v. Wilcox*, 2025 WL 1464804, 605 U. S. __ (May 22, 2025), (MSPB), *Dellinger v. Bessent*, 2025 WL 717383, at *1 (D.C. Cir. Mar. 5, 2025) (OSC).

16

*Trump v. Wilcox*, 2025 WL 1464804, 605 U.S. __ (May 22, 2025), when Congress drafted the CSRA in 1978, the constitutionality of independent agency heads was firmly supported by four decades of Supreme Court precedent, *see Humphrey's Executor v. United States*, 292 U.S. 602 (1935). Regardless of the outcome of *Wilcox*, the text, structure, and purpose of the CSRA permit only one conclusion: Congress intended independent agency heads to hear federal workers' claims. Channeling these claims to decimated agencies, or ones weighted with one-sided appointees, would derogate Congress' explicit statutory intent.

By gutting the very agencies where it seeks to send Plaintiffs' claims, the government has ensured that Plaintiffs cannot receive meaningful judicial review. Plaintiffs lack the opportunity for "meaningful judicial review" where they may not receive an appealable decision, such as from the MSPB which lacks a quorum. *Aguilar v. U.S. Immigr. & Customs Enf't Div. of DHS*, 510 F.3d 1, 12 (1st Cir. 2007). And here, Plaintiffs can never receive an appealable final order from a nonfunctional agency. *See also E. Bridge, LLC v. Chao*, 320 F.3d 84, 89–90 & n.10 (1st Cir. 2003) (no channeling "where further administrative exhaustion is deemed futile"); *Tilton v. S.E.C.*, 824 F.3d 276, 286 (2d Cir. 2016).

### B.    Plaintiffs have standing to bring their claims.

To show standing, a plaintiff must show an injury that is (1) "concrete and particularized"; (2) traceable to the allegedly unlawful action; and (3) redressable by relief from the court. *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 27 (1st Cir. 2007). An organization such as a labor union may allege "associational" standing on behalf of members suffering their own injuries. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Or it may allege "organizational" standing based on its own injuries. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Here, Plaintiffs properly allege both forms of standing.

### 1.    Plaintiffs have associational standing.

Associational standing "allows an organization . . . to sue on behalf of its members when

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 308 (1st Cir. 2024). Defendants challenge only the first and third elements of associational standing. Mot. 19–20. But Defendants' arguments either misapply the law or ignore Plaintiffs' well-pleaded factual allegations.

### a.    The union members have standing.

Plaintiffs have alleged that the Fork Program was unlawful for failure to adhere to notice-and-comment rulemaking requirements, as an arbitrary and capricious final agency action, and as a violation of statutory and constitutional limitations on agency and executive authority. AC ¶¶ 213–57. Plaintiffs' members, as the individuals affected by the unlawful Fork Directive, easily have standing to sue in their own right. As Plaintiffs have alleged, these members suffered various forms of harm as a result of the Fork Directive's unlawful design and rollout. Members were unable to make any kind of informed or reasoned decision about their employment, and were unable to supply information and comment material to program design and rollout, even as Defendants forced them to choose between an apparently lawless and unfunded program and the threat of termination. *Id.* ¶¶ 48–54, 57–59, 63–93, 102–05, 108–11, 120–22, 125, 132–37. Because the program was not designed subject to normal rulemaking and imposed arbitrary, capricious, and illegal conditions on those supposedly subject to it, members who joined the program were routinely denied the benefits they were promised; members who sought to join the program were routinely denied access to it, contrary to Defendants' promises; and members who unsuccessfully attempted to make use of the program were left legitimately fearing for their positions. *Id.* ¶¶ 57–59, 125–37. Even when members attempted to get information about the program or comply with its rules, they were unable to. *Id.* ¶¶ 55–81, 125–37.

18

Because Defendants cannot possibly contend that the Fork Program complied with the APA or the statutory or constitutional limitations on executive power, Defendants suggest that standing is impossible where a member either accepted "an otherwise unavailable benefit" or "declined to participate in the program." Mot. 20–21. As Defendants would have it, the Fork Program, however lawless, couldn't have left any federal employee worse off. *See id.* But here Defendants are simply ignoring Plaintiffs' allegations. Plaintiffs *have* alleged member injury from the illegal development and rollout of the Fork Program—including for members who joined the Program but were denied the promised benefits, for those were unable to join the Program despite complying with the promised terms, and those put in the impossible situation of attempting to decide how to respond to Defendants' illegal and unfunded Program while their employment was being threatened. *See, e.g.*, AC ¶¶ 125–36.

In any event, Defendants' theory of standing is not the law. Plaintiffs and their members need not show that the relief they seek here would guarantee them a substantively "better" outcome than Defendants' promised program. *See* Mot. 21 (suggesting that standing depends on what OPM decides to do post-remand). Nor would such a requirement make any logical sense, when Plaintiffs have already alleged injury due to Defendants' failure to honor their promises. *See, e.g.*, AC ¶¶ 125–36. In the context of an unlawful agency action, "[a]ll that is required . . . is some possibility that the requested relief"—here, the requirement to redo the process to comply with applicable law—could "prompt the injury-causing party to reconsider the decision." *Nulankeyutmonen*, 503 F.3d at 28; *see also Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 2023 WL 6691015, at *14 (D. Mass. Oct. 12, 2023) (standing established by identifying a "procedural omission" that affected the "substantive result" caused by the agency action), *aff'd*, 123 F.4th 1 (1st Cir. 2024). Plaintiffs have amply alleged procedural omissions causing the Fork

Directive to be developed and implemented in a way that harmed members.

In a single paragraph, citing no standing case law, Defendants insist that Plaintiffs' members also lack standing to seek an order forbidding retaliation against them for applying for the Fork Directive. Mot. 20. Plaintiffs' allegations on this subject are specific, thorough, and contextualized. *See, e.g.*, AC ¶¶ 125, 129, 132–33. That Defendants disagree with Plaintiffs' allegations regarding their emotional state, the personal and professional stress they feel, their working environments, or their relationships with their supervisors in no way renders those allegations insufficient.

### b. The members' direct participation is not required.

The lack of members' participation in this litigation is likewise no barrier to associational standing. As an initial matter, although Defendants do not acknowledge it, this prong of the *Hunt* test is a "prudential" consideration rather than a constitutional requirement. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 314 (1st Cir. 2005) ("[A]s we are dealing with a matter of prudential standing, the limitation has no Article III implications."). Accordingly, courts have "latitude" in determining whether and how to apply this prong depending on "case-by-case judgments." *Pharm. Care*, 429 F.3d at 314. For example, because this is not a damages case, but a case seeking non-individualized equitable relief, "the varying circumstances of the individual plaintiffs" or their members are immaterial. *Id.* at 314. In such situations, courts may allow an association to sue "even if some proof from individual non-party members is required." *Id.*

Defendants cite *Boston Parent Coalition* for the proposition that the facts supporting member standing must be "well documented and uncontested" to satisfy the third prong of the *Hunt* test. Mot. 22 (quoting *Boston Parent Coal. For Acad. Excellence Corp. v. Sch. Comm. For City of Boston*, 89 F.4th 46, 55 (1st Cir. 2023), *cert. denied*, 145 S. Ct. 15 (2024)). But if that

were the rule, it would swallow the *Hunt* test and eviscerate any option for associational

standing. Unsurprisingly, that is not the rule, least of all on a challenge to the pleading. Rather, in

*Boston Parent Coalition*, the court simply noted each side's arguments regarding member

participation in the litigation, then concluded that the arguments against standing "strike us as

better suited to challenging the merits of the [Plaintiff's] claims, not its standing to assert those

claims." *Id.* at 55–56. So too here. There is no claim for individual damages or individualized

injunctive relief. To the extent Defendants intend to dispute that the Fork Program was arbitrary,

capricious, or otherwise unlawful, and thereby injured federal workers—and except as to

Plaintiffs' request for "retaliation-related relief," Defendants have not disputed injury, Mot. 20–

21—that is a question for the merits, not the threshold ability to sue.

### 2.    Plaintiffs have organizational standing.

An organization has standing, in "its own right[,] to seek judicial relief from injury to

itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth*,

422 U.S. at 511. Plaintiffs have identified multiple such injuries.

***First***, Plaintiffs have alleged that Defendants' violations of the APA and the limitations

on agency and executive authority have interfered with Plaintiffs' services to their members. AC

¶¶ 175–88. It is well-established that "actions [that] directly affect[] and interfere[] with [an

organization's] core business activities constitute a cognizable injury for Article III purposes."

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (citing *Havens Realty Corp. v.

Coleman*, 455 U.S. 363, 379 (1982)). Here, Defendants prevented Plaintiffs from exercising a

core function: advising members of their rights and benefits in the workplace.

In an attempt to avoid this precedent, Defendants mischaracterize Plaintiffs' standing

allegations, framing Plaintiffs as issue-advocacy organizations whose resources were diverted by

"opposing [the challenged] policies." Mot. 18 (quoting *Hippocratic Med.*, 602 U.S. at 395). But

Plaintiffs have not asserted standing based on an impairment to their policy mission; their injury is to their ability to provide substantive services to their members, AC ¶¶ 175–88—the same injury *affirmed* as a basis for standing in *Hippocratic Medicine*, 605 U.S. at 395 (standing existed where an advocacy organization *also* provided counselling services, which were allegedly impaired due to defendant's conduct).[13] Those services are even more fundamental here, where Plaintiffs have a duty of representation under federal labor law. 5 U.S.C. § 7114; *Widakuswara*, 2025 WL 1166400, at *8 (AFSCME and AFGE "expending significant resources to . . . perform their core services [such as] advising members about the terms of their employment and the implication of Defendants' actions" sufficient for organizational standing); *AFGE v. U.S. OPM* ("*OPM II*"), 2025 WL 1150698, at *10–11 (N.D. Cal., Apr. 18, 2025) (same).

        *Second*, Plaintiffs have properly alleged that Defendants' unlawful actions will harm their membership, their finances, and their ability to bargain on behalf of members. AC ¶ 191. Injuries to unions' bargaining power and relationships to their members are straightforward Article III injuries. *See, e.g.*, *Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 164 (1st Cir. 1995); *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO by Negron v. Union De Carpinteros De P.R.*, 615 F. Supp. 3d 87, 95 (D.P.R. 2022); *see also Hunt*, 432 U.S. at 345 (loss of dues confers standing); *Am. Libr. Ass'n v. Sonderling*, 2025 WL 1262054, at *2 (D.D.C. May 1, 2025) (reduction in "bargaining power . . . of AFSCME-affiliated unions" constitutes irreparable harm).

        *Third*, Plaintiffs allege that OPM denied them the opportunity to participate in the decision-making process in a way that affected their interests. *See Nulankeyutmonen*, 503 F.3d at

---

[13] Courts have reached the same conclusion on multiple occasions following *Hippocratic Medicine*. *See, e.g.*, *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 395–97 (4th Cir. 2024); *Caicedo v. DeSantis*, 2024 WL 4729160, at *4-5 (M.D. Fla. Nov. 8, 2024); *La Union Del Pueblo Entero v. Abbott*, 2024 WL 4488082, at *33-34 (W.D. Tex. Oct. 11, 2024).

28; *Seafreeze*, 2023 WL 6691015, at *14; *Citizens of Karst, Inc. v. U.S. Army Corps of Eng'rs*, 160 F. Supp. 3d 451, 457 (D.P.R. 2016), *aff'd,* 123 F.4th 1 (1st Cir. 2024).

**Fourth**, as to Plaintiffs' reputational injury, Defendants' only counterargument is that Plaintiffs have not "connect[ed] the dots between their demanded injunctive relief and any alleged injury to their reputation." Mot. 17. Plaintiffs have not expressly sought injunctive relief. AC at 59. If Defendants are referring to Plaintiffs' request that the Fork Directive be vacated and remanded to OPM for compliance with the APA, then Defendants are mistaken. Plaintiffs allege that the Fork Directive's unlawful rollout and implementation has harmed their relationships with members in a way that proper and reasoned decision making via the notice-and-comment process, would not. AC ¶¶ 189–90. To the extent Defendants take issue with Plaintiffs' allegations, that dispute is for the merits.

### C.   Plaintiffs have plausibly alleged their claims.

#### 1.   Plaintiffs allege that the Fork Directive constitutes final agency action.

Defendants' sole substantive challenge to Plaintiffs' APA claims is that Plaintiffs failed to identify a final agency action reviewable under the APA. Mot. 23–25. Not so. A final agency action "mark[s] the consummation of the agency's decisionmaking process" and is an act that determines "rights or obligations" or "from which legal consequences will flow." *Hawkes*, 578 U.S. at 599 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)); 5 U.S.C. § 704. Courts take a "'pragmatic' approach" to determining finality. *Id.* at 599. Defendants nowhere contest that the Directive was an agency action marking the consummation of OPM's decision making process (whatever that was). Nor could they. The APA's definition of "agency action" "is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). In no sense is the Directive "merely tentative or interlocutory [in] nature." *Bennett*, 520 U.S. at 178. OPM fully implemented and executed it.

Defendants instead argue that no legal consequences flowed from OPM's unprecedented missive to the entire federal workforce but rather from a worker's "choice" regarding OPM's "offer." Mot. 24. That argument finds no support in the law. The final agency action standard requires showing "that the challenged act had an immediate and practical impact . . . or altered the legal regime in which it operates." *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019). The Fork Directive did both. The AC details at length the Directive's "immediate and practical impact." AC ¶¶ 47–52, 101–04 (requiring workers' response within eight days), ¶¶ 126–37 (Plaintiffs' members accepted or declined Directive and suffered ongoing injuries within same time period), ¶¶ 75–78, 163–74 (Plaintiffs were required to act, and thus injured, within same time period). Indeed, this Court twice ordered OPM to leave enrollment open because of the obvious and serious immediate practical impacts the Directive imposed.

The Fork Directive also "altered the legal regime" in which the Plaintiffs and other affected parties operate. *Bennett*, 520 U.S. at 178. The Supreme Court's decision in *Bennett v. Spear* is instructive. There, the EPA issued a "Biological Opinion" that warned the Bureau of Reclamation that its activities placed certain endangered fish in jeopardy, and the EPA identified steps the Bureau could take to solve the problem, including raising water levels. *Id.* at 157–60. The EPA argued there was no final agency action because the Opinion "d[id] not conclusively determine" how the Bureau would allocate the water; it merely gave the Bureau options, making the Bureau's ultimate independent decision the proximate cause of any injury. *Id.* at 168, 177–178. Rejecting that argument, the Court held that the Opinion itself had "direct and appreciable legal consequences" because it authorized certain actions and benefits if, and only if, the affected party complied with certain conditions, in contrast to other agency actions that were "purely advisory and in no way affected the legal rights of the relevant actors." *Id.* at 178.

The same is true here. The Fork Directive quite obviously had direct and appreciable legal consequences on both workers and federal agencies: it was, in essence, a purportedly binding legal contract and commitment made by the federal government. Comply, OPM said, and the government will provide certain benefits and make certain legally enforceable commitments. Fail to comply, and you will receive none of those promised benefits and may well be fired. Agency action that "bind[s . . .] the Government and represent[s] the Government's position" in subsequent litigation constitutes final agency action subject to the APA. *Hawkes*, 578 U.S. at 598–99. Here, OPM's Fork Directive bound the federal government to implement the Directive's program and bound the government in potential litigation.

Defendant's argument that employees could choose whether to participate or not, rendering the Fork Directive a non-final agency action, also fails because the Directive was coercive, repeatedly threatening termination without benefits if a worker refused to participate, a threat that came to fruition within hours of the closure of the sign up period. AC ¶¶ 50–53; *see Bennett*, 520 U.S. at 169 (recognizing the "powerful coercive effect" the EPA's opinion had on the Bureau). The government does not address, let alone challenge, these allegations.

None of Defendants' cited cases support their novel theory of finality. *Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. E.P.A.*, 313 F.3d 852 (4th Cir. 2002), concerned an EPA guidance document finding that secondhand smoke was carcinogenic. The court held that the document did not constitute final agency action because the underlying statute specifically precluded the EPA from doing anything to act on the guidance, regardless of its persuasive effect on executive branch decisions. *Id.* at 859–60. Here, by contrast, Plaintiffs allege that OPM *did* act, that real and immediate consequences flowed from that act, and that OPM was wholly responsible for creating and implementing the full Directive. *See, e.g.*, AC ¶¶ 112–16. Similarly,

in *California Communities Against Toxics v. EPA*, 934 F.3d 627, 637–38 (D.C. Cir. 2019), the challenged EPA guidance was not a final agency action because it had no actual effect—it could not be relied upon in any proceeding, states faced no penalty for ignoring it, and there were clear paths to challenge any decision adopting its reasoning. But the Fork Directive had immediate effect: workers had to join or risk being fired, agencies relied on OPM to offer advice, and no clear channels (other than this lawsuit) exist to challenge the APA violations.

Finally, Defendants suggest that Plaintiffs mount a "broad programmatic attack" rather than challenge a "discrete" agency action. Mot. 24–25. Defendants misstate the law. All a plaintiff must do is "identify specific and discrete governmental conduct, rather than launch a 'broad programmatic attack' on the government's operations." *City of New York*, 913 F.3d at 431. Plaintiffs do not ask the Court to "adjudicate generalized grievances" to "improve an agency's performance or operations." *Id.* Nor do Plaintiffs seek a disfavored "obey the law injunction," *id.*, or ask that the Court "inject[]" itself "into day-to-day agency management," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004). Plaintiffs challenge the creation and execution of the Fork Directive—a discrete agency action carried out by OPM without following a single procedure required by the APA. That is exactly the kind of action that courts can review.

### 2. Plaintiffs have stated an ultra vires claim.

Defendants contend that Plaintiffs' *ultra vires* claim is "not cognizable" even if Plaintiffs have no judicial recourse through the CSRA or APA. Mot. 25–27. Defendants are wrong.

"Judicial review for *ultra vires* agency action rests on the longstanding principle that if an agency action is unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F. 4th 756, 763 (D.C. Cir. 2022). Allowing an *ultra vires* claim to proceed in *OPM II*, the court held that "OPM's directive constituted an *ultra vires* act that

infringed upon all impacted agencies' statutory authority to hire and fire their own employees."
2025 WL 1150698, at *6. So too here. As alleged in the Amended Complaint, OPM had no
statutory authority whatsoever to issue the Fork Directive to all federal agencies, impinging on
their own statutorily provided power to manage their own workforces. *See* AC ¶ 255; *OPM II*,
2025 WL 1150698, at *6. Defendants nowhere rebut this allegation, and Plaintiffs may seek
"equitable relief under the Constitution to challenge governmental action under separation-of-
powers principles." *PFLAG, Inc. v. Trump*, 2025 WL 685124, at *10 (D. Md. Mar. 4, 2025).

Plaintiffs may also pursue a non-statutory cause of action if "its absence would wholly
deprive the party of a meaningful and adequate means of vindicating its rights" and if Congress
has not clearly precluded judicial review. *Commonwealth of P.R. v. United States*, 490 F.3d 50,
59 (1st Cir. 2007). Defendants argue that even if the APA precluded judicial review, a non-
statutory claim would still be unavailable. Mot. 26–27. That is incorrect. In *Saget v. Trump*, 345
F. Supp. 287 (E.D.N.Y. 2018), the court refused to dismiss an *ultra vires* claim on the grounds
that the plaintiffs had asserted the same claim under the APA, holding: "If . . . this Court or an
appellate court were to hold that the APA does not provide a cause of action, Plaintiffs would
still be entitled to pursue a standalone *ultra vires* claim." *Id.* at 300; *see also Chamber of Com. of
the U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996) (allowing a common law *ultra vires*
claims where the plaintiff failed to satisfy the conditions for judicial review of an APA claim).

Defendants rely on *Federal Express* to argue that allowing an *ultra vires* claim to proceed
here would transform that claim "[in]to the functional equivalent of the very APA action that
Congress prohibited." 39 F.4th at 764. In that case, however, Congress had expressly removed
the challenged actions from the APA's scope. *Id.* at 763. That has not occurred here.

## V.    CONCLUSION

For the foregoing reasons, the government's motion should be denied.

2973542

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Plaintiffs respectfully request the opportunity to be heard.

DATED this 5th day of June, 2025.


By:    */s/ Cody S. Harris*
CODY S. HARRIS (CA Bar No. 255302)
ERIN E. MEYER (BBO #677869)
AJAY S. KRISHNAN (CA Bar No. 222476)
BAILEY W. HEAPS (CA Bar No. 295870)
NIALL R. FRIZZELL (CA Bar No. 311929)
CHARLOTTE J. KAMAI (CA Bar No. 344786)
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188
emeyer@keker.com
akrishnan@keker.com
charris@keker.com
bheaps@keker.com
nfrizzell@keker.com
ckamai@keker.com
*Counsel for Plaintiffs*

28

Elena Goldstein (NY Bar No. 4210456)
Michael C. Martinez (D.C. Bar No. 1686872)
Daniel McGrath (D.C. Bar No. 1531723)
Skye Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Facsimile: (202) 796-4426
egoldstein@democracyforward.org
mmartinez@democracyforward.org
dmcgrath@democracyforward.org
sperryman@democracyforward.org
*Counsel for Plaintiffs*

Teague P. Paterson (D.C. Bar No. 144528)
Matthew S. Blumin (D.C. Bar No. 144528)
Georgina C. Yeomans (D.C. Bar No. 1510777)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street N.W.
Washington, D.C. 20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
*Counsel for American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME)*

2973542

Rushab B. Sanghvi (D.C. Bar No. 1012814)
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, D.C. 20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928
SanghR@afge.org
Grajaa@afge.org
*Counsel for Plaintiff American Federation
of Government Employees, AFL-CIO
(AFGE) and Local 3707*

Sarah Suszczyk (M.D. Bar No. 0512150240)
NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, SEIU
LOCAL 5000
NAGE/IBPO/IAEP/IBCO
159 Burgin Parkway
Quincy, MA 01269
Telephone: (202) 639-6426
Facsimile: (617) 376-0285
Ssuszczyk@nage.org
*Counsel for Plaintiff National Association of
Government Employees, SEIU Local 5000*

2973542

## CERTIFICATE OF SERVICE

On June 5, 2025, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court for the District of Massachusetts, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

*/s/ Cody S. Harris*
CODY S. HARRIS (CA Bar No. 255302)

2973542